UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES OBERGEFELL and | : | Case No. 1:13-cv-501 |
| JOHN ARTHUR, et al, | : | |
| | : | Judge Timothy S. Black |
| Plaintiffs, | : | |
| | : | MOTION FOR TEMPORARY |
| vs. | : | RESTRAINING ORDER AND |
| | : | PRELIMINARY INJUNCTION |
| JOHN KASICH, et al, | : | |
| | : | |
| Defendants. | : | |

Pursuant to Fed. R. Civ. Pro. 65, plaintiffs hereby move for a temporary restraining order and preliminary injunction prohibiting the defendants from enforcing Ohio Rev. Code §3101.01(C) (3) and (4) and Art. XV, §11 of the Ohio Constitution as applied to same-sex couples married in jurisdictions where same-sex marriage is legal who seek to have their out-of-state marriage accepted as legal in Ohio. This includes but is not limited to such officials completing death certificates for the plaintiffs. A proposed order is attached.

Notice will be provided to the defendants but due to the precarious health of plaintiff John Arthur plaintiffs request an expedited hearing and an expedited ruling on the merits.

Plaintiffs request that bond be set at $1.00.

### MEMORANDUM OF LAW

#### I. INTRODUCTION

This civil rights case challenges as unconstitutional the Ohio statute and state constitutional amendment which deny legal recognition in Ohio to the marriages of same-sex couples who are married in one of the many states and numerous foreign countries

where same-sex marriages are legal. The named plaintiffs have been in a committed relationship for over twenty years. John Arthur suffers from debilitating ALS disease and is currently a hospice patient. Following the historic decision by the U.S. Supreme Court in *United States v. Windsor*, the couple traveled to Maryland and was married in accordance with the laws of that state. Now back in Ohio, their marriage is not recognized by the state of Ohio for any purpose. Meanwhile the marriages of opposite-sex couples that are legal in other states but would not be allowed in Ohio (e.g., marriages of first cousins or a young partner) are routinely accepted in Ohio if those marriages are legal in the state where they are celebrated. This recognition of opposite-sex marriages but rejection of same-sex marriages that do not meet the Ohio criteria for marriage violates rights secured to the plaintiffs by the United States Constitution. Plaintiffs seek declaratory and injunctive relief for themselves.

## II. STATEMENT OF FACTS[1]

**A.     James and John Are Married in Maryland**

1. James Arthur and John Obergefell have been in a committed relationship and have been Cincinnati residents for more than twenty years.

2. In 2011, John was diagnosed with amyotrophic lateral sclerosis (ALS). The disease has caused progressive and severe muscle deterioration. The disease has no known cure. It is fatal.

3. John is currently a hospice patient.

4. On July 11, 2013, friends and family helped finance a trip by James and John to Maryland. They traveled in a special jet equipped with the medical equipment and a medical staff to serve John's needs.

---
[1] See Declarations of Plaintiffs, attached.

5. They were married in Anne Arundel County, Maryland.

6. They returned to Cincinnati that same day.

**B. The Marriage of James and John is not Recognized in Ohio**

7. The marriage of James and John is legally recognized in Maryland.

8. Their marriage is also recognized by the federal government by virtue of the decision in *United States v. Windsor*, 133 S.Ct. 2675 (June 26, 2013).

9. Their marriage is not recognized in Ohio.

10. Ohio law prohibits legal recognition of the marriage of James and John. Ohio Rev. Code. § 3101.01(C )(2) states, "Any marriage entered into by persons of the same-sex in any other jurisdiction shall be considered and treated in all respects as having no legal force or effect in this state and shall not be recognized by this state."

11. The Ohio constitution also prohibits recognition of the marriage of James and John. OH Const. Art. XV, §11 states, "Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage."

**C. Marriages of Opposite-sex Couples are Treated Differently**

12. Opposite-sex couples do face restrictions in Ohio on who may marry. ORC §3101.01(A) states, "Male persons of age eighteen years and female persons of the age of sixteen years, *not nearer of kin than second cousins*…may be joined in marriage." (emphasis added). But the validity of their marriages is determined by the law of the state where their marriage was celebrated. *Mazzolini v. Mazzolini,* 168 Ohio St. 357, 358

(Ohio Sup. Ct. 1958) (Marriage of first cousins was legal in Massachusetts and therefore is legal in Ohio regardless of Ohio statute to contrary); *Peefer v. State*, 42 Ohio App. 276, 287, 182 N.E. 117, 121 (1931) (*citing Courtright v. Courtright*, 1891 WL 1022 (Ohio Com. Pl. 1891) (where under aged couples leave the state to marry in a state in which their marriage is valid and return to Ohio, the marriage cannot be set aside based on Ohio's law against marriage of under aged people).More than 1,000 federal benefits, privileges and responsibilities are impacted by marital status.  Opposite-sex couples who reside in Ohio and not in the jurisdictions where they celebrated their legal marriages will be entitled to all of those federal benefits even if (e.g., due to kinship or age) their marriages would not have been recognized in Ohio had they attempted to marry in Ohio. Same-sex married couples including James and John who do not reside in jurisdictions where they celebrated their legal marriages will be denied many of those federal state benefits solely because they live in Ohio.  They will also be denied state and employer related benefits.

    13. One very personal reflection of the harm imposed by defendants is evident from the death record.  Unfortunately John is likely to die soon.  If John dies first, the death record should record his "marital status at time of death" as "married."  Unless this Court acts, his death record, consistent with Ohio law, will list his status as unmarried.  That form should also record James as the "surviving spouse".  Unless this Court acts, the death record will be blank for surviving spouse.  That is, unless this court acts, the permanent death records for James and for John will not reflect their marriage at all. Opposite-sex couples married in other jurisdictions under circumstances otherwise not

4

permitted in Ohio are treated completely differently. Their marriages will be reflected as valid and recognized on the death certificates of these opposite-sex couples.

  14. James and John were honored when close friends, an opposite-sex married couple from Cincinnati, designated them to raise their child should the couple pass away while their child was still a minor. Should they have to serve James and John want the child to accept them as parents with the full dignity allowed any family. They do not want to be viewed as a second-tier family.

  15. The different treatment of same-sex marriages celebrated in other jurisdictions from opposite-sex marriages celebrated in other jurisdictions is not supported by a legitimate state interest and imposes severe harm on same-sex couples including Plaintiffs James and John.

### III.  ARGUMENT

**A. Standard for Granting Preliminary Relief**

The standard for evaluating a request for preliminary injunctive relief under Rule 65 is well established in this Circuit. Though, there is no "rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief," *Tate v. Frey*, 735 F.2d 986, 990 (6th Cir. 1984) (citations omitted), the court should consider the following four factors:

  1. Whether the party seeking the injunction has shown a substantial likelihood of success on the merits;

  2. Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

  3. Whether the injunction will cause others to suffer substantial harm;

  4. Whether the public interest would be served by the preliminary injunction.

*Memphis Planned Parenthood, Inc. v. Sunquist*, 175 F.3d 456, 460 (6th Cir. 1999); *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 n.3 (6th Cir. 1991). *See also Jane Doe v. Barron,* 92 F.Supp.2d 694, 695 (S.D. Ohio 1999); *Women's Medical Professional Corp. v. Voinovich*, 911 F. Supp. 1051 (S.D. Ohio 1995), aff'd, 130 F.3d 187 (6th Cir. 1997), *cert. denied*, 523 U.S. 1036 (1998). These factors are "to be balanced and [are] not prerequisites that must be satisfied . . . they are not meant to be rigid and unbending requirements." *McPherson v. Michigan High School Athletic Association*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc). A finding of irreparable injury "is the single most important prerequisite that the Court must examine when ruling upon a motion for preliminary injunction."

Even if the Court is not certain that a plaintiff is likely to succeed on the merits, a preliminary injunction is still appropriate where the plaintiff shows "'serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant,'" *DeLorean*, 755 F.2d 1223, 1229 (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)), or if "the merits present a sufficiently serious question to justify further investigation," *DeLorean*, 755 F.2d at 1230.

In this case, as thoroughly set out below and in the accompanying declarations, the plaintiffs meet the test for preliminary relief. Their likelihood of success on the merits, their irreparable harm, the balance of hardships and the public interest all strongly favor the issuance of an injunction.

  **B.**   **Plaintiffs Have a Likelihood of Success Because Ohio's Different Treatment of Same-Sex Marriages Celebrated in Other Jurisdictions Compared to Opposite-Sex Marriages Celebrated in Other Jurisdictions Violates Plaintiffs' Right to Equal Protection Under the Law.**

Plaintiffs, a same-sex couple, have been legally married in another state. They reside in Ohio where their marriage is not recognized as valid. They are treated differently than they would be if they were in a comparable opposite-sex marriage. The different treatment of same-sex marriages celebrated in other jurisdictions from opposite-sex marriages celebrated in other jurisdictions violates Plaintiffs' right to Equal protection under the law.

  **1. Marriage Restrictions on Same-Sex Couples Must Comply with Equal Protection**

The Fourteenth Amendment states that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV.

The Supreme Court has long recognized that marriage and domestic relations is a matter generally left to the states. *Ex parte Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States"). But the restrictions imposed on marriage by states must nonetheless comply with the Constitution. *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (statute limiting marriage to same-race couples violated equal protection and due process); *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (statute restricting from marriage persons owing child support violated equal protection).

7

In *United States v. Windsor,* 133 S. Ct. 2675 (2013) the Supreme Court again applied the principle of equal protection to a statute restricting marriage.  At issue was the federal Defense of Marriage Act ("DOMA") which denied recognition to same-sex marriages for the purposes of federal law.  This included marriages from the 12 states and District of Columbia where same-sex couples could legally marry.  The Court held that the law was unconstitutional because it violated equal protection and due process principles guaranteed by the Fifth Amendment.  Plaintiff was legally married under New York Law but because DOMA denied federal recognition to same-sex spouses, the plaintiff did not qualify for the marital exemption from the federal estate tax that a heterosexual spouse would have been entitled to.  *Id.*

The federal DOMA was enacted for the express purpose of undermining states like New York that have legalized same-sex marriage.  "The avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Id.* at 2693.  The Court further held that "[t]he States' interest in defining and regulating the marital relation, subject to constitutional guarantees, stems from the understanding that *marriage is more than a routine classification for purposes of certain statutory benefits.*  Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State and it can form 'but one element in a personal bond that is more enduring.'" *Id.* at 2692 (*quoting* Lawrence *v. Texas,* 539 U.S. 558, (2003) (*emphasis added*).

Describing New York's legalization of same-sex marriage, the Court noted "[f]or same-sex couples who wished to be married, the State acted to give their lawful conduct a

8

lawful status. This status is a far-reaching legal acknowledgment of the intimate relationship between two people, a relationship deemed by the State worthy of dignity in the community equal with all other marriages. It reflects both the community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality." *Id.* at 2692-93.

In *Windsor*, the Court cited *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) for the concept that a legislative desire to harm a politically unpopular group of people cannot justify disparate treatment of that group. *Id.* at 2693. In *Moreno*, a federal statute prohibiting households containing "unrelated persons" from qualifying for food stamps was held to be in violation of the Equal Protection Clause under a rational basis analysis. The legislative purpose behind the statute was to prohibit "hippies" from taking advantage of food stamps. The Court held that "the classification here in issue is not only 'imprecise'; it is wholly without any rational basis." 413 U.S. at 538.

As to gay rights in particular, the Court in *Windsor* based its equal protection analysis on an earlier Supreme Court case, *Romer v. Evans*, 517 U.S. 620 (1996). That case challenged Colorado's adoption of an amendment to the state constitution prohibiting any special protections for homosexuals. *Id.* The Supreme Court struck down "Amendment 2" because, the Court held, "[w]e cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id.* at 635. The Court in *Romer* deemed this "class legislation . . . obnoxious to the prohibitions of the Fourteenth

9

Amendment." *Id. (quoting Civil Rights Cases*, 109 U.S. 3, 24, (1883)). The Court in *Romer* also held that Amendment 2 "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot so deem a class of persons a stranger to its laws. Amendment 2 violates the Equal Protection Clause . . . ." 517 U.S. 635-36.

Likewise, in *Windsor*, the Court held that the purpose of the federal DOMA was "to impose inequality, not for other reasons like governmental efficiency." *Windsor*, 133 S. Ct. at 2694. The Supreme Court in *Windsor* described how families with same-sex parents are treated by DOMA:

> The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472... And it humiliates . . . children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

*Windsor*, 133 S. Ct. at 2694.

In sum, under Supreme Court jurisprudence states remain free to determine conditions for valid marriages but those restrictions themselves must be supported by legitimate state interests since they impose restrictions on important liberty interests of citizens who wish to marry.

### 2. Ohio Statute and Constitution Denying Recognition of Marriages of Same-Sex Couples Legally Married in Other States Violate Equal Protection

Ohio has created two tiers of married couples: opposite-sex couples married in other states and same-sex couples married in other states. The marriages of opposite-sex couples who are married outside Ohio under circumstances that do not comport with

10

Ohio law are considered valid and legal so long as those marriages are legal in the state where they are celebrated.  The marriages of same-sex couples who are married outside Ohio in states where same-sex marriage is legal are considered invalid in Ohio.  That difference in treatment violates Equal Protection.

### a. Validity of marriages of opposite-sex couples depend on law of state where marriage celebrated

It is black letter law that in Ohio the validity of a marriage is determined by looking at whether it complies with the law of the jurisdiction where it was celebrated:

> Generally, a marriage solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. Thus, the validity of a common-law marriage is determined by the law of the state where it was consummated, and that of a solemnized marriage by the law of the state where it was contracted. Likewise, a marriage created in a foreign nation is valid according to that nation's laws. . . . The fact that the parties to a marriage left the state to marry in order to evade Ohio's marriage laws is immaterial to the marriage's validity in Ohio.

45 Ohio Jur. 3d Family Law § 11.  In *Mazzolini v. Mazzolini,* 168 Ohio St. 357, 358 (Ohio Sup. Ct. 1958), the Court refused to annul a marriage between first cousins since it was legal for first cousins to marry in Massachusetts where their marriage was celebrated. *See also Hardin v. Davis*, 16 Ohio Supp. 19, *22 (Com. Pl. Hamilton Co. May 18, 1945) ("But, although first cousins cannot marry in Ohio, it has been held that if they go to another state where such marriages are allowed, marry, and return to Ohio, the marriage is legal in Ohio"); *Slovenian Mut. Ben. Ass'n v. Knafelj*, 36 Ohio App. 562, 173 N.E. 630 (1930); and *see Courtright v. Courtright*, 11 Ohio Dec. Reprint 413, 414 (Ohio Ct. C.P. Franklin Cnty. 1891) aff'd without opinion, 53 Ohio 685 (Ohio 1895) (marriage between persons considered underage in Ohio married in a state where their marriage is legal "can not be set aside, either because it was not contracted in accordance with the law of this

state, or because the parties went out of the state for the purpose of evading the laws of this state"); *Peefer v. State*, 182 N.E. 117 (Ohio Ct. App. 1931) (same).

      b.    **Validity of marriages of same-sex couples should also depend on law of state where marriage celebrated**.

Ohio does reserve the right to deem invalid those marriages that the legislature has expressly determined to be invalid.  See *Hardin*, supra.  But if that determination of invalidity for a class of marriages is itself a violation of equal protection then the law must be held to be unconstitutional.  That is the situation faced with respect to Ohio Rev. Code §3101.01(C) (3) and (4) and Art. XV, §11, of the Ohio Constitution.  These provisions expressly state that Ohio will not treat as valid the marriages of same sex couples married legally in other states.  Therefore as applied to same-sex couples who obtain legal marriages in other jurisdictions, this distinction between opposite sex couples and same-sex couples is unconstitutional.

There is no legitimate state purpose served by failing to recognize same-sex marriages celebrated in states where they are legal.  In fact, the very purpose of the Ohio provisions is to, "impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Windsor* 133 S.Ct. at 2639.  The purpose served by treating same-sex married couples different from opposite-sex married couples is the same improper purpose that failed in *Windsor*, "to impose inequality, not for other reasons like governmental efficiency." *Id.* at 2694.  This improper purpose also caused Art. 2 of the Colorado Constitution to be held unconstitutional in *Romer* since Amendment 2, "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot

do. A State cannot so deem a class of persons a stranger to its laws. Amendment 2 violates the Equal Protection Clause . . . ."  517 U.S. 635-36.

The purpose behind the Ohio provisions is to single out an unpopular group and cause them harm.  As set out above this is not a legitimate state purpose.  But if there is some other government purpose – some appropriate purpose - it cannot possibly outweigh the severe burden[2] imposed by the Ohio provisions on same-sex couples who marry in states where same-sex marriage is legal.  James and John are family.   Families deserve the highest level of protection under the First Amendment right of association: "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions."  *Zablocki v. Redhail*, 434 U.S. 374, 384, (1978) (citing *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).  In *Windsor*, the Court acknowledge the special relationship shared by married couples, "The States' interest in defining and regulating the marital relation, subject to constitutional guarantees, stems from the understanding that marriage is more than a routine classification for purposes of certain statutory benefits.  Private, consensual sexual intimacy between two adult persons of the same sex may not be punished by the State, and it can form 'but one element in a personal bond that is more enduring.'" *Id.* at 2692 (*quoting* Lawrence *v. Texas,* 539 U.S. 558, (2003) (*emphasis added*).

---

[2] This is true regardless of whether the classification of same-sex married persons is reviewed under rational basis (*Romer*) or heightened scrutiny (*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012)).

Ohio Rev. Code §3101.01(C) (3) and (4) and Art. XV, §11, Ohio Constitution as applied to these plaintiffs who are validly married in another state violates the equal protection clause because the state has no legitimate interest in treating same-sex married couples differently than opposite-sex married couples and any interest it does articulate cannot possibly outweigh the sever burden on same-sex married couples.

**C.      Plaintiffs Are Experiencing Irreparable Harm**

Denying a citizen his right to free speech constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment Freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury"). Denying plaintiffs their associational rights similarly imposes irreparable harm. In this case John is in hospice care and will soon die due to the deterioration of his muscles as a result of ALS. His family time with James is largely in the past. But as a result of the Ohio provisions the state will not even record that his family ever existed. The death certificate will declare his status as of the time of death. And Ohio views the marriage of James and John as void. So the marriage will not be recorded and James will not be listed as his surviving spouse. This official record of John's death – the last official document recording his existence on earth – will be forever wrong and will fail to record the most important part of his life – his marriage to James. This harm is irreparable and the Court must act before he dies.

**D.      The Balance of Hardships and the Public Interest Favor Issuance of an Injunction**

In constitutional cases, an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban*

14

*Mobility for Reg. Transp.,* 698 F.3d 885, 896 (6th Cir.2012). In this case the public interest is clearly served by awarding and injunction. Ohio is not harmed by the treatment of married same-sex couples on an equal basis with unmarried same-sex couples. The harm on the other hand to the married same-sex couples is severe. Their relationship is not valid under Ohio law so they must meticulously keep powers of attorney, medical power of attorney, and living wills up to date and available. They are denied tax benefits, public benefits and employer benefits that are tied to their status as legally married in Ohio. In *Windsor* the Supreme Court stated that there were over 1,000 federal benefits that are impacted. The status of those federal benefits is still at risk for individuals like the plaintiffs who are legally married but not residing in a state that recognizes their marriage. The balance of hardships clearly favors relief for the plaintiffs.

## IV.    CONCLUSION

This Court should issue a preliminary injunction restraining the defendants from enforcing Ohio Rev. Code §3101.01(C) (3) and (4) and Art. XV, §11, of the Ohio Constitution as applied to same-sex couples married in jurisdictions where same-sex marriage is legal who seek to have their out of state marriage accepted as legal in Ohio. This includes but is not limited to such officials completing death certificates as the need arises for the plaintiffs in a manner consistent with the attached proposed order.

                                    Respectfully submitted,

                                    /s/ Alphonse A. Gerhardstein
                                    Alphonse A. Gerhardstein # 0032053
                                    Trial Attorney for Plaintiffs
                                    Jennifer L. Branch #0038893

15

                                              Jacklyn Gonzales Martin #0090242
                                              GERHARDSTEIN & BRANCH CO. LPA
                                              Attorneys for the Plaintiffs
                                              432 Walnut Street, Suite 400
                                              Cincinnati, Ohio 45202
                                              (513) 621-9100
                                              (513) 345-5543 fax
                                              agerhardstein@gbfirm.com
                                              jbranch@gbfirm.com
                                              jgmartin@gbfirm.com

## CERTIFICATE OF SERVICE

     I hereby certify all defendants were served with a copy of this Motion by email service on July 19, 2013 and putative counsel for defendants have also been serve dby email on that date.

                                              /s/Alphonse A Gerhardstein