**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JAMES OBERGEFELL and** | : | **Case No. 1:13-cv-00501** |
| **JOHN ARTHUR,** | : | |
| | : | **Judge Timothy S. Black** |
| **Plaintiffs,** | : | |
| | : | **HEARING MEMORANDUM** |
| **vs.** | : | **OF PLAINTIFFS IN SUPPORT** |
| | : | **OF MOTION FOR TRO (Doc. 3)** |
| **JOHN KASICH, et al,** | : | |
| | : | |
| **Defendants.** | : | |

### I.      INTRODUCTION

This action challenges Ohio law prohibiting same-sex marriage as applied to the two plaintiffs, James Obergefell and John Arthur.  This Court set 11:00 a.m. on Monday July 22, 2013 as a deadline for additional briefing in support of the application for a TRO.  This memorandum will address the facts regarding the equal protection claim of gay citizens and the issue of irreparable harm.

### II ARGUMENT

A.  **There is no Rational Basis for distinguishing between same-sex couples and opposite-sex couples with respect to marriage policy**.

Plaintiffs have argued that Ohio's recognition of opposite-sex marriages from other states and lack of recognition of same-sex marriages from other states violates equal protection.  *See* Motion and Memorandum, Doc. 3.  Defendants may argue that Ohio law does not recognize all opposite-sex marriages from other states.  In one of the cases cited by plaintiffs in their motion, the Ohio Supreme Court held that even though a marriage between first cousins did not comply with Ohio law, such a marriage of two partners which was legal when celebrated in

1

Massachusetts would not be annulled in Ohio.  The Court set the principle of "*lex loci contractus*" or looking to the state where celebrated to determine the legality of the marriage. *Mazzolini v. Mazzolini*, 168 Ohio St. 357, 358 (1958).  In that case the Ohio Supreme Court also stated, "The policy of the law is to sustain marriages, where they are not incestuous, polygamous, shocking to good morals, unalterably opposed to a well defined public policy, or prohibited." *Id*.  It may well be argued that in Ohio the passage of Ohio Rev. Code § 3101.01(C)(2) and OH Const. Art. XV, §11 indicates that this State views same-sex marriages as "shocking to good morals, unalterably opposed to a well defined public policy, or prohibited." These laws certainly prohibit same-sex marriages.  But the point of this lawsuit is to secure a ruling that targeting same-sex couples in a way that treats them differently than opposite-sex couples is simply no longer a valid governmental purpose.  *United States v. Windsor*, 133 S. Ct. 2675 (2013)  made that very clear as argued in the Memorandum in Support of the Motion for a TRO (Doc. 3).

But how did we get to his point?  Why is this conclusion so obvious?  A great deal of work has been done, some by this Court, carefully exploring the nature and history of gay people.  Simply reviewing that work would be helpful.  In 1993 Cincinnati passed Article XII to its city charter.  In effect, that article repealed city anti-discrimination provisions protecting gay citizens and prohibited similar protections from ever being passed or enforced by the City in the future.  This Court held extensive evidentiary hearings in 1993 and 1994 in that case and concluded, in part, regarding gay people as follows:

1. Homosexuals comprise between 5 and 13% of the population.
2. Sexual orientation is a characteristic which exists separately and independently from sexual conduct or behavior.
3. Sexual orientation is a deeply rooted, complex combination of factors including a predisposition towards affiliation, affection, or bonding with members of the opposite and/or the same gender.

2

5.    Sexual behavior is not necessarily a good predictor of a person's sexual orientation.

6.    Gender non-conformity such as cross-dressing is not indicative of homosexuality.

8.    Sexual orientation is set in at a very early age—3 to 5 years—and is not only involuntary, but is unamenable to change.

9.    Sexual orientation bears no relation to an individual's ability to perform, contribute to, or participate in, society.

10.   There is no meaningful difference between children raised by gays and lesbians and those raised by heterosexuals. Similarly, children raised by gay and lesbian parents are no more likely to be gay or lesbian than those children raised by heterosexuals.

11.   There is no correlation between homosexuality and pedophilia. Homosexuality is not indicative of a tendency towards child molestation.

12.   Homosexuality is not a mental illness.

13.   Homosexuals have suffered a history of pervasive, irrational and invidious discrimination in government and private employment, in political organization and in all facets of society in general, based on their sexual orientation.

14.   Pervasive private and institutional discrimination against gays, lesbians and bisexuals often has a profound negative psychological impact on gays, lesbians and bisexuals.

15.   Gays, lesbians and bisexuals are an identifiable group based on their sexual orientation and their shared history of discrimination based on that characteristic.

16.   Gays, lesbians and bisexuals are often the target of violence by heterosexuals due to their sexual orientation.

17.   In at least certain crucial respects, gays, lesbians and bisexuals are relatively politically powerless.

*Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 860 F. Supp. 417, 426-27 (S.D. Ohio 1994) *rev'd and vacated*, 54 F.3d 261 (6th Cir. 1995) *cert. granted, judgment vacated*, 518 U.S. 1001, 116 S. Ct. 2519, 135 L. Ed. 2d 1044 (1996) and *rev'd and vacated*, 128 F.3d 289 (6th Cir. 1997).  Article XII was eventually repealed by the people and is no longer the law in Cincinnati.  But the findings by this Court are helpful in understanding the plaintiffs in this case and the group that Ohio is targeting by the laws at issue in this case.

Another trial addressing the nature and history of gay people recently went forward regarding California Proposition 8 and directly addressed the issues of same-sex and opposite-sex marriage.  Some of the same witnesses that testified in Cincinnati also testified in California.

The findings and conclusions that led to rejection of the state's alleged interests in treating same-sex marriage differently that opposite-sex marriage are instructive:

### PURPORTED INTEREST # 1: RESERVING MARRIAGE AS A UNION BETWEEN A MAN AND A WOMAN AND EXCLUDING ANY OTHER RELATIONSHIP

Proponents first argue that Proposition 8 is rational because it preserves: (1) "the traditional institution of marriage as the union of a man and a woman"; (2) "the traditional social and legal purposes, functions, and structure of marriage"; and (3) "the traditional meaning of marriage as it has always been defined in the English language." Doc. # 605 at 12-13. These interests relate to maintaining the definition of marriage as the union of a man and a woman for its own sake.

Tradition alone, however, cannot form a rational basis for a law. *Williams v. Illinois,* 399 U.S. 235, 239, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). The "ancient lineage" of a classification does not make it rational. *Heller,* 509 U.S. at 327, 113 S.Ct. 2637. Rather, the state must have an interest apart from the fact of the tradition itself.

The evidence shows that the tradition of restricting an individual's choice of spouse based on gender does not rationally further a state interest despite its "ancient lineage." Instead, the evidence shows that the tradition of gender restrictions arose when spouses were legally required to adhere to specific gender roles. See FF 26-27. California has eliminated all legally-mandated gender roles except the requirement that a marriage consist of one man and one woman. FF 32. Proposition 8 thus enshrines in the California Constitution a gender restriction that the evidence shows to be nothing more than an artifact of a foregone notion that men and women fulfill different roles in civic life. The tradition of restricting marriage to opposite-sex couples does not further any state interest. Rather, the evidence shows that Proposition 8 harms the state's interest in equality, because it mandates that men and women be treated differently based only on antiquated and discredited notions of gender. See FF 32, 57.

Proponents' argument that tradition prefers opposite-sex couples to same-sex couples equates to the notion that opposite-sex relationships are simply better than same-sex relationships. Tradition alone cannot legitimate this purported interest. Plaintiffs presented evidence showing conclusively that the state has no interest in preferring opposite-sex couples to same-sex couples or in preferring heterosexuality to homosexuality. See FF 48-50. Moreover, the state cannot have an interest in disadvantaging an unpopular minority group simply because the group is unpopular. *Moreno,* 413 U.S. at 534, 93 S.Ct. 2821.

The evidence shows that the state advances nothing when it adheres to the tradition of excluding same-sex couples from marriage. Proponents' asserted state interests in tradition are nothing more than tautologies and do not amount to rational bases for Proposition 8.

4

**PURPORTED INTEREST # 2: PROCEEDING WITH CAUTION WHEN
IMPLEMENTING SOCIAL CHANGES**

Proponents next argue that Proposition 8 is related to state interests in: (1)
"[a]cting incrementally and with caution when considering a radical transformation to the
fundamental nature of a bedrock social institution"; (2) "[d]ecreasing the probability of
weakening the institution of marriage"; (3) "[d]ecreasing the probability of adverse
consequences that could result from weakening the institution of marriage"; and (4)
"[d]ecreasing the probability of the potential adverse consequences of same-sex
marriage." Doc. # 605 at 13-14.

Plaintiffs presented evidence at trial sufficient to rebut any claim that marriage for
same-sex couples amounts to a sweeping social change. See FF 55. Instead, the evidence
shows beyond debate that allowing same-sex couples to marry has at least a neutral, if not
a positive, effect on the institution of marriage and that same-sex couples' marriages
would benefit the state. Id. Moreover, the evidence shows that the rights of those opposed
to homosexuality or same-sex couples will remain unaffected if the state ceases to
enforce Proposition 8. FF 55, 62.

The contrary evidence proponents presented is not credible. Indeed, proponents
presented no reliable evidence that allowing same-sex couples to marry will have any
negative effects on society or on the institution of marriage. The process of allowing
same-sex couples to marry is straightforward, and no evidence suggests that the state
needs any significant lead time to integrate same-sex couples into marriage. See
Background to Proposition 8 above. Consider, by contrast, *Cooper v. Aaron,* 358 U.S. 1,
7, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (recognizing that a school district needed time to
implement racial integration but nevertheless finding a delay unconstitutional because the
school board's plan did not provide for "the earliest practicable completion of
desegregation"). The evidence shows that allowing same-sex couples to marry will be
simple for California to implement because it has already done so; no change need be
phased in. California need not restructure any institution to allow same-sex couples to
marry. See FF 55.

Because the evidence shows same-sex marriage has and will have no adverse
effects on society or the institution of marriage, California has no interest in waiting and
no practical need to wait to grant marriage licenses to same-sex couples. Proposition 8 is
thus not rationally related to proponents' purported interests in proceeding with caution
when implementing social change.

**PURPORTED INTEREST # 3: PROMOTING OPPOSITE-SEX PARENTING OVER SAME-SEX PARENTING**

Proponents' largest group of purported state interests relates to opposite-sex parents. Proponents argue Proposition 8:(1) promotes "stability and responsibility in naturally procreative relationships"; (2) promotes "enduring and stable family structures for the responsible raising and care of children by their biological parents"; (3) increases "the probability that natural procreation will occur within stable, enduring, and supporting family structures"; (4) promotes "the natural and mutually beneficial bond between parents and their biological children"; (5) increases "the probability that each child will be raised by both of his or her biological parents"; (6) increases "the probability that each child will be raised by both a father and a mother"; and (7) increases "the probability that each child will have a legally recognized father and mother." Doc. # 605 at 13-14.

The evidence supports two points which together show Proposition 8 does not advance any of the identified interests: (1) same-sex parents and opposite-sex parents are of equal quality, FF 69-73, and (2) Proposition 8 does not make it more likely that opposite-sex couples will marry and raise offspring biologically related to both parents, FF 43, 46, 51.

The evidence does not support a finding that California has an interest in preferring opposite-sex parents over same-sex parents. Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant to children's developmental outcomes. FF 70. Moreover, Proposition 8 has nothing to do with children, as Proposition 8 simply prevents same-sex couples from marrying. FF 57. Same-sex couples can have (or adopt) and raise children. When they do, they are treated identically to opposite-sex parents under California law. FF 49. Even if California had an interest in preferring opposite-sex parents to same-sex parents-and the evidence plainly shows that California does not-Proposition 8 is not rationally related to that interest, because Proposition 8 does not affect who can or should become a parent under California law. FF 49, 57.

To the extent California has an interest in encouraging sexual activity to occur within marriage (a debatable proposition in light of *Lawrence,* 539 U.S. at 571, 123 S.Ct. 2472) the evidence shows Proposition 8 to be detrimental to that interest. Because of Proposition 8, same-sex couples are not permitted to engage in sexual activity within marriage. FF 53. Domestic partnerships, in which sexual activity is apparently expected, are separate from marriage and thus codify California's encouragement of non-marital sexual activity. Cal. Fam. Code §§ 297-299.6. To the extent proponents seek to encourage a norm that sexual activity occur within marriage to ensure that reproduction occur within stable households, Proposition 8 discourages that norm because it requires some sexual activity and child-bearing and child-rearing to occur outside marriage.

6

Proponents argue Proposition 8 advances a state interest in encouraging the formation of stable households. Instead, the evidence shows that Proposition 8 undermines that state interest, because same-sex households have become less stable by the passage of Proposition 8. The inability to marry denies same-sex couples the benefits, including stability, attendant to marriage. FF 50. Proponents failed to put forth any credible evidence that married opposite-sex households are made more stable through Proposition 8. FF 55. The only rational conclusion in light of the evidence is that Proposition 8 makes it less likely that California children will be raised in stable households. See FF 50, 56.

None of the interests put forth by proponents relating to parents and children is advanced by Proposition 8; instead, the evidence shows Proposition 8 disadvantages families and their children.

### PURPORTED INTEREST # 4: PROTECTING THE FREEDOM OF THOSE WHO OPPOSE MARRIAGE FOR SAME-SEX COUPLES

Proponents next argue that Proposition 8 protects the First Amendment freedom of those who disagree with allowing marriage for couples of the same sex. Proponents argue that Proposition 8: (1) preserves "the prerogative and responsibility of parents to provide for the ethical and moral development and education of their own children"; and (2) accommodates "the First Amendment rights of individuals and institutions that oppose same-sex marriage on religious or moral grounds." Doc. # 605 at 14.

These purported interests fail as a matter of law. Proposition 8 does not affect any First Amendment right or responsibility of parents to educate their children. See *In re Marriage Cases,* 76 Cal.Rptr.3d 683, 183 P.3d at 451-452. Californians are prevented from distinguishing between same-sex partners and opposite-sex spouses in public accommodations, as California antidiscrimination law requires identical treatment for same-sex unions and opposite-sex marriages. *Koebke v. Bernardo Heights Country Club,* 36 Cal.4th 824, 31 Cal.Rptr.3d 565, 115 P.3d 1212, 1217-1218 (2005). The evidence shows that Proposition 8 does nothing other than eliminate the right of same-sex couples to marry in California. See FF 57, 62. Proposition 8 is not rationally related to an interest in protecting the rights of those opposed to same-sex couples because, as a matter of law, Proposition 8 does not affect the rights of those opposed to homosexuality or to marriage for couples of the same sex. FF 62.

To the extent proponents argue that one of the rights of those morally opposed to same-sex unions is the right to prevent same-sex couples from marrying, as explained presently those individuals' moral views are an insufficient basis upon which to enact a legislative classification.

7

## PURPORTED INTEREST # 5: TREATING SAME-SEX COUPLES
## DIFFERENTLY FROM OPPOSITE-SEX COUPLES

Proponents argue that Proposition 8 advances a state interest in treating same-sex couples differently from opposite-sex couples by: (1) "[u]sing different names for different things"; (2) "[m]aintaining the flexibility to separately address the needs of different types of relationships"; (3) "[e]nsuring that California marriages are recognized in other jurisdictions"; and (4) "[c]onforming California's definition of marriage to federal law." Doc. # 605 at 14.

Here, proponents assume a premise that the evidence thoroughly rebutted: rather than being different, same-sex and opposite-sex unions are, for all purposes relevant to California law, exactly the same. FF 47-50. The evidence shows conclusively that moral and religious views form the only basis for a belief that same-sex couples are different from opposite-sex couples. See FF 48, 76-80. The evidence fatally undermines any purported state interest in treating couples differently; thus, these interests do not provide a rational basis supporting Proposition 8.

In addition, proponents appear to claim that Proposition 8 advances a state interest in easing administrative burdens associated with issuing and recognizing marriage licenses. Under precedents such as *Craig v. Boren,* "administrative ease and convenience" are not important government objectives. 429 U.S. 190, 198, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Even assuming the state were to have an interest in administrative convenience, Proposition 8 actually creates an administrative burden on California because California must maintain a parallel institution for same-sex couples to provide the equivalent rights and benefits afforded to married couples. See FF 53. Domestic partnerships create an institutional scheme that must be regulated separately from marriage. Compare Cal. Fam. Code §§ 297-299.6 with Cal. Fam. Code §§ 300-536. California may determine whether to retain domestic partnerships or eliminate them in the absence of Proposition 8; the court presumes, however, that as long as Proposition 8 is in effect, domestic partnerships and the accompanying administrative burden will remain. Proposition 8 thus hinders rather than advances administrative convenience.

## PURPORTED INTEREST # 6: THE CATCHALL INTEREST

Finally, proponents assert that Proposition 8 advances "[a]ny other conceivable legitimate interests identified by the parties, amici, or the court at any stage of the proceedings." Doc. # 605 at 15. But proponents, amici and the court, despite ample opportunity and a full trial, have failed to identify any rational basis Proposition 8 could conceivably advance. Proponents, represented by able and energetic counsel, developed a full trial record in support of Proposition 8. The resulting evidence shows that Proposition 8 simply conflicts with the guarantees of the Fourteenth Amendment.

Many of the purported interests identified by proponents are nothing more than a fear or unarticulated dislike of same-sex couples. Those interests that are legitimate are

unrelated to the classification drawn by Proposition 8. The evidence shows that, by every available metric, opposite-sex couples are not better than their same-sex counterparts; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal. FF 47-50. Proposition 8 violates the Equal Protection Clause because it does not treat them equally.

### A PRIVATE MORAL VIEW THAT SAME-SEX COUPLES ARE INFERIOR TO OPPOSITE-SEX COUPLES IS NOT A PROPER BASIS FOR LEGISLATION

In the absence of a rational basis, what remains of proponents' case is an inference, amply supported by evidence in the record, that Proposition 8 was premised on the belief that same-sex couples simply are not as good as opposite-sex couples. FF 78-80. Whether that belief is based on moral disapproval of homosexuality, animus towards gays and lesbians or simply a belief that a relationship between a man and a woman is inherently better than a relationship between two men or two women, this belief is not a proper basis on which to legislate. See *Romer,* 517 U.S. at 633, 116 S.Ct. 1620; *Moreno,* 413 U.S. at 534, 93 S.Ct. 2821; *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) ("[T]he Constitution cannot control [private biases] but neither can it tolerate them.").

The evidence shows that Proposition 8 was a hard-fought campaign and that the majority of California voters supported the initiative. See Background to Proposition 8 above, FF 17-18, 79-80. The arguments surrounding Proposition 8 raise a question similar to that addressed in *Lawrence,* when the Court asked whether a majority of citizens could use the power of the state to enforce "profound and deep convictions accepted as ethical and moral principles" through the criminal code. 539 U.S. at 571, 123 S.Ct. 2472. The question here is whether California voters can enforce those same principles through regulation of marriage licenses. They cannot. California's obligation is to treat its citizens equally, not to "mandate [its] own moral code." *Id.* (citing *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 850, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). "[M]oral disapproval, without any other asserted state interest," has never been a rational basis for legislation. *Lawrence,* 539 U.S. at 582, 123 S.Ct. 2472 (O'Connor, J, concurring). Tradition alone cannot support legislation. See *Williams,* 399 U.S. at 239, 90 S.Ct. 2018; *Romer,* 517 U.S. at 635, 116 S.Ct. 1620; *Lawrence,* 539 U.S. at 579, 123 S.Ct. 2472.

Proponents' purported rationales are nothing more than post-hoc justifications. While the Equal Protection Clause does not prohibit post-hoc rationales, they must connect to the classification drawn. Here, the purported state interests fit so poorly with Proposition 8 that they are irrational, as explained above. What is left is evidence that Proposition 8 enacts a moral view that there is something "wrong" with same-sex couples. See FF 78-80.

The evidence at trial regarding the campaign to pass Proposition 8 uncloaks the most likely explanation for its passage: a desire to advance the belief that opposite-sex couples are morally superior to same- sex couples. FF 79-80. The campaign relied heavily on negative stereotypes about gays and lesbians and focused on protecting children from inchoate threats vaguely associated with gays and lesbians. FF 79-80; See PX0016 Video, *Have You Thought About It?* (video of a young girl asking whether the viewer has considered the consequences to her of Proposition 8 but not explaining what those consequences might be).

At trial, proponents' counsel attempted through cross-examination to show that the campaign wanted to protect children from learning about same-sex marriage in school. See PX0390A Video, Ron Prentice Addressing Supporters of Proposition 8, Excerpt; Tr. 132:25-133:3 (proponents' counsel to Katami: "But the fact is that what the Yes on 8 campaign was pointing at, is that kids would be taught about same-sex relationships in first and second grade; isn't that a fact, that that's what they were referring to?"). The evidence shows, however, that Proposition 8 played on a fear that exposure to homosexuality would turn children into homosexuals and that parents should dread having children who are not heterosexual. FF 79; PX0099 Video, *It's Already Happened* (mother's expression of horror upon realizing her daughter now knows she can marry a princess).

The testimony of George Chauncey places the Protect Marriage campaign advertisements in historical context as echoing messages from previous campaigns to enact legal measures to disadvantage gays and lesbians. FF 74, 77-80. The Protect Marriage campaign advertisements ensured California voters had these previous fear-inducing messages in mind. FF 80. The evidence at trial shows those fears to be completely unfounded. FF 47-49, 68-73, 76-80.

Moral disapproval alone is an improper basis on which to deny rights to gay men and lesbians. The evidence shows conclusively that Proposition 8 enacts, without reason, a private moral view that same-sex couples are inferior to opposite-sex couples. FF 76, 79-80; *Romer,* 517 U.S. at 634, 116 S.Ct. 1620 ("[L]aws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected."). Because Proposition 8 disadvantages gays and lesbians without any rational justification, Proposition 8 violates the Equal Protection Clause of the Fourteenth Amendment.

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 998-1003(N.D. Cal. 2010) *aff'd sub nom. Perry*

*v. Brown*, 671 F.3d 1052 (9th Cir. 2012) *vacated and remanded sub nom. Hollingsworth v.*

*Perry*, 133 S. Ct. 2652 (U.S. 2013).

Those findings make clear that laws targeting same sex couples are targeting people due to their status which is established at an early age and immutable.  Laws designed to hurt people because of something they cannot change are not a legitimate state purpose. The Ohio laws at issue in this case were pursued through a campaign of fear much like that in California.  See, *When Romer Met Feeney:  Why the Second Sentence of the Ohio Marriage Amendment Violates Equal Protection*, 61 Case W. Res. L. Rev. 1315 (2011) (tracing history of Ohio campaign).  None of the interests that will be suggested by the state establish a proper state interest under either heightened scrutiny or rational basis review.

**B.  Each Plaintiff Will Suffer Irreparable Harm If the Injunction Does Not Issue.**

Constitutional violations are routinely recognized as triggering irreparable harm unless they are promptly remedied. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").  The Supreme Court has long recognized as fundamental the rights associated with marriage, divorce, and the education and rearing of children.  *Zablocki v. Redhail*, 434 U.S. 374 (1978).  In the case at bar the State of Ohio is severely burdening the fundamental right of these plaintiffs to marry on an equal basis with opposite-sex couples.

When the importance of the issues at stake is so high, cases involving families, dignity, and privacy begin with orders granting temporary restraining orders and preliminary injunctions based on the irreparable harm the restrictions impose on the plaintiffs.  *See*, *Moreno et al v. United States Department of Agriculture, et al*, 345 F.Supp. 310 (Dist. Col. 1972), *aff'd. U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 93 S. Ct. 2821 (1973).   In *Moreno*, unrelated household members sought to declare a food stamp law unconstitutional because it limited food stamps to "related" household members.  Congress's intent was to deny food stamps to hippy

11

commune members.  The court immediately issued a temporary restraining order enjoining the restriction to related persons. The harm to the plaintiffs was substantial: poor people were being denied food.  *See also*, *Bassett v. Snyder*, 12-10038, 2013 WL 3285111 (E.D. Mich. June 28, 2013) (state law prohibiting public employee medical benefit plans from covering same-sex partners caused irreparable harm because of threat to plaintiffs' health); *Society of Sisters v. Pierce*, 296 F. 928 (D.C. Ore. 1924), *aff'd.  Pierce v. Society of Sisters*, 268 US 510  (1925) (state law prohibiting public school attendance caused private school irreparable harm since the school had a property interest in operating a school and the loss of attendance destroyed the use of the school property); *Bellamy v. Froehlke*, 347 F.Supp. 1241 (W.D. N.C.1972) (army reservists with long hair claimed equal protection violation for army refusing to allow them to wear a wig, while bald and disfigured soldiers were permitted to wear wigs.  Irreparable harm shown based on constitutional right to dignity of individual human beings).

This Court found irreparable harm in several constitutional cases, issuing injunctions.  In *Planned Parenthood Cincinnati Region et al v. Taft*, et al., USDC SD OH, Case No. 1:04-cv-00493 (Order,  Doc. 36, 9/22/04, p. 12) the Court determined that an abortion statute, if enforced, would impose irreparable harm.  In *Spencer v. Blackwell*, 347 F.Supp.2d 528 (S.D. OH 2004), the Court issued an injunction on election eve because of the irreparable harm a state statute would cause a voter's constitutional right to vote.  "'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.'" *Id*. quoting, *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526) *rev'd on other grounds*, 338 F.3d 547 (6th Cir. 2004).

In *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 838 F. Supp. 1235, 1242-43 (S.D. Ohio 1993) *rev'd and vacated*, 54 F.3d 261 (6th Cir. 1995) *cert. granted, judgment vacated,* 518 U.S. 1001, 116 S. Ct. 2519 (1996), the Court concluded "Plaintiffs will suffer irreparable harm if the Court does not issue the injunction because of the threatened infringement of the Plaintiffs' fundamental rights." (citing *Evans v. Romer,* 854 P.2d 1270, 1286 (Colo.), *cert. denied,* 510 U.S. 959, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993); *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (*New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); and *Weaver v. University of Cincinnati,* 942 F.2d 1039, 1043 (6th Cir.1991)). The Court found that the threat faced by the Plaintiffs in, among other things, their employment and housing situations and the increased threat of harassment, all contributed to Plaintiffs' injury.  838 F. Supp. at 1243.

Courts have followed the principle that "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."§ 11A Fed. Prac. & Proc. Civ. § 2948.1 (2d ed.).  *See, e.g., Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of plaintiff's constitutional rights); *ACLU of KY v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) (holding if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated; *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm) (citations omitted); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3rd Cir. 1997) (denial of preliminary injunctive relief was irreparable harm to plaintiffs' voting and associational rights); *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992)

(holding that plaintiffs may establish irreparable harm based on an alleged violation of their Fourth Amendment rights); *McDonell v. Hunter,* 746 F.2d 785, 787 (8th Cir.1984) (finding that a violation of privacy constitutes an irreparable harm);  *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (holding allegation of violation of Eighth Amendment rights sufficient showing of irreparable harm); and *Doe v. Mundy*, 514 F.2d 1179 (7th Cir 1975) (denial of constitutional privacy right was irreparable harm); *Beerheide v. Zavaras*, 997 F.Supp. 1405 (D.C. Colo.1998) (irreparable harm satisfied by allegation of deprivation of free exercise of religion).

In this case, not only is the fundamental right to marriage at issue, the Court also has the additional consideration of plaintiff John Arthur's medical condition.  He is near death due to progressive ALS disease.  He wants to be buried in his family plot at Spring Grove Cemetery. He also wants his husband James to be buried next to him someday.  The family plot directive limits those who may be interred in the plot to descendants and married spouses.  If the funeral director does not obtain a death certificate listing John as a spouse, James cannot be buried at Spring Grove with John.  John does not want his burial delayed until this case is finally decided. Nor does he want his remains to be buried at Spring Grove and later exhumed.  John and James believe that would be a serious indignity. The uncertainty on this issue during John's final illness is the cause of extreme emotional hardship to the couple.

Dying with an incorrect death certificate that prohibits John from being buried with dignity is irreparable harm.  Preventing disruption of human remains can be irreparable harm and grounds for the issuance of an injunction.  *See*, *Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 209 F. Supp. 2d 1008, 1022 (D.S.D. 2002) (court issued injunction because of the importance of the human remains and artifacts to the Native American plaintiffs, the threat of irreparable harm remains high).

14

Additionally, John's harm is irreparable because his injury is present now while he is alive.  A later decision allowing an amendment to the death certificate cannot remediate the harm to John as he will have passed away while still suffering the harm.  John will not be able to enjoy the right to have his marriage recognized after his death.  Yes, relief can be awarded that might correct his death certificate but he will not know of that relief after he has passed.  In that sense, the harm facing John in particular is truly irreparable.

But even for James, recognizing his marriage after his spouse has died will be important but of little comfort since the person with whom he seeks to share these brief days of marriage in Ohio is John.  James and John are experiencing irreparable harm today, and every minute that passes while their marriage is not recognized in Ohio simply cannot be regained.  Given both the importance of the issues at stake and the imminent death of one of the marriage partners, plaintiffs will suffer irreparable harm without a temporary restraining order.

## II.       CONCLUSION

This Court should issue a temporary restraining order restraining the defendants from enforcing Ohio Rev. Code §3101.01(C) (3) and (4) and Art. XV, §11, of the Ohio Constitution as applied to same-sex couples married in jurisdictions where same-sex marriage is legal who seek to have their out-of-state marriage accepted as legal in Ohio.  This includes but is not limited to such officials completing death certificates as the need arises for the plaintiffs in a manner consistent with its order.

Respectfully submitted,

/s/ Alphonse A. Gerhardstein
Alphonse A. Gerhardstein # 0032053
Trial Attorney for Plaintiffs
Jennifer L. Branch #0038893
Jacklyn Gonzales Martin #0090242

15

GERHARDSTEIN & BRANCH CO. LPA
Attorneys for Plaintiffs
432 Walnut Street, Suite 400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543 fax
agerhardstein@gbfirm.com
jbranch@gbfirm.com
jgmartin@gbfirm.com


## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2013, on or before 10:00 a.m. a copy of the foregoing

pleading was filed electronically.  Notice of this filing will be sent to all parties for whom

counsel has entered an appearance by operation of the Court's electronic filing system.  Parties

may access this filing through the Court's system.  I further certify that a copy of the foregoing

pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all

parties for whom counsel has not yet entered an appearance electronically.

/s/Alphonse A Gerhardstein