IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **JAMES OBERGEFELL,** *et al.,* | : | |
| | : | |
| Plaintiffs, | : | Case No. 13-CV-501 |
| | : | |
| v. | : | Judge Timothy S. Black |
| | : | |
| **JOHN KASICH**, *et al.,* | : | |
| | : | |
| Defendants. | : | |

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

No one doubts that the circumstances surrounding this case are very sad. A dying man wants a state declaration: for Ohio to recognize, on his death certificate, a marriage that is legal in Maryland but expressly barred by Ohio's voters in Ohio's Constitution. But the Motion seeks to do much more, not just in this case in the long run, but in this emergency request. Plaintiffs ask the Court, in a *temporary restraining order,* to strike down Ohio's definition of marriage and to alter its Constitution. And they seek this broad relief for all those who marry in those other States that allow such marriage. Yet the Motion does not even purport to make a case for such a radical reshaping of Ohio law, or explain why that must be done overnight in a TRO. The Court should reject that ambitious request, and it should also reject the seemingly "narrower" relief regarding the death certificate. As shown below, to the extent that the certificate relief is not meant to trigger broader implications, but is truly limited to one paper, it does not confer any concrete benefit to the Plaintiffs, and the absence of the relief does not irreparably harm them. Moreover, the State's interests here are substantial.

In seeking any relief, broad or narrow, Plaintiffs ask this federal Court to disregard the U.S. Supreme Court's recent reminder that marriage is a matter of *State* concern: "By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *United States v. Windsor*, 133 S. Ct. 2675, *2013 U.S. LEXIS 4921, at *30-31 (2013). "The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens." *Id.* at *34. "In order to respect this principle, the federal courts, as a general rule, do not adjudicate issues of marital status even where there might otherwise be a basis for federal jurisdiction." *Id.* at *35. To be sure, *Windsor* has been heralded by some as precedent supporting court-ordered recognition of same-sex marriage, but the decision mandated federal recognition for federal purposes of some States' marriages precisely because those *States* chose that marriage policy, and because that is a *State's* choice.

While debate continues in Ohio, as across the nation, Ohio's voters strongly declared just a few years ago that Ohio would follow the traditional definition of marriage. The Ohio Constitution's Article XV, Section 11, was enacted to enshrine in our highest law the definition adopted in Ohio Revised Code § 3101.01(C): marriage in Ohio is between one man and one woman. Just as Maryland is free to choose to recognize same-sex marriage, Ohio is free to follow tradition. Federal law does not contradict that, and to the contrary, Section 2 of the federal Defense of Marriage Act—left untouched by *Windsor*—protects Ohio's right to decide for itself, and specifically to decline to recognize other States' marriages. 28 U.S.C. § 1738C. Plaintiffs thus ask the Court to invalidate federal law with trumping Ohio's Constitution.

The Court should reject the Motion's invitation to take the unprecedented step of rewriting federal and Ohio law in this way. It should deny the use of a TRO. As detailed below,

an Ohio death certificate does not confer any benefits, so changing it does nothing concrete, and in any case, such certificates can be amended later, so no emergency relief is warranted.

## FACTS

The State Defendants have no reason to challenge the facts as Plaintiffs describe them regarding Plaintiffs' situation, especially regarding Mr. Arthur's health problems. The State Defendants note, though, that Plaintiffs do not allege any facts regarding anyone other than Mr. Obergefell and Mr. Arthur. Further, because Plaintiffs' TRO request focuses on an anticipated death certificate—although they seek relief broader than that—the State Defendants summarize here the details of such a certificate, and its legal context.

Ohio's office of vital statistics maintains the "statewide system" for the "registration of births, deaths, fetal deaths, and other vital statistics." R.C. 3705.02. The Director of the office of vital statistics is responsible for directing and supervising a system of vital statistics and maintaining all vital records. R.C. 3705.03(A)(2). Included in the definition of "vital records" are certificates or reports of marriage and death. R.C. 3705.01(P).

R.C. 3705.16 sets forth the official procedure by which all deaths in Ohio are registered with the bureau of vital statistics. A death is registered by filing of a death certificate, the completion and filing of which is the responsibility of a funeral director, or other person in charge of the remains. R.C. 3705.16.

All death certificates are the property of the State of Ohio. O.A.C. 3701-5-02(C). They contain several parts, including personal and statistical information, a medical certificate of death, and a statement of facts regarding the final disposition of the body. *See* OAC 3701-05-02(A)(2), Appendix B (a blank death certificate form is attached as Exhibit A). The medical certificate must be filled out by a physician, medical examiner, or coroner, (R.C. 3705.16(C),

3

while the funeral director is responsible for a statement regarding the final disposition of the body. R.C. 3705.16(B).

The personal and statistical portion of a death certificate must also be completed by a funeral director or other person in charge of the remains. *Id.*; Exhibit A blank death certificate form. The deceased's marital status and the name of the surviving spouse are part of the personal and statistical portion. In order to complete it, the funeral director obtains this information from the "best qualified persons or sources available." R.C. 3705.16(B). Neither the Governor nor the Ohio Attorney General has any official role in the completion, filing, or maintenance of a death certificate. No other state or local officials, even those who maintain the records, are tasked with completing the certificate.

A death certificate is the manner by which an individual's death is registered with a local registrar of vital statistics. R.C. 3705.16. The local registrar transmits the original death certificate to Ohio's office of vital statistics, which maintains them in a "systematic manner." R.C. 3705.07. The office of vital statistics also maintains Ohio's permanent index of deaths, which by law must include the name of the decedent, the place and date of death, the death certificate number, and the volume in which it is located. *Id.* Ohio does not officially authorize or approve anyone's marriage—same-sex or otherwise—through a death certificate or through its permanent index. Ohio's marriage records are separate from its death records: an entirely separate system provides for the registration of marriages, divorces, dissolutions, and annulments. *See* R.C. 3705.21.

In addition, an error or omission in any vital record, including a birth or death certificate, can be corrected. R.C. 3705.22. Whenever it is alleged that facts in a birth or death record are not true, the Director of the Department of Health may require satisfactory evidence to prove that

4

is the case. *Id*. Such evidence may be presented in the form of affidavits, amended records, or certificates and when it establishes an incorrect fact, the original record "shall be supplemented" by that evidence. *Id*. A person having knowledge of the incorrect fact may swear to it in a form affidavit provided by the Ohio Department of Health. *See, id*.

## LAW AND ARGUMENT

No temporary restraining order is justified here, whether to broadly rewrite Ohio law and its adherence to traditional marriage definitions, or to order the anticipated death certificate to be written to reflect that Messrs. Arthur and Obergefell were married in Maryland.

**A.     Plaintiffs must show an entitlement to preliminary relief under the four factors.**

Before granting a preliminary injunction or temporary restraining order, the Court must examine four separate factors: "(1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause harm to others; and (4) whether the public interest would be served by the issuance of a preliminary injunction." *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

Plaintiffs bear the heavy burden of establishing their clear entitlement to injunctive relief. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it.") (citation omitted). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)(citation omitted).

**B.     The sole issue in this TRO motion should be the death certificate as to these Plaintiffs, and any broader attack on Ohio's marriage law is unjustified as emergency relief.**

Although no relief is warranted here, the Motion's attempt to seek global relief—striking down Ohio's marriage law for all purposes, as to all those obtaining a same-sex marriage in another State or another country—is especially unjustified.

To be sure, the Motion seeks relief that is far more expansive than is appropriate at the TRO stage, not just an order regarding a death certificate. Although much of the motion focuses on the facts relating to the certificate, the Proposed Order leaves no doubt as to the broader scope. It asks the Court to suspend application of Article XV § 11 of Ohio's Constitution and Ohio Revised Code § 3101.01(C) "to same-sex couples married in jurisdictions where same-sex marriage is legal who seek to have their out-of-state marriage accepted as legal in Ohio." (Doc.3-3, Order Proposed by Plaintiffs at 2). That is, they seek relief for all such couples, as to all purposes. But such relief is unwarranted.

First, while Plaintiffs ask for such broad relief in the proposed order, they present no facts or argument to justify it. Plaintiffs do not bring a facial challenge to Ohio law, but an as-applied one, meaning as applied to *them*, not all others. No other plaintiffs are present. And, in any case, the Motion contains no facts about others, nor any facts about why emergency relief is supposedly needed to justify the immediate changes that will occur if Ohio's definition of marriage is temporarily changed at this stage in the proceedings.

Second, such broad relief—a TRO striking down an Ohio statute and constitutional provision—could not be justified in any event. That is so not only because of the absence of the injunctive factors, but because such issues are intrinsically not suited to a TRO or to any form of temporary relief. Marriage implicates so many issues such that "temporary" relief is impossible in the real world. If unknown numbers of people are considered married overnight, legal effects

would occur immediately, from taxes to pensions to more.  But if such things happen temporarily, and such relief does not survive at a permanent stage, or is overturned on appeal, undoing the entanglements would be difficult for all concerned.

Indeed, the problems with such disentanglement, or arguments about vested rights, would likely be invoked later as an argument to make relief permanent.  That type of bootstrapping is wrong:  the issue should be determined carefully on its merits, not backed into.

Third, on principle, such a massive legal change deserves full consideration with appropriate briefing and consideration, not a TRO addressed within one business day on scant facts.  The State Defendants stand by Ohio's right to choose a traditional definition of marriage.  Equally important, if that right is to be challenged in court, Ohioans deserve to have their day in court to defend the law, not have it overridden overnight.  That alone is enough to reject this TRO.  And a denial of the TRO does not determine Plaintiffs' case or preclude further examination of the issues.

**C.    Plaintiffs are not entitled to a TRO regarding the death certificate.**

Not only should the Court limit its consideration to the death certificate issue, but in considering that issue, it should deny the motion.  Plaintiffs do not meet the factors needed for such a TRO, for all the reasons detailed below.  In particular, they cannot show that a lack of relief harms them, or that obtaining the requested relief would help them, as they cannot show that the certificate alone has any concrete effects.  Alternatively, if it did have some effect, any such effect is a reason not to grant "emergency" relief, because longer-term consequences deserve much fuller consideration.

> 1. **Plaintiffs cannot demonstrate a strong likelihood of success on the merits of their death certificate claim.**
>
>    a. **Plaintiffs have no constitutionally cognizable claim regarding death certificates, and no legally enforceable benefit to Plaintiffs turns on the death certificate wording they identify.**

Because it is based on unverified, self-reported information, a death certificate does not constitute evidence of a valid marriage for any purpose in the state of Ohio. Stating that a decedent was married on a death certificate (whether he was married or not), or stating that a person was the decedent's spouse (whether he was or was not), *does not trigger any entitlement or benefit under the law of the state of Ohio*. *Cf. State v. Carswell*, 114 Ohio St.3d 210, 2007-Ohio-3723, 871 N.E.2d 547 (noting that "[a]ny legal benefits that these persons might possess (such as a right to inherit property through intestacy) are derived from other statutory provisions, not from the person's status as a family or household member in the domestic-violence statute").

Ohio collects marital information on death certificates because it is required by the National Center for Health Statistics ("NCHS") for statistical purposes only. Crucially, *the state of Ohio itself does nothing with this information*. Plaintiffs' concern that their marriage will not be recognized in this essentially statistical information may be allayed by the fact that a decedent's spouse's name is not reported. That is, Ohio reports only the name of the decedent and marital status: it does not identify their surviving spouses. And nothing in the law surrounding the elements of a death certificate in any way limits the representations or accounts of their marital history and status that Plaintiffs may wish to provide to friends, relations, or others. The form of which Plaintiffs complain does not deprive them of a constitutional right.

Plaintiffs cannot establish a strong likelihood that they will succeed in proving a constitutional deprivation (as they must) if their Maryland marriage is not reflected on an Ohio death certificate. Preliminary injunctive relief must therefore be denied.

8

      **b.**      **Plaintiffs cannot demonstrate that the United States Constitution guarantees that marital information will be included on a death certificate.**

Plaintiffs bring their claims under 42 U.S.C. § 1983, which provides an avenue to relief for those deprived of "rights" or "privileges" secured by the constitution of the United States. 42 U.S.C. § 1983. Yet, Plaintiffs cannot establish a constitutional "right" to the description of one's marital status on a death certificate, which is a document maintained by the state for the purpose of documenting the fact and cause of death, and which contains marital information for broad statistical purposes only. Importantly, the State of Ohio does not confer any benefit upon a deceased's estate or a surviving spouse based upon the marital status listed on a death certificate. As the death certificate (which merely contains an incidental reference to marital status) confers no marriage-related State benefit -- let alone any immediate and inalterable State benefit -- there is no right to have any particular information regarding marital status on the certificate.

      **c.**      **Plaintiffs cannot show a strong likelihood of success on the larger issue in this case.**

Because Plaintiffs cannot demonstrate entitlement to temporary injunctive relief, this Court does not need to decide immediately and on a rushed emergency basis whether, consistent with the U.S. Constitution, Ohio can refuse to recognize Plaintiffs' same-sex marriage performed under Maryland law. The important issues surrounding Ohio's traditional marriage definition can be addressed fully and fairly with appropriate briefing and consideration.

When those issues are appropriately considered, they will be assessed against the backdrop of our nation's constitutional and societal traditions and in light of the Supreme Court's recent pronouncements on marriage questions. The federal law as enacted by Congress that no State shall be required to give effect to proceedings of another State "respecting a relationship

9

between persons of the same sex that is treated as a marriage under the laws of such other State…" also will help to inform those determinations. 28 U.S.C. §1738C.

In *United States v. Windsor*, Justice Kennedy underscored the Court's understanding that marriage is a matter of traditional State, not federal, concern:

> By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States.
> . . .
> The recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens. *See Williams v. North Carolina*, 317 U. S. 287, 298, 63 S. Ct. 207, 87 L. Ed. 279 (1942) ("Each state as a sovereign has a rightful and legitimate concern in the marital status of persons domiciled within its borders"). The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the "[p]rotection of offspring, property interests, and the enforcement of marital responsibilities."
> . . .
> Consistent with this allocation of authority, the Federal Government, throughout our history, has deferred to state-law policy decisions with respect to domestic relations.
> . . .
> The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning; for "when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States."

*United States v. Windsor*, 133 S. Ct. 2675, 2013 U.S. LEXIS 4921, at *30-36. Here, the voters of the state of Ohio have directly exercised their right to determine that their State will recognize only marriages between opposite sex partners.

While certain other states now have made different choices, Ohio's choice – a choice that the United States Congress has explicitly affirmed is the State's to make – is aligned with the significant majority of other States and reflects the position taken by every other State only a decade ago. As Justice Kennedy, writing for the majority, pointed out in *Windsor*:

> It seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage. For

10

marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization.

*Id*. at *28-29.  Justice Alito's dissent echoed the same point in observing that:  "While modern cultural changes have weakened the link between marriage and procreation in the popular mind, there is no doubt that, throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship."  *Id* at *115-16.

The United States Constitution in no way dictates whether a State should recognize same-sex marriage:  it does not address the issue or choose between the competing social visions that the States may consider on this same-sex/opposite-sex question.  Indeed, the result in *Windsor* that Plaintiffs herald in their complaint was hinged at multiple levels to the States' central, legitimate role in determining whether to authorize same-sex marriage.  Justice Kennedy noted that "[t]he State's power in defining the marital relation is of central relevance in this case" even beyond issues of federalism because the federal government historically has relied on state law to define marriage.  2013 US LEXIS 4921 at *37.

To any extent that the equal protection clause is applicable here, it "'prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'"  *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir. 2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)).  When the class at issue has not been recognized as a suspect or quasi-suspect class, courts examine a classification under rational basis review should the equal protection review be triggered.  *Davis v. Prison Health Services*, 679 F.3d 433, 438 (6th Cir. 2012).  In the Sixth Circuit, sexual

11

orientation is not recognized as a suspect class, and the Sixth Circuit has applied rational basis review.  *Id.*; *see also Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006).

"On rational basis review, a classification bears a strong presumption of validity and a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Alexander v. Merit Sys. Prot. Bd.*, 165 F.3d 474, 484 (6th Cir. 1999) (internal quotation marks and citation omitted).  The classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

This standard presents a high bar.  Plaintiffs will not succeed in an attempt to show that Ohio's statute and constitutional amendment choosing not to recognize out-of-state same-sex marriages lack a rational relation to a legitimate state interest.  *See, e.g.*, *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006) (federal appeals court finds that "the many laws defining marriage as the union of one man and one woman and extending a variety of benefits to married couples are rationally related to the government interest in steering procreation into marriage.") (quotation omitted).

A classification will be upheld when "the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not[.]" *Johnson v. Robison*, 415 U.S. 361, 383 (1974).  Against this background, as the Court in *Bruning* concluded, "we cannot conclude that the State's justification 'lacks a rational relationship to legitimate state interests.'" *Bruning*, 455 F.3d at 867-68 (noting that the personal views of the Judges "regarding this political and sociological debate" do not govern)(internal citations omitted).  Justice Alito

observed in his *Windsor* dissent that various sides in the marriage debate advance rational arguments, including the position that "marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing," and "more philosophical" arguments premised on the view that "marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so. 2013 US LEXIS 4921 at * 115 (citing to Girgis, Anderson, George, What is Marriage? Man and Woman: A Defense, at 23-28.).

Even more fundamentally, same-sex marriage is, in the scope of the course of human history, a new concept, being first adopted by the Netherlands in 2000, and in the United States by Massachusetts in 2003. *Id.* at *105 (Alito, J., dissenting). It is rational for a State to proceed deliberatively and elect to keep the traditional definition of marriage unless the people of the State determine that recognizing same-sex marriage will not weaken the fundamental institution on which so much of our society rests. Justice Alito observed:

> Family structure reflects the characteristics of a civilization, and changes in family structure and in the popular understanding of marriage and the family can have profound effects. There are those who think that allowing same-sex marriage will seriously undermine the institution of marriage …. Others think that recognition of same-sex marriage will fortify a now-shaky institution …. At present, no one—including social scientists, philosophers, and historians—can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be. And judges are certainly not equipped to make such an assessment….Any change on a question so fundamental should be made by the people through their elected officials.

*Id*. at 106-109.

Moreover, Section 2 of the federal Defense of Marriage Act—which was not at issue in *Windsor*, which has never been held unconstitutional by the Sixth Circuit or the U.S. Supreme Court, and which Plaintiffs do not challenge as unconstitutional in this action—provides that "[n]o State . . . shall be required to give effect to any public act, record, or judicial proceeding of

any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State . . . or a right or claim arising from such relationship." 28 U.S.C. § 1738C. Under this federal law not challenged here, the people of Ohio have a right to define their own standard on the issue, without having Maryland's choice, for example, imposed upon them. It is rational for the State of Ohio to exercise a choice that the United States Congress has explicitly protected for the State.

The Motion offers absolutely no evidence or authority in scorning the determination made by the people of Ohio as a product of unreasoning bigotry. Its allegation that "[t]he purpose behind the Ohio provisions is to single out an unpopular group and cause them harm" is accompanied by absolutely no citation. (Doc. 3, Plaintiffs' Motion at 13). The characterization is entirely unfounded and carries no legal weight whatsoever.

And Plaintiffs' repeated citation to *Mazzolini v. Mazzolini*, 168 Ohio St. 357 (1958) does not at all bear out their contention that any marriage approved by another State must be recognized here. *See id* 3, 11. Quite to the contrary, the Ohio court said there that it was adopting "the general rule, 'that a marriage between persons of a class that the statute simply says shall not marry … is not *void in the absence of a declaration in the statute* that such marriage is void.'" 168 Ohio St. at 360 (emphasis added)(citation omitted). The Court held that because "the statutes of Ohio do not expressly declare that a first-cousin marriage is void ab initio," such marriages from other States would be recognized. *Id.* at 359 (emphasis added). By contrast, with R.C. 3101.01 and Article XV, Section 11 of the Ohio Constitution, the people of Ohio have spoken and consistent with *Mazzolini* their choice must be honored unless the people revisit the question.

Finally, Plaintiffs seem glancingly to invoke substantive due process theory, but of course a right to same-sex marriage is not "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

> **2. Plaintiffs have not shown that they will suffer irreparable harm absent a TRO regarding the death certificate.**

Mr. Arthur cannot meet his burden of establishing that the U.S. Constitution guarantees anyone the right to have his or her marital status listed on a death certificate at the time of death. Similarly, Mr. Obergefell cannot meet his burden of establishing that the U.S. Constitution guarantees anyone the right to be listed as a surviving spouse on someone else's death certificate. The harm that they allege—that an official record of Mr. Arthur's life will not record his marriage to Mr. Obergefell (Doc. 3, 14)—does not rise to the level of a constitutional one. Plaintiffs cannot prove that they will suffer irreparable constitutional harm simply because Ohio does not assign the same meaning or rules to a death certificate that they do. Absent constitutional harm, the Plaintiffs cannot succeed under 42 U.S.C. § 1983.

Even if the Plaintiffs were able to establish that anyone has a constitutional right to have marital status from another State listed on a death certificate, any harm in failing to include it is not irreparable. R.C. 3705.22 sets forth the procedure by which the information in vital records, including death certificates, can be corrected. By statute, errors or omissions in death certificates are reparable, and Plaintiffs cannot prove otherwise. This fact alone is dispositive of their request for a temporary restraining order. Equally dispositive of their request is the fact that it is for temporary relief that by law and by definition cannot bring the certainty and finality to the issue that Plaintiffs seek.

Finally, because neither the Governor nor the Attorney General is responsible for the issuance of a death certificate, Plaintiffs' asserted injury will not be redressed by enjoining and

ordering the State Defendants to do or not to do anything.  No matter what this Court orders the Governor or the Attorney General to do, what is written down on either of the Plaintiffs' death certificates will still be up to an unknown funeral director, physician, medical examiner, or coroner.  *See* R.C. 3705.16.  After it is completed it will come under the authority of the state registrar of vital statistics.  R.C. 3705.03.  Simply put, a decision favorable to the Plaintiffs that *temporarily* enjoins the State Defendants from acting in any manner with respect to Mr. Arthur's death certificate will not alter its contents.  Plaintiffs cannot establish that they will suffer irreparable harm absent a temporary restraining order when the restraining order will not prevent the asserted harm.

      **3.**      **Both the balance of harms and the public interest as determined by the people of Ohio weigh in favor of denying a TRO as to the death certificate.**

At this temporary restraining order phase, this balance of harms weighs heavily in the State's favor.  Once again, a death certificate is not Ohio's official record of marriage.  Even if it were, the harm that Plaintiffs allege is that their marital status will not be included on a State-owned record *that can be amended.*  Far weightier is the harm that will be done to Ohio's duly adopted Constitutional rule, and to the peoples' right as recognized and protected under federal statute *not* to recognize same-sex marriages performed in other states.  See, *Windsor*, 2013 U.S. LEXIS 4921, at *9, (recognizing that 28 U.S.C. § 1738C allows States to refuse to recognize same-sex marriages performed under the laws of other States).

As the Supreme Court observes:  "The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the 'protection of offspring, property interests, and the enforcement of marital responsibilities." *Id.* at *34 (internal grammar and citations omitted).  The State has substantial interests in not having its valid laws on such important matters set aside by courts, especially in a hasty TRO context.

16

*See, e.g., Summit Co. Dem. Cent. & Exec. Com. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004) ("if the plaintiffs are not correct in their view of the law, the State will be irreparably injured in its ability to execute valid laws, which are presumed constitutional … There is also a strong public interest in permitting legitimate statutory processes to operate...").

Again, subject to the constitutional rights of persons, the "'regulation of domestic relations' is "an area that has long been regarded as virtually exclusive province of the States." *Windsor*, 2013 U.S. LEXIS 4921, at *5*, quoting, *Sosna v. Iowa,* 419 U.S. 393, 404 (1975). To this end, on May 5, 2004 the Ohio General Assembly passed HB 272, which amended R.C. 3101.01(C) to declare that Ohio does not recognize same-sex marriages performed in Ohio or in any other jurisdiction. Similarly, in 2004, Ohio voters, exercising the authority over Ohio's constitution granted to them by R.C. 3519.01, initiated a petition to place Issue 1, a constitutional amendment which would prohibit recognition of same-sex marriages or civil unions, before the voters. Ohio Secretary of State, 2004 Elections Results, State Issue 1, Nov. 2, 2004, http://www.sos.state.oh.us/sos/elections/Research/electResultsMain/2004ElectionsResults/04-1102Issue1.aspx. 61.7% of Ohio's voters approved the measure. *Id.*

## CONCLUSION

The Ohio Constitution does not recognize same-sex marriages, even if authorized in another State, because Ohio voters expressly chose to enshrine traditional marriage in the Constitution less than a decade ago. Overriding the democratic process on such a fundamental issue would impose substantial harm on the State and its people. Because the harm to the State far outweighs any to the Plaintiffs, the Court should deny their motion for a temporary restraining order rewriting Ohio law.

Respectfully submitted,

MIKE DEWINE
Ohio Attorney General


/s/ *Bridget E. Coontz*
BRIDGET E. COONTZ (0072919)*
　　*Lead and Trial Counsel
KRISTOPHER J. ARMSTRONG (0077799)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
bridget.coontz@ohioattorneygeneral.gov
kristopher.armstrong@ohioattorneygeneral.gov

*Counsel for Defendants Governor John Kasich and Attorney General Mike DeWine*

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document was filed electronically on July 22, 2013. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

                                                /s/ *Bridget E. Coontz*
                                                Bridget E. Coontz (0072919)*
                                                Assistant Attorney General