UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES OBERGEFELL, *et al.* | : | Case No. 1:13-cv-501 |
| | : | |
| Plaintiffs, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| JOHN KASICH, *et al.* | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR
## A TEMPORARY RESTRAINING ORDER

This is not a complicated case. The issue is whether the State of Ohio can discriminate against same sex marriages lawfully solemnized out of state, when Ohio law has historically and unambiguously provided that the validity of a marriage is determined by whether it complies with the law of the jurisdiction where it was celebrated.

Throughout Ohio's history, Ohio law has been clear: a marriage solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. Thus, for example, under Ohio law, out-of-state marriages between first cousins are recognized by Ohio, even though Ohio law does not authorize marriages between first cousins. Likewise, under Ohio law, out of state marriages of minors are recognized by Ohio, even though Ohio law does not authorize marriages of minors.

How then can Ohio, especially given the historical status of Ohio law, single out same sex marriages as ones it will not recognize? The short answer is that Ohio cannot ...

at least not under the circumstances here.

By treating lawful same sex marriages differently than it treats lawful opposite sex marriages (*e.g.*, marriages of first cousins and marriages of minors), Ohio law, as applied to these Plaintiffs, likely violates the United States Constitution which guarantees that "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction equal protection of the laws."

The end result here and now is that the local Ohio Registrar of death certificates is hereby **ORDERED** not to accept for recording a death certificate for John Arthur that does not record Mr. Arthur's status at death as "married" and James Obergefell as his "surviving spouse."

## I. AGREED FACTS AND CIRCUMSTANCES

Less than a month ago, on June 26, 2013, the United States Supreme Court issued its historic decision in *United States v. Windsor*, __ U.S. __, 133 S.Ct. 2675 (2013). The Supreme Court held that the federal Defense of Marriage Act ("DOMA"), which denied recognition to same-sex marriages for purposes of federal law, was unconstitutional, as it denied fundamental fairness and equal protection of the law to gay citizens. While the holding in *Windsor* is ostensibly limited to a finding that the federal government cannot refuse to recognize state laws authorizing same sex marriage, the issue whether States can refuse to recognize out-of-state same sex marriages is now surely headed to the fore. Indeed, just as Justice Scalia predicted in his animated dissent, by virtue of the present lawsuit, "the state-law shoe" has now dropped in Ohio. *Windsor*, 133 S.Ct. at 77-78.

Plaintiffs James Obergefell and John Arthur are male Cincinnati residents who have been living together in a committed and intimate relationship for more than twenty years, and they were very recently legally married in the state of Maryland pursuant to the laws of Maryland recognizing same sex marriage.

Mr. Arthur is currently a hospice patient. He is dying of amyotrophic lateral sclerosis ("ALS"). ALS is a progressive disease that has caused Mr. Arthur severe and worsening muscle deterioration, has no known cure, and is fatal.

On July 11, 2013, Plaintiffs traveled to Maryland in a special jet equipped with medical equipment and a medical staff necessary to serve Mr. Arthur's needs, whereupon Plaintiffs were married in the jet as it sat on the tarmac in Anne Arundel County, Maryland. They returned to Cincinnati that same day.

Plaintiffs' marriage is legally recognized in Maryland and by the federal government by virtue of the very recent and historic decision of the United States Supreme Court in *United States v. Windsor*, __ U.S. __, 133 S.Ct. 2675 (2013). Plaintiffs' marriage is not recognized in Ohio, as legal recognition of same-sex marriages is prohibited by Ohio law enacted in 2004. *See* Ohio Rev. Code. § 3101.01(C )(2)&(3) and Ohio Constitution Art. XV, §11.

Mr. Arthur is certain to die soon. Consistent with Ohio law, his death record will list his "marital status at time of death" as "unmarried" and will not record Mr. Obergefell as the "surviving spouse."

3

## II.  PLAINTIFFS' MOTION

Plaintiffs seek an order of this Court declaring unconstitutional the Ohio laws forbidding recognition of legal same sex marriages from other states and requiring the Registrar of Ohio death certificates to record John Arthur as "married" and to record James Obergefell as his "surviving spouse" at the time of Mr. Arthur's death, which is imminent.

## III.  STANDARD OF REVIEW

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).  These four considerations are factors to be balanced, not prerequisites that must be met.  *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997), and there is no "rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief."  *Tate v. Frey*, 735 F.2d 986, 990 (6th Cir. 1984).

Plaintiffs bear the burden of demonstrating their entitlement to a preliminary injunction, and an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."

*Overstreet,* 305 F.3d at 513.  In the Sixth Circuit, "[t]he standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm[.]"  *Reid v. Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2 (N.D. Ohio Jan 26, 2011) (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).  Moreover, "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

Even if the court is not certain that a plaintiff is likely to succeed on the merits, a preliminary injunction is still appropriate where the plaintiff shows "'serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant'" or if "the merits present a sufficiently serious question to justify further investigation."  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229-30 (6th Cir. 1985) (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc*., 679 F.2d 100, 105 (6th Cir. 1982)).

## IV.  ANALYSIS

The Fourteenth Amendment to the Constitution of the United States provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.

5

Plaintiffs, a same-sex couple, are legally married in Maryland. They reside in Ohio where their marriage is not recognized as valid. They are treated differently than they would be if they were in a comparable opposite-sex marriage. By treating lawful same sex marriages differently than it treats lawful opposite sex marriages (*e.g.*, marriages of first cousins and marriages of minors), Plaintiffs assert that the Ohio laws barring recognition of out-of-state same sex marriages, enacted in 2004, violate equal protection.

Although the law has long recognized that marriage and domestic relations are matters generally left to the states, *see Ex parte Burrus*, 136 U.S. 586, 593-94 (1890), the restrictions imposed on marriage by states, however, must nonetheless comply with the Constitution. *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (statute limiting marriage to same-race couples violated equal protection and due process); *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) (statute restricting from marriage persons owing child support violated equal protection).

In *Windsor*, the Supreme Court again applied the principle of equal protection to a statute restricting marriage when it reviewed the constitutionality of the federal Defense of Marriage Act ("DOMA"), which denied recognition to same-sex marriages for purposes of federal law. This included marriages from the twelve states and District of Columbia in which same-sex couples could legally marry. The Supreme Court held that the federal law was unconstitutional because it violated equal protection and due process principles guaranteed by the Fifth Amendment. *Windsor*, 133 S. Ct. at 2675.

In reality, the decision of the United States Supreme Court in *Windsor* was not unprecedented as the Supreme Court relied upon its equal protection analysis from an earlier case, where, in 1996, the Court held that an amendment to a state constitution, ostensibly just prohibiting any special protections for gay people, in truth violated the Equal Protection Clause, under even a rational basis analysis. *Romer v. Evans*, 517 U.S. 620 (1996).

In *Romer*, the Supreme Court struck down Colorado's Amendment 2 because, the Court held, "[w]e cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id*. at 635. The Supreme Court deemed this "class legislation ... obnoxious to the prohibitions of the Fourteenth Amendment." *Id*. (quoting *Civil Rights Cases*, 109 U.S. 3, 24 (1883)).

As the Supreme Court in *Romer* held so succinctly: [Colorado law] "classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot so deem a class of persons a stranger to its laws. Amendment 2 violates the Equal Protection Clause[.]" 517 U.S. at 635-36.

As the Supreme Court explained in striking down DOMA, "[t]he avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the

7

unquestioned authority of the States." *Windsor*, 133 S. Ct. at 2693.

Similarly, in *Windsor*, the Supreme Court cited *U. S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973), for the proposition that a legislative desire to harm a politically unpopular group of people cannot justify disparate treatment of that group. *Windsor*, 133 S. Ct. at 2693. In *Moreno*, a federal statute prohibiting households containing "unrelated persons" from qualifying for food stamps was held to be in violation of the Equal Protection Clause under a rational basis analysis. The legislative purpose of the statute was to prohibit "hippies" from taking advantage of food stamps. The Supreme Court held that "the classification here … is wholly without any rational basis." *Moreno*, 413 U.S. at 538. Likewise, in *Windsor*, the Supreme Court held that the purpose of the federal DOMA was "to impose inequality, not for other reasons like governmental efficiency." 133 S. Ct. at 2694.

Under Supreme Court jurisprudence, states are free to determine conditions for valid marriages, but these restrictions must be supported by legitimate state purposes because they infringe on important liberty interests around marriage and intimate relations.

In derogation of law, the Ohio scheme has unjustifiably created two tiers of couples: (1) opposite-sex married couples legally married in other states; and (2) same-sex married couples legally married in other states. This lack of equal protection of law is fatal.

As a threshold matter, it is absolutely clear that under Ohio law, from the founding of the State through at least 2004, the validity of an opposite-sex marriage is to be determined by whether it complies with the law of the jurisdiction where it was celebrated. That is, a marriage solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. Thus the leading compendium of Ohio law states:

"Generally, a marriage solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. Thus, the validity of a common-law marriage is determined by the law of the state where it was consummated, and that of a solemnized marriage by the law of the state where it was contracted. Likewise, a marriage created in a foreign nation is valid according to that nation's laws. […] The fact that the parties to a marriage left the state to marry in order to evade Ohio's marriage laws is immaterial to the marriage's validity in Ohio." *See* 45 Ohio Jur. 3d Family Law § 11.

Longstanding Ohio law has been clear: a marriage solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. This legal approach is firmly rooted in the longstanding legal principle of "*lex loci contractus*" -- *i.e.*, the law of the place of the contracting controls. Ohio has adopted this legal approach from its inception as a State.

Thus, for example, under Ohio law, as declared by the Supreme Court of Ohio in 1958, out-of-state marriages between first cousins are recognized by Ohio, even though Ohio law does not authorize marriages between first cousins. *Mazzolini v. Mazzolini*, 155 N.E.2d 206, 208 (Ohio Sup. Ct. **1958**) (marriage of first cousins was legal in Massachusetts and therefore is legal in Ohio regardless of the Ohio statute to the contrary).

9

Likewise, under Ohio law, out-of-state marriages of minors are recognized by Ohio, even though Ohio law does not authorize marriages of minors. *See Hardin v. Davis*, 16 Ohio Supp. 19, at *22 (Com. Pl. Hamilton Co. May 18, **1945**) ("But, although first cousins cannot marry in Ohio, it has been held that if they go to another state where such marriages are allowed, marry, and return to Ohio, the marriage is legal in Ohio"); *see also Slovenian Mut. Ben. Ass'n v. Knafelj*, 173 N.E. 630, 631 (Ohio App. **1930**) ("It is true that, under the laws of Ohio, if she were his first cousin he could not marry her; but they could go to the state of Michigan, or the state of Georgia, and perhaps many other states in the United States, and intermarry, and then come right back into Ohio and the marriage would be legal"); *see also Peefer v. State*, 182 N.E. 117, 121 (Ohio App. **1931**) (where underage couples leave the state to marry in a state in which their marriage is valid and return to Ohio, the marriage cannot be set aside based on Ohio's law against marriage of underage people); *see also Courtright v. Courtright*, 1891 Ohio Misc. LEXIS 161, at *7, *aff'd without opinion*, 53 Ohio 685 (Ohio **1895**) (marriage between persons considered underage in Ohio married in a state where their marriage is legal "cannot be set aside, either because it was not contracted in accordance with the law of this state, or because the parties went out of the state for the purpose of evading the laws of this state").

Quintessentially, Plaintiffs have established a substantial likelihood that they will prevail at trial on their claim that by treating lawful same sex marriages differently than it treats lawful opposite sex marriages (*e.g.*, marriages of first cousins and marriages of

10

minors), Ohio law, as applied here, violates the United States Constitution which guarantees that "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction equal protection of the laws."

Moreover, as the United States Supreme Court found in *Windsor*, there is no legitimate state purpose served by refusing to recognize same-sex marriages celebrated in states where they are legal. Instead, as in *Windsor*, and at least on this early record here, the very purpose of the Ohio provisions, enacted in 2004, is to "impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Windsor*, 133 S.Ct. at 2639. The purpose served by treating same-sex married couples differently than opposite-sex married couples is the same improper purpose that failed in *Windsor* and in *Romer*: "to impose inequality" and to make gay citizens unequal under the law. *See Windsor*, 133 S.Ct. at 2694; s*ee Romer*, 517 U.S. at 635-36. It is beyond cavil that it is constitutionally prohibited to single out and disadvantage an unpopular group.

Even if there were proffered some attendant governmental purpose to discriminate against gay couples, other than to effect pure animus, it is difficult to imagine how it could outweigh the severe burden imposed by the ban imposed on same-sex couples legally married in other states. Families deserve the highest level of protection under the First Amendment right of association:

11

> "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for as noble a purpose as any involved in our prior decisions."

*Zablocki v. Redhail*, 434 U.S. 374, 384, (1978) (citing *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965)).  Even if the classification of same-sex couples legally married in other states is reviewed under the least demanding rational basis test, this Court on this record cannot find a rational basis for the Ohio provisions discriminating against lawful, out-of-state same sex marriages that is not related to the impermissible expression of disapproval of same-sex married couples.

Consequently, Plaintiffs have demonstrated a strong likelihood of success on the merits.

Moreover, denying Plaintiffs their associational rights under the circumstances presented here imposes irreparable harm.  Constitutional violations are routinely recognized as triggering irreparable harm unless they are promptly remedied.  *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").  As stated, rights associated with marriage are fundamental.  *Zablocki*, 434 U.S. at 374.  Thus, this Court has routinely concluded that "Plaintiffs will suffer irreparable harm if the Court does not issue the injunction because of the threatened infringement of the Plaintiffs' fundamental rights."  *See, e.g.*, *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 838 F. Supp. 1235, 1242-43 (S.D. Ohio 1993) *rev'd and vacated*, 54 F.3d 261 (6th Cir. 1995)

*cert. granted*, *judgment vacated*, 518 U.S. 1001 (1996). In fact, "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." § 11A Fed. Prac. & Proc. Civ. § 2948.1 (2d ed.).[1]

In addition to the alleged denial of Plaintiffs' constitutional rights, the Court must also consider the fact that Mr. Arthur is in hospice care and death is imminent. Without a temporary restraining order, the official record of Mr. Arthur's death, and the last official document recording his existence on earth, will incorrectly classify him as unmarried, despite his legal marriage to Mr. Obergefell. The death certificate will also incorrectly fail to record Mr. Obergefell as the "surviving spouse," which status he lawfully enjoys. Furthermore, Mr. Arthur wants to be buried in his family plot at Spring Grove Cemetery. He also wants Mr. Obergefell to be buried next to him someday. The family plot directive limits those who may be interred in the plot to descendants and married spouses. Thus, without a temporary restraining order, Mr. Arthur's burial may be delayed or his

---

[1] *See, e.g., Overstreet,* 305 F.3d at 578 (6th Cir. 2002) (a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of plaintiff's constitutional rights); *ACLU of KY v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) (if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm) (citations omitted); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3rd Cir. 1997) (denial of preliminary injunctive relief was irreparable harm to plaintiffs' voting and associational rights); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that plaintiffs may establish irreparable harm based on an alleged violation of their Fourth Amendment rights); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) (finding that a violation of privacy constitutes an irreparable harm); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (holding allegation of violation of Eighth Amendment rights sufficient showing of irreparable harm); *Doe v. Mundy*, 514 F.2d 1179 (7th Cir 1975) (denial of constitutional privacy right was irreparable harm); *Beerheide v. Zavaras*, 997 F.Supp. 1405 (D.C. Colo. 1998) (irreparable harm satisfied by allegation of deprivation of free exercise of religion).

remains may have to be exhumed when this case is finally decided. *See Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 209 F. Supp. 2d 1008, 1022 (D.S.D. 2002) (disruption of human remains can be irreparable harm).

Finally, the uncertainty around this issue during Mr. Arthur's final illness is the cause of extreme emotional hardship to the couple. Dying with an incorrect death certificate that prohibits Mr. Arthur from being buried with dignity constitutes irreparable harm. Furthermore, Mr. Arthur's harm is irreparable because his injury is present now, while he is alive. A later decision allowing an amendment to the death certificate cannot remediate the harm to Mr. Arthur, as he will have passed away.

Moreover, there is absolutely no evidence that the State of Ohio or its citizens will be harmed by the issuance of an order temporarily restraining the enforcement of these provisions against the Plaintiffs in this case. No one beyond Plaintiffs themselves will be affected by such a limited order at all. Without an injunction, however, the harm to Plaintiffs is severe. Plaintiffs are not currently accorded the same dignity and recognition as similarly situated opposite-sex couples. Moreover, upon Mr. Arthur's death, Plaintiffs' legally valid marriage will be incorrectly recorded in Ohio as not existing. Balanced against this severe and irreparable harm to Plaintiffs is the truth that there is no evidence in the record that the issuance of a preliminary injunction would cause substantial harm to the public.

And, as a final consideration, "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban*   15

14

*Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012).

Weighing all factors applicable to analyzing whether injunctive relief should issue, the Court finds that each factor supports the granting of a temporary restraining order.

### V. CONCLUSION

This Court finds that Plaintiffs have established by clear and convincing evidence their entitlement to injunctive relief. Accordingly, Plaintiffs' motion for a temporary restraining order (Doc. 3) is **GRANTED**, and a temporary restraining order shall issue by separate order, directing, *inter alia*, that the local Ohio Registrar of death certificates is hereby **ORDERED** not to accept for recording a death certificate for John Arthur which does not record his status as "married" and/or does not record James Obergefell as Mr. Arthur's "surviving spouse" at the time of Mr. Obergefell's death, which is imminent.

**IT IS SO ORDERED**.

Date: July 22, 2013   */s/ Timothy S. Black*
Timothy S. Black
United States District Judge

15