# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **JAMES OBERGEFELL, et al.,** | : | |
| | : | Case No. 1:13-cv-00501 |
| Plaintiffs, | : | |
| | : | District Judge Timothy S. Black |
| **v.** | : | |
| | : | |
| **THEODORE E. WYMYSLO, M.D.,** | : | |
| | : | |
| Defendant. | : | |

---

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR DECLARATORY AND PERMANENT INJUNCTION

---

Respectfully submitted,

MIKE DEWINE
Ohio Attorney General

/s/ *Bridget E. Coontz*

---

BRIDGET E. COONTZ (0072919)*
    *Lead and Trial Counsel
ZACHERY P. KELLER (0086930)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
bridget.coontz@ohioattorneygeneral.gov
zachery.keller@ohioattorneygeneral.gov

*Counsel for State Defendants*

i

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

"By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *United States v. Windsor*, 133 S. Ct. 2675, 2689-90 (2013).  The democratic process, not select federal courts, is best equipped to evaluate the definition of marriage.  In 2004, three million Ohio voters amended Ohio's Constitution to define "marriage" in Ohio as uniquely between a man and a woman.  Under these circumstances, the Court should decline Plaintiffs' invitation to require that certain Ohio death certificates reference same-sex marriages established in other states.

BACKGROUND ....................................................................................................2

LAW AND ARGUMENT.......................................................................................5

     I.      Binding Supreme Court precedent and federal law dispositively
           forecloses Plaintiffs' claims....................................................................5

          A.     The United States Supreme Court has determined that the
               issue of same-sex marriage does not raise a substantial
               federal question under constitutional analysis. ............................5

Binding Supreme Court precedent precludes Plaintiffs' due process and equal protection claims. *Baker v. Nelson*, 409 U.S. 810 (1972).  In *Baker*, the United States Supreme Court summarily dismissed for lack of a federal question a constitutional challenge to Minnesota's statutory definition of marriage as a union between a man and a woman.  In determining that a substantial federal question was not raised, the Court necessarily rejected the contention that Minnesota's ban on same-sex marriage violated the Equal Protection and Due Process Clauses. *Baker* remains binding and precludes equal protection and due process challenges to state laws prohibiting recognition of same-sex marriage.  *See, e.g.*, *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1303 (M.D. Fla. 2005); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1084 (D. Haw. 2012).

          B.     The Supreme Court's decision in *Windsor* re-affirmed each
               State's responsibility to define marriage in this fundamental
               regard and did not affect *Baker*.................................................8

The Supreme Court's decision in *Windsor* does not change the precedent of Baker, but instead reaffirms that defining marriage falls squarely within the province of the states.  The *Windsor* Court struck down Section 3 of DOMA, which precluded federal recognition of same sex marriage, even where a State has elected to do so.  The Court stressed that domestic relations has long been the almost exclusive responsibility of the states and the "recognition of civil marriages is central to state domestic relations law."  *Windsor*, 133 S. Ct.. 2691.

          C.     Congress, too, has expressly recognized the States'
               authority to define marriage in this regard, including the
               right to refuse to recognize out-of-state marriages. ....................9

The states' right to define their different policies with respect to same-sex marriage includes the right to determine whether or not to recognize same-sex marriages of other states.  Federal law, unchallenged here, makes this clear.  28 U.S.C.A. § 1738C.  This Court cannot accord Plaintiffs

i

the relief they seek unless the Court invalidates this controlling federal statute, which Windsor expressly left untouched. See generally *Windsor*, 133 S. Ct. 2675. Plaintiffs' decision not to challenge the federal law endorsing Ohio's right to determine its own definition of marriage requires dismissal here.

II. Even if binding Supreme Court precedent and federal statute did not compel dismissal of Plaintiffs' claims, this Court should decline to rewrite the state policy in dispute..........................................................11

Deeply rooted principles of federalism compel the conclusion that federal courts should not intrude upon Ohio citizens' choice regarding same-sex marriage policy. Courts have long recognized the states' general supremacy in determining matters of domestic law, including marriage, and federal courts have been reluctant to tread on this territory. See *Windsor*, 133 S. Ct. at 2691. Although the federal government has never taken the position that Ohio or any other state must perform same-sex marriages or recognize same-sex marriages celebrated out of state, Plaintiffs ask this Court to do just that. Such a ruling would immunize Plaintiffs' position on one side of the same-sex marriage debate from the democratic process, significantly affect Ohio law, and force Ohio to act contrary to its express public policy and the will of its citizens. Federal courts are not well-suited to delve into these fields of Ohio law and policy, particularly where Ohio's marriage laws are "the product of direct legislation by the people." *Equality Foundation of Greater Cincinnati, v. Cincinnati,* 128 F.3d 289, 298 (6th Cir. 1997).

III. Plaintiffs' claims rely on a fundamental misunderstanding of Ohio law...........................................................................................................14

Plaintiffs' claims hinge on the erroneous premise that Ohio automatically recognizes all out-of-state opposite-sex marriages. To the contrary, Ohio has always refused to recognize *any* marriage celebrated out of state that is "unalterably opposed to a well-defined public policy, or prohibited." *Mazzolini v. Mazzolini*, 168 Ohio St. 357, 358, 155 N.E.2d 206, 208 (Ohio 1958); *Peefer v. State*, 42 Ohio App. 276, 286, 182 N.E. 117, 121 (Ohio App. Ct. 1931).

IV. Because Ohio's marriage laws survive rational basis scrutiny, Plaintiffs' Equal Protection and Due Process Claims fail on the merits.............................................................................................................15

Under any form of equal protection or substantive due process analysis, Plaintiffs' claims fail because Ohio's marriage laws survive rational basis review. Where no suspect class or fundamental right is implicated, rational basis review requires a court to sustain the challenged government action where the varying treatment of different groups or persons is rationally related to a legitimate state interest. *See Sadie v. City of Cleveland*, 718 F.3d 596, 601-02 (6th Cir. 2013).

A. Rational basis is the proper level of scrutiny to apply here. .......................16

### 1. Sixth Circuit precedent requires application of rational basis scrutiny.

The Sixth Circuit has repeatedly and unambiguously ruled that classifications based on sexual orientation are subject to rational basis scrutiny. *See, e.g., Equality Foundation,* 128 F.3d 289; *Davis v. Prison Health Servs*., 679 F.3d 433, 438 (6th Cir. 2012); *Scarbrough v. Morgan Cnty. Bd. Of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006). The clear majority of circuits have reached the same conclusion.

### 2.    Plaintiffs' arguments regarding heightened scrutiny ignore binding precedent and lack support.

The Sixth Circuit has rejected any contention that sexual orientation is subject to heightened scrutiny and binding precedent requires rational basis review.

#### a.    Plaintiffs cannot prove that sexual orientation is a suspect classification.

Sexual orientation is not a suspect class in the Sixth Circuit. *See generally Equality Foundation*, 128 F.3d 289. Thus, a point-by-point review of the suspect class factors is unwarranted. In any case, Plaintiffs' submissions, which this Court need not consider, fail to substantiate a history of public discrimination by the State of Ohio. Moreover, in light of recent victories, "homosexuals have meaningful political power to protect their interests…through democratic processes" and do not "require extraordinary protection from majoritarian processes via heightened scrutiny." *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1013 (D. Nev. 2012).

#### b.    A prohibition against recognition of same-sex marriage is not a classification based on gender.

Plaintiffs' contention that Ohio's marriage laws are gender-based classifications, triggering intermediate scrutiny, also fails. It is well-established that equal protection jurisprudence treats gender and sexual orientation as distinct categories. *Compare United States v. Virginia*, 518 U.S. 515, 531 (1996) *with Romer v. Evans*, 517 U.S. 620, 632 (1996). Moreover, the laws at issue here do not favor of disfavor one sex over another. Courts have overwhelmingly rejected attempts to frame challenges to same-sex marriage restrictions as creating a gender–based classification. *See, e.g.*, *Sandoval*, 911 F. Supp. 2d at 1005; *Jackson*, 884 F. Supp. 2d at 1098.

#### c.    Same-sex marriage is not a fundamental right under Court precedent.

Plaintiffs cannot invoke heightened scrutiny by arguing that the right to same-sex marriage is embedded within the fundamental right to marry. The vast majority of courts to consider the issue have found that same-sex marriage is not a fundamental right and is not included within the fundamental right to marry. *See, e.g., Jackson*, 884 F. Supp. 2d at 1094-98; *Wilson*, 354 F. Supp. 2d at 1306-07. This Court should not expand—and redefine—the traditional right to marry to include same-sex marriage. A fundamental right "must be 'objectively, deeply rooted in Nation's history and tradition, and implicit in the concept of ordered liberty.'" *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 601 (6th Cir. 2013) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). The possibility of same-sex marriage is a recent development in our nation's history and is not deeply rooted in history and tradition.

#### d.    Ohio's marriage laws do not exclude same-sex couples from the political process.

Plaintiffs' assertion that Ohio's marriage laws exclude same-sex couples from the political process is unpersuasive. The political process doctrine impacts situations "when the majority has not only won, but has rigged the game to reproduce its success indefinitely." *Coal. to Defend*

iii

*Affirmative Action v. Regents of the Univ. of Mich.*, 701 F.3d 466, 475 (6th Cir. 2012).  Through Ohio's initiative process, proponents of traditional marriage passed a constitutional amendment.  Advocates of same-sex marriage may use the same process in the same way.

B.   **Applying rational basis review, the Court must exercise judicial restraint in considering Ohio's marriage laws and may not guess at some collective motivation of Ohio voters.** .........................................................................................**28**

1.   **The Court cannot speculate as to the differing motivations of Ohio voters or legislators in supporting Ohio's same-sex marriage laws.**

Where, as here, the law in question is a direct result of an electoral vote, a reviewing court cannot even inquire into the actual motivations of the electorate in adopting a measure via initiative or referendum.  *Equality Foundation*, 128 F.3d at 294 n.4.  Similarly, the Court cannot inquire into the motivations of lawmakers.  *FCC v. Beach Comm's, Inc.*, 508 U.S. 307, 315 (1993).  Rather, rational basis review requires the Court to consider all potential justifications.

2.   **Rational basis review requires the Court to defer greatly to Ohio's marriage laws.**

Rational basis review is "a paradigm of judicial restraint."  *Beach*, 508 U.S. at 314.  A "strong presumption of validity" attaches to the law being challenged.  *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013).  Rational basis review does not permit a court "to judge the wisdom, fairness, or logic of legislative choices."  *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 505-06 (6th Cir. 2007).  Judicial restraint ensures that the democratic process will find the correct result, not the court, as contemplated by the Constitution.  *Spurlock v. Fox*, 716 F.3d 383, 402 (6th Cir. 2013).

3.   **Under rational basis review, Plaintiffs bear the burden of negating every conceivable basis that might support Ohio's marriage laws.**

Under rational basis review, a law "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *Spurlock*, 716 F.3d at 402.  If Ohio's marriage laws can "be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny."  *Am. Exp. Travel*, 641 F.3d 685, 690 (2011).  Plaintiffs bear the burden "to negative every conceivable basis which might support it."  *Heller v. Doe*, 509 U.S. 312, 320 (1993).  It is not enough for Plaintiffs to simply submit evidence detracting from potential justifications for Ohio's marriage laws.  Instead, the Court must accept any "rational speculation" and even imperfect "generalizations."  *Id*. at 320-21.

C.   **Plaintiffs have failed in their legal burden of negating "every conceivable basis" for Ohio's preservation of traditional marriage, and Ohio's marriage laws therefore satisfy rational basis review.** ............................................................................................**33**

1.   **Ohio's marriage laws are rationally related to several conceivable, and legitimate, justifications.**

There are a number of conceivable legitimate reasons why lawmakers and voters passed Ohio's marriage laws.  The broad majority of federal courts to address the issue have concluded that States' decisions regarding treatment of same-sex marriage survive rational basis review.  *See, e.g.*, *Sandoval*, 911 F. Supp. 2d 996; *Jackson*, 884 F. Supp. 2d 1065.  Finally, Plaintiffs requested determination that a state cannot adopt the traditional definition of marriage for the purposes of its own law lacks support. "[I]n the nearly one hundred and fifty years since the Fourteenth Amendment was adopted, . . . no Justice of the Supreme Court has suggested that a state statute or constitutional provision codifying the traditional definition of marriage violates the Equal Protection Clause or any other provision of the United States Constitution." *Bruning*, 455 F.3d at 870.  This Court should similarly refrain from reaching this unjustified conclusion.

> **2. Plaintiffs' sweeping and unjustified allegations of improper purpose and effect do not  negate the rational bases for Ohio's marriage laws.**

Plaintiffs' unsubstantiated and erroneous allegation that Ohio's decision not to recognize out-of-state same-sex marriages has "the primary purpose and effect" of harming same-sex couples cannot negate the numerous rational bases that support that decision.  Ohio's marriage laws do not fit the mold of the "unusual character" analysis the Court focused on in *Windsor* because Ohio's marriage laws reflect no departure from Ohio's traditional practices. Rather, Ohio's legislators and citizens exercised the States' traditional authority—codified in Section 2 of DOMA—to define marriage for the purposes of State law and to refuse to recognize marriages expressly prohibited by Ohio law and public policy.  Nor do Ohio's marriage laws withdraw any rights Ohio has previously granted.

> IV.   The Court should respect the will of Ohio voters and exercise judicial restraint. ...............................................................................................................42

Ultimately, the issue before the court, and in this Nation, involves two debates.  The first is an ongoing debate about the proper definition of marriage.  The second debate involves whether to cut short the first and relates to who gets to decide.  The answer to both is that in the main, determinations regarding "the definition and regulation of marriage" are within the "authority and realm of the separate states." *Windsor*, 133 S.Ct. at 2689-90.  Given the importance of respecting the right of the Ohio people to define marriage and the complex and delicate nature of this inquiry into the definition of marriage, judicial restraint is vital to the Court's decision.  The Court should not "short-circuit" ongoing Ohio debate over the proper definition of marriage. *Jackson v. Abercrombie*, 884 F. Supp.2d 1065, 1118 (D. Haw. 2012).

> V.   CONCLUSION.....................................................................................................46

# TABLE OF AUTHORITIES

## Cases

*Am. Exp. Travel*,
   641 F.3d 685 (6th Cir. 2011) ........................................................................... 41, 43

*Ambris v. City of Cleveland*,
   No. 1:12CV774, 2012 WL 5874367 (N.D. Ohio Nov. 19, 2012) ......................... 34

*Andersen v. King Cnty.*,
   158 Wash. 2d 1 (Wash. 2006) ............................................................................ 52

*Arthur v. City of Toledo*,
   782 F.2d 565 (6th Cir.1986) ............................................................................... 40

*Bailey v. Callaghan*,
   715 F.3d 956 (6th Cir. 2013) ........................................................................ 41, 42

*Baker v. Nelson*,
   409 U.S. 810 (1972).................................................................................... passim

*Bassett v. Snyder*,
   No. 12–10038, 2013 WL 3285111 (E.D. Mich., June 28, 2013)........................... 31

*Califano v. Westcott*,
   443 U.S. 76 (1979)............................................................................................ 35

*Citizens for Equal Protection v. Bruning*,
   455 F.3d 859(8th Cir. 2006) ...................................................... 24, 29, 39, 52

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)..................................................................................... 42, 55

*Conaway v. Deane*,
   932 A.2d 571(Md. App. 2007)........................................................................... 36

*Defend Affirmative Action v. Regents of the Univ. of Mich.*,
   701 F.3d 466 (6th Cir. 2012) ............................................................................. 39

*Dixon v. Univ. of Toledo*,
   702 F.3d 269 (6th Cir. 2012) ............................................................................. 27

*Doe v. Michigan Dept. of State Police*,
   490 F.3d 491(6th Cir. 2007) ............................................................................. 42

*Equality Foundation of Greater Cincinnati, et al. v. City of Cincinnati*,
   128 F.3d 289(6th Cir. 1997) .................................................................... passim

*ESJ Properties, LLC v. City of Toledo,*
    698 F.3d 845 (6th Cir. 2012) ........................................................ 36, 37

*F.C.C. v. Beach Comm'n, Inc.,*
    508 U.S. 307 (1993).......................................................................... 41

*Grinter v. Knight,*
    532 F.3d 567 (6th Cir. 2008) ............................................................. 38

*Hernandez v. Robles,*
    7 N.Y.3d 338(N.Y. 2006) ........................................................... passim

*Hicks v. Miranda,*
    422 U.S. 332 (1975)........................................................................... 18

*In re Kandu,*
    315 B.R. 123 (Bkrtcy. W.D. Wash 2004)....................................... 39, 52

*In re Stiles Estate,*
    59 Ohio St.2d 73, 391 N.E.2d 1026 (Ohio 1979) ................................ 26

*Jackson v. Abercrombie,*
    884 F. Supp. 2d 1065, 10845 (D. Haw. 2012) ............................. passim

*James v. Valtierra,*
    402 U.S. 137 (1971).......................................................................... 41

*Johnson v. Johnson,*
    385 F.3d 503 (5th Cir. 2004) ............................................................. 29

*Lee v. Pauldine,*
    No. 1:12–cv–077, 2013 WL 65111, (S.D. Ohio Jan. 4, 2013) ............. 29

*Loesel v. City of Frankenmuth,*
    692 F.3d 452 (6th Cir. 2012) ............................................................. 43

*Lofton v. Sec'y of Dept. of Children & Family Servs.,*
    358 F.3d 804 (11th Cir. 2004) .......................................................... 29

*Loving v. Virginia,*
    388 U.S. 1 (1967)................................................................... 35, 36, 38

*Massachusetts v. United States Dep't of Health & Human Servs.,*
    682 F.3d 1 (5th Cir. 2012) ................................................................. 18

*Mazzolini v. Mazzolini,*
    168 Ohio St. 357, 155 N.E.2d 206 (Ohio 1958) ...................... 26, 27, 46

*Midkiff v. Adams Cnty. Reg'l Water Dist.*,
    409 F.3d 758 (6th Cir. 2005) ............................................... 37

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) ........................................................ 35

*Morrison v. Sadle*,
    821 N.E.2d 15 (Ind. App. 2005) ........................................ 52

*Nabozny v. Podlesny*,
    92 F.3d 446 (7th Cir. 1996) ............................................. 30

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932) ........................................................ 47

*Ohio ex rel. Eaton v Price*,
    360 U.S. 246 (1959) ........................................................ 18

*Padula v. Webster*,
    822 F.2d 97 (D.C. Cir. 1987) ........................................... 30

*Peefer v. State*,
    42 Ohio App. 276, 182 N.E. 117 (Ohio App. Ct. 1931) ......... 26, 27

*Price-Cornelison v. Brooks*,
    524 F.3d 1103 (10th Cir. 2008) ....................................... 29

*Romer v. Evans*,
    517 U.S. 620 (1996) ........................................... 34, 40, 53, 54

*Sadie v. City of Cleveland*,
    718 F.3d 596 (6th Cir. 2013) ........................................... 28

*Scarbrough v. Morgan Cnty. Bd. of Educ.*,
    470 F.3d 250 (6th Cir. 2006) ...................................... 28, 30

*Seger v. Kentucky High School Athletic Ass'n*,
    453 F. App'x 630 (6th Cir. 2011) ..................................... 43

*Sevcik v. Sandoval*,
    911 F. Supp. 2d 996 (D. Nev. 2012) ................................ 33

*Spurlock v. Fox*,
    716 F.3d 383 (6th Cir. 2013) ...................................... 42, 43

*Standhardt v. Superior Court ex rel. Cnty. of Maricopa*,
    206 Ariz. 276 (Ariz. App. 2003) ...................................... 52

*Stanton v. Stanton*,
421 U.S. 7 (1975) ............................................................................... 35

*TriHealth, Inc. v. Board of Comm'rs, Hamilton Cnty., Ohio*,
430 F.3d 783 (6th Cir. 2005) ............................................................ 44

*U.S. Citizens Ass'n v. Sebelius*,
705 F.3d 588 (6th Cir. 2013) ............................................................ 37

*United States v. Virginia*,
518 U.S. 515(1996) ........................................................................... 34

*United States v. Windsor*,
133 S. Ct. 2675(2013) ................................................................. passim

*Vance v. Bradley*,
440 U.S. 93 (1979) ............................................................................ 42

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) ............................................................ 29

*Washington v. Glucksberg*,
521 U.S. 702 (1997) .......................................................................... 37

*Washington v. Seattle School District No. 1*,
458 U.S. 457 (1982) .......................................................................... 41

*Williams v. North Carolina*,
317 U.S. 287(1942) ........................................................................... 25

*Wilson v. Ake*,
354 F. Supp. 2d 1298 (M.D. Fla. 2005) ...................................... passim

*Woodward v. United States*,
871 F.2d 1068 (Fed. Cir. 1989) ........................................................ 30

## **Statutes**

28 U.S.C. § 1738C ........................................................... 13, 22, 24, 47

O.R.C. § 3101.01(C) .............................................................. 14, 15, 54

O.R.C. § 3101.01(C)(3) ................................................................... 15

## **Other Authorities**

Ohio Const., Article XV § 11 .......................................... 13, 15, 25, 54

ix

## <u>INTRODUCTION</u>

"By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States." *United States v. Windsor*, 133 S. Ct. 2675, 2689-90 (2013). In 2004, three million Ohio voters exercised this authority and amended Ohio's Constitution to adopt Article XV § 11, which defines "marriage" in Ohio as uniquely between a man and a woman. In preserving the traditional definition of marriage, Ohio's law is consistent not only with the history of the institution nationally and across the world, but with the law of most States today.

The definition of marriage recently has been and is today the subject of vigorous debate and exchange that our democratic system is fully equipped to handle. The basic nature of this fundamental institution should be established by the people of Ohio and not by select federal Judges: Our federal Constitution leaves this sort of evaluation with the people, and the determination of Ohio's voters should not be ignored.

The fact that the definition of "marriage" in Ohio and in most other states differs from the definition adopted by Maryland and Delaware does not raise an issue of constitutional import. Rather, this variation is the natural by-product of a well-established principle of federalism explicitly protected by federal statute, *see* 28 U.S.C. § 1738C, and recently acknowledged again by the United States Supreme Court in observing that the "recognition of civil marriage is central to state domestic relations law applicable to its residents and citizens." *Windsor*, 133 S. Ct. at 2691. "In order to respect this principle, the federal courts, as a general rule, do not adjudicate issues of marital status even where there might otherwise be a basis for federal jurisdiction." *Id.*

Indeed, the very premise of *Windsor* in mandating federal recognition of State marriage law is that the fundamental concept of what constitutes marriage is a matter quintessentially appropriate for determination by the States. The request that this Court ignore the will of the

Ohio voters, and short-circuit the democratic discussion and determination at issue here, flies in the face of firmly entrenched principles of federalism and legal precedent. In fact, Plaintiffs' brief appears to recognize that the relief sought here, which would require by judicial fiat that certain Ohio death certificates reference same-sex marriages from other jurisdictions, cannot be squared with the binding law of this Circuit. Plaintiffs disregard controlling Supreme Court and Sixth Circuit precedent and hold the marriage definition as ratified by Ohio voters to impermissibly strict scrutiny. The Court should decline such invitation as contrary both to precedent and to the will of the people as expressed through the democratic process.

## BACKGROUND

This case challenges Ohio's authority, with regard to death certificates issued by the State, to define the fundamental concept of marriage within its borders. In 2004, Ohio's lawmakers and citizens took steps to preserve Ohio's definition of marriage. This included the passage of Ohio's Defense of Marriage Act ("the Act"), codified at Ohio Rev. Code § 3101.01(C). The Act provides in part:

> (C)(1) Any marriage between persons of the same sex is against the strong public policy of this state. Any marriage between persons of the same sex shall have no legal force or effect in this state and, if attempted to be entered into in this state, is void ab initio and shall not be recognized by this state.
>
> (2) Any marriage entered into by persons of the same sex in any other jurisdiction shall be considered and treated in all respects as having no legal force or effect in this state and shall not be recognized by this state.
>
> (3) The recognition or extension by the state of the specific statutory benefits of a legal marriage to nonmarital relationships between persons of the same sex or different sexes is against the strong public policy of this state. Any public act, record, or judicial proceeding of this state . . . that extends the specific statutory benefits of legal marriage to nonmarital relationships between persons of the same sex or different sexes is void ab initio. . . .

2

Ohio Rev. Code § 3101.01(C). The Act disavows any intent to prohibit extension of non-marital benefits to same-sex relationships or to affect private agreements. Ohio Rev. Code § 3101.01(C)(3).

On February 6, 2004, after the Act passed both the Ohio House of Representatives and Senate, Governor Robert Taft signed it into law. In doing so, Governor Taft emphasized that the purpose of the law was not to discriminate against any Ohio citizens, but "to reaffirm existing Ohio law with respect to our most basic, rooted, and time-honored institution: marriage between a man and a woman." (*See* Becker Ex. G, Doc. No. 41-8.)

Following passage of the Act, Ohio's citizens opted to amend the Ohio Constitution to include a definition of marriage as being exclusively between a man and a woman. Put to the voters on November 4, 2004, Article XV § 11 of the Ohio Constitution passed with over three million votes, by a margin of sixty-one percent in favor of the amendment and only thirty-eight percent against. "State Issue 1: November 2, 2004," Ohio Secretary of State, *available at* http://www.sos.state.oh.us/sos/elections/Research/electResultsMain/2004ElectionsResults/04-1102Issue1.aspx (last visited Nov. 18, 2013).

Article XV § 11 of the Ohio Constitution now reflects the will of these three million votes. It states:

> Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage.

Ohio Const. Art. XV § 11. It is that sovereign will of the voters, as applied to Ohio death certificates, which Plaintiffs seek to overturn in this case.

3

Plaintiffs James Obergefell and John Arthur, a same-sex couple married under the laws of Maryland, sued challenging Ohio's failure to "recognize" their marriage on Mr. Arthur's death certificate. (*See generally* Compl., Doc. No. 1.) When they filed this lawsuit, Mr. Arthur suffered from amyotrophic lateral sclerosis ("ALS") and was in hospice care. (*Id.* at ¶¶ 9-10.) Contemplating the need for a death certificate, Plaintiffs Arthur and Obergefell sought temporary relief, which this Court granted. (Order, Doc. No. 13.) Sadly, Mr. Arthur has since passed away. Pursuant to this Court's order, his death certificate was issued to reflect his Maryland marriage to Obergefell. (Doc. No. 52-3.)

Plaintiff David Brian Michener joined this action in September 2013, after the unexpected death of William Ives, the man to whom Mr. Michener was married under the laws of Delaware. (Am. Compl., Doc. No. 24.) Relying on arguments previously made, Mr. Michener's request for a temporary order that Mr. Ives' death certificate reflect their Delaware marriage was granted. (Order, Doc. No. 23.) Mr. Ives' death certificate has since been issued pursuant to this Court's order. (Doc. No. 52-4.)

Plaintiff Robert Grunn, an Ohio funeral director, entered this case seeking a declaration that he may report the same-sex marriages of any future un-identified client on Ohio death certificates.[1] (Second Am. Compl. ¶ VII.B, Doc. No. 33.) Although not requested in the Second Amended Complaint (*see id.*), he also now seeks an injunction prohibiting enforcement of

---

[1] For the reasons detailed in Defendant's Motion to Dismiss (Doc. No. 38), Dr. Wymyslo reiterates that Mr. Grunn should be dismissed from this lawsuit entirely. This Court agreed that Mr. Grunn failed to state a claim on his own behalf, but it permitted him to pursue the rights of future same-sex clients married in jurisdictions recognizing same-sex marriage. Dr. Wymyslo respectfully disagrees with and preserves his objections to this Court's decision to permit Mr. Grunn to remain in this lawsuit in any capacity. Because the Court has ruled on this issue, however, Dr. Wymyslo does not repeat those arguments in this brief other than through this restatement by reference.

Ohio's marriage laws as they may be applied to him during the course of his service to un-identified future clients. (*See* Pls.' Proposed Order 2-3, Doc. No. 53-2.)

Finally, although this entire case is an *as applied* challenge (Pls.' Mem. Supp. 1, Doc. No. 53-1) premised upon facts surrounding the issuance of death certificates, Plaintiffs collectively seek something broader. As phrased, the relief they seek — albeit cabined to death certificates in the context of people whose same-sex marriages are authorized by other jurisdictions — does not apply against only those issuing death certificates, rather it merely "includes such officials". (*Id.* at 50.) Their request should be denied. Ohio's popularly enacted marriage laws are constitutional, and the Court should deny the declaratory judgment and any form of injunctive relief.

## LAW AND ARGUMENT

### I.      Binding Supreme Court precedent and federal law dispositively forecloses Plaintiffs' claims.

#### A.      The United States Supreme Court has determined that the issue of same-sex marriage does not raise a substantial federal question under constitutional analysis.

As a threshold matter, binding Supreme Court precedent precludes Plaintiffs' due process and equal protection claims here. In *Baker v. Nelson*, 409 U.S. 810 (1972), the United States Supreme Court summarily dismissed for lack of a federal question an appeal of the Minnesota Supreme Court's decision upholding Minnesota's statutory definition of "marriage" as being a union between a man and a woman. *Id.* The appeal expressly placed before the Court the issues of whether (1) Minnesota's "refusal to sanctify appellants' [same-sex] marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment"; and (2) Minnesota's "refusal, pursuant to Minnesota marriage statutes,

to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment." *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 10845 (D. Haw. 2012) (quoting *Baker v. Nelson*, Jurisdictional Stmt., No. 71-1027, at 3 (Feb. 11, 1971)). The Supreme Court dismissed the case "for want of a substantial federal question." *Baker*, 409 U.S. at 810.

*Baker*'s dismissal governs today. "A dismissal for lack of a substantial federal question constitutes an adjudication on the merits that is binding on lower federal courts." *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1303 (M.D. Fla. 2005) (citing *Hicks v. Miranda*, 422 U.S. 332, 344 (1975)); *see also Ohio ex rel. Eaton v Price*, 360 U.S. 246, 247 (1959) ("Votes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case . . . ."). "The precedential value of a dismissal for want of a substantial federal question extends beyond the facts of the particular case *to all similar cases."* *Jackson*, 884 F. Supp. 2d at 1087 (emphasis in original) (citations and internal quotations omitted). Thus, *Baker* is binding precedent unless the Supreme Court overturns it. *Massachusetts v. United States Dep't of Health & Human Servs.*, 682 F.3d 1, 8 (5th Cir. 2012) (citing *Hicks*, 422 U.S. at 334).

*Baker* means that Plaintiffs' claims here fail. Like the appellants in *Baker*, Plaintiffs challenge marriage laws prohibiting same-sex marriage as violating the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. *See Baker v. Nelson*, 291 Minn. 310 (1971); (Second Am. Compl. ¶ 50).

In determining that these issues did not raise a substantial federal question, the Court necessarily rejected the plaintiffs' contention that Minnesota's ban on same-sex marriage violated the Equal Protection and Due Process Clauses of the Constitution. This Court is thus

bound by *Baker* to find that no substantial federal question exists to be answered here: this case should be dismissed on that basis.  Ohio's marriage provisions are constitutional and can be applied in the context of couples married under the laws of other jurisdictions that have made different policy determinations.

Other courts have similarly concluded that *Baker* precludes equal protection and due process challenges to state laws prohibiting recognition of same-sex marriage.  In *Wilson*, for example, the federal District Court for the Middle District of Florida concluded that *Baker* disposed of plaintiffs' claims that Florida's refusal to recognize their out-of-state same-sex marriage violated their equal protection and due process rights.  354 F. Supp. 2d at 1301-02. According to the court, *Baker* "addressed the same issues presented in this action and this Court is bound to follow the Supreme Court's decision."  *Id.* at 1304-05.  The court rejected the plaintiffs' argument that subsequent Supreme Court decisions had altered the "dispositive effect of *Baker*."  *Id.* at 1305.  After examining and rejecting the plaintiffs' reliance on the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003) as purportedly contrary authority, the court concluded "[t]he Supreme Court has not explicitly or implicitly overturned its holding in *Baker* or provided the lower courts, including this Court, with any reason to believe that the holding is invalid today."  *Id*.  The court thus dismissed the plaintiffs' challenge to Florida's marriage laws.

Similarly, in *Jackson*, the court thoroughly examined *Baker*, as well as the Supreme Court's more recent precedent, to determine that *Baker* foreclosed the plaintiffs' challenge to Hawaii's marriage laws limiting marriage to unions between a man and a woman.  884 F. Supp. 2d at 1084-1088.  After concluding that *Baker* remained valid precedent in the wake of subsequent Supreme Court decisions, including *Lawrence* and *Romer*, the court ruled that *Baker*

"necessarily decided that a state law defining marriage as a union between a man and a woman does not violate the Equal Protection Clause." *Id.* at 1088. Because "*Baker* is the last word from the Supreme Court regarding the constitutionality of a state law limiting marriages to opposite-sex couples" it "remains binding . . . ." *Id. Baker* foreclosed the plaintiffs' challenge, as it does in this case.

### B.   The Supreme Court's decision in *Windsor* re-affirmed each State's responsibility to define marriage in this fundamental regard and did not affect *Baker*.

The Supreme Court's decision in *Windsor* does not undermine the precedential effect of *Baker*. To the contrary, *Windsor* only reaffirms that the task of defining marriage falls squarely within the province of the States.

*Windsor* considered the constitutionality of Section 3 of DOMA, which imposed federal definitions of "marriage" and "spouse" that precluded the federal government from recognizing same-sex marriage, even where a State has elected to do so. The Court struck down this provision because it represented an "unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage." *Windsor*, 133 S. Ct. at 2692. The Court stressed that, subject to constitutional guarantees, "regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States." *Id.* at 2691 (citation omitted). This "allocation of authority" stems from the fact that "recognition of civil marriages is central to state domestic relations law applicable to its residents and citizens." *Id.* Indeed, as the Court emphasized, "[t]he definition of marriage is the foundation of the State's broader authority…with respect to the protection of offspring, property interests, and the enforcement of marital responsibilities." *Id.* (citations and internal quotation marks omitted).

*Windsor* is thus deeply rooted in federalism: the "unquestioned authority of the [s]tates" to regulate in the area of marriage that led the *Windsor* Court to rule as it did. *Id.* at 2693.

Simply put, the Court concluded that in passing Section 3 of DOMA the federal government unnecessarily waded into waters that it would historically not tread. That is, until DOMA was passed, "the Federal Government, through our history, [would] defer[] to state-law policy decisions with respect to domestic relations." *Id*. at 2691; *see also Bond v. United States,* 131 S. Ct. 2355, 2366 (2011) ("Impermissible interference with state sovereignty is not within the enumerated powers of the National Government, and action that exceeds the National Government's enumerated powers undermines the sovereign interests of States.") (internal citation omitted). Because Section 3 of DOMA represented a deviation from that firmly entrenched precedent and an abrogation of the "unquestioned authority of the States," *Windsor* S. Ct. at 2693, the Court deemed the provision unconstitutional.

But what *Windsor* did – re-affirm the States' right to define the basic nature of marriage – is just as important as what it did not do – and that is take that right away. *See Pedersen v Office of Personnel Mgmt.,* 881 F. Supp. 2d 294, 307 (D.C. Conn. 2012) (that "DOMA impacts federal benefits and obligations, but does not prohibit a state from authorizing or forbidding same-sex marriages, as was the case in *Baker*"). After *Windsor,* each State retains the sovereign responsibility to define marriage. *Windsor* in no way disturbs *Baker's* conclusion that adopting the traditional definition of marriage presents a matter solely of state law.

### C.    Congress, too, has expressly recognized the States' authority to define marriage in this regard, including the right to refuse to recognize out-of-state marriages.

The States' role to define their different policies with respect to same-sex marriage includes the authority to determine whether or not to recognize same-sex marriages that take place in other states. Federal law, unchallenged here, makes this point clear. Section 2 of the federal DOMA provides:

> *No State*, territory, or possession of the United States, or Indian tribe, *shall be required to give effect to any public act*, record, or judicial proceeding *of any other State*, territory, possession, or tribe *respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State*, territory, possession, or tribe, or a right or claim arising from such relationship.

28 U.S.C. § 1738C (emphasis added).   That is the law of the land, and Plaintiffs here have not sought to challenge it.  But this Court cannot accord Plaintiffs the relief they seek unless the Court somehow invalidates this controlling federal statute – something the Court should not do *sua sponte,* and with the federal government unrepresented.  Plaintiffs' brief fails to address this insurmountable hurdle in any way.

*Windsor* left this provision of DOMA untouched.  *See Windsor*, 133 S. Ct. at 2682-83. Indeed, *Windsor* acknowledged that States' separate authority to define marriage means that "[m]arriage laws vary in some respects from State to State."   *Id.* at 2691.  To hold otherwise would improperly allow one state to impose its definition of "marriage" upon another, in direct contravention of the individual States' deeply rooted authority to define and regulate marriage. *Id.* ("The significance of state responsibilities for the definition and regulation of marriage dates to the Nation's beginning . . . ."); *see also id*. at 2697 (Roberts, C.J., dissenting) ("There is no departure [from the allocation of responsibilities between the State and Federal Governments] when one State adopts or keeps a definition of marriage that differs from that of its neighbor, for it is entirely expected that state definitions would 'vary, subject to constitutional guarantees, from one State to the next."); *Wilson,* 354 F. Supp. 2d at 1304 (rejecting the plaintiffs' attempt to apply Full Faith and Credit Clause to require Florida to recognize their Massachusetts marriage in violation of Florida's statute banning same-sex marriage as an improper "license for a single State to create national policy").

Indeed, Plaintiffs' own purported expert acknowledges the historical precedent for such variation when discussing the failure of efforts to create uniform marriage laws across the country. (*See* Grossman Decl. ¶¶ 21-25*,* Doc. No. 44-1.) Implicit in this recognition is that each State has, and has always had, the right to define marriage within its borders.

In short, *Baker*'s holding that a State's decision regarding whether to recognize same-sex marriage presents no substantial federal question — and thus necessarily no constitutional violations — remains in full force today. This Court must therefore dismiss Plaintiffs' claims for lack of a substantial federal question pursuant to that Supreme Court adjudication on the merits. Moreover, Plaintiffs' decision not to challenge the federal law endorsing Ohio's right to determine its own definition of marriage itself requires dismissal here. Plaintiffs do not contest the constitutionality of Section 2 of DOMA, and because this Court cannot grant the relief they seek without invalidating the federal law that explicitly preserves Ohio's policy not to recognize same-sex out-of-state marriages, the relief Plaintiffs seek is not available to them.

## II. Even if binding Supreme Court precedent and federal statute did not compel dismissal of Plaintiffs' claims, this Court should decline to rewrite the state policy in dispute.

Even absent *Baker's* binding dictate, deeply rooted principles of federalism compel the conclusion that federal courts have no basis for forcing Ohio to immediately and fundamentally re-shape its laws in an area that "has long been regarded as a virtually exclusive province of the States." *Windsor*, 133 S. Ct. at 2691 (citation omitted).

As explained above, the Supreme Court's recent decision in *Windsor* reaffirmed and relied on these tenets to reject the federal government's intrusion into the area of defining marriage. But *Windsor*'s focus on the States' role in matters related to marriage is far from novel. Rather, courts have long recognized the States' general supremacy in determining matters of domestic law, including marriage. Not surprisingly, federal courts have been reluctant to

tread on this territory.  As Justice Alito observed in his dissent in *Windsor*, "the Constitution simply does not speak to the issue of same-sex marriage."  *Id.* at 2715.  "The silence of the Constitution on this question should be enough to end the matter as far as the judiciary is concerned."  *Id.* at 2718.

Perhaps recognizing this point, the federal government has—tellingly—never taken the position that Ohio, or any other state, must permit same-sex marriages.  Nor has it argued that States must recognize same-sex marriages celebrated out of state, as Plaintiffs urge this Court to immediately do in the death certificate context presented here.  To the contrary, as just discussed, *Congress* has expressly acknowledged and *codified* the States' discretion to refuse to recognize same-sex marriages performed in other states.  28 U.S.C. § 1738C.  Thus there is no authority or justification supporting the federal government's right to intervene in the States' decision-making process with respect to same-sex marriage.

Yet that is precisely what Plaintiffs ask this Court to do.  They invite the Court to force Ohio to act — immediately — contrary to the express public policy of the state, state law, the state Constitution, and the expressed will of the people.  They seek to force the will of one side of the debate over same-sex marriage upon the other rather than allow it to be determined through the democratic process.  Simply put, Plaintiffs ask to immunize their position from the democratic process rather than allow Ohio to shape a marriage policy with which they may not agree.

But doing so has significant implications in Ohio law, and the State, not the court system, is in the best position to consider and decide those issues.  "The package of government benefits and restrictions that accompany the institution of formal marriage serve a variety of other purposes."  *Citizens for Equal Protection v. Bruning,* 455 F.3d 859, 868 (8th Cir. 2006).  Indeed,

in Ohio the definition of marriage implicates hundreds of different laws across a broad spectrum of issues, including but not limited to matters related to insurance, mortgages, guardianship of children, and real property. As the *Windsor* Court recognized, "[t]he definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of offspring, property interests, and the enforcement of marital responsibilities.'" 133 S. Ct. at 2691 (quoting *Williams v. North Carolina*, 317 U.S. 287, 298 (1942)).

The federal courts are not well suited to delve into these fields of Ohio law and policy. This is particularly true where federal intervention would contravene the will of more than three million voters. Ohio's marriage laws are "the product of direct legislation by the people . . . that occupies a special posture in this nation's constitutional tradition and jurisprudence." *Equality Foundation of Greater Cincinnati, et al. v. City of Cincinnati,* 128 F.3d 289, 297 (6th Cir. 1997). Such an "expression of the popular will expressed by majority plebiscite . . . must not be cavalierly disregarded." *Id.* (quoting *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 679 (1976)). It is a "proper exercise of [Ohio's] sovereign authority within our federal system, all in the way that the Framers of the Constitution intended." *Windsor*, 133 S. Ct. at 2692. "The dynamics of state government in the federal system are to allow the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other." *Id.*

Ohio formed that consensus in 2004 with the passage of Ohio's marriage amendment. That it is the opposite of the consensus reached by the state of New York and discussed in *Windsor* is of no consequence here. Like New York's law, Article XV § 11 is "the initiative of those who [sought] a voice in shaping the destiny of their own times." *Id.* (quoting *Bond*, 131 S.

13

Ct. at 2359). And it is "without doubt a proper exercise of [Ohio's] sovereign authority within our federal system." *Id.* The federal courts should not intrude upon and cast aside Ohio citizens' choice regarding the State's policies with respect to same-sex marriage.

### III. Plaintiffs' claims rely on a fundamental misunderstanding of Ohio law.

Plaintiffs' claims in this case hinge on the erroneous premise that Ohio automatically recognizes all out-of-state opposite-sex marriages. (*See, e.g.*, Pls.' Mem. Supp. 1) ("[M]arriages of opposite-sex couples who have been married in other jurisdictions are recognized in Ohio whether or not their marriage would have been permitted in Ohio in the first place . . . ."). To the contrary, as even the cases Plaintiffs cite make clear, Ohio has always refused to recognize *any* marriage celebrated out of state that is "unalterably opposed to a well-defined public policy, or prohibited." *Mazzolini v. Mazzolini*, 168 Ohio St. 357, 358, 155 N.E.2d 206, 208 (Ohio 1958) (finding no cause for annulment existed because marriages between cousins were not not void ab initio under Ohio law); *Peefer v. State*, 42 Ohio App. 276, 286-287, 182 N.E. 117, 121 (Ohio App. Ct. 1931) (stressing that "[i]t is well established in this state that a marriage valid where made is valid here *unless expressly prohibited by law*," and rejecting challenge to a marriage involving minor "over the common law age" beneath which a marriage — including an out-of-state marriage — would be void ab initio under Ohio law) (emphasis added)).

The blanket rule that Plaintiffs posit that any "marriage solemnized outside of Ohio is valid in Ohio", (Pls.' Mem. Supp. 13), is not the law and ignores the difference between a marriage "void ab initio" (not recognized in Ohio) and one that is merely voidable at the instance of one of the parties. Plaintiffs' brief errs in suggesting that Ohio law would never treat out-of-state marriage as void "due to consanguinity or age." (*Id.* at 1.) Regarding "consanguinity," for example, in *In re Stiles Estate*, 59 Ohio St.2d 73, 74-75, 391 N.E.2d 1026, 1027 (Ohio 1979), the court refused to recognize a marriage between an uncle and a niece because the court concluded

that Ohio law prohibited such marriages.  The court expressly "decline[d] to adopt [*Mazzolini's*] reasoning" and "confine[d] *Mazzolini's*] holding to the peculiar fact situation that confronted this court at that time."  *Id.*  Moreover, the court found *Mazzolini* distinguishable because the marriage between first cousins upheld by the *Mazzolini* court was merely "not approved by law," rather than "expressly prohibited" by it:

> Although a marriage in Ohio between first cousins is not approved by law, it is not expressly prohibited and made void by any statutory enactment, and, where first cousins by blood, one a resident of Massachusetts and the other a resident of Ohio, are lawfully married in Massachusetts and remove to Ohio to live, such marriage is not void in Ohio, and an action by the Ohio resident instituted in Ohio to annul the marriage on the ground that it is void ab initio cannot be maintained.

*Id.*; *see also Peefer, supra* (relating to Plaintiffs' age contention).

Contrary to Plaintiffs' erroneous characterization, Ohio's refusal to recognize out-of-state same-sex marriages, which are expressly prohibited under Ohio law and contrary to the express public policy of the State, is a straightforward application of the longstanding rule governing recognition of out-of-state marriages.  Ohio's laws treat same-sex marriages as part of a larger category of marriages entered into out of state that would not be recognized in Ohio.

## IV.  Because Ohio's marriage laws survive rational basis scrutiny, Plaintiffs' Equal Protection and Due Process Claims fail on the merits.

If the Court reaches any form of equal protection or substantive due process analysis, Plaintiffs claims fail because Ohio's marriage laws survive rational basis review.  At its heart, the Equal Protection Clause of the Fourteenth Amendment "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights."  *Dixon v. Univ. of Toledo*, 702 F.3d 269, 278 (6th Cir. 2012) (internal quotations omitted).  At the same time, "where no suspect class or fundamental right is implicated, [the court] appl[ies] the rational-basis test and sustain[s] the government action in question unless the varying treatment

15

of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the Court] can only conclude that the [government's] actions were irrational." *Sadie v. City of Cleveland*, 718 F.3d 596, 601-02 (6th Cir. 2013) (internal quotations omitted).

### A. Rational basis is the proper level of scrutiny to apply here.

#### 1. Sixth Circuit precedent requires application of rational basis scrutiny.

The Sixth Circuit has repeatedly ruled that classifications based on sexual orientation are subject to rational basis scrutiny. *See, e.g., Equality Foundation*, 128 F.3d 289; *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012). In *Equality Foundation,* the Sixth Circuit expressly *rejected* the plaintiffs' argument and district court's holding that a city ordinance said to impact gay, lesbian, and bisexual citizens on the basis of their sexual orientation warranted heightened scrutiny. According to the Court, "because the Cincinnati Charter Amendment targeted no suspect class or quasi-suspect class, and divested no one of any fundamental right, it was not subject to either form of heightened constitutional scrutiny." *Equality Foundation*, 128 F.3d at 293. Rather, the charter "should have been assessed under the most common and least rigorous equal protection norm (the 'rational relationship' test), which directed that challenged legislation must stand if it rationally furthers any conceivable legitimate governmental interest." *Id.*; s*ee also Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) (applying rational basis review to challenged conduct because "[i]nasmuch as homosexuality is not a suspect class in this circuit, we cannot hold that persons who associate with homosexuals constitute a suspect class").

The Sixth Circuit reaffirmed this position in 2012, concluding that because "this court has not recognized sexual orientation as a suspect classification, [the plaintiff's claim that he was

discriminated against on the basis of his sexual orientation] is governed by rational basis review." *Davis*, 679 F.3d at 438.

Consistent with this binding authority, this Court too has recently acknowledged that under the prevailing law of this Circuit, "[a]n equal protection claim brought on this basis is governed by rational basis review." *Lee v. Pauldine*, No. 1:12–cv–077, 2013 WL 65111, at *6 (S.D. Ohio Jan. 4, 2013) (Report and Recommendation adopted in full on February 21, 2013).

The Sixth Circuit, of course, is not alone in applying rational basis review to claims premised on sexual orientation. To the contrary, most circuits have similarly rejected invitations to subject classifications based on sexual orientation to heightened scrutiny. *See, e.g.*, *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1114 n.9 (10th Cir. 2008) ("[T]his court, like many others, has previously rejected the notion that homosexuality is a suspect classification."); *Bruning*, 455 F.3d at 866-67 (concluding that Nebraska's constitutional amendment prohibiting same-sex marriages "should receive rational-basis review under the Equal Protection Clause, rather than a heightened level of judicial scrutiny" and noting that "the Supreme Court has never ruled that sexual orientation is a suspect classification for equal protection purposes"); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004) (applying rational basis review to plaintiff's discrimination claim premised on sexual orientation, observing that "[n]either the Supreme Court nor this court has recognized sexual orientation as a suspect classification or protected group"); *Lofton v. Sec'y of Dept. of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004) ("Because the present case involves neither a fundamental right nor a suspect class, we review the Florida statute [prohibiting adoption by same-sex couples] under the rational-basis standard."); *Veney v. Wyche*, 293 F.3d 726, 731-32 (4th Cir. 2002) (plaintiff's claim that he had been "discriminated against on the basis of sexual preference" was "subject to rational basis review"); *Nabozny v. Podlesny*,

92 F.3d 446, 458 (7th Cir. 1996) ("Our court has already ruled that, in the context of the military, discrimination on the basis of sexual orientation is subject to rational basis review."); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) ("[W]e conclude that Woodward is not a member of a class to which heightened scrutiny must be afforded nor that the Navy must have a compelling interest to justify discrimination against Woodward because of his admitted homosexuality."); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987) (FBI's policy against hiring homosexuals subject to rational basis review because "practicing homosexuals" did not constitute a "suspect class").

Notwithstanding the litany of binding authority, Plaintiffs spend nearly half of their merits brief arguing that heightened scrutiny applies. But Plaintiffs do not and cannot supply any argument that would permit this Court to disregard Sixth Circuit authority on this point. They instead cite to the binding Sixth Circuit precedent establishing that rational basis applies. (*See* Pls.' Mem. Supp. 16.) Thus, Plaintiffs' proffered justifications in support of heightened scrutiny only confirm that rational basis is the appropriate standard here. And although they appear to concede that their quarrel on this score is with the Sixth Circuit, (*see* Pls.' Mem. Supp. 15) ("the Sixth Circuit has not conducted a thorough review of its *controlling* law regarding the appropriate level of scrutiny for classifications based on sexual orientation") (emphasis added), they nonetheless urge this Court to take a path that the rule of law clearly precludes and to ignore that "controlling" authority.

Plaintiffs argue, for instance, that the Supreme Court's decision in *Lawrence* somehow altered the scrutiny landscape for classifications based on sexual orientation. But, as discussed above, the Sixth Circuit has repeatedly affirmed that, post-*Lawrence,* rational basis applies. For example, the Sixth Circuit decided *Scarborough* in 2006, and *Davis* just last year. Thus,

Plaintiffs' theory that "lower courts without controlling post-*Lawrence* precedent on the issue", (Pls.' Mem. Supp. 17), should revisit the question of whether heightened scrutiny applies to sexual orientation classifications is irrelevant here in the Sixth Circuit, where "post-*Lawrence*" precedent dictates that rational basis applies.

Plaintiffs also argue unconvincingly that *Equality Foundation* is now "questionable authority." (Pls.' Mem. Supp. 16.) In support of this untenable position, they cite *Bassett v. Snyder*, No. 12–10038, 2013 WL 3285111 (E.D. Mich., June 28, 2013). But *Bassett* expressly reaffirmed that "[a]t present . . . [heightened scrutiny] is *not* the law of the [Sixth] Circuit, and it cannot govern the decision here." 2013 WL 328511, at *16. The court thus concluded that "*Sixth Circuit precedents require* that the standard against which [the challenged law prohibiting public employers from providing benefits to same-sex partners of their employees] must be measured in the plaintiffs' equal protection challenge is *rational basis*." *Id*. at *17 (emphases added).

Furthermore, the Supreme Court's recent decision in *Windsor* did not overturn Sixth Circuit precedent. Instead, *Windsor* supports the continued application of rational basis review to sexual orientation. Because the Second Circuit had applied intermediate scrutiny to the classification based on sexual orientation, *see Windsor v. United States*, 699 F.3d 169, 181-85 (2nd Cir. 2012), the issue of the appropriate level of scrutiny was directly before the Supreme Court. Despite the opportunity, the Court declined to reclassify sexual orientation as a suspect class and thus did not affirm the lower court's determination that intermediate scrutiny applied. Rather, the Court rested its decision on the conclusion that there was "no legitimate purpose" for federal intrusion on a matter so uniquely reserved to the states in finding an improper motive.

*Windsor*, 133 S. Ct. at 2696.  That is a rational basis standard.  *Windsor* thus does not disturb the binding precedent requiring rational basis review.

> ### 2.  Plaintiffs' arguments regarding heightened scrutiny ignore binding precedent and lack support.

Ignoring overwhelming authority to the contrary, Plaintiffs spend a substantial portion of their briefing arguing for heightened scrutiny.  The Sixth Circuit has rejected, expressly and implicitly, any contention that sexual orientation is subject to heightened scrutiny.  Thus, Plaintiffs' various arguments for heightened scrutiny all fail.

> #### a.  Plaintiffs cannot prove that sexual orientation is a suspect classification.

Given the existence of binding precedent, sexual orientation is not a suspect class in the Sixth Circuit.  Thus, a point-by-point review of the suspect-class factors—as Plaintiffs encourage — is unwarranted.  Relatedly, the Court need not consider Plaintiffs' declarations relating to whether sexual orientation is a suspect class.  This type of submission is not new to the suspect class debate, and the Sixth Circuit has already resolved the issue. *See generally Equality Foundation*, 128 F.3d 289 (rejecting trial court's consideration of social science evidence to apply heightened scrutiny).

Moreover, Plaintiffs' submissions fail to substantiate a history of public discrimination by the state of Ohio that they suggest authorizes overturning the marriage provision of Ohio's Constitution.  They instead rely primarily on certain federal actions as well as some matters relating to other state and local governments.  (*See* Pls.' Mem. Supp. at 18-20.)  For example, Plaintiffs quote signs displayed "[i]n the mid-twentieth century [in] bars in New York and Los Angeles" and cite to "[r]aids on gay bars in Chicago" from the same era to support their historical-discrimination argument. (*Id.* at 19.)   Indeed, the *only* Ohio-specific example to which Plaintiffs point is a single Cincinnati ordinance passed in 1993 that prohibited the city from

making sexual orientation the basis for a protected class. But not only did the Sixth Circuit uphold the ordinance as constitutionally permissible, *see Equality Foundation*, 54 F.3d 261, (reaffirmed in *Equality Foundation*, 128 F.3d 289), Cincinnati voters *repealed that ordinance* in 2004, as Plaintiffs themselves are forced to concede. This isolated enactment and repeal would hardly seem to argue for Plaintiffs' theories on political power.

Plaintiffs provide no basis for setting aside by judicial fiat the will of Ohio voters defining marriage as between a man and a woman. Certainly the repeal nine years ago of the referenced Cincinnati ordinance cuts against Plaintiffs' position. Plaintiffs' own proffered historian espouses that the concept of homosexuality as a distinct category is a historically recent concept, emerging only in the late nineteenth century, and that it was not until the 1970s and 1980s that gay people became an increasingly visible group in society. (Chauncey Decl. ¶¶ 11-14). Given the relative youth of sexual orientation as a distinct classification, and the current state of attitudes toward homosexuality, it is reasonable to conclude that gays and lesbians have been increasingly successful in advocating and protecting their rights.

The United States District Court for the District of Nevada pointed to public developments in observing just last year:

> The States are currently in the midst of an intense democratic debate about the novel concept of same-sex marriage, and homosexuals have meaningful political power to protect their interests. At the state level, homosexuals recently prevailed during the 2012 general elections on same-sex marriage ballot measures in the States of Maine, Maryland, and Washington, and they prevailed against a fourth ballot measure that would have prohibited same sex marriage under the Minnesota Constitution. It simply cannot be seriously maintained, in light of these and other recent democratic victories, that homosexuals do not have the ability to protect themselves from discrimination through democratic processes such that extraordinary protection from majoritarian processes is appropriate.

*Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1013 (D. Nev. 2012) (adding: "The fact that national attitudes are shifting in favor of acceptance of same-sex marriage and homosexual rights in

21

general only tends to weaken the argument that homosexuals require extraordinary protection from majoritarian processes via heightened scrutiny under the Equal Protection Clause. . . . Only where a discrete minority group's political power is so weak and ineffective as to make attempts to succeed democratically utterly futile is it even arguably appropriate for a court to remove relevant issues from the democratic process, except where a constitutional prohibition clearly removes the issue from legislative control. . . .").  Plaintiffs here have not argued that any attempt to work within the democratic process to affect the debate on marriage within this State is "utterly futile" or "virtually hopeless" for those who subscribe to their policy position, *see id.* at 1009, and they do not justify nullifying Ohio's constitutional provision here.

> **b.  A prohibition against recognizing same-sex marriage is not a classification based on gender.**

Plaintiffs' contention that Ohio's marriage laws are gender-based classifications also fails.  Plaintiffs maintain that limiting marriage to a man and a woman discriminates on the basis of gender and thus triggers gender-based intermediate scrutiny.  This argument is unpersuasive for multiple reasons, and flies in the face of precedent from across the country.

On a fundamental level, it is well-established that equal protection jurisprudence treats gender classification and sexual orientation classification as distinct categories.  *Compare United States v. Virginia*, 518 U.S. 515, 531 (1996) (applying intermediate scrutiny to gender-based classification); *with Romer v. Evans*, 517 U.S. 620, 632 (1996) (applying rational basis standards to a sexual orientation classification); *see also Ambris v. City of Cleveland*, No. 1:12CV774, 2012 WL 5874367, at *5 (N.D. Ohio Nov. 19, 2012) ("Gender classifications invoke the intermediate level of scrutiny. . . .  Sexual orientation classifications . . . receive the lowest level of scrutiny."); *Jackson*, 884 F. Supp. 2d at 1099 ("[D]iscrimination on the basis of sex, and discrimination on the basis of sexual orientation . . . traditionally have been viewed as distinct

22

phenomena.") (Internal quotations omitted).  Applying gender-based scrutiny to Ohio's marriage laws would render this distinction meaningless.

Moreover, the laws at issue here simply do not favor or disfavor one sex over another so as to trigger intermediate scrutiny.  This is not like the cases cited by Plaintiffs (*see* Pls' Mem. Supp. 31) where fathers were favored over mothers for purposes of unemployment benefits, *see Califano v. Westcott*, 443 U.S. 76 (1979), or where a statute provided one age of majority for girls and another for boys, *see Stanton v. Stanton*, 421 U.S. 7 (1975).  Nor is it like the case of *Miss. Univ. for Women v. Hogan,* 458 U.S. 718 (1982), where the rule in question excluded males from a state-supported program open to women.  Ohio's marriage laws do not elevate one gender over another.

Courts have overwhelmingly rejected attempts to frame challenges to same-sex marriage restrictions as creating a gender-based class requiring heightened scrutiny.  *See, e.g.*, *Sandoval*, 911 F. Supp. 2d at 1005 ("The laws at issue here are not directed toward persons of any particular gender, nor do they affect people of any particular gender disproportionately such that a gender-based animus can reasonably be perceived."); *Jackson*, 884 F. Supp. 2d at 1098 ("The Court [] agrees with the vast majority of courts considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination.") (collecting cases); *Hernandez v. Robles*, 7 N.Y.3d 338, 364 (N.Y. 2006) ("By limiting marriage to opposite-sex couples, New York is not engaging in sex discrimination. The limitation does not put men and women in different classes, and give one class a benefit not given to the other.").  Here, Ohio's marriage laws do not constitute gender discrimination.

Courts have repeatedly rejected comparison to the circumstances of *Loving v. Virginia,* 388 U.S. 1 (1967).  In *Loving* the Court held that "equal application" of an anti-miscegenation

statute could not save that law from heightened scrutiny. 388 U.S. at 8. The Supreme Court recognized that the statute "rest[ed] solely upon distinctions drawn according to race" and was "designed to maintain White Supremacy." *Id.* at 11. In this case, however, nothing indicates that the laws are designed to negatively affect a specific gender, and Plaintiffs do not argue that they are. *See Sandoval*, 911 F. Supp. 2d at 1005 (rejecting gender classification comparison between *Loving* statute and same-sex marriage law); *Robles*, 7 N.Y.3d at 364 ("This is not the kind of sham equality that the Supreme Court confronted in *Loving* . . . Plaintiffs do not argue here that the legislation they challenge is designed to subordinate either men to women or women to men as a class."); *cf. Conaway v. Deane*, 932 A.2d 571, 598 (Md. App. 2007) (marriage statute "does not discriminate on the basis of sex …. [It does] not separate men and women into discrete classes for the purpose of granting to one class of persons benefits at the expense of the other class. Nor does the statute, facially or in its application, place men and women on an uneven playing field."). Instead, in this *as applied* Equal Protection challenge, Plaintiffs claim that Ohio law treats them differently from others based upon their sexual orientation (Second Am. Compl. ¶ 31), not their gender. Their attempt to force their claims into a gender classification framework cannot avoid the binding Sixth Circuit precedent establishing that rational basis applies.

> **c.** **Same-sex marriage is not a fundamental right under Court precedent.**

Plaintiffs cannot invoke heightened scrutiny by arguing that the right to same-sex marriage is embedded within the fundamental right to marry. (*See* Pls.' Mem. Supp. 32-36.) The lack of a fundamental right also forecloses any substantive due process analysis. *See ESJ Properties, LLC v. City of Toledo,* 698 F.3d 845, 862 (6th Cir. 2012) ("Substantive due process affords only those protections so rooted in the traditions and conscience of our people as to be

24

ranked as fundamental.") (internal quotation omitted).  The vast majority of courts to consider the issue have found that same-sex marriage is not a fundamental right and is not included within the fundamental right to marry.  *See, e.g., Jackson*, 884 F. Supp. 2d at 1094-98 ("Other courts considering claims that same-sex couples have a fundamental right to marry, have concluded that the right at issue is not the existing fundamental 'right to marry.'") (collecting cases); *Wilson*, 354 F. Supp. 2d at 1306-07 ("No federal court has recognized that [due process]…includes the right to marry a person of the same sex.") (internal citation omitted); *Conaway*, 401 Md. at 313 ("[V]irtually every court to have considered the issue has held that same-sex marriage is not constitutionally protected as fundamental in either their state or the Nation as a whole."); *Hernandez*, 7 N.Y.3d at 362 ("The right to marry is unquestionably a fundamental right . . . . The right to marry someone of the same sex, however, is not "deeply rooted," it has not even been asserted until relatively recent times.").

And this Court should not expand—and redefine—the traditional right to marry to include a concept that the Supreme Court's jurisprudence never considered in that context.  For the purposes of substantive due process, a fundamental right "must be 'objectively, deeply rooted in Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'"  *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 601 (6th Cir. 2013) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).  If government action implicates a fundamental right, heightened scrutiny applies.  *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005).  "[T]he list of liberty interests and fundamental rights is short, and the Supreme Court has expressed very little interest in expanding it."  *EJS Properties*, 698 F.3d at 860 (internal quotations omitted).  Consequently, "identifying a new fundamental right subject to the protections of substantive due process is often an uphill

25

battle . . . ." *Grinter v. Knight*, 532 F.3d 567, 573 (6th Cir. 2008). The Supreme Court also "require[s] in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721. Furthermore, "*[o]ur Nation's history, legal traditions, and practices* [] provide the crucial guideposts for responsible decision making, . . . that direct and restrain [] exposition of the Due Process Clause." *Id.* (emphasis added) (internal quotations and citations omitted).

Same-sex marriage was not expressly legalized in any state in this country until 2004 when Massachusetts began issuing same-sex marriage licenses. (Grossman Decl. ¶ 46.) The concept of same-sex marriage is undoubtedly not rooted in our nation's history and is still not the law in some thirty-five states. *See, e.g.*, *Jackson*, 884 F. Supp. 2d at 1096 ("It is beyond dispute that the right to same-sex marriage is not objectively, deeply rooted in this Nation's history and tradition."). Rather, the possibility of same-sex marriage is a recent development, and "[i]t seems fair to conclude that, until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage." *Windsor*, 133 S. Ct. at 2689. And Plaintiffs do not attempt to argue that the concept of ordered liberty depends on the recognition of same-sex marriage.

Plaintiffs' reliance on *Lawrence* and *Loving* does not compel a different conclusion. *See, e.g.*, *Jackson*, 884 F. Supp. 2d at 1096-97 (rejecting reliance on *Lawrence* and *Loving* to establish a fundamental right to same-sex marriage); *Wilson*, 354 F. Supp. 2d at 1306 (distinguishing *Lawrence*); *Hernandez*, 7 N.Y.3d at 363 (same). Indeed, the Supreme Court went out of its way in *Lawrence* expressly to recite that its holding did not reach the right of "formal recognition to any relationship that homosexual persons seek to enter." 539 U.S. at 578.

26

Likewise, *Loving* did nothing to expand the right to marriage beyond the traditional context of an opposite-sex relationship.  *See Jackson*, 884 F. Supp. 2d at 1095 ("[T]he Supreme Court, in discussing the fundamental right to marry, has had no reason to consider anything other than the traditional and ordinary understanding of marriage as a union between a man and a woman."); *In re Kandu*, 315 B.R. 123, 140 (Bkrtcy. W.D. Wash 2004) ("[I]t would be incorrect to suggest that the Supreme Court, in its long line of cases on the subject, conferred the fundamental right to marry on anything other than a traditional, opposite-sex relationship.").

> **d.      Ohio's marriage laws do not exclude same-sex couples from the political process.**

Finally, Plaintiffs' assertion that Ohio's marriage laws, and specifically the constitutional amendment, lock same-sex couples out of the political process, is equally unpersuasive.   (Pls.' Mem. Supp. 36-37.)  The political process doctrine, on which Plaintiffs presumably rely, "hews to the unremarkable notion that when two competitors are running a race, one may not require the other to run twice as far or to scale obstacles not present in the first runner's course."  *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.*, 701 F.3d 466, 474 (6th Cir. 2012), *cert. granted* 133 S. Ct. 1633 (2013).  Importantly, "the Constitution does not protect minorities from political defeat: Politics necessarily produces winners and losers."  *Id.* at 474-75; *cf. also Bruning*, 455 F.3d at 870 ("The First Amendment guarantees the right to advocate; it does not guarantee political success.").   Accordingly, the political process doctrine governs situations "when the majority has not only won, but has rigged the game to reproduce its success indefinitely."  *Coal. to Defend Affirmative Action*, 701 F.3d at 475.

The political process doctrine does not apply to this case.  Plaintiffs' complaint is with a result, not an unequal process.  Through Ohio's initiative process, proponents of traditional marriage passed a constitutional amendment on a specific issue: the definition of marriage (or

marriage equivalents) under Ohio law. But they did not change the rules of the game to ensure the indefinite success and continuation of the constitutional amendment. Advocates of same-sex marriage are free to use the same process that proponents of traditional marriage used to advocate their beliefs and change the Ohio Constitution on the exact same issue. Under these circumstances, supporters of same-sex marriage have not been fenced off from the political process.

Plaintiffs' comparison to the facts of *Romer* is misplaced. *Romer* involved a very broad constitutional amendment completely banning gays and lesbians from obtaining any form of protected status and from seeking relief from any branch of government. 517 U.S. at 624. The constitutional amendment here, on the other hand, simply reflects Ohio's policy on a discrete issue, the definition of marriage. Regardless, and ironically in light of Plaintiffs' argument, *the Romer Court still applied rational basis review*. 517 U.S. at 632.

In sum, the binding post-*Romer* precedent leads inescapably to the conclusion that rational basis applies. This Court cannot override Sixth Circuit decisions that are directly on point.

> **B.**  **Applying rational basis review, the Court must exercise judicial restraint in considering Ohio's marriage laws and may not guess at some collective motivation of Ohio voters.**
>
>> **1.**  **The Court cannot speculate as to the differing motivations of Ohio voters or legislators in supporting Ohio's same-sex marriage laws.**

Rational basis review is at its pinnacle where, as here, the law in question is a direct result of an electoral vote. A "reviewing court in this circuit may not even inquire into the electorate's possible actual motivations for adopting a measure via initiative or referendum*." Equality Foundation*, 128 F.3d at 293 n.4; s*ee also Arthur v. City of Toledo*, 782 F.2d 565, 573 (6th Cir.1986) ("Several important policy considerations limit a court's examination of the

factors motivating the electorate in a referendum election," including:  the need to protect the "secret ballot," the "value of referendum elections," and the impermissibility of inferring "comments of a few citizens, even those with power" to the "total electorate") (citations omitted); *Washington v. Seattle School District No. 1*, 458 U.S. 457, 465 n. 9 (1982) (quoting district court's observation that "the secret ballot raises an impenetrable barrier" to examining "subjective intent" behind an initiative); *James v. Valtierra*, 402 U.S. 137, 141 (1971) ("Provisions for referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice.").

Moreover, "[a]s the product of direct legislation by the people, a popularly enacted initiative or referendum occupies a special posture in this nation's constitutional tradition and jurisprudence. An expression of the popular will expressed by majority plebiscite, especially at the lowest level of government (which is the level of government closest to the people), must not be cavalierly disregarded." *Equality Foundation*, 128 F.3d at 297-98.  Thus the Court must instead "consider all hypothetical justifications which potentially support the enactment." *Id.* at 293 n. 4.

Similarly, the Court cannot inquire into the motivations of lawmakers.  As the Supreme Court emphasized in *F.C.C. v. Beach Comm'n, Inc.*, 508 U.S. 307 (1993), "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315; s*ee also Am. Exp. Travel*, 641 F.3d 685, 690 (6th Cir. 2011); *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) ("[A]ny *conceivable* legitimate governmental interest will do; and even then it is constitutionally irrelevant whether the

conceivable interest actually underlay the enactment of the challenged provision.") (emphasis in original, internal quotations omitted).

Because binding precedent precludes the Court from inquiring into motivations, Plaintiffs' submissions regarding the asserted potential motivations of Ohio voters and particular lawmakers should not be considered. (*See e.g.*, Becker Decl., Doc. No. 41-1.) The Court cannot attempt to determine the motivations of each individual lawmaker and all three million Ohio voters who chose to preserve Ohio's definition of marriage. Rather than permitting this impossible task, rational basis review requires this Court to consider all potential justifications.

**2.** **Rational basis review requires the Court to defer greatly to Ohio's marriage laws.**

It is difficult to overstate the deference the Court must afford Ohio's marriage laws, and particularly Ohio's constitutional amendment, under rational basis review. Rational basis review is "a paradigm of *judicial* restraint." *Beach*, 508 U.S. at 314 (internal quotations omitted). The Court must apply "a strong presumption of validity" to the law. *Bailey*, 715 F.3d at 960 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). "Indeed, 'rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 505-06 (6th Cir. 2007) (quoting *Heller*, 509 U.S. at 319). The standard reflects the belief that "['judicial intervention is generally unwarranted no matter how unwisely [a court] may think a political branch has acted.'" *Beach*, 508 U.S. at 314 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). Consequently, "'[w]hen social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.'" *Spurlock v. Fox*, 716 F.3d 383, 402 (6th Cir. 2013) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

30

### 3. Under rational basis review, Plaintiffs bear the burden of negating every conceivable basis that might support Ohio's marriage laws.

Under rational basis review, a law "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Spurlock*, 716 F.3d at 402. "[A] classification under rational basis review must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Seger v. Kentucky High School Athletic Ass'n*, 453 F. App'x 630, 635 (6th Cir. 2011) (quoting *Beach*, 508 U.S. at 313). Thus, "the burden is on the one attacking the legislative arrangement to *negative every conceivable basis* which might support it . . . ." *Heller*, 509 U.S. at 320 (internal quotations omitted) (emphasis added).

As the Supreme Court has stressed, *"[a] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."* *Beach*, 508 U.S. at 315 (emphasis added). This rule recognizes and preserves the careful balance of powers between the judicial and legislative branches: "Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Id.* (internal quotations omitted). These restraints have "added force" where, as here (because the concept of civil marriage requires some definition as to what falls within its purview), "the legislature must necessarily engage in a process of line drawing." *Id.* (internal quotations omitted). In short, if Ohio's marriage laws can "be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny." *Am. Exp. Travel*, 641 F.3d at 690.

Defendant has "no obligation to produce evidence to sustain the rationality of [the State's] actions . . . ." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 465 (6th Cir. 2012) (internal quotations omitted). Moreover, "[C]ourts are compelled under rational-basis review to accept a

legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.  In other words, "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality."  *Id.* (internal quotations omitted).   Nor are courts licensed to "judge the wisdom, fairness, or logic of legislative choices."  *TriHealth, Inc. v. Board of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005).

These rational basis principles recognize that "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."  *Heller*, 509 U.S. at 321 (internal quotations omitted).  Thus, even where "'[t]he assumptions underlying [the government's] rationales [are] erroneous, [] the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immunize' the [legislative] choice from constitutional challenge.'"  *Id.* at 333 (quoting *Beach*, 508 U.S. at 320).

Following the rational basis standard, therefore, it is not enough for Plaintiffs to simply submit materials disputing the validity potential reasons for Ohio marriage laws. The proper definition of marriage just is not something that is susceptible of judicial divination based on the particular opinions or legal conclusions of hand-picked social scientists.  Instead, the Court must accept any "rational speculation"—and even imperfect "generalizations"—that could have conceivably motivated Ohio lawmakers and voters in passing Ohio's marriage laws.  *See Heller*, 509 U.S. at 320-21.

**C.    Plaintiffs have failed in their legal burden of negating "every conceivable basis" for Ohio's preservation of traditional marriage, and Ohio's marriage laws therefore satisfy rational basis review.**

**1.    Ohio's marriage laws are rationally related to several conceivable, and legitimate, justifications.**

Rational basis review is satisfied here, because there are several conceivable legitimate reasons why lawmakers and voters passed Ohio's marriage laws including the decision to preserve uniformly the traditional definition of marriage without regard to contrary determinations by some other jurisdictions.    Ohioans' desire to retain the right to define marriage through the democratic process is legitimate.  It is rational for Ohioans to want to set this State's same-sex marriage policy rather than to allow Maryland or Delaware do it for them. This is especially true where, as here, a State's definition directly contradicts the one historically and uniformly applied in Ohio.

Plaintiffs ask that Ohio's democratic process, which chose Ohio's marriage definition, be made subservient to that of Delaware and Maryland.  It is precisely this "license for a single State to create national policy" that the court rejected in *Wilson,* and it is completely rational for Ohio to want to avoid this result.  354 F. Supp. 2d at 1304 (rejecting the plaintiffs' attempt to apply Full Faith and Credit Clause to require Florida to recognize their Massachusetts marriage in violation of Florida's statute banning same-sex marriage.); *see also Sandoval,* 911 F. Supp. 2d 996, 1021 (D.Nev. 2012) ("As to those Plaintiffs validly married in other jurisdictions whose marriages the State of Nevada refuses to recognize, the protection of Nevada's public policy is a valid reason for the State's refusal to credit the judgment of another state, lest other states be able to dictate the public policy of Nevada.")

Relatedly, avoiding judicial intrusion upon a historically legislative function (defining "marriage") is a legitimate basis for the passage of Ohio's marriage laws.   Ohioans could have

feared that, absent the strong public policy statement set forth in both the constitutional amendment and the statute, they would be abdicating that function to the courts, including out-of-state courts.  (*See* Becker Decl. Ex. E, Doc. No. 41-6) (statement of Rep. Seitz, p. 5, lns. 1-3, ""I'm not willing to leave it to courts to define what Ohio's public policy might be."); (statement of Rep. Grendell, p. 46, lns. 9-11, "There's no judge in Massachusetts who is accountable to one person who lives in this state, but we all are.  And that's why it is important that we retain the policy, power in Ohio to decide on what is marriage."); (statement of Rep. Grendell, p. 47, lns. 18-20, "I'm going to vote that the people of Ohio deserve to have their representatives decide the public policy of this state.").  That courts could intrude upon this area, absent an express statement of public policy, is hardly unrealistic.  *See Mazzolini*, 168 Ohio St. at 358-59. Ohioans' desire to retain this democratic voice is certainly rational.  See *Sandoval,* 911 F. Supp. 2d at 1021 ("[T]he protection of Nevada's public policy is a valid reason for the State's refusal to credit the judgment of another state, lest other states be able to dictate the public policy of Nevada.")

This desire to retain a democratic voice in setting marriage policy directly relates to yet another rational state interest, and that is Ohio's interest in approaching social change with deliberation and due care.  Before this last decade, no State permitted same-sex marriage.  Now, some States have chosen to expand marriage to include same-sex couples, while most others, including Ohio, have not.  It is undisputed that allowing same-sex marriage would fundamentally alter Ohio's definition of marriage.  Faced with these circumstances, Ohio lawmakers and voters could rationally choose to examine the impact that changing marriage laws has had or will have in other States and wait before allowing any such change to occur in Ohio.  As the *Jackson* court found: "[T]he state may rationally decide to observe the effect of allowing same-sex marriage in

other states before changing its definition of marriage." 884 F. Supp. 2d at 1118. Ohio's marriage laws are rationally connected to this purpose, as they leave to the democratic process any change that may occur. Specifically too, by reaffirming Ohio's definition of marriage in the 2004 constitutional amendment, voters assured that it is the will of the people of *Ohio*, not that of a court or another state, that controls. "[T]he state could rationally conclude that it is addressing a divisive social issue with caution." *Id.* at 1072.

Justice Brandeis's metaphor of the States as the laboratories of democracy remains powerful — and rational — today. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Wanting to see how revision efforts in other States progress, and to assess the results of such changes, and take them into account in setting future policy, is a conceivable rational basis that could have informed votes. *See Jackson*, 884 F. Supp. 2d at 1118 (noting the legitimate interest in addressing "a highly-debated social issue cautiously").

Ohio's desire to protect its right to define marriage from another state or a court is not only rational, it is authorized by federal statute. Under a rational basis review, Section 2 of DOMA itself provides sufficient justification for Ohio's action. In passing Ohio's marriage laws, lawmakers and voters were exercising the authority that the federal government has preserved for the States. Congress, through Section 2 of DOMA, has confirmed each individual State's right to decide for itself whether to recognize the same-sex marriages of the other States. 28 U.S.C. § 1738C. *Windsor* left this provision of DOMA untouched, and Plaintiffs do not challenge it here. Under these circumstances, Ohio's reaffirmation of the traditional definition of marriage and refusal to recognize out-of-state same-sex marriages is a rational, discretionary policy decision based on State authority that federal law protects.

Yet another interest that may have motivated certain Ohio voters and lawmakers is the desire not to alter the definition of marriage without evaluating steps to safeguard the religious rights and beliefs of others. Such concerns have been the subject of significant ongoing debate and attention by people on all sides of the marriage policy issue. As recently as this year, for example, a diverse group of noted law professors has emphasized that, "[w]hile we have a range of views on the underlying issue of same-sex marriage, we wholeheartedly share the belief that when same-sex marriage is recognized it should be accompanied by corresponding protections for religious liberty." "*Religious Liberty Implications of Legalizing Same-Sex Marriage*" p. 1 fn. 1, available at http://www.nysun/files/lawprofessorletter.pdf (last visited Nov. 18, 2013). The group recites that "the conflicts between same-sex marriage and religious conscience will be both certain and considerable if adequate protections are not provided." *Id.* at 1. They continue, "[w]ithout adequate safeguards, many religious individuals will be forced to engage in conduct that violates their deepest religious beliefs, and religious organizations will be constrained in crucial aspects of their religious exercise." *Id.* Other scholars will disagree. But a desire to ensure that any such issues are fully analyzed and appropriately accommodated is a conceivable legitimate basis for legislators and voters not to want to authorize a move away from the traditional definition of marriage absent reflection and agreement on any considered course of action. That is especially true in the context in which the challenged statute and amendment were adopted, as courts in other jurisdictions contemplated rulings that otherwise might have been claimed to have extraterritorial effect.

Most federal courts to address the issue have concluded that States' decisions regarding treatment of same-sex marriage survive rational basis review.

In *Sandoval*, for example, the United States District Court for the District of Nevada conducted a thorough analysis of Nevada's prohibition on same-sex marriage and concluded that the law satisfied rational basis scrutiny.   911 F. Supp. 2d at 1016-1017.   Stressing that rational basis scrutiny does not permit a court to "judge the perceived wisdom or fairness of a law" or to "examine the actual rationale for the law when adopted," the court considered whether the plaintiffs had satisfied their burden of "negat[ing] every conceivable basis which might support" Nevada's marriage law.  *Id.*  at 1014 In concluding the plaintiffs failed to do so, the court cited numerous potential legitimate bases that could conceivably support the law, among them "[t]he protection of the traditional institution of marriage, which is a conceivable basis for the distinction drawn in this case."   *Id*.  The court reasoned that "[t]he *Lawrence* Court appears to have strongly implied that in an appropriate case, such as the present one, the preservation of the traditional institution of marriage should be considered a legitimate state interest rationally related to prohibiting same-sex marriage."  *Id*.  at 1015.

Consistent with this position, the court concluded that Nevada had not "crossed the constitutional line" by maintaining a distinction between same-sex marriage and traditional marriage.  *Sandoval*, 911 F. Supp. at 1015.  Significantly, the court reached this conclusion despite opining that the plaintiffs' arguments in support of same-sex marriage had a rational basis, too.  *Id*. at 1016-1017.  Because they could not negate the states' conceivable legitimate bases in support of the law, however, Plaintiffs' arguments failed:

> The legal question is not whether Plaintiffs have any conceivable rational philosophical argument concerning the nature of marriage.  They do.  The legal question is whether the State of Nevada has any conceivable rational basis for the distinction it has drawn.  It does, and the laws at issue in this case therefore survive rational basis review under the Equal Protection clause.

*Id*.

The district court of Hawaii reached the same conclusion in *Jackson*.  Like the *Sandoval* court, *Jackson* emphasized the deference the State's decision regarding marriage deserved.  It too observed that several potential legitimate bases supported Hawaii's then-current decision to prohibit same-sex marriage.  Consistent with this deferential standard, the State did not need to prove that any potential justification was empirically accurate.  *Jackson*, 884 F. Supp. 2d at 1115-11166.  Rather, if the question was "at least debatable" or "not irrational," the state's rationale withstood scrutiny.  *Id*.  Among the potential justifications cited in *Jackson* was the State's legitimate interest in "proceeding with caution" in fundamentally altering its definition of marriage.  *Id.* at 1116-1118.  The court upheld this legitimate interest, deeming it "at least debatable that altering [the meaning of marriage] would render a profound change in the public consciousness of a social institution of ancient origin."  *Id.* at 1117-1118 (internal quotation omitted).[2]

Preserving the traditional definition of marriage thus represents another legitimate reason for Ohio's marriage laws.  By limiting marriage to opposite-sex relationships, Ohio voters made the policy decision to honor the traditional form of marriage for the purposes of Ohio law.  In *Lawrence*, Justice O'Connor—who has herself recently presided over a same-sex marriage—recognized "preserving the traditional institution of marriage" as itself a "a legitimate state interest."  539 U.S. at 585 (O'Connor, J., concurring and adding that "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group").

---

[2] Leaving the decision to the people does not itself determine what that position will be over time.  In Hawaii, for example, the federal courts appropriately left the issue to the people of that State through its political processes.  The Hawaii legislature has since changed the law through those democratic processes to permit same-sex marriage.

Justice O'Connor's position makes sense.  The on-going social debate is between two competing views of marriage.  *See Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting).  One side of this debate views marriage "as an intrinsically opposite-sex institution" based on human history and experience.  *Id*.  As Justice Alito observed in *Windsor*, this traditional view takes the position that "throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship."  *Id*.  While others may disagree with this view, to cut off any further debate on the issue would go against the rational basis approach.

Moreover, the idea of preserving traditional marriage should not be cast off as implicit animus.  Obviously, government cannot use history or tradition to cloak invidious discrimination.  *See Lawrence*, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (internal quotation omitted).  At the same time, however, history and tradition are still important parts of the rational basis analysis and the Supreme Court has acknowledged the importance of history in considering the scope of marriage:  *Windsor* specifically recognized that in defining marriage, States were free to consider "the historical roots of the institution . . ."  133 S. Ct. at 2692-93.

Central to these "historical roots" is a traditional definition of marriage as being between a man and a woman.  Under such conditions, it would be inappropriate to reject the voters' adoption of traditional view of marriage as wholly unsupported.  As the highest court of New York observed:

> [T]he traditional definition of marriage is not merely a by-product of historical injustice. Its history is of a different kind.  The idea that same-sex marriage is even possible is a relatively new one. Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex.

A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted.

*Hernandez*, 7 N.Y.3d at 361.  "The protection of the traditional institution of marriage, which is a conceivable basis for the distinction drawn in this case, is a legitimate state interest." *Sandoval*, 911 F. Supp. 2d at 1014.

Tellingly, many courts, judges, and justices have accepted these rationales that the State outlines above, along with other reasons such courts have found to be legitimate justifications for state laws precluding same-sex marriage.  *See, e.g., Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring); *Bruning*, 455 F.3d at 867-88; *Jackson*, 884 F. Supp. 2d at 1114-19; *Sandoval*, 911 F. Supp. 2d at 1015; *Wilson*, 354 F. Supp. 2d at 1308; *In re Kandu*, 315 B.R. at 146; *Conaway*, 401 Md. at 317-19 (Md. 2007); *Hernandez*, 7 N.Y.3d at 359-60; *Andersen v. King Cnty.,* 158 Wash. 2d 1, 37-39 (Wash. 2006); *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 677 (Tex. App. 2010); *Morrison v. Sadler*, 821 N.E.2d 15, 35 (Ind. App. 2005); *Standhardt v. Superior Court ex rel. Cnty. of Maricopa,* 206 Ariz. 276, 286-89 (Ariz. App. 2003).

Finally, in applying rational basis review, the Court should not lose sight of the broad nature of Plaintiffs' request.  By asking this Court to invalidate in the death certificate context Ohio's marriage laws with regard to out-of-state marriages, Plaintiffs seek a determination that a state cannot adopt the traditional definition of marriage for the purposes of its own law.  Any such determination would lack support.  The *Bruning* court recognized as much, stating: "[i]n the nearly one hundred and fifty years since the Fourteenth Amendment was adopted, . . . no Justice of the Supreme Court has suggested that a state statute or constitutional provision codifying the traditional definition of marriage violates the Equal Protection Clause or any other provision of the United States Constitution."  455 F.3d at 870.  This Court should similarly refrain from reaching this unjustified conclusion.

40

### 2. Plaintiffs' sweeping and un-justified allegations of improper purpose and effect do not negate the rational bases for Ohio's marriage laws.

Plaintiffs' unsubstantiated and erroneous allegation that Ohio's decision not to recognize out-of-state same-sex marriages has "the primary purpose and effect" of harming same-sex couples cannot negate the numerous rational bases that support that decision.  Clinging to a strained reading of the Supreme Court's decision in *Windsor*, Plaintiffs suggest that this Court should declare unconstitutional Ohio's statute and constitutional amendment prohibiting recognition of out-of-state same-sex marriages, notwithstanding that the policy is rationally related to legitimate state interests.  But *Windsor* supports no such result.

As explained above, the *Windsor* Court found the federal government's intrusion on the "tradition[al] [] reliance on state law to define marriage"  of such an "unusual character" that it allowed for an inference of improper (discriminatory) motive.  133 S. Ct. at 2692-93; *see also id.* at 2697 (Roberts, C.J., dissenting) ("The dominant theme of the majority opinion is that the Federal Government's intrusion into an area 'central to state domestic relations law applicable to its residents and citizens' is sufficiently 'unusual' to set off alarm bells. . . [I]t is undeniable that its judgment is based on federalism.").  Given the "unusual character" of the situation the Court decided that the legislation was motivated by animus, and did not reach the reasonableness of the many potential explanations proffered in support of Section 3 of DOMA.  *See id.* at 2693-95; *see also Romer*, 517 U.S. at 633, 635 (striking down Colorado amendment, which denied homosexuals "protection across the board" and was "divorced from any factual context" because the law was "discrimination[] of an unusual character").

Ohio's marriage laws do not fit the mold of an "unusual character" analysis the Court focused on in *Windsor and Romer*.  Ohio's legislators and citizens exercised the States' traditional authority—codified in Section 2 of DOMA—to define marriage for the purposes of

State law and to refuse to recognize marriages expressly prohibited by Ohio law and public policy. Moreover, as discussed above, Ohio's refusal to recognize out-of-state same-sex marriages represents a straightforward application of its longstanding practice with respect to out-of-state marriages. Contrary to Plaintiffs' repeated assertions, Ohio does not recognize all out-of-state opposite-sex marriages, but instead refuses to recognize any out-of-state that is expressly prohibited under Ohio law or contrary to the express public policy of the state. *See supra* at § III. Because Ohio's marriage laws reflect no departure from Ohio's traditional practices, *Windsor* provides no authority for overlooking the rational bases that support Ohio's marriage laws.

Nor do Ohio's marriage laws withdraw any rights Ohio has previously granted. Thus Plaintiffs cannot rely on *Romer* and its progeny to overcome the rational bases for the laws. The theme common to *Romer* and its progeny is that once a state grants a right to same-sex couples any later decision to withdraw that right triggers careful examination. Importantly, neither Article XV § 11 nor Ohio Rev. Code Section 3101.01(C) constituted a policy *change* in Ohio law. And Plaintiffs do not urge, and cannot support, that a State is *required* to grant the right in the first place.

## IV. The Court should respect the will of Ohio voters and exercise judicial restraint.

Ultimately, the issue before the Court, and in this Nation, involves two debates. The first is an ongoing debate about the proper definition of marriage. The second debate involves whether to cut short the first, and relates to who gets to decide. Do the States, and the people through their democratic decision-making processes, define marriage? Or should federal Judges make that determination and remove this fundamental question from the civic arena? The answer to both is that in the main, determinations regarding "the definition and regulation of

marriage" are "within the authority and realm of the separate States." *Windsor*, 133 S. Ct. at 2689-90.  Moreover, "[a]n expression of the popular will expressed by majority plebiscite, especially at the lowest level of government (which is the level of government closest to the people), must not be cavalierly disregarded." *Equality Foundation*, 128 F.3d at 297.

It is the right of the Ohio people to define marriage, and the will of over three million Ohio voters cannot be cavalierly disregarded.  Rather, "[a]s the product of direct legislation by the people, a popularly enacted initiative or referendum occupies a special posture in this nation's constitutional tradition and jurisprudence." *Id.; see also, e.g.*, *City of Cleburne*, 473 U.S. at 440 ("When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.") (internal citations omitted).

Moreover, the definition of marriage is not a simple factual issue that any Court is best positioned to decide.  It is beyond dispute that the debate remains relatively new and that "until recent years" same-sex marriage was nonexistent. *Windsor*, 133 S. Ct. at 2689.  Research in the area is also relatively young and "[a]t present no one — including social scientists, philosophers, and historians—can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be." *Id.* at 2716 (Alito, J. dissenting).

 Given the complex and delicate nature of any inquiry into the definition of marriage, judicial modesty is vital to the Court's decision.  It is not a coincidence that this case implicates a rational basis review standard that is "a paradigm of *judicial* restraint." *Beach*, 508 U.S. at 314 (emphasis added).  Indeed, the convergence of rational basis review and federalist principles in the area of marriage reflect that there are some debates a federal court should not enter. Consistent with these principles, the Court should not "short-circuit" ongoing Ohio debate over

the proper definition of marriage.  *See Jackson*, 884 F. Supp. 2d at 1118 ("[T]o suddenly constitutionalize the issue of same-sex marriage would short-circuit the legislative actions that have been taking place in Hawaii.") (internal quotations omitted); *id*. at 1070 ("The Court is mindful of the Supreme Court's cautionary note that '[b]y extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.'  Thus, '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'") (citations omitted).   As the *Jackson* Court aptly explained, judicial restraint is "especially important" in cases like this one "where moral and personal passions run high and where there is great risk that the liberty protected by the Due Process Clause [will] be subtly transformed into the policy preferences' of unelected judges." *Id.* at 1094 (internal quotations omitted).  On these important issues of "social needs and policy,"  "it is the paramount role of the *legislature* as a coordinate branch of our government to meet the needs and demands of changing times and legislative accordingly." *Id*.  at 1118 (emphasis added).  Moreover, as *Jackson* recognized, "[d]eliberate consideration of, and incremental responses to rapidly evolving scientific and social understanding is the norm of the political process—that it may seem painfully slow to those who are already persuaded by the arguments in favor of change is not a sufficient basis to conclude that the processes are constitutionally infirm." *Id.* at 1118-19.

The State's position regarding judicial restraint is hardly novel.  Justice Ginsburg recently offered insightful commentary on the importance of judicial restraint when considering divisive social issues.  In a May 2013 speech, given at the University of Chicago, Justice Ginsburg referred to *Roe v. Wade* in acknowledging the perils of resolving fundamental social questions in sweeping manner divorced from the democratic process.  Jason Keyser, "Ginsburg Says Roe

gave Abortion Opponents Target," *Associated Press* (May 11, 2013) *available at* http://bigstory.ap.org/article/ginsburg-says-roe-gave-abortion-opponents-target (last visited Nov. 18, 2013). Justice Ginsburg stressed the virtues of "judicial restraint," and allowing "change [to] develop in the political process." *Id.*

Finally, Plaintiffs ask the Court to overreach, even under the terms of their own Complaint. Although Plaintiffs frame their request as an "as-applied" challenge (Second Am. Compl. ¶ 50), they ultimately seek a directive that would have the effect of enjoining anyone who assists in completing Ohio death certificates from observing Ohio's marriage laws. (Proposed Order, Doc. No. 53-2.) Based on the applicable standards, the Court cannot invalidate Ohio's marriage laws without concluding that Ohio voters had no conceivable rational basis for affirming the traditional definition of marriage. Nevertheless, "to say that in preserving the traditional definition of marriage [Ohio]—along with [the majority of] other states…has acted . . . absurdly, ignorantly, or with bigotry, such that the federal judiciary must take the extraordinary step of intervening and overthrowing the democratic process, is simply untenable." *Jackson*, 884 F. Supp. 2d at 1093 (internal quotations omitted). The Court should enter judgment for the Defendant.

## V.  CONCLUSION

For the above reasons this Court should deny Plaintiffs' request for declaratory and injunctive relief and dismiss this action.

Respectfully submitted,

MIKE DEWINE
Ohio Attorney General


/s/ *Bridget E. Coontz*
BRIDGET E. COONTZ (0072919)*
   *Lead and Trial Counsel
ZACHERY P. KELLER (0086930)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
Tel: (614) 466-2872; Fax: (614) 728-7592
bridget.coontz@ohioattorneygeneral.gov
zachery.keller@ohioattorneygeneral.gov

*Counsel for State Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was filed electronically on November 18, 2013.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ *Bridget E. Coontz*

Bridget E. Coontz (0072919)*
Assistant Attorney General