1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF OHIO

3                         WESTERN DIVISION

4                            - - -

5    JAMES OBERGEFELL, et al.,      :   CASE NO. 1:13cv501
                                    :
6                    Plaintiffs,    :   Cincinnati, Ohio
                                    :
7          - v -                    :   Monday, July 22, 2013
                                    :   1:33 p.m.
8    JOHN KASICH,                   :
                                    :   **MOTION FOR**
9                    Defendants.    :   **TEMPORARY RESTRAINING ORDER**

10                           - - -

11                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
12                           - - -

13   APPEARANCES:

14   For the Plaintiffs:       ALPHONSE A. GERHARDSTEIN, ESQ.
                               JENNIFER L. BRANCH, ESQ.
15                             JACKLYN GONZALES MARTIN, ESQ.
                               Gerhardstein & ranch Co. LPA
16                             432 Walnut Street, Suite 400
                               Cincinnati, OH  45202

17

18   For the Defendant Kasich: BRIDGET C. COONTZ, ESQ.
                               KRISTOPHER ARMSTRONG, ESQ.
19                             Ohio Attorney General's Office
                               Constitutional Offices
20                             30 East Broad Street, 16th Floor
                               Columbus, OH  43215

21

22   For the Defendant Jones:  AARON M. HERZIG, ESQ.
                               City of Cincinnati
23                             Law Department
                               801 Plum Street, Room 214
                               Cincinnati, OH  45202

24

25   Court Reporter:  Jodie D. Perkins, RMR, CRR


              Proceedings reported by stenotype.
       Transcript produced by computer-aided transcription.

1           AFTERNOON SESSION, Monday, July 22, 2013

2      (Proceedings commenced at 1:33 p.m.)

3        THE COURT:  Good afternoon, ladies and gentlemen.

4 We're here in the open courtroom on the record in the civil

5 case of *James Obergefell and John Arthur versus John Kasich* in

6 his official capacity, et al.

7        We're set for hearing on plaintiffs' motion for a

8 temporary restraining order.  I would like the attorneys to

9 enter their appearances for the record.  I'll then make a short

10 statement, inquire as to how the parties intend to proceed, and

11 then we will proceed at this hearing on the plaintiffs' motion

12 for a temporary restraining order.

13        So who appears as counsel for the plaintiffs and who

14 do you have with you?

15        MR. GERHARDSTEIN:  Al Gerhardstein for the plaintiff.

16 And with me is plaintiff, James Obergefell; and Jennifer

17 Branch, as co-counsel; and Jacklyn Gonzales Martin, as

18 co-counsel.

19        THE COURT:  Very well.  Good afternoon.

20        And on behalf of the State defendants, the Ohio

21 Attorney General and the Ohio governor, in their official

22 capacities, if counsel would enter their appearances.

23        MS. COONTZ:  Good afternoon, Your Honor.  Bridget

24 Coontz from the Ohio Attorney General's Office on behalf of the

25 AG and the governor.  With me is Kristopher Armstrong, also an

1  Assistant Attorney General.

2       THE COURT:  Very well.  And we have counsel here on

3  behalf of the local defendant, Camille Jones, in her capacity

4  as registrar of vital statistics.  Counsel, if would you be

5  willing to enter your appearance for the record.

6       MR. HERZIG:  Good afternoon, Your Honor.  Aaron

7  Herzig, City of Cincinnati, on behalf of Doctor Jones in her

8  official capacity.

9       THE COURT:  Very well.  We have the appearances

10  entered of record.

11       I would like to inquire of each of you as to how you

12  would propose to proceed; and after I've heard it, we'll see

13  how we're going to proceed.

14       How does the plaintiff propose to proceed?

15       MR. GERHARDSTEIN:  Your Honor, I have talked to

16  defense counsel and propose the following:  That plaintiff

17  start with a summary of the argument and then supplement the

18  facts with short testimony from plaintiff James Obergefell, and

19  then defense counsel can -- when they give their argument, they

20  can include any response they have to the testimony they've

21  just heard.  And then if you want to hear any more, maybe give

22  us a chance to respond to that.  We'll be able to go in that

23  fashion.

24       THE COURT:  And forgive me for asking.  How long do

25  you anticipate your presentation will consume?

1          MR. GERHARDSTEIN:  Forty minutes.

2          THE COURT:  Very well.  On behalf of the State

3    defendants, how do you all propose we proceed?

4          MS. COONTZ:  Your Honor, we're in agreement with the

5    manner in which the plaintiff has just explained.

6          THE COURT:  So we'll have argument from the plaintiff,

7    and then they're going to call a plaintiff to the witness stand

8    for testimony, they're then going to argue further, and then

9    we'll turn to you all and we'll hear argument?

10         MS. COONTZ:  That is correct, Your Honor.

11         THE COURT:  Do you anticipate presenting testimony?

12         MS. COONTZ:  No, we don't, Your Honor.

13         THE COURT:  Very well.  How does the City propose to

14   proceed?

15         MR. HERZIG:  Your Honor, the City is fine with the

16   manner proposed by the plaintiffs.

17         THE COURT:  And the City will argue after the State

18   defendants have argued?

19         MR. HERZIG:  Yes, Your Honor.  And we have no one to

20   provide testimony.

21         THE COURT:  Very well.  And at the conclusion of those

22   arguments, the Court would anticipate a reply from the

23   plaintiffs.

24         I would propose that you proceed accordingly, Counsel.

25         MR. GERHARDSTEIN:  Thank you, Your Honor.  May I

1    approach?

2            THE COURT:  Yes.  Thank you.

3            MR. GERHARDSTEIN:  Judge, Jennifer Branch, and Jackie

4    Gonzales Martin, and I are here on behalf of James Obergefell

5    and John Arthur.  The evidence is going to show that these two

6    men are in love, and they've been life partners for more than

7    20 years.  James and John were recently married in Maryland.

8    The marriage between same sex couples are legal in Maryland but

9    their marriage is not recognized in Ohio.

10           Why is that?  Because Ohio doesn't recognize any

11   marriages between same sex couples under Article 15, Section 11

12   of the Ohio Constitution and Ohio Revised Code 3101.01(C).

13           Now, had James and John been an opposite sex couple

14   and gone to Maryland, Ohio would recognize their Maryland

15   marriage.  So they filed this lawsuit alleging that as applied

16   to them, and only to them, the Ohio Constitution, Article 15,

17   Section 11 and Ohio Revised Code 3101.01 violate the Equal

18   Protection Clause of the United States.

19           We're going to show that under any level of review

20   Ohio has no legitimate state interest that supports the burden

21   on these two men that they experience in terms of their First

22   Amendment rights, their privacy rights, as they live and

23   receive or don't receive benefits that they would have received

24   as a married couple recognized by this state.

25           As we set out in our hearing memorandum, Judge, the

1   facts about gay people were thoroughly explored by Judge

2   Spiegel just across the hall, in the *Equality Foundation* case

3   almost 20 years ago.

4       THE COURT:  And before we get to that, if this Court

5   were to find, as you argue, that the Ohio law as applied to

6   these two plaintiffs is violative of the equal protection

7   guarantees of the United States' Constitution, would not that

8   ruling apply to also similarly-situated people?

9       MR. GERHARDSTEIN:  Well, there would be -- first of

10  all, we're asking for a TRO, so it is a ruling that there would

11  be a substantial likelihood of success.  And it would certainly

12  have some precedential value that a TRO generally does not.

13  And then we'd have time, as the State has asked for, for a full

14  presentation and a preliminary injunction hearing, should there

15  be any additional facts that are necessary.  And that ruling

16  would probably have more precedential value.

17      So, I mean, we aren't trying to rush a really

18  important decision.  We are trying to protect the interests of

19  these two men, one of which is dying, as I will explain

20  shortly.

21      THE COURT:  Is a temporary restraining order a final

22  appealable order?

23      MR. GERHARDSTEIN:  No.

24      THE COURT:  And are the parties and the Court in a

25  position to continue in effect by mutual agreement a temporary

1    restraining order, if one were issued, such that we would then

2    not be rushed to have the full-blown trial?

3            MR. GERHARDSTEIN:  Plaintiffs would be willing to,

4    Your Honor.

5            THE COURT:  Very well.

6            MR. GERHARDSTEIN:  So as I was saying, more than 20

7    years ago, in *Equality Foundation*, Judge Spiegel made findings

8    that are very relevant to this case; and then again, just a

9    couple of years ago, Judge Webster in the Prop 8 trial, made

10   similar findings.

11           And very briefly, they come down to this.  We learned

12   in those cases that sexual orientation is established at an

13   early age; that is not amenable to change; that gay people make

14   stable and loving partners, at least as stable and loving as

15   opposite sex people; that gay people are as effective as

16   parents as opposite sex people, and we also learned that

17   there's been a history of discrimination and even violence

18   against gay people.  We've learned that the discrimination

19   against gay people has included passage of laws designed simply

20   to hurt them.

21           So those laws do not have a legitimate governmental

22   purpose.  Most of the facts, for the purposes of this motion

23   for a TRO, are stipulated.  If you look at our pleadings and

24   their responses, the City doesn't challenge the plaintiffs'

25   central premise at all and doesn't defend what it calls Ohio's

1   discriminatory ban on same sex marriages.

2       And the State cannot overcome plaintiffs' central

3   premise, and that's this. If an opposite sex couple marries in

4   another state under circumstances that are not allowed under

5   Ohio law, like a marriage of first cousins, then Ohio will

6   nonetheless recognize that opposite sex couples' marriage when

7   that couple returns to Ohio and seeks recognition. But when a

8   gay couple gets married where same sex marriage is legal, Ohio

9   will not recognize that marriage.

10      We say that violates the Equal Protection Clause. The

11  State says Ohio has a law prohibiting same sex marriage, so it

12  doesn't have to recognize the Maryland law. But Ohio has a law

13  that says if first cousins come before a proper official and

14  says, as first cousins we want to marry, they're not going to

15  let them marry either. So we do have comparables here.

16      And the State goes on to argue that there's an

17  expressed prohibition on same sex marriage, and that

18  distinguishes it from, in their eyes, the situation of first

19  cousins. But that argument is no longer viable after *Windsor*,

20  because in the *Windsor* case, the U.S. Supreme Court stated that

21  if the same sex couple is married in a state where same sex

22  marriage is legal, that the federal government then has to

23  recognize that same sex marriage on an equal basis with

24  opposite sex marriages.

25      And that was required by the principle of equal

1   protection, not full faith and credit.  The State spent a lot

2   of time in their brief saying, well, there's a provision of the

3   federal DOMA law that allows states to continue not to

4   authorize same sex marriages.

5          That's right, and not to recognize other states' same

6   sex marriages.  That's right, as a provision of full faith and

7   credit.  We're not arguing full faith and credit.  Under

8   *Windsor*, as applied to these two plaintiffs, if Ohio is going

9   to go ahead and recognize opposite sex marriages that do not

10  meet Ohio marriage criteria, then it has to recognize same sex

11  marriages that do not meet Ohio marriage criteria.

12         THE COURT:  So if the State of Ohio were to pass

13  legislation that it's going to recognize only these categories

14  of marriage and one of them includes -- they're going to only

15  except these categories of marriages and same sex marriage is

16  not on that list and they apply that uniformly, can states

17  prohibit same sex marriage?

18         MR. GERHARDSTEIN:  Well, first of all, let's

19  understand that we're not challenging Ohio's right to designate

20  what marriages may be celebrated in this state yet.  I mean, at

21  this point we're simply talking about recognizing marriages

22  from other states where they're legal.  And at this point, Ohio

23  has made a pretty blanket rule that accepts all of the

24  marriages from other states, regardless of whether they would

25  meet the technical requirements of a marriage in Ohio.

1      So if Ohio chose to try to conform all of that and

2   take away the differences, then we'd probably be back in court

3   saying, well, you're only doing that in order to continue to

4   discriminate.  But we don't have that case yet either.

5      No one in this courtroom yet has challenged the notion

6   that there really are differences between same sex marriage and

7   opposite sex marriage that can't be explained except by saying

8   that they don't want to treat them the same.  I mean, first

9   cousins can't be married in Ohio, can be married in other

10  states; underage women can't be married in Ohio, can be married

11  in other states -- and we could provide a chart about all of

12  the differences at some point if the Court wants.  But they

13  come back to Ohio and they are -- all of those opposite sex

14  marriages are recognized, the same sex marriages are not.

15  After *Windsor*, you can't do that.

16      THE COURT:  And that's because the law of the State of

17  Ohio, since its formation, or at least 1994, was that the

18  validity of a marriage is determined by the laws of the

19  jurisdiction in which the marriage was solemnized.

20      MR. GERHARDSTEIN:  That's correct.  And actually,

21  that's still the law in Ohio, except for this exception they're

22  trying to carve out that we say you can't carve out under

23  *Windsor* anymore.

24      THE COURT:  And the exception that they're trying to

25  carve out, you say they can't carve out because there is no

1   legitimate state interest in discriminating against same sex

2   marriage?

3           MR. GERHARDSTEIN:  As compared to opposite sex

4   marriage.  And it is really important that we're saying that

5   because, again, the Supreme Court has recognized that Ohio can

6   continue to not authorize same sex marriages to be celebrated

7   in this state.

8           The issue is what are they going to do about opposite

9   sex marriages celebrated outside of Ohio that don't conform to

10  Ohio law and then they get recognized here versus same sex

11  marriages that are similarly situated, the Equal Protection

12  Clause does not recognize a state interest, and we learned this

13  in *Windsor*, between those two types of marriages.  Once the

14  state says we're going to recognize the marriage, then the

15  Supreme Court says equal protection applies.

16          THE COURT:  So your argument is not that Ohio has to

17  authorize same sex marriage in Ohio, but your argument is that

18  Ohio has to recognize another state's law that permits same sex

19  marriage?

20          MR. GERHARDSTEIN:  Yes, because of the unique way that

21  Ohio already recognizes another state's marriages, which may

22  not conform to Ohio law.  That's exactly it, Judge.

23          And we're here on a TRO because one plaintiff, John

24  Arthur, is dying.  The evidence is going to show that he has

25  days or, at most, weeks left to live.  When he dies, the final

1  record of his life in Ohio will be his death certificate.

2  Unless this court acts, the death certificate will not reflect

3  his marriage at all and will not reflect that his husband,

4  James Obergefell, is his surviving spouse.

5          Now the State responds saying that the death record is

6  no big deal, and they say procedures exist that allow us to fix

7  it later.  But it is not that simple.  There actually is some

8  case law -- which we've been checking since we got the State's

9  brief -- that makes it clear that the intent behind any

10 procedural rules to fix a death or a birth certificate is just

11 that -- they're fixing errors and not legal issues.

12         So if you look at *En re Marriage License for Nash* at

13 2003 Westlaw 23097095, it's an Ohio Court of Appeals 11th

14 District decision from 2003, and in that case, the court said

15 that the procedures the State cited to can't be used to fix a

16 marriage license that -- in such a way that it would permit a

17 transsexual to marry, in violation of what that court

18 determined to be Ohio law.

19         So they're looking at these as ministerial errors that

20 can be fixed and not as legal errors, which is what we've got

21 before the court.

22         And you could also look at *State ex rel. Stark versus

23 Zipf*, Z-I-P-F, 172 Ohio State 462, a 1961 case in which a widow

24 sought to have the cause of death on a death certificate

25 changed so that suicide would be removed.  And the Court said,

1    you know, these procedures are not present to fix something as

2    substantial as whether it is a suicide or not, and said that

3    they're really only there to deal with situations where you've

4    got a mistake of another type of fact.

5           If you really look at the value of a death certificate

6    under Ohio law, you learn very quickly under 2105.35 that it's

7    prima facie evidence of everything related to the death.  So it

8    is the official state record of that.  And that's true across

9    the country, if you look at 42 ALR 1554.

10          And then even after there's any dispute or any inquiry

11   into the cause of death and into the facts surrounding the

12   death that one might use the death record for in the short

13   term, after a number of years, 50 years, the director of the

14   public -- of the State Department of Public Health turns all of

15   those records over to the Ohio Historical Society, and then the

16   death record becomes part of the genealogical history of

17   everybody in Ohio.  And the bottom line is, if you don't get it

18   right, that's how the dead person is remembered for eternity as

19   a citizen of Ohio.

20          And this is a very serious matter.  The City, by the

21   way, appears to disagree with the State as to how easily this

22   matter can be resolved just by having bureaucrats meet, and

23   they make it clear that this court must act, at a minimum, to

24   relieve the defendant, Doctor Jones, of the time constraints

25   that exist in order to allow accurate completion of the record

1    through due litigation before this court.

2            So without action by this court, there will be no

3    error on the death certificate for the State to fix because it

4    will be completed according to existing law, and that will

5    include having a blank next to Marriage and having a blank next

6    to Surviving Spouse.

7            So an injunction must issue to at least stop the

8    deadlines imposed on Defendant Jones from preventing accurate

9    relief in this case.

10           Properly recording the marriage of these men on this

11   final and important document is itself a really important goal

12   for our clients; but equally important, as you will hear from

13   James Obergefell shortly, is the emotional burden these men

14   feel during every moment of John's last days while they are

15   rejected as married by their own state.

16           At the preliminary phone conversation that this court

17   held, you asked for some additional facts and law about

18   irreparable harm, and our filing this morning provided

19   substantial law, especially about the value of any deprivation

20   of a constitutional right.  But I think it bears -- it's

21   helpful to hear from Mr. Obergefell himself as to the harm that

22   he and his partner feel and experience as a result of his

23   impending death without this being resolved.

24           So, Judge, what I would ask is that we take some

25   testimony from Mr. Obergefell, and then I trust that after the

1    hearing and after you review all of the evidence and you study

2    the growing precedent in favor of equal treatment for gay

3    people and same sex couples that you will grant a TRO as

4    proposed, enjoining the defendants from enforcing Article 15,

5    Section 11 of the Ohio Constitution and Ohio Revised Code

6    3101.01(C) as applied to these plaintiffs.

7           THE COURT:  Can I ask you a question before we get to

8    testimony?

9           MR. GERHARDSTEIN:  Sure.

10          THE COURT:  Who would the court order to prepare the

11   death certificate to say, Married Under Maryland Law, Surviving

12   Spouse Under Maryland Law?

13          MR. GERHARDSTEIN:  You would order Doctor Camille

14   Jones to do that, but you also -- the State's a necessary

15   party, number one, because as applied to these plaintiffs we're

16   saying that contrary law is unconstitutional, and I had to give

17   notice to the Ohio Attorney General under state law for that.

18   And Doctor Camille Jones needs to have the reassurance that the

19   State, which supervises her in this work, has also been ordered

20   to comply with this Court's directive.  So you're ordering

21   these defendants to accomplish that.

22          THE COURT:  But I thought a death certificate was

23   prepared by a medical examiner or a doctor or a citizen out

24   there.

25          MR. GERHARDSTEIN:  There is -- the initial step is

1  that certain people, funeral home directors, doctors, coroners,

2  prepare, and then they also rely on citizens, like

3  Mr. Obergefell, for a lot of the information, but it is Doctor

4  Camille Jones that has to receive it and make sure that it is

5  accurate.  So if she knowingly knows that Mr. Obergefell has

6  put himself down as the surviving spouse and listed John as

7  married, she can't accept it.  So we have a problem, and that's

8  the problem we're trying to resolve here.

9          THE COURT:  And once the Court issues an order

10  requiring her to be restrained from accepting a death

11  certificate that doesn't list Mr. Arthur as, or whomever it is,

12  as Married Under Maryland Law, and Surviving Spouse Under

13  Maryland Law?

14          MR. GERHARDSTEIN:  That's correct.

15          THE COURT:  Okay.  Thank you.

16          If you're ready, I am prepared to hear testimony.

17          MR. GERHARDSTEIN:  Plaintiff calls Mr. James

18  Obergefell.

19          THE COURT:  If the gentleman would be willing to

20  approach.

21      (Witness complied.)

22          THE COURT:  And as you arrive, if you would pause and

23  raise your right hand for the oath to tell the truth.

24                    JAMES OBERGEFELL

25  being first duly sworn, was examined and testified as follows:

```
1              THE COURT:  Good afternoon.

2              THE WITNESS:  Hello.

3              THE COURT:  You may proceed, Counsel.

4                      DIRECT EXAMINATION

5    BY MR. GERHARDSTEIN:

6    Q.  State your full name, please.

7    A.  James Obergefell.

8    Q.  And do you reside in Cincinnati?

9    A.  I do.

10   Q.  Are you married?

11   A.  Yes, I am.

12   Q.  To whom are you married?

13   A.  John Arthur.

14   Q.  Where did you get married?

15   A.  Glen Burnie, Maryland.

16   Q.  And when did you get married?

17   A.  July 11th, 2013.

18   Q.  I'm going to show you what's been previously marked as

19   Plaintiff's Exhibit 1.  Do you have an exhibit pile in front of

20   you there?

21   A.  I do.

22   Q.  Thank you.

23       Can you tell me what that is?

24   A.  That is our certified marriage license from the state of

25   Maryland, Anne Arundel County.
```

1   Q.  And that reflects that under Maryland law you were duly

2   married and your marriage is recognized under Maryland law?

3   A.  Yes, it does.

4   Q.  So you are married to John Arthur, right?

5   A.  Correct.

6   Q.  You've read the complaint that was filed in this case,

7   right?

8   A.  I did.

9   Q.  Are the facts in the complaint accurate and true?

10  A.  Yes, they are.

11  Q.  You and John both filed declarations in support of the

12  motion for a temporary restraining order, right?

13  A.  Correct, we did.

14  Q.  Are the facts stated in your declaration true and accurate?

15  A.  Yes.

16  Q.  Now, because we've done that work already and we're here on

17  a temporary restraining order, I'm not going to ask you to

18  repeat everything in the declaration.  But I would like you to

19  tell the Court, just briefly, how long you and John have been

20  together and what the relationship has meant to the two of you.

21  A.  We've been together since December 31st, 1992, and it's

22  been my world.  It's been my life.  We've been committed in a

23  committed relationship since that time.  And, in our eyes, we

24  are married.  Our families love us.  Our families consider us

25  married.  Our families and friends treat us as a committed

1  married couple.

2  Q.  Now you've been a couple and lived together for 20 years.

3  Why is it so important to be married?

4  A.  Well, I think that's the same for any couple who decides to

5  get married, no matter how long they've been together.  We want

6  our country, our state, to recognize our relationship and to

7  say yes, you matter, you were married; you have the rights, the

8  benefits and the responsibilities that go with that, just as

9  any other couple.  With John near death, it was very important

10  to us to have our relationship formalized and recognized by our

11  government.

12  Q.  Now, some of those benefits are economic, like the right to

13  file a joint tax return, right?

14  A.  Correct.

15  Q.  But what brings you in to court today is something more

16  urgent, right?

17  A.  Yes.

18  Q.  By the way, has the City of Cincinnati done anything

19  symbolic to recognize you as a couple and to recognize your

20  marriage?

21  A.  They have.  They have proclaimed July 11th, 2013, John

22  Arthur and Jim Obergefell Day, in honor of our marriage.

23  Q.  And is a copy of that proclamation signed by Mayor Mallory

24  present in the record as Plaintiffs' Exhibit 2?

25  A.  It is.

1  Q.  John is not with you here today in the courtroom?

2  A.  No, he is not.

3  Q.  Why is that?

4  A.  John was diagnosed with ALS two years ago, and he is now

5  confined to bed unable to go anywhere without proper medical

6  assistance.

7  Q.  You signed his declaration using a Power of Attorney?

8  A.  Yes, I did.

9  Q.  Was he fully engaged in the preparation of that declaration

10 and did he help draft it?  Did he review it?

11 A.  Absolutely.  He helped draft it.  He reviewed it and gave

12 his approval.

13 Q.  And I don't want to belabor this, but for the purposes of

14 the record, we do need to have some sense of how imminent, if

15 you know, John's passing might be.

16 A.  I would say days, maybe weeks if we're lucky.  Last week

17 the R.N. with our hospice service pulled me aside after their

18 visit with John to tell me I should start preparing because she

19 believes the end is close.

20 Q.  Have you seen the form that's used for a Certificate of

21 Death in Ohio?

22 A.  I have.

23 Q.  And is a copy of that form present in front of you as

24 Plaintiffs' Exhibit 3?

25 A.  It is.

1  Q.  Now there's a box Number 10 where it says Marital Status at

2  Time of Death.

3      Did I read that correctly?

4  A.  Yes, you did.

5  Q.  And if this court does not act, how will that box be filled

6  in?

7  A.  Unmarried.

8  Q.  And the next box -- and just to finish that thought, how

9  should it be filled in?

10 A.  Married.

11 Q.  And the next box says, Surviving Spouse's Name.  If this

12 court doesn't act, how will that box be filled in?

13 A.  It will remain blank.

14 Q.  How should it be filled in?

15 A.  James Obergefell.  My name should be there.

16 Q.  So if you would, just tell the Court how the problem with

17 the death certificate and recognition of your marriage by the

18 state of Ohio harms you and John.

19 A.  And I have to read this; otherwise, I will probably not get

20 through it.

21 Q.  That's okay.  Go ahead.

22 A.  Your Honor, during our 20 years together, John and I have

23 taken care of each other during good times and bad, for richer

24 and in poorer, and in sickness and in health.

25     For the past two years, I've had the honor of caring for

him as ALS has stolen every ability from him. Rarely a day goes by that he doesn't apologize for what he feels he's done to me by getting sick. He is physically incapable of doing anything to thank me or assuage his feelings of guilt, and we all know that there are times when words aren't enough. We need to do something.

What he wants is to die knowing that I will be legally cared for and recognized as his spouse after he is gone. That would give him peace, knowing he was able to care for me as his last thank you.

When I learned that John would forever be listed as unmarried on his death certificate nor would my name be listed as his spouse, my heart broke. John's final record as a person and as a citizen of Ohio should reflect and respect our 20-year relationship and legal marriage. Not to do so is hurtful, and it is hurtful for the rest of time.

I would like you to look at this picture. It's a photograph of our portrait we had painted about five years into our relationship. It's painted from photographs the artist took in Spring Grove Cemetery. Why Spring Grove? A couple of reasons. It's a beautiful, peaceful place that we both love. But it is also where John's mother's family plot is located. John has always planned to be memorialized on that family plot, and his plan changed to include me. However, we later learned that interment rules put in place by his grandfather and his

1    grandfather's siblings at the time the property was purchased

2    limited burials and memorials to descendants and married

3    spouses only.  John can be memorialized on the family plot, but

4    Spring Grove interprets the interment rules and there is no

5    guarantee that they will recognize our marriage and allow me to

6    be there as well if Ohio does not.

7         We've been beside each other for more than 20 years, and we

8    deserve to be beside each other in perpetuity.  We want the

9    option to do that in the family plot in Spring Grove, but that

10   should not require keeping John's remains in limbo or having

11   his life go unmarked for an indefinite period of time.

12        It is impossible for me to explain how or describe why, but

13   getting married changed everything.  We feel different.  Life

14   feels different.  We feel better.  We feel more connected and

15   more valued.

16        John's life will end soon.  I know that, and he knows that.

17   What a horrible thing to look at your spouse at the end of your

18   life and have your last thoughts be, I love you, Jim, but I

19   still can't legally call you husband in a state where we built

20   our life together, paid taxes, and were productive members of

21   society.  I'm sorry I couldn't take care of you as a thank you

22   for the way that you took care of me.

23        I will have to live with that the rest of my life, knowing

24   that those were his last thoughts and not, I love you, Jim, my

25   husband.

1    We very much want a ruling that gets clear direction on the

2  death certificate.  That ruling will not just be an order about

3  the details of death, it will be much more because, Judge, it

4  will state the reasons for your order, and that is even more

5  important.

6    Every day John and I live without equal protection.  Every

7  day we are treated differently than opposite sex couples who go

8  to other states and are married, and that denies us both

9  dignity and justice.  To hear a federal judge in Ohio say to me

10  and say to John before he dies that our marriage is equal and

11  that it will be recognized would mean that we can stop living

12  in uncertainty and inequality, allow us to focus solely on

13  John's quality of life and permit us to fully and truly end

14  John's life together as a married couple.

15    Each day without that right is a day too long.  Everyone

16  deserves to die with dignity.  To allow our marriage to remain

17  unrecognized by our home state and to allow me, his spouse, to

18  remain in legal limbo is to cause John to die without dignity.

19  There is no reparation for the harm that causes us.

20    Thank you.

21    MR. GERHARDSTEIN:  Thank you, Judge.  If you have no

22  further questions, I'll reserve further argument until after we

23  hear from defense.

24    THE COURT:  Adverse parties wish to inquire?

25    MS. COONTZ:  No, Your Honor.

1          MR. HERZIG:  No, Your Honor.

2          THE COURT:  You can step down sir.

3          THE WITNESS:  Thank you.

4          (Mr. Obergefell resumed his seat at counsel table.)

5          MR. GERHARDSTEIN:  Judge, for the record, the picture

6    he showed you was Exhibit 4, and I'll move the admission of

7    Exhibits 1 through 4.

8          THE COURT:  Any objection to the admission of

9    exhibits?

10          MS. COONTZ:  No, Your Honor.

11          MR. HERZIG:  Not for purposes of today, Your Honor.

12          THE COURT:  Those exhibits are admitted into evidence.

13      (Plaintiffs' Exhibit Numbers 1 through 4 were admitted into

14    evidence.)

15          THE COURT:  As I understand it, the plaintiff had made

16    its opening portion of argument and has presented testimony and

17    is now prepared to pause and permit the respondents to respond;

18    is that right?  Is that where we are, the plaintiff is now

19    pausing?

20          MR. GERHARDSTEIN:  Yes, Your Honor.

21          THE COURT:  Very well.  On behalf of the State

22    defendant.

23          MS. COONTZ:  Thank you, Your Honor.

24          May it please the Court, counselors, Mr. Obergefell,

25    I'm here today on behalf of the Ohio Attorney General Mike

1    DeWine and Governor John Kasich.  This is a sympathetic case

2    and it's a hard one, but we have to keep in mind why we're here

3    today -- as plaintiffs' motion for a temporary restraining

4    order only.

5         Plaintiffs challenge is an applied one; that is, that

6    Article 15, Section 11 of the Ohio Constitution and Ohio

7    Revised Code 3101(C) as applied to them through a death

8    certificate is unconstitutional because they were married in

9    Maryland and a perspective death certificate will not reflect

10   that marriage.

11        This court can only consider a temporary restraining

12   order that will prevent the specific irreparable harm that

13   plaintiffs allege.  That's it.

14        Now plaintiffs are before this court asking it to

15   effectively, but only temporarily, do something that no other

16   federal court has done in an overnight temporary restraining

17   order, and that is strike down a state statute and

18   constitutional provision which defines marriage as a union

19   between a man and a woman.

20        This court cannot go out on a legal limb, and it

21   doesn't need to because, as the Court well knows, there are

22   four factors that the plaintiffs are required to establish for

23   the issuance of a temporary restraining order, and perhaps the

24   most important factor in this case is the lack of irreparable

25   harm.  In fact, it is dispositive to plaintiffs' motion.

1        By statute, a death certificate can be changed;

2   therefore, the harm that plaintiffs allege, an omission on the

3   death certificate, an omission related to marital information

4   is, by statute, reparable.  3705.22 specifically provides that

5   an error or an omission on a death certificate can be

6   corrected.  The plaintiffs cannot prove irreparable harm when

7   the law allows this change.

8        THE COURT:  What if the plaintiff dies in the

9   meantime?

10       MS. COONTZ:  I'm sorry?

11       THE COURT:  What if the plaintiff dies in the meantime

12  and then we go back and fix the death certificate, if that's

13  what the law requires?  Has not that dead plaintiff suffered

14  irreparable harm?

15       MS. COONTZ:  The harm being that the plaintiff died

16  with the death certificate that did not reflect their marriage?

17       THE COURT:  Correct.

18       MS. COONTZ:  Your Honor, in that situation it's the

19  knowledge that we're talking about.  The plaintiff is going

20  to -- if he passes away --

21       THE COURT:  He's going to pass away.

22       MS. COONTZ:  When he passes away, he's not going to

23  know what his death certificate says.  Unfortunately, nobody

24  does.  Nobody dies with the knowledge of what their death

25  certificate says.  And if, ultimately, a death certificate is

 1   incorrect, Ohio law carves out a way to fix it, and that law is

 2   being applied equally, as it would be applied to any other

 3   decedent in the state of Ohio.

 4          Further, the relief sought will not repair or prevent

 5   that harm.  The remedy that plaintiffs seek is a temporary

 6   restraining order which, by its very nature, is temporary.  It

 7   could dissolve.  It could be changed at a preliminary

 8   injunction.  It could be appealed.  It could change at a

 9   permanent injunction stage.  It will be years before this issue

10   reaches finality.

11          THE COURT:  I didn't think a TRO was a final

12   appealable order.

13          MS. COONTZ:  If the TRO would go to a preliminary

14   injunction stage, then that preliminary injunction would be

15   appealable, Your Honor, is what I'm referring to.

16          So essentially, understandably, plaintiffs want this

17   finality, but this order is not going to give it to them.

18          We need to put the brakes on.  We need a thorough,

19   deliberate briefing and evidentiary schedule for this matter.

20   And an overnight temporary restraining order when there is no

21   evidence of irreparable harm is not appropriate in this

22   circumstance.

23          THE COURT:  And just to divert you, what sort of path

24   forward do you see on getting to a preliminary injunction

25   hearing such that a final order, appealable order, could be

1   reached?

2         MS. COONTZ:  Well, Your Honor, the Court -- in

3   answering that question, the Court raised a good question with

4   respect to the injunctive relief that can be ordered in this

5   situation with respect to the State defendant, with respect to

6   the governor and the Ohio Attorney General's Office.

7         Mr. Gerhardstein correctly stated that it is the duty

8   of the Attorney General to defend statutes, to defend

9   constitutional amendments.  An injunction against the governor

10  and the Attorney General's Office won't give the plaintiffs the

11  relief that they seek.  A declaratory judgment action, fully

12  briefed, with evidence on the record, with the statute and the

13  constitutional amendment -- or defendant is the way to handle

14  this particular situation.

15        So as far as preliminary injunctive relief, it is

16  questionable whether this court could order any injunctive

17  relief as against the governor and the Attorney General that

18  would prevent the irreparable harm that the plaintiffs allege

19  absent the injunction.

20        Further, the balance of harm in this situation weighs

21  in favor of, once again, slowing down this case.  While we

22  understand that there's the possibility that the plaintiff

23  could die in the meantime, what we're talking about is the

24  recognition of one marriage, because this isn't a class

25  challenge, versus a constitutional amendment that was passed by

1    the Ohio voters.  A careful and deliberate briefing process to

2    litigate the validity of that particular constitutional

3    amendment is what is appropriate in this case.

4         THE COURT:  So you're talking about two months of

5    testimony as to whether there's a legitimate State purpose to

6    discriminate against same sex marriages?

7         MS. COONTZ:  Your Honor, no, I'm not suggesting that

8    this is something that has to be protracted, but the Court

9    raises a good point, as well as the cases cited in

10   Mr. Gerhardstein's brief, that all of the cases cited were not

11   the result of a temporary restraining order.  They were,

12   rather, protracted litigation.  I am not, you know, the State's

13   position is not that this has to be protracted litigation, but

14   it is certainly not something that can be decided overnight.

15   Once again, the irreparable harm -- there's no evidence of

16   irreparable harm that would justify the granting of a temporary

17   restraining order, especially for temporary relief.  That is

18   what is here before the Court today.

19        We understand that the plaintiffs want a ruling.  They

20   want a ruling so that they can remove this legal limbo that

21   Mr. Obergefell referred to.  The Court's ruling today is not

22   going to end that legal limbo.

23        So because the plaintiffs have not established that

24   they will suffer irreparable harm absent this temporary

25   restraining order, which again is the only issue that's before

1   the Court today, temporary injunctive relief is not appropriate

2   in this particular situation.

3           Thank you.

4           Does the Court -- I'm sorry.  Does the Court have any

5   further questions?

6           THE COURT:  Not at this time.  Thank you.

7           MS. COONTZ:  Thank you.

8           THE COURT:  Mr. Herzig?

9           MR. HERZIG:  May it please the Court, counsel, Aaron

10  Herzig for Doctor Camille Jones in her official capacity with

11  the City of Cincinnati.  Your Honor, I'll be brief.

12          We are in this case, essentially an instrumentality of

13  a state scheme for vital statistics recording and reporting.

14  Doctor Jones is the local representative of the state registrar

15  who ultimately keeps and holds these records.  It puts us in

16  the middle.  If there were three tables, I would be the one

17  sitting in the middle of this dispute and it does leave us

18  asking for guidance as to whether she has to comply with

19  current Ohio law or, if that law is unconstitutional, whether

20  she can comply with plaintiffs request to be listed as married

21  on the death certificate.

22          But we don't particularly have a dog in the fight with

23  regard to the substantive issue of the constitutional amendment

24  and the statute itself.  I think the actions of the City of

25  Cincinnati, over the last decade or so, indicate that the City

1   is very sympathetic to the idea that Ohio should be a place

2   where same sex marriage is permitted.  As plaintiffs adduced in

3   testimony, there was a proclamation given specific to this

4   marriage declaring it their day in the City of Cincinnati on

5   July 11th, specifically referring to the fact that the same sex

6   and other lesbian, gay, bisexual couples should have the same

7   rights in every state as they do in the states where they're

8   allowed to marry.

9          But as it stands right now, Doctor Jones is compelled

10  to comply with Ohio law and risks either being in violation of

11  her duties or potentially criminal sanctions, which we talked

12  about in our brief, if she doesn't comply.  And so we do look

13  to this Court for guidance on those issues.

14         THE COURT:  Why can't you ensure that the death

15  certificate says, under Status, Married according to Maryland

16  law?

17         MR. HERZIG:  Your Honor hits on an interesting

18  solution and one that would, in fact, be accurate and I think

19  keep Doctor Jones out of some of the issues that we talked

20  about.  I don't know how the state registrar's system would

21  treat that when it arrives with them.  The state registrar is

22  ultimately the individual under the director of health who has

23  responsibility for the vital records system.  But certainly,

24  that's an order that our client would comply with.

25         THE COURT:  So what is the process by which a death

1    certificate will be prepared for Mr. Arthur?

2            MR. HERZIG:  My understanding, based on the Ohio

3    Revised Code and the Ohio Administrative Code, is a preliminary

4    death certificate is created usually by a funeral director or a

5    physician.  If the funeral director doesn't do it, they have 48

6    hours to have a physician determine the cause of death and put

7    that medical information on there.  They then are supposed to,

8    within five days, file that preliminary death certificate with

9    the medical information with the vital statistics registrar

10   here in Cincinnati.

11           If they don't -- if they don't receive a death

12   certificate within five working days of the death, the

13   registrar, under the Administrative Code, is supposed to go out

14   and investigate that and essentially make the filing occur at

15   that point.

16           There are situations I think where that the time

17   limits can be extended and there are times when errors can be

18   corrected, as both parties have explained, but that's the basic

19   idea.

20           THE COURT:  So the funeral director prepares the

21   preliminary death certificate and fills out the box as to

22   status and surviving spouse, and that funeral director presents

23   it to the local registrar and she records it?

24           MR. HERZIG:  Yes, Your Honor.  My understanding is

25   there's an electronic system that the funeral director can

1    access and fill that out electronically in the first instance,

2    although they do bring a paper copy to the vital statistics

3    registrar with the complete medical information.  The

4    information is based on what they call the informant, the

5    individual who talked to the funeral director and would explain

6    the boxes, how the boxes should be filled out.

7            THE COURT:  And if a funeral director filled out the

8    boxes on Mr. Arthur's perspective death certificate Married

9    Under Maryland Law; Surviving Spouse, Mr. James O, Under

10   Maryland Law, would she be able to record it?

11           MR. HERZIG:  I think under the Ohio Constitution and

12   the 3101.01, if she knew that that was being presented to her

13   as trying to give affects to a marriage outside of Ohio that is

14   not legal in Ohio, that is not recognized by Ohio, I'm not sure

15   that she could do that.

16           I will say that my understanding is, of the typical

17   situation, this information isn't checked.  If someone has a

18   name that is not -- where it is not easy to tell if it is a man

19   or a woman -- I'm Aaron and I've spent half of my life telling

20   people at StarBucks that it is two A's, not E-R-I-N.  So I

21   understand the issue.

22           Typically, our registrars don't even look.  They're

23   looking to make sure that the medical information is correct

24   and if it needs to be referred to the coroner for further

25   investigation; otherwise, they send it up to the State and I

1    don't think the State gives any particular directive about

2    ensuring the accuracy of that other information.

3         So were it not for the fact that we were being

4    presented with someone saying absolutely, recognize a same sex

5    marriage, we might not know that we had recognized one.

6         THE COURT:  And do you think putting on the death

7    certificate Married Under Maryland Law is an Ohio recognition

8    of same sex marriage?

9         MR. HERZIG:  No, Your Honor, I don't think I said that

10   or certainly didn't intend to.  I think that would be a

11   statement, an accurate statement, that this marriage was under

12   Maryland law.  The concern would be how the next person might

13   interpret that document or misunderstand it but, no, I don't

14   think that in itself would be a recognition.

15        THE COURT:  And what is the timing that compels your

16   client, plaintiff may have referred to, in order to take your

17   time pressure off on recording the death certificate so that

18   there's enough time to make sure that it is correct?

19        MR. HERZIG:  Your Honor, the Administrative Code talks

20   about there being five working days to file the death

21   certificate before the vital records registrar would go out and

22   investigate why it hasn't been filed.  So I don't know exactly

23   how long that process takes thereafter, but the Administrative

24   Code calls for five working days from death to filing.

25        THE COURT:  So a funeral director fills out a death

1    certificate, files it with vital statistics within five days.

2    What does the registrar do?  Is there any affirmative act?

3            MR. HERZIG:  My understanding, Your Honor, is the

4    registrar would then check to make sure that the basic

5    information is there and then send -- I believe the original

6    goes to the State and a copy stays here.  They also enter

7    information into the same electronic database, but paper and

8    electronic go hand in hand.

9            THE COURT:  And the City, the City of Cincinnati takes

10   the position in this litigation that it will not defend the

11   propriety of the same sex marriage ban in Ohio?

12           MR. HERZIG:  That's correct, Your Honor.  Not

13   dissimilar from the Obama administration's position with the

14   federal DOMA.  They continue to enforce it, but they do not

15   defend it.

16           THE COURT:  Very well.  Have you had a chance to

17   present your position?

18           MR. HERZIG:  I have.  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           Typically we would now put it back for a reply, if

21   any.  Typically, when I ask lawyers, Do you want an opportunity

22   to reply, they say yes.

23           MR. GERHARDSTEIN:  Yes, Your Honor.

24           THE COURT:  Very well.

25           MR. GERHARDSTEIN:  Thank you for your thoughtful

1  questions, Judge, and thanks for making this time available

2  today.

3          There is no way, with all due respect, that Married

4  Under Maryland Law satisfies the plaintiffs in this case,

5  legally or emotionally and in terms of repairing the harm.

6  That is simply a reflection of what truly does exist -- they

7  are married under Maryland law.  But they're here because they

8  should be married under Ohio law, given the equal protection

9  violation, and to simply --

10          THE COURT:  So you're looking to this court to strike

11  down the amendment to the Ohio Constitution which resulted from

12  a statewide vote saying that, in Ohio, we're not going to

13  recognize or celebrate same sex marriages?

14          MR. GERHARDSTEIN:  I am looking to this court to

15  enjoin, as applied to these two, and then to fully explore it

16  so that this isn't done on a wrong basis, the disparate

17  treatment of opposite sex couples married in other states and

18  same sex couples married in other states where those marriages

19  are both legal in those states but not legal in Ohio.

20          Ohio says, I am going to take all of the opposite sex

21  couples and recognize them as valid; I'm not going to do that

22  for same sex couples.  That deserves a merits ruling.

23          Now, I'm all about trying to make sure that the record

24  is complete enough so that it matches the seriousness of what

25  we're talking about.  It's unfortunate, very unfortunate, that

one of the plaintiffs is near death.  And we have just heard
enough of a difference of opinion between the two defendants
about what happens with respect to the death certificate that
that in itself suggests that the Court has to act to put it all
on hold.  And that comes in the form of a temporary restraining
order, and that can only come with some sort of acknowledgment
that there's a likelihood of success on the merits.

So we are looking to take baby steps.  We do want a
temporary restraining order to put this situation into
perspective.  That order will, in and of itself, begin to
address the harm that these two men have suffered.

And I heard the State argue very passionately that
there's no harm here.  But there are many, many cases that
we've cited that indicate that a day that you live with a
constitutional violation is irreparable.  You can't have that
day back.  They can't have their recognition of marriage,
however it comes back, even if it is just saying I think your
marriage will be recognized because you've established that
there's a likelihood of success.

That's as much as we can do for the Court right now
for these gentlemen.  And that would be very helpful, and it
would begin to remediate this harm that they're suffering.  It
is both.  It is the technical problems of the death
certificate, which don't seem to be able to be solved without
some action, and it's the daily action of their lives knowing

1    that they can't expect that this will change.  And, indeed, I

2    think given the protection violation, they should have the hope

3    of knowing that this can change.

4          And if you look at some of the other cases, there was

5    a representation made that these big constitutional issues

6    don't start with temporary restraining orders.  We do that all

7    the time, Judge.  I mean, especially in reproductive health,

8    there's a lot of statutes that get enjoined.  *Equality*

9    *Foundation* itself started with a preliminary injunction, and

10   that was only because we had enough time before the effective

11   daylight of Article 12 to do it.  But it was still temporary

12   relief to put everything on hold while we explored it

13   thoroughly.

14         And I think this is a simple enough issue that when

15   you look at the likelihood of success on the merits, the severe

16   harm that the plaintiffs really are suffering, and then you

17   also look at the other factors.  When you look at the balance

18   of harms, there's not much that the State is going to be harmed

19   by here.  This is simply the thorough explanation of a problem

20   that the State created by recognizing opposite sex couples who

21   are married in other states.

22         And the public interest is always served by following

23   the constitution.  I mean, we shouldn't let a day go by where

24   we think there is a serious constitutional violation governing

25   our civil life and we say, well, let's deal with it tomorrow.

1    I mean, let's not.  Let's try to address these in a responsible

2    way, which is what we propose today.

3         THE COURT:  In terms of balancing the potential harm

4    to each, your argument is that the State won't be harmed

5    because this is just a baby step and it only applies to these

6    two plaintiffs and it's not going to apply across the board

7    until or unless there's full blown proof that there's no

8    legitimate State reason to ban same sex marriages?

9         MR. GERHARDSTEIN:  That's part of it.  And the rest of

10   it is that it really does violate the Constitution, so the

11   State isn't harmed if you're righting a wrong.

12        THE COURT:  But a temporary restraining order

13   typically is designed to protect the status quo.

14        MR. GERHARDSTEIN:  And that's a good point, but that

15   doesn't trump everything else.  And you might say that the

16   status quo is that the State recognizes out-of-state marriages.

17   And now we've identified an out-of-state marriage that it

18   doesn't recognize.

19        I think that originally there wasn't a lot of thought

20   put into whether there's going to be now 13 places you can go

21   within the continental United States to get married as a same

22   sex couple, and I think facts have superseded where the State

23   was at.  And the status quo here is that the State does

24   recognize out-of-state marriages, and we're just trying to

25   include an out-of-state marriage that's out of step with -- the

1   State's response to it is out of step.

2          THE COURT:  The status quo is the law in this state,

3   as written by this state's legislatures over the last 100 or

4   more years, has been that the validity of a marriage is

5   determined by its compliance with the laws of the jurisdiction

6   in which it was solemnized or celebrated.

7          MR. GERHARDSTEIN:  That's correct.  That's the

8   overriding legal principle that has guided the recognition of

9   out-of-state marriages.

10          THE COURT:  And Ohio's effort in 1994 to single out

11  same sex couples as not being worthy of recognition of marriage

12  in this state is unlawful because it denies equal protection of

13  laws to our citizens?

14          MR. GERHARDSTEIN:  Correct.  And I think it was 2004

15  that they passed that.  And it is unlawful because it denies

16  equal protection and imposes on a growing number of Ohio

17  citizens on a daily basis their right to equal justice.

18          THE COURT:  And as the Court is balancing the

19  respective harms to each side, if the Court were to put on a

20  temporary order, is not the State harmed when a single federal

21  judge with the stroke of a pen puts on hold a democratically

22  elected amendment to the Constitution?

23          MR. GERHARDSTEIN:  Judge, this is how our system

24  works.  And the worst way to protect minority rights is to put

25  them up for a vote.  So, in fact, initiatives that have civil

1    rights implications that are passed by an initiative as opposed

2    to deliberative bodies often are more suspect because it is the

3    passion of the campaign.

4           And, in fact, if you look at -- and this gets ahead of

5    where we are in the record.  But if you look at the trial brief

6    we filed this morning, we cite to a Law Review article that

7    reviewed the campaign that led to the passage of this.  And

8    just as in Prop 8, there were lots of misstatements and lots of

9    attempts to appeal to the passion of the majority who were

10   fearful of gay people.

11          And that's what happens sometimes when you put civil

12   rights issues up for vote, and it shouldn't be a surprise that

13   we have an insular minority who are basically targeted because

14   of their status and suddenly their rights are defined by a

15   majority that doesn't understand them, isn't open to them, and

16   doesn't think about the Equal Protection Clause as much as we

17   do in a courtroom.

18          THE COURT:  The mere fact that voters establish law

19   doesn't make the law lawful?

20          MR. GERHARDSTEIN:  No.  In fact, you look at Romer.  I

21   mean, Romer is Colorado Amendment 2.  The whole state

22   constitution was amended to target gays and say that they

23   couldn't get the protection of civil rights laws.  And the

24   United States Supreme Court, in a brief and very focused

25   decision, said that's an illegitimate purpose.  And the fact

1    the majority of the people of Colorado passed it may have

2    explained how it happened, because they didn't have a

3    legislative service commission with a bunch of lawyers saying,

4    by the way, you're not allowed to do this.  They just voted.

5    And that happens when you put minority rights up for a majority

6    vote.

7            Judge, we do believe that, in light of the evidence

8    that we've been able to present and the legal arguments so far,

9    and if you look at the revised proposed temporary restraining

10   order, that there is enough present in terms of likelihood of

11   success on the merits, irreparable harm, balance of hardships

12   and public interest, that this Court should enjoin the

13   defendants from enforcing the subject Ohio laws so that these

14   two men can be free of the application of those laws as it

15   applies to their marriage; and particularly, that this Court

16   can restrain anybody who is about to fill out a death

17   certificate from filling it out in such a way that their

18   marriage in Maryland would not be recognized, until you've been

19   able to hear the case on the merits.

20           THE COURT:  Very well.

21           MR. GERHARDSTEIN:  Thank you.

22           THE COURT:  Thank you.

23           The Court's going to take the matter under

24   consideration.  I understand the timing and urgency of this.

25   The Court has spent considerable time reviewing the parties'

1   pleadings and briefs to date.  I need a little more time.  I'll

2   act expeditiously.

3        I will act today.  And no matter what, it's absolutely

4   clear in the law that it is constitutionally prohibited to

5   single out and disadvantage a group of people simply because

6   their beliefs don't coincide with the popular majority view.

7        The Court expresses its appreciation to counsel for

8   their hard work today.  The Court expresses its appreciation to

9   the attorneys and the plaintiffs, and the defendants, and the

10  citizens in being patient.  Give me the time to do what the

11  evidence and the law requires.  And I intend to make an initial

12  ruling today.

13       Having said all of that, unless there's something

14  further, the Court is prepared to recess.  Is there more today,

15  from the plaintiffs?

16       MR. GERHARDSTEIN:  No, Your Honor.

17       THE COURT:  From the State defendants?

18       MS. COONTZ:  Nothing further, Your Honor.  Thank you.

19       THE COURT:  From the City of Cincinnati?

20       MR. HERZIG:  No, Your Honor.

21       THE COURT:  Very well.  The Court prepares to adjourn.

22       THE COURTROOM DEPUTY:  All rise.  This court is now

23  adjourned.

24            (The proceedings concluded at 2:38 p.m.)

25

```
 1                          I N D E X

 2   PLAINTIFFS' WITNESS:          DIRECT    CROSS

 3   JAMES OBERGEFELL                16        --

 4

 5

 6                        E X H I B I T S

 7   PLAINTIFFS' EXHIBITS:         ADMITTED:

 8   Numbers 1, 2, 3 and 4:           25

 9

10                          - - -

11

12

13

14

15                   C E R T I F I C A T E

16           I, Jodie D. Perkins, RMR, CRR, the undersigned,

17   certify that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19

20                            s/Jodie D. Perkins
                              _____
21                            Jodie D. Perkins, RMR, CRR
                              Official Court Reporter
22

23

24

25
```