```
 1                  UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION

 3                          - - -

 4  JAMES OBERGEFELL, et al.,    :   CASE NO. 1:13cv501
                                 :
 5               Plaintiffs,     :   Cincinnati, Ohio
                                 :
 6        - v -                  :   Wednesday, December 18, 2013
                                 :   10:00 a.m.
 7  CAMILLE JONES, et al.,       :   MOTION FOR DECLARATORY
                                 :   JUDGMENT AND PERMANENT
 8               Defendants.  :      INJUNCTION
                          - - -
 9                TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE TIMOTHY S. BLACK, JUDGE
10                          - - -

11  APPEARANCES:

12  For the Plaintiffs:

13  ALPHONSE A. GERHARDSTEIN, ESQ.    LISA T. MEEKS, ESQ.
    JENNIFER L. BRANCH, ESQ.          Newman & Meeks Co. LPA
14  JACKLYN GONZALES MARTIN, ESQ.     617 Vine Street
    Gerhardstein & Branch Co. LPA     Suite 1401
15  432 Walnut Street, Suite 400      Cincinnati, OH  45202
    Cincinnati, OH  45202
16
    For the Defendant Wymyslo:  BRIDGET C. COONTZ, ESQ.
17                              ZACHARY KELLER, ESQ.
                                RYAN L. RICHARDSON, ESQ.
18                              Ohio Attorney General's Office
                                Constitutional Offices Section
19                              30 East Broad Street, 16th Floor
                                Columbus, OH  43215
20
    For the Defendant Jones:    AARON M. HERZIG, ESQ.
21                              City of Cincinnati
                                Law Department
22                              801 Plum Street, Room 214
                                Cincinnati, OH  45202
23

24  Courtroom Deputy:  Mary Rogers

25  Court Reporter:    Jodie D. Perkins, RMR, CRR
```

Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

MORNING SESSION, Wednesday, December 18, 2013

(Proceedings commenced at 10:00 a.m.)

THE COURT:  Good morning ladies, and gentlemen.  I'm here in the open courtroom on the record on the civil case of *James Obergefell, et al., versus Theodore Wymyslo, et al.*

We're set for final hearing on the plaintiffs' motion for declaratory judgment and permanent injunction.  The Court is prepared and ready to proceed in that regard.

I'd ask that the attorneys enter their appearances for the record and help me as to who is here.  And then I wish to hear from each attorney what you anticipate presenting and the length of time, and we will proceed.

So for purposes of the record, who appears on behalf of the plaintiffs?

MR. GERHARDSTEIN:  Judge, I'm Al Gerhardstein, and with me is James Obergefell at the table.  We have Robert Grunn at the end.  David Michener is a plaintiff, sitting next to Robert Grunn.

And with me is counsel.  Behind me is Lisa Meeks and Jennifer Branch, Jackie Gonzales Martin.  And Adam Gerhardstein is here, who is admitted in Minnesota but not yet in Ohio.

THE COURT:  Very well.

MR. GERHARDSTEIN:  We've agreed on an hour apiece, but I think we're both so impressed with our briefing that we may not need all of that time.

1    THE COURT:  Very well.  Thank you.

2    And on behalf of the State's defendant?

3    MS. COONTZ:  Good morning, Your Honor.

4    Bridget Coontz on behalf of Doctor Wymyslo.  With me

5    today is Assistant Attorney General Zach Keller, and Assistant

6    Attorney General Ryan Richardson.

7    And plaintiffs' counsel is correct, I do not believe

8    we're going to need a full hour.

9    THE COURT:  The Court may.

10   Very well.  Good morning, welcome.

11   And on behalf of the City defendant?

12   MR. HERZIG:  Good morning, Your Honor.  Eric Herzig

13   for Doctor Jones for the City of Cincinnati.  I don't need to

14   speak in separate arguments from the City unless we're

15   separately implicated during the arguments of the others.

16   THE COURT:  Very well.  Welcome.

17   Well, the Court's ready to proceed.  On behalf of the

18   plaintiffs, Mr. Gerhardstein.

19   MR. GERHARDSTEIN:  May it please the Court, this case

20   is about love surviving death.  Whether the plaintiffs, who

21   were married in other states, can require Ohio to recognize

22   their valid legal same-sex marriages on their Ohio death

23   certificates.

24   We need to remind ourselves where we've been.  When

25   James Obergefell and John Arthur started this case, they really

had a simple goal.  John Arthur was going to die and they
wanted his Ohio death certificate to accurately report that he
was married and that James Obergefell was his surviving spouse.

You granted a TRO ordering that result, and John died
on October 22nd, 2013.  His death certificate, which is in the
record at 52-3, records that he was married when he died and
that James was his surviving spouse.

Another TRO was issued at the request of plaintiff,
David Michener, and now his death certificate -- his spouse's
death certificate -- William Ives, is also in the record
recording that he was married and that David Michener was his
surviving spouse.

Mr.Obergefell and Mr. Michener are here today seeking
to make permanent the injunctions that have been issued so far,
because Ohio retains the power to amend their husbands' death
certificates unless this Court says no by issuing a permanent
injunction.

Mr. Grunn is here as the funeral director who handled
the cremation of John Arthur and filled out the death
certificate for John Arthur that's in this record.  And he will
have more same-sex clients who are married in other states but
who die in Ohio.  And he seeks a declaratory judgment and
injunction that permits him to fill out those clients' death
certificates in a way that recognizes the marriage of those
clients, like he's done for John Arthur.

Now Doctor Jones, the City defendant, the local
registrar for the Ohio Department of Health, has not opposed
this relief, but she's also indicated to the Court that she
wants the Court to say it's okay so that when she's
participating in the submission of these records, she's not
prosecuted for submitting false records to Doctor Wymyslo.

It's only the State, Doctor Wymyslo, the Director of
the Ohio Department of Health, who says that couples like James
and John, or David and William, should not have their
out-of-state same-sex marriages recognized by Ohio for any
purpose, even to grant them the dignity at death by recognizing
their marriages on their death certificates. And by refusing
even this limited relief, Doctor Wymyslo is violating the Equal
Protection Clause and the Due Process Clause of the United
States Constitution.

So, let's review what the classification is that we're
talking about, because that's central to understanding an equal
protection argument.

Seventeen states in the District of Columbia and
Canada and other countries now permit gay marriage. The
marriage of John and Jim, and of Dave and William, are
recognized in all of those jurisdictions and now, because of
*Windsor*, in the federal government.

The problem is that every day more married same-sex
couples will be moving to Ohio who have been married in those

states, and a growing number of those individuals are going to die in Ohio.  Director Wymyslo says the registrars and funeral directors may not list those individuals as married on their death certificates.

So what if -- what if instead of marrying John, James had married his female first cousin, out of state, and then when they moved back to Ohio she had died.  Under 3101(A), Ohio would not let that marriage take place between first cousins.  But if she had come back and died after they were married, Ohio would have recognized the marriage and we wouldn't be here.  There would be no problem.  Her death certificate would record him as the surviving spouse, because Ohio follows the place-of-celebration rule.

Same for underage wives.  Females cannot get married on their own in Ohio if they're under 16.  But if a 15-year-old goes off to a state where that's legal and gets married, then comes back, Ohio will recognize the marriage.

So now we have these same-sex marriages.  James and John were legally married in Maryland, David and William were legally married in Delaware, so their marriages are legal in the states where they were celebrated, but they're not treated the same by Director Wymyslo.

And we also have a category that we haven't talked about much in this case yet, which is common-law marriages.  Common-law marriages were banned in Ohio in 1991 by statute.

But to this day, Ohio continues to recognize common-law marriages where they are legal in those states if they come here to Ohio and then need to rely on their married status.

And, in fact, that same statute that created the problem before this Court amended the common-law marriage statute, 3105.12, to say, well, we do recognize common-law marriages from other states unless they're same-sex marriages.

So that is yet another example of the difference in treatment by Ohio that violates the place-of-celebration rule.

So, we've made a little progress through the briefing, and that is that the State concedes that discrimination based on sexual orientation can violate the Equal Protection Clause.

The State cites *Scarbrough and Davis versus Prison Health Services* for the point that rational basis applies, and we'll get to that in a minute. But remember that in both of those cases, dismissals of the claim of sexual orientation discrimination were reversed by the Sixth Circuit and said, no, go back to the trial court and try this case, because purposeful discrimination based on sexual orientation violates equal protection.

So we made that much progress. But the failure -- so I'm not going to talk about rational basis yet because I want to start with a discussion of whether heightened scrutiny applies. And that's why we built the record we did. The record supports heightened scrutiny.

1    And it's really based on two things:  First, under

2  equal protection, there's two traditional categories that a

3  court looks at in order to see if there is a special reason

4  that a classification should be reviewed under a higher level

5  than rational basis.  Those four categories are:  History of

6  discrimination; whether the category that's distinctive to the

7  group is related to that person's ability to contribute to

8  society; lack of political power; and immutability.

9    The most important of those categories are:  History

10  of discrimination and ability to contribute to society.

11    We've got the leading expert in the world on

12  discrimination against gays, Professor Chauncey, his report is

13  at 42-1 in the record, and we also have a very thorough review

14  of the history of discrimination against gays in Ohio by

15  Professor Becker, and her report is at 41-3.

16    And both of these reports together thoroughly document

17  that gays have been targeted, persecuted and oppressed with

18  respect to all areas of discrimination, public accommodations,

19  crimes, violence, every area of discrimination, in addition to

20  marriage.

21    So that category is satisfied.

22    With respect to the ability to contribute to society,

23  the notion is you shouldn't be creating a government

24  classification if the classification is based on something that

25  doesn't relate to whether the person can be a productive

citizen.  So that heightened scrutiny was granted when race was the classification, when gender was the classification, when national origin was the classification, because the notion is, if you're really creating government classifications based on that, that's prejudice.  That's just punishing people for who they are.

And if you look at Professor Peplau's report in 46-1, she thoroughly documents how people who are gay, lesbian, bisexual, or transgender can contribute fully to society just as people of various races, people of various genders, and there's really no purpose at all to be served by creating a classification based on sexual orientation.

THE COURT:  Is there any dispute in the record that sexual orientation has relevance to a person's ability to contribute to society?

MR. GERHARDSTEIN:  I have seen none.

THE COURT:  I agree.

MR. GERHARDSTEIN:  Okay.  And so the next category, which is not as important but still often discussed, is whether the group that is the target of any government classification lacks meaningful political power.

And Professor Segura and, again, Professor Becker -- Segura is at 47-1 -- have addressed this.  And one might say, well, look what's happened here recently.  There's been a growing number of states through their legislatures adopting

the notion that they will recognize gay marriage.  And that's true.

But this notion of political power is something that we look at over the long run, and there are 40 states that have either constitutional prohibitions or statutes that have been passed mainly since 2004 that prohibit gay marriage and that demonstrate that gays, unless they are in very, very strong coalition, do lack a significant amount of political power.

And of course in Ohio, we don't even have a civil rights act that protects gays from discrimination in public accommodations.  We don't have a civil rights act that protects gays from discrimination in employment.  Our office gets called routinely by people who have been discriminated against because they're gay, and we can't help them unless they're a public employee.

So there's plenty of work to do and plenty of muscle that doesn't exist in the gay community yet.

THE COURT:  There's no federal relief yet, either.

MR. GERHARDSTEIN:  That's correct.  And that is up in the Congress this year, but it does not look, at this point, that the House is willing to even address it.  So that's still an issue.

THE COURT:  The Senate passed it.

MR. GERHARDSTEIN:  Correct.

THE COURT:  And the gridlocked Congress is unable to

1   act further.

2        MR. GERHARDSTEIN:  That's correct.

3        And the last category is whether the anchor for the

4   classification hits on something that's immutable.  And sexual

5   orientation is that.  And, again, look at Peplau.  And the

6   notion is, if you're really classifying things based on a core

7   trait, then you're not basing it on anything that's a

8   legitimate governmental purpose.  And that's certainly true

9   when it comes to sexual orientation.

10       So the classification here, the denial of recognition

11   of same-sex marriages, while recognizing similar opposite-sex

12   marriages, is based on a category that targets a group that is

13   fully able to contribute to society, that's been the target of

14   discrimination, that lacks meaningful political power, and the

15   core trait is immutable.  And all of those suggest that

16   heightened scrutiny should be addressed, along with the fact

17   that we're talking about marriage and marriage is a fundamental

18   right.  And that is something that the Supreme Court has

19   recognized for prisoners in *Turner*, for people who owe child

20   support in *Zablocki*, and for people of various races in *Loving*.

21   So it is a fundamental right to marriage that's burdened here.

22   And that, again, supports the notion that there should be

23   heightened scrutiny.

24       And that suggests that in order to defend this

25   statute, the State has to show that this classification is

substantially related to an important governmental purpose, and they can't do it, because there is no purpose in discriminating against gays with respect to recognition of their marriages in other states that has been identified that meets this high burden.

THE COURT:  And before you go there and get to that, I want to back up on this fundamental right to marriage.  The only way we get to heightened scrutiny is if there's a fundamental right at issue; is that right?

MR. GERHARDSTEIN:  That is one path.  That's the due process path.

THE COURT:  And on the due process path, every court that's ruled on the issue has held that, although there's a fundamental right to marriage, that's not speaking to a fundamental right to have same-sex marriages, because that's not deeply rooted in our nation and tradition.

MR. GERHARDSTEIN:  You know, this is where *Lawrence* is so instructive because *Lawrence* didn't say this case is about the fundamental right to have same-sex sexual acts.  *Lawrence* said this case is about the fundamental right to have physical intimacy in your loving relationship.

So that's how we have to look at this.  *Lawrence* reversed *Bowers*, and in reversing *Bowers*, it said, you know, we aren't going to define gays by conduct that some people associate with gays.  Instead, we're going to look at this,

this desire to engage in this physical intimacy, and say that that is a fundamental right.  And they didn't even get to marriage yet and they're recognizing a fundamental right.

And in rejecting *Bowers*, they said *Bowers* was not correct when it was decided and it is not correct today.  Its continuance as precedent demeans the lives of homosexual persons and represents an invitation to subject homosexual persons to discrimination, both in public and in private spheres.

So to take that sort of analysis and -- *Lawrence* also said, yes, we look to the traditions of society, but you have to frame that look at our traditions correctly.  And the way they framed it was not a right to homosexual physical acts but, rather, to intimate acts.

The way we need to frame it is a right to marriage, not same-sex marriages, but a right to marriage.  And it's that right to marriage that's burdened.

Because there was a long tradition in this country of banning interracial marriage, and it wasn't framed in *Loving* as a right to interracial marriage -- it was a right to marriage. And that's the correct way to look at it, because sometimes the tradition is the embodiment of a long-term prejudice.  And in *Loving*, we found that, and it was right for the Court to knock it down.

Here, we have the same thing.  It is the right to

marriage that's the issue, and not just same-sex marriages.

THE COURT:  Because we have a liberty interest in, as consenting adults, to engage in private sexual intimacy and to marry who we choose?

MR. GERHARDSTEIN:  Yes, all of those things.  The private sexual intimacy was guaranteed through *Lawrence*, and the right to marry was the start of that, was actually recognized here in *Windsor*.  So, yes in both instances.

THE COURT:  So that's the liberty interest you're talking about --

MR. GERHARDSTEIN:  Correct.

THE COURT:  -- that gets it to heightened scrutiny?

MR. GERHARDSTEIN:  And that gets us to heightened scrutiny as a parallel path to the heightened scrutiny that's supported by the history of discrimination and the other factors that traditionally are looked at and that were set out in *Cleburne* and *Frontiero* and the alien education cases in those regards.

But, you know, and I want to emphasize that this, at this stage, has to be a parallel review of what we should talk about next, which will be rational basis.  Because there is the Sixth Circuit cases -- there are the Sixth Circuit cases -- most recently *Davis* in 2012 -- that says you have to use rational basis.

But I would suggest, as the court said in *Bassett*,

that this court say to the Sixth Circuit, respectfully, maybe
you should look at this again. Because when the Court parrots
that conclusion, as they do in two-sentence statements, we have
to use rational basis, there is no heightened scrutiny. If you
really review the basis for the Sixth Circuit holding in that
regard, it all goes back to an *Equality Foundation*. And I know
that case because I lost it. And *Equality Foundation* was
decided in 1997, and it squarely is grounded on *Bowers*.

THE COURT: Which was reversed.

MR. GERHARDSTEIN: Which was reversed, after *Equality
Foundation* was decided.

So when you -- and if you look at *Equality
Foundation* -- and I remember this from the argument -- the
Sixth Circuit panel, both in argument and then in the decision,
said: We reject heightened scrutiny -- and I quote -- because
the conduct which defined them as homosexuals was
constitutionally proscribable. Meaning, the Sixth Circuit
panel at that time thought that gay people were defined by the
sex acts they engaged in. And since *Bowers* said that can be
criminal, there's no way that could ever been heightened
scrutiny.

And that's all wrong. *Lawrence* says it's wrong and,
hopefully, the Sixth Circuit will revisit it if this Court
chooses to explore that as at least an alternate basis of
reasoning in a case like this.

1        THE COURT:  Okay.  Before you get to rational basis,
2   I'm still back on the fundamental right.

3        MR. GERHARDSTEIN:  Okay.

4        THE COURT:  We talk about the liberty interest in
5   private behavior and marriage.  Is there a liberty interest if
6   you get married in one state and come to the next state and the
7   next state refuses to recognize it?  Isn't that violating your
8   liberty interest in the right to remain married?

9        MR. GERHARDSTEIN:  Yes.  The fundamental right to
10  marriage should be transportable across state lines.  And
11  that's what the celebration rule really gave us.  It gave us
12  the certainty of knowing that, if I'm going to have a good time
13  and go to Vegas and get married and celebrate and then come
14  back to Ohio and live my more mundane life after my big party,
15  yes, I'm still married even though I was married in Vegas.

16        And more concretely for this case, if I am a
17  common-law marriage in another state, if I'm a first-cousin
18  marriage in another state, if I'm an underage marriage in
19  another state, and if all of those are legal in those states
20  and I come back to Ohio, even though I couldn't do those
21  marriages here, Ohio is going to recognize them because it
22  follows the place-of-celebration rule.

23        And Professor Grossman is our expert on marriage and
24  the history of marriage, and she actually says that Ohio is at
25  the far end of this celebration rule, recognizing everything.

So that's a very important liberty interest. It's been well established in Ohio as a liberty interest, and it is critical to the negotiations that we're trying to explore in this case.

And on top of all of that is Professor Becker's review of the 2004 campaign for the constitutional amendment and for the laws that are passed that are the subject of what we're doing in court today. And she very carefully documents how much animus was just spread all over the campaign itself.

No one of these things standing alone may be enough, but I think, as a package, it is fair for this Court to say that there really is no legitimate governmental purpose and that the classification in this case is based on a hostility towards gays and a desire to hurt that identifiable group.

So, what do we do about rational basis? The marriage recognition ban flunks even this lowest level of review. And I'm taking the State up on their invitation here. They say: We have to apply rational basis. So let's do that.

And that takes us to *Windsor versus United States*. And we see in *Windsor* that the Supreme Court was attempting, and did, apply rational basis. And they said when they were talking about equal protection at 133 Supreme Court 2692: Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the Constitutional provision. And they cite *Romer*.

So what was the discrimination of an unusual character in *Windsor*?  Well, the discrimination of an unusual character in *Windsor* was the fact that the federal government, Congress, had never told us what was a good marriage and that they would recognize, and what was a marriage that they would no longer recognize.  And here comes DOMA, Section 3, and they pass a law in 1996 that says, all right, from here on out, we are only going to recognize, for federal law purposes, marriages between a man and a woman.

And the Supreme Court said, well, that's a discrimination of an unusual character because you've just done something you had never done before solely to target this group of folks who get same-sex marriages, even if it's legal in the state where they get their same-sex marriages.  So the Supreme Court gave it careful consideration and struck it down and said, no, you need to recognize those marriages from those states that say they're legal, because otherwise, under this rational basis test, if we give it a careful consideration, there's really no legitimate governmental purpose to be served by changing the rules just because some states are now recognizing same-sex marriages.

And what was the unusual discrimination in *Romer*?  In *Romer*, we have the Colorado Amendment 2 passed on top of a state that had jurisdiction that had already granted protections from discrimination to people who were gay, lesbian

transgender and bisexual.  And then they did this sweeping

Amendment 2, and the Supreme Court said, that's an unusual

discrimination because you're taking away something that had

already been standing there and already existed; you're taking

away rights that local municipalities had granted and now

you're doing it solely because of sexual orientation.  The

purpose, when we give that careful consideration, can only be

to harm the gay people.

So, the way the Supreme Court said it in *Windsor* was:

DOMA's unusual deviation -- again, that's their framework,

"unusual deviation" -- from the usual tradition of recognizing

and accepting state definitions of marriage here operate to

deprive same-sex couples of the benefits and responsibilities

that come with the federal recognition of their marriages.

And I quote:  This is strong evidence of a law having

the purpose and effect of disapproval of that class.  That's

*Windsor* 133 at 2693.  And of course, the Court goes on to say

that there's no legitimate purpose in that situation.

So what is the discrimination of an unusual character

here?  Ohio has a long tradition of recognizing, through its

place-of-celebration rule, marriages contracted in other states

that would not have been authorized here -- common-law

marriage, first cousins, underage.

So according, as I said, to Professor Grossman, Ohio

fell on the extreme pro-recognition end of the spectrum.  And

now in gay marriages authorized in other states, Ohio changes its rules and refuses recognition to same-sex marriages while leaving everything else the same.

That deserves the same recognition and careful consideration that we see the Supreme Court doing in *Windsor* and in *Romer*. And because it is unusual and it is a change in the law triggered solely by the prospect of some states providing same-sex protection -- same-sex marriages protection, then it is, in the words of *Windsor*, strong evidence of a law having the purpose and effect of disapproval of that class.

So it didn't work in *Windsor*, it didn't work in *Romer*, and it shouldn't work here. And the arguments raised by the State are the same as those raised and rejected in *Windsor* and also in *Hollingsworth versus Perry*. And in the face of that analysis, it's hard for the State to come up with any purpose that meets that test, even though we label it a rational basis test.

But what did the State say? In their brief they said, well, this court should stand down because we need to respect the democratic process. People voted for these prohibitions, for these discriminatory refusals to recognize gay marriage. Therefore, we ought to leave it alone.

And of course we know -- just look at *Romer* -- we know that judicial review applies to regulations as well as to statewide initiatives. *Romer* was a statewide initiative but

the Supreme Court didn't have any trouble declaring it
unconstitutional.

And it is the duty of the judiciary to enforce the
Constitution and to exercise restraint.  But you can't not
enforce the Constitution, and you can't just stand down in the
face of a constitutional violation.

So this case is a perfect example of the proper
balance, because what we're asking the Court to do is not
create something that would become the *Roe v. Wade* of gay
rights.  I mean, we're talking about a limited injunction that
solves a discrete and concrete problem, a very real problem.

I mean, we have clients here who have presented to the
Court a problem that, until this Court acted, would not have
been solved, and won't be solved going forward without the
permanent injunction.  So that's measured judicial action, and
its exactly the type of judicial restraint that balances the
role of the courts and the role of any public vote.

So what's --

THE COURT:  Can we talk about that?

MR. GERHARDSTEIN:  Sure.

THE COURT:  I mean, the State makes a big deal about
the people of Ohio voted to establish these bans.  The law is
clear that, you know, voters can't pass a statute to violate
the Constitution.  Is that where we are?

MR. GERHARDSTEIN:  Right.  Yes.

1          THE COURT:  All right.  Help me on fundamental

2    history.  Give me some examples of things voters have approved

3    that have been struck down by the Supreme Court as violations

4    of constitutional law.

5          MR. GERHARDSTEIN:  Well, I mean, Prop 8 was an

6    example.  Now the Supreme Court didn't rule on the merits of

7    that, but the Ninth Circuit did.

8          The -- *Romer* is the best example because there the

9    state-wide initiative was passed by 66 percent of the voters of

10   Colorado and the Supreme Court struck it down as a violation of

11   equal protection because its purpose and effect was to harm gay

12   people.  And that was under the Equal Protection Clause.  So

13   that is the absolute best example of a popular initiative that

14   was struck down, and the most relevant to this case.

15         *Lawrence* was a statute.  *Cleburne* was a statute.

16   *Frontiero* and *Zablocki* were statutes.  Well, actually, I think

17   *Zablocki* was a local initiative, if I'm not mistaken.

18         So there are other initiatives -- *Hunter versus*

19   *Erickson* was a housing initiative passed by the public to

20   prohibit certain types of public housing, and that was struck

21   down as a violation of the Due Process Clause by the U.S.

22   Supreme Court.

23         So there are examples, and we would be happy to

24   supplement that if the Court wants some supplemental briefing.

25         THE COURT:  Well, just big picture, I suppose there

1  were statutes passed by voters that refused to permit marriages

2  between people of different races.

3       MR. GERHARDSTEIN:  Yes.  I actually don't know if that

4  was an initiative or not, but *Loving* struck down the Virginia

5  statute that prohibited what they call miscegenation, but I

6  don't know whether that was passed by popular vote or by the

7  legislature.  I think it was by the legislature.

8       THE COURT:  So your position is, with all due respect,

9  the mere fact that the majority of the voters in 2004 voted for

10  something, if it is unlawful discrimination, the Court is

11  required to act?

12       MR. GERHARDSTEIN:  That's right.  And that's also why

13  we cited the Federalist Papers in our brief, because this is

14  basic.  The founders knew that if you just do democracy, then

15  the majority could be tyrannical.  They can pass laws that

16  would absolutely oppress the minority and there would be no

17  remedy.

18       That's where courts come in.  Courts are here to say,

19  all right, we have these fundamental principles that we're

20  going to honor, equal protection, due process, and if the

21  majority passes a law that violates those fundamental

22  principles, it's the job of the court to strike it down.

23  Strike it down wide?  No.  Strike it down as narrowly as

24  possible so that the democratic process could fix it, and

25  that's all we are doing here.

1          THE COURT:  Just fix the death certificate issue?

2          MR. GERHARDSTEIN:  Well, the democratic process may

3    choose to fix more than that, but the only issue before this

4    Court is the failure to recognize marriages when citizens come

5    before a registrar seeking a death certificate that has the

6    marriage on it -- that should have the marriage on it.

7          I mean, yesterday was my anniversary, 41 years

8    married.  If I die tomorrow, I am sure that my wife would want

9    on my death certificate, and I would too, the fact that the

10   biggest event in my life is properly noted.

11         And that's all same-sex marriage, death certificate,

12   remedial relief will say.  Yes, that was the biggest event in

13   John and James' life.  That was a defining aspect of themselves

14   as a couple.  And they deserve to have the same dignity that my

15   wife and I would have.

16         And the fact that it is a same-sex marriage shouldn't

17   be the defining factor here.  Especially in light of the double

18   standard that Ohio has created when it comes to recognizing

19   marriages that are celebrated in violation of Ohio rules but in

20   other jurisdictions.

21         So what's the other criteria that the State has cited

22   as a basis for defending this under a rational basis?  They

23   said, well, we should preserve the tradition, the traditional

24   definition of marriage.

25         Well, that's like saying because we've always done it

this way.  And that's not a very thorough or responsible way to address a big matter of public policy.  And this was directly addressed in *Windsor* where the court said that wasn't good enough.

In fact, the court has said repeatedly that tradition can actually be a reflection of entrenched prejudice.  I mean, one of the best examples is the case that went to the U.S. Supreme Court about the Virginia Military Institute.  I mean, that's just an honored and storied institution but they didn't have any women.  And it was a government-funded institution.  And their main defense was, well, of course we don't have any women, this is the way we've always done it, this is the Virginia Military Institute.  And the Supreme Court said, not good enough.

I mean, that is a tradition that has entrenched prejudice.  And they struck it down and said, if you're going to use public money, you better open it up because there's no way to fix this problem other than to recognize it as prejudice against women.  And that is true.

That was true in *Loving* as well.  So the fact that something has been around a long time is not, in and of itself, a support for ongoing prejudice.

The other thing the State argued was religious liberty.  And Doctor Wymyslo didn't actually say that that's a support or a defense on a rational basis.  The brief simply

argued that we need to consider religious objections if we're
going to make any change in the recognition ban, and we agree.

But that isn't a defense to what we're talking about.
Rather, that's just a fix that needs to be adopted by the
legislature if they want to explore further striking down the
failure to recognize same-sex marriages. And we cite in our
brief the Connecticut statute that seems to balance the
interests of religion and people who have a problem with
recognizing same-sex marriages.

Again, that's where you just shoot back to the
legislature and let them solve the problem. That is not the
problem before this Court.

One thing the State did not argue was the interest of
children, and the amicus argued that CCV-- CCV was, of course,
the primary motivator in the state for the anti-gay, you know,
marriage amendments that we're challenging. And maybe the
State didn't argue the interests of children because Ohio does
permit gay people to adopt.

Now we have plenty of problems with the extent to
which they permit it. We think there should be second-parent
adoption, there should be stepchildren adoption, there's plenty
of work to do on adoption.

But at its core, even the Ohio Supreme Court has
already ruled that a gay person can be a parent and be an
adoptive parent. And of, course, those adoptions in Ohio

routinely come with gay partners in the house and a gay household.  So it would be sort of disingenuous for Ohio to say that children shouldn't be raised in same-sex households while they're at least starting to permit that to happen across the state.

THE COURT:  This isn't really on point, but gay adoption in Ohio, a gay citizen can adopt a child.

MR. GERHARDSTEIN:  Right.

THE COURT:  But a gay couple cannot, as a couple.

MR. GERHARDSTEIN:  Right.

THE COURT:  Very well.  It is not relevant to this, perhaps.

MR. GERHARDSTEIN:  So it's certainly relevant to Dave Michener, who has three children.

THE COURT:  And he and his partner adopted three children?

MR. GERHARDSTEIN:  That's right.

THE COURT:  I need to know more about those plaintiffs.  I understand he's present, but were they Cincinnatians?  They were a couple for 18 years, they adopted three kids.  Were they Cincinnatians?  Did they go to Delaware just to get married?  Do you know?

MR. GERHARDSTEIN:  They have interests in Delaware, property and so forth.  They did go to Delaware to get married, as many people have been doing since *Windsor*, in order to get

 1   advantage of the federal recognition of their marriage, if

 2   nothing else.

 3       THE COURT:  Does the fact that your couples are not

 4   traditional migratory couples have any impact on the analysis

 5   here?

 6       MR. GERHARDSTEIN:  You know, that's called an evasive

 7   marriage.

 8       THE COURT:  Right.

 9       MR. GERHARDSTEIN:  Which doesn't have any impact,

10   especially after *Windsor*.  I mean, you're only using common

11   sense to say, wow, the federal government is going to recognize

12   valid marriages from any of 17 states -- Illinois just started

13   and their marriages will start in June of 2014 -- why shouldn't

14   I get married, especially if it is pretty easy to do, so that I

15   can at least get somebody in America, the federal government,

16   to recognize my marriage?

17       So that doesn't matter.  And it doesn't matter even

18   under the place-of-celebration rule in Ohio because some of the

19   cases involved so-called evasive marriages even under

20   place-of-celebration rule, so that's not a serious factor.

21       But Dave Michener has three children that he's now

22   raising alone.  They are in school.  They are -- they were a

23   healthy couple that were raising very healthy children and

24   they're all well balanced and doing well and grieving the loss

25   of their other dad.

1       But it is a great example of a couple that is totally

2  disrespected by the rule in this case.  They will go forward

3  with their remaining dad.  And unless this Court had acted, the

4  marriage between their parents wouldn't have been recognized.

5  And that's a total affront to their sense of stability and

6  normalcy and balance that they wouldn't have experienced except

7  for the fact that they had same-sex parents.

8       THE COURT:  And I would say this to anyone in any

9  case, and I said it in this case before, and it is the first

10 opportunity I've had to see Mr. Michener to express on behalf

11 of the community and the court, I regret your loss.

12      MR. MICHENER:  Thank you, Judge.

13      MR. GERHARDSTEIN:  Thank you, Judge.

14      The other thing about this whole notion of focusing on

15 children is there's absolutely no fit between this alleged

16 purpose and its impact.  I mean, refusing to recognize gay

17 marriages doesn't promote opposite-sex marriages.  I mean,

18 refusing to recognize gay marriages doesn't make opposite-sex

19 parents any better, or opposite second parents with their

20 children any healthier as families.

21      Refusing to recognize gay marriages doesn't reduce or

22 increase the number of same-sex couples that have children with

23 them.  They're still there, they're living in our midst and

24 they're struggling to make sense of a law that doesn't respect

25 them.

1     But even in spite of the discrimination that has

2 occurred to date, every bit of science -- and this is where

3 Doctor Fulcher's report is very important -- every bit of

4 science that has looked at this conclusively establishes that

5 children of gay and lesbian couples are just as well balanced

6 as opposite-sex couples, and there's certainly no benefit to be

7 gained by refusing to recognize the marriages of their parents.

8     So there's a couple other points that I think we

9 should address:  Number one is *Baker versus Nelson*.  The State

10 has said there's no case here because in *Baker versus Nelson* --

11 in 1972, the U.S. Supreme Court dismissed a petition, an

12 appeal, from the Minnesota Supreme Court saying that this

13 couple that wants to have their marriage -- that wants to get

14 married in Minnesota and were denied by the Minnesota Supreme

15 Court, do not state a substantial federal question.

16     And all I can say to that, Judge, is that so much has

17 happened since 1972, that that should not be a barrier to a

18 thorough examination of the law in light of the subsequent

19 precedent, both on the right to marriage, on equal protection,

20 and on gay rights with respect to *Romer* and *Windsor* itself.

21     And maybe the most telling thing about the power of

22 the *Baker* decision today is that I can't find it cited in the

23 *Windsor* case at all.  Not even the dissent cited *Baker versus*

24 *Nelson*.

25     So, I really think it's appropriate, and we cited

another District Court that has taken a good look at this -- I think in Pennsylvania -- and concluded that *Baker versus Nelson* should not be a hindrance to a thorough review of these issues.

THE COURT:  And that spoke to marriage creation as opposed to recognition?

MR. GERHARDSTEIN:  The *Baker versus Nelson* case did. So in that sense, it doesn't even relate to a recognition argument.  And, of course*, Windsor* was a recognition argument. And what we bring to this Court is a recognition argument as well.

THE COURT:  Right.  You're not asking this Court to order Ohio to perform gay sex marriages, correct?

MR. GERHARDSTEIN:  That's correct.

THE COURT:  You're asking this Court to require Ohio to recognize on death certificates valid marriages of same-sex couples out of state.

MR. GERHARDSTEIN:  That's correct, based on its similar treatment of opposite-sex couples who couldn't accomplish a marriage in Ohio.

THE COURT:  And the historical tradition of not striking down evasive marriages.

MR. GERHARDSTEIN:  That's right.  That's very true.

The other thing the State has cited is Section 2 of DOMA, which was not addressed by the U.S. Supreme Court except to say that this case doesn't involve Section 2.

And similarly, we would say that our case doesn't involve Section 2. It is not a defense to equal protection and due process.

Section 2, of course, says that no state need give effect to public records act or judicial proceedings that recognize same-sex marriages. But it is, first, very suspect under *Windsor* since in Section 2, again, Congress is doing that unusual discrimination. It is labeling some marriages as good and some as bad which, in Section 3, the Supreme Court said you couldn't do.

And secondly, and most importantly, the Full Faith and Credit principle must be addressed in light and consistently with other constitutional provisions.

So if this directive by Congress to states that they need not recognize public documents and orders that involve same-sex marriages, violates the Constitution, violates the Equal Protection Clause and the Due Process Clause for the reasons we stated, the fact that it is blatantly laid out in Section 2 doesn't enhance the argument. If anything, it simply is a further indication that these types of measures are written to punish, to identify, and to hurt this group of same-sex married people.

And we don't need to address whether DOMA Section 2 is constitutional or not because we're directly making our arguments under the Equal Protection Clause and under the Due

Process Clause.  It cannot provide a defense, it cannot be the
rational basis because Congress told us so.  That's just a
circular argument.  And in that sense, it doesn't advance the
analysis that this Court must proceed with.

THE COURT:  And you think this Court can grant the
relief you seek without striking down as unconstitutional DOMA
Section 2?

MR. GERHARDSTEIN:  Right, because we have not tried to
invoke the Full Faith and Credit Clause.  And we aren't
leading -- our doctrinal analysis doesn't go through that
passage.  We're just saying -- and by the way, the
place-of-celebration rule isn't based on Full Faith and Credit.
I mean, this is just a longstanding practice between states
that are trying to live together in a nation.  And it isn't
dependent upon Full Faith and Credit, and it need not be
addressed.

Again, we're trying to do and suggest to this Court,
limited judicial relief.  You don't need to reach out and solve
constitutional problems that are unnecessary to solve, and
that's a basic doctrine that all courts try to follow.

So, Judge, you know, we do ask that you grant the
permanent injunction and the declaratory relief for the married
plaintiffs.  This will protect their death certificates.  It
will protect the death certificate of John Arthur and William
Ives from amendment, which could happen.

It will also allow the surviving spouses, David and James, if they should die and not be remarried, to be listed as widows, so they still have a viable issue here.

And then for Robert Grunn, it will provide the clear direction he needs to be able to record as married decedents who were spouses in same-sex marriages celebrated in jurisdictions where those marriages are authorized so that he doesn't have to run back to court, either a third-party standing or dragging a grieving spouse with him, to get direction on that issue next time around.

THE COURT: So what do you want the order to say as to Grunn?

MR. GERHARDSTEIN: Our proposed order as to Grunn --

THE COURT: I thought this was sort of an as-applied challenge relating to these four plaintiffs, one of whom he serviced as a funeral director. What are you asking that the Court do?

MR. GERHARDSTEIN: Declare that plaintiff, Robert Grunn, may, consistent with the Constitution, report that a decedent married in a state authorizing same-sex marriage is, quote, married, or widowed, and report the name of the decedent's surviving spouse on an Ohio death certificate he completes in the course of his work as a funeral director in Ohio.

That's from our proposed order at 53-2 of the record.

1          THE COURT:  Very well.

2          MR. GERHARDSTEIN:  And we've also asked that that

3   declaration be accompanied by an injunction.  And to be fair,

4   our last paragraph also asks that Director Wymyslo and Jones be

5   required to issue directives to other funeral directors

6   consistent with this order.

7          That reaches a little further than just Robert Grunn.

8   This Court need not do that, but it would be unfortunate if, as

9   a result of this case, we had inconsistent rules about

10  recognition across the state.

11          But I don't take that last paragraph to be nearly as

12  important as the directive to Grunn himself, because we can

13  always take up additional funeral directors and additional

14  discussions with the State going forward.

15          THE COURT:  Very well.

16          MR. GERHARDSTEIN:  Thank you.

17          THE COURT:  Did you reserve some time for reply?  Or

18  anticipate that?

19          MR. GERHARDSTEIN:  Yes.

20          THE COURT:  Very well.

21          Morning, Ms. Coontz.

22          MS. COONTZ:  Good morning, Your Honor.

23          May it please the Court, counsel for plaintiffs have

24  made very clear that this case is about recognition of

25  out-of-state same-sex marriages in a very narrow context, death

certificates.  That's it.

And accepting as a given that the plaintiffs are not challenging Ohio's right to define marriage as between a man and a woman, this case is very narrow.

So even if the plaintiffs get all of the relief that they seek, same-sex marriages will still not be permitted in Ohio and it won't be recognized in Ohio anywhere other than in the plaintiffs' death certificates and the death certificates that are issued by Mr. Grunn.

And even if plaintiffs get everything that they want in this case, Section 2 of DOMA, which gives Ohio the authority to define marriage as being between a man and a woman, will remain presumptively constitutional federal law.

So the question before this Court is a purely legal one, and that is whether Ohio can refuse to recognize same-sex marriages on death certificates only.

*Windsor*, Section 2 of DOMA, and *Baker versus Nelson* tell us that it can.

Six months ago, the court decided in *Windsor* that rational basis -- as plaintiffs concede -- rational basis applies to a classification based on sexual orientation.  And the Court premised its decision on the same principles of Federalism and the unquestioned authority of states to define marriage that control in this case.

Because as the *Windsor* court stated, the whole subject

1   of domestic relations belongs to the laws of the state.  And

2   this is not a new concept.  And it is why, in *Baker versus*

3   *Nelson*, the Supreme Court said that there's no federal question

4   when it comes to states' marriage laws in general.

5           *Windsor* did not overrule *Baker*.  And in *Baker* --

6   excuse me -- the Florida District Court recognized this and it

7   is why, when faced with a similar recognition situation that we

8   have today, the court refused to recognize -- Florida refused

9   to recognize plaintiffs' Massachusetts marriage.

10          In our case, Ohio doesn't recognize plaintiffs'

11  respective Maryland and Delaware marriages.  And in accordance

12  with *Baker*, that's okay.  That is permissible under prevailing

13  Supreme Court precedent.

14          And since *Baker*, the Supreme Court has never said that

15  one state has to recognize same-sex marriages performed by

16  another.  It certainly didn't say that in *Windsor*.

17          THE COURT:  In *Windsor*, what it said was that the

18  federal government was required to recognize same-sex marriages

19  that the -- under state law?

20          MS. COONTZ:  Correct.

21          THE COURT:  Yes?

22          MS. COONTZ:  Correct, correct.

23          THE COURT:  And they said that the federal government

24  had to do that based on the Due Process and Equal Protection

25  Clauses of the Federal Constitution, right?

1      MS. COONTZ:  Correct.

2      THE COURT:  So if the federal government can't violate

3  the Due Process Clause or Equal Protection Clause, why can a

4  state?

5      MS. COONTZ:  Because the federal government's law did

6  not satisfy a rational basis, which is the applicable standard

7  in this case.

8      What the *Windsor* court looked at is the validity of

9  the federal government's intervention into the area of marriage

10  laws.  And that's how the Court began its decision, because

11  that's really what Section 3 of DOMA was.  It was the

12  federal -- excuse me -- federal government intervening into the

13  state's well-established right to define marriage.

14      THE COURT:  It was an unusual move.

15      MS. COONTZ:  Absolutely.  It was a move of an unusual

16  character, as the Court said.

17      THE COURT:  And in Ohio, wasn't it a movement of

18  unusual characteristics when Ohio, for the first time ever in

19  its history, picked out a type of marriage that Ohio wasn't

20  going to recognize?

21      MS. COONTZ:  It didn't change Ohio law.  Before Issue

22  1 was passed, same-sex marriage was not legal in Ohio.  So when

23  Issue 1 was passed, when the constitutional amendment was

24  adopted, it was not a move of unusual character.  It's not --

25  it doesn't create the inference of animus that was present for

1   the *Windsor* court.

2          The *Windsor* court said, look, federal government,

3   you've tread into waters that you have historically not tread.

4   And they went over and above to give a long descriptive history

5   of the principles of Federalism and how much this was

6   exclusively left to the states.  And because the federal

7   government went there, the court inferred animus.

8          Ohio has never allowed same-sex marriages.  So when

9   Issue 1 was passed, it wasn't a change in direction, it was a

10  reaffirmation of the public policy of the State of Ohio.  It

11  was not an unusual move by any stretch.  It was the same --

12  same law that had always been in place before the

13  constitutional amendment was passed.

14         THE COURT:  But wasn't it the first time ever that

15  Ohio picked out a kind of marriage and said, we're not going to

16  recognize that one?

17         MS. COONTZ:  That doesn't change the fact that the law

18  itself did not change.  It does not change the fact that before

19  Issue 1, same-sex marriage was prohibited, and after same-sex

20  marriages -- excuse me -- after Issue 1, same-sex marriages.

21  And that is clearly distinguishable from the situation in

22  *Windsor*.

23         THE COURT:  Issue 1 was the amendment of the Ohio

24  Constitution?

25         MS. COONTZ:  Yes, Your Honor.  Yes, Your Honor.  That

1  was the ballot name for Issue 1.

2       So what the *Windsor* court did is also as important as

3  what it didn't do, because the *Windsor* court obviously knew

4  about the *Baker* decision and clearly the Windsor court

5  didn't -- from what plaintiffs' counsel is saying is correct.

6  The *Windsor* court didn't address *Baker* in its decision.  It

7  didn't need to, because the *Windsor* decision addressed a

8  federal statute.

9       Since *Baker*, the Supreme Court has never said that one

10 state must recognize the same-sex marriages performed under the

11 laws of another state.  *Windsor* did not overrule *Baker*.  But

12 even if this Court is not convinced that *Baker* controls,

13 Section 2 of DOMA does.

14      Section 2 is the presumptively constitutional federal

15 statute that tells us that a state does not have to recognize

16 the same-sex marriages performed in another state.  And

17 plaintiffs aren't challenging its constitutionality in this

18 case.  So no matter what happens in this case, Ohio will still

19 have a federal statutory right to refuse to recognize same-sex

20 marriages performed out of state.

21      THE COURT:  But does that fact answer the question

22 whether that's a rational basis for the marriage recognition

23 ban?

24      MS. COONTZ:  Ohio's reliance on a presumptively

25 constitutional federal statute could be a rational basis for a

voter to vote for Issue 1.  It could be a rational basis that

supports Ohio's law itself.  But even if Section 2 and DOMA

don't -- excuse me Section 2 of DOMA and *Baker* don't foreclose

this action, plaintiffs haven't negated every conceivable

rational basis in support of Ohio's marriage laws in this

narrow context, as they must.

The rational basis review is the most deferential

standard of review.  And as plaintiffs admit, it is the

appropriate standard of review in this case.

The Sixth Circuit has recognized that under the

rational basis standard for accepting legislative schemes are

far from daunting, and the Court will be satisfied with

rational speculation, and it's constitutionally irrelevant what

reasons in fact underlay the legislative decision.

So the state doesn't have to prove that the reasons

that it advances actually support the legislation at issue.

Rational speculation is sufficient.

And in this case there are a number of conceivable

rational bases in support of not recognizing an out-of-state

same-sex marriage in the narrow context that plaintiffs are

requesting this Court.

THE COURT:  Okay.  We'll get to those in a moment.

MS. COONTZ:  Okay.

THE COURT:  So the Court's not to consider what the

primary sponsor of the constitutional amendment was out

advancing, which, in their description, was to fight the
pro-homosexual community.

MS. COONTZ:  To be clear, the plaintiffs are not
before this Court challenging the entire scheme of Ohio's
marriage laws.  They're only asking this Court to declare them
unconstitutional in a limited context.

But to answer the Court's question, no.  In the Sixth
Circuit, we don't look at the motivation behind the electorate
in passing certain legislature.  Because how do we?  How do
we reduce to one sentence the will of three million voters?

THE COURT:  You look at what the sponsors were
advertising and saying during the election season.

MS. COONTZ:  But as the Court cautioned in *Arthur*, to
take the motivations of the sponsors and infer that that was
the motivation of the rest of the voters is improper.  We
simply can't do that.  I can't stand before this Court and say
what three million people were thinking.  And the courts have
to recognize the difficulty in doing that, which is why we
don't look at the motivation when trying to determine what was
the purpose behind a particular legislative scheme.

And again, in this case, there are a number of
conceivable rational bases for this, for the legislative scheme
that Ohio has enacted.

THE COURT:  And you're about to tick right through
them.

1    But you do acknowledge that voters can't pass
2  unconstitutional stuff, right?
3    MS. COONTZ:  Yes.  Yes, I do.
4    THE COURT:  Okay.
5    MS. COONTZ:  The desire to have consistent legislation
6  of a consistent legislative scheme is, in and of itself,
7  entirely consistent.
8    Plaintiffs are before this Court asking it to carve
9  out one separate sect of recognition about same-sex marriage:
10 death certificates only.  They're not saying that Ohio will
11 have to recognize same-sex marriage in any other context.  This
12 request, in and of itself, demonstrates that there's a rational
13 basis for Ohio's law because it is entirely rational for Ohio
14 to want to remain consistent in its definition of marriage
15 throughout Ohio law.
16    It's even more rational, in this as-applied challenge,
17 as plaintiffs have made clear, when they're only asking for
18 this relief for one particular funeral home director, to say,
19 no, the recognition -- the Ohio's marriage laws with respect to
20 death certificates apply equally among all funeral directors.
21    Ohio needs to be consistent.  And it is entirely
22 rational for Ohio to want to remain consistent in this
23 legislative scheme and that, in and of itself, supports the
24 rational basis for refusing to recognize same-sex marriages in
25 recognition of death certificates alone.

1    The desire to use caution when making a dramatic

2 shift in --

3    THE COURT:  Is that a rational interest that arose

4 simply because of this lawsuit?

5    MS. COONTZ:  It doesn't matter under rational basis.

6 The question is not whether -- I mean, did anybody -- would

7 anybody who had voted for Issue 1, did anybody think that a

8 plaintiff was going to be here asking for a single carve out in

9 the context of death certificates?  I don't know, but I highly

10 doubt it.

11    But under a rational basis, it doesn't matter, because

12 it's not whether the basis offered actually supports --

13 actually supported the legislation when it was enacted.  The

14 question is whether it is a rational basis supporting the law

15 as it exists today.

16    THE COURT:  But you and I understand that the Court's

17 order is going to relate to these plaintiffs, and then there's

18 going to be a court order out there that people are going to

19 reference, particularly if it is sustained on appeal, right?

20    MS. COONTZ:  Yes.

21    THE COURT:  So, I mean, I know the plaintiffs say it

22 is just as-applied to them, but in the real world out there,

23 the stakes are larger, are they not?

24    MS. COONTZ:  Yes.

25    THE COURT:  Very well.

1    MS. COONTZ:  And ultimately, what the Court's question

2  goes to is plaintiffs want to have to defend the rational basis

3  of this very narrowly but really this seeks broader relief.  I

4  mean, the Court's question goes to, yeah, they're seeking a

5  precedent that they don't have to establish the rational basis

6  for that entire precedent they're trying to say, oh, this is

7  narrowed to one limited context.  But the limited context in

8  which -- to which the plaintiffs have confined it, in and of

9  itself, provides a rational basis for the consistency that Ohio

10  wants to have with its laws.

11    Similarly, the desire to use caution when making such

12  a dramatic shift in Ohio's policy is entirely rational.  The

13  terms "husband," "wife," and "spouse" collectively appear

14  hundreds of times throughout the Ohio's Revised Code, so

15  changing who is and who is not married under Ohio law has

16  sweeping consequences.  The voters' desire to evaluate and make

17  that change deliberatively, if it's going to happen, is

18  entirely rational.

19    And the *Jackson* court recognized this when it said

20  that the State may rationally decide to observe the effects of

21  allowing same-sex marriage in other states before changing its

22  definition of marriage.

23    THE COURT:  Who said that, *Jackson*?

24    MS. COONTZ:  *Jackson*, 884 F.Supp.2d at 1118.

25    THE COURT:  What court?  District Court?

1          MS. COONTZ:  Yes.

2          THE COURT:  After or before *Windsor*?

3          MS. COONTZ:  Before *Windsor*, Your Honor.

4          And again, Your Honor, it is entirely rational --

5          THE COURT:  I mean, the need to act cautiously has

6    never been a valid defense to stopping unconstitutional

7    activity, has it?

8          MS. COONTZ:  No, but that presumes that the statute is

9    unconstitutional, and the State's position is that it's not.

10         THE COURT:  Very well.

11         MS. COONTZ:  Again, Your Honor, that -- the existence

12   of Section 2 to DOMA itself is entirely rational.  It is

13   entirely rational for the State to say:  We have a

14   presumptively constitutional federal statute that allows Ohio

15   to set its marriage laws as it has, and it provides a rational

16   basis for Ohio's marriage policy.

17         Ohio's desire to retain the right to define marriage

18   is rational.  Ohio doesn't want Delaware or Maryland to define

19   who is married under Ohio law.  To allow that to happen would

20   allow one state to set the marriage policy for all others.

21         THE COURT:  This Court is not going to have anything

22   to do with ordering Ohio to perform same-sex marriages.  That's

23   not before the Court.  It is a very limited issue.  It is when

24   one state gives you something and you come to Ohio, can Ohio

25   take it away without due process.

1        MS. COONTZ:  It's recognition.

2        THE COURT:  Right.

3        MS. COONTZ:  It is.  But what the plaintiffs are

4   asking is that Ohio treat their marriages as valid in Ohio when

5   Ohio law provides that they're not.  And Section 2 of DOMA says

6   that Ohio does not have to.

7        And Ohio -- no matter what happens in this case,

8   Section 2 of DOMA will remain good law because plaintiffs are

9   not challenging it.  It is not before the Court today.

10        Ohio's desire to retain the right to define marriage

11   within its borders is especially -- especially important in

12   this case when just six months ago the *Windsor* court

13   re-affirmed that right.  It, again, went through the history of

14   the principles of Federalism and the right of a state to define

15   marriage for itself.

16        Ohio's desire to retain the right to define marriage

17   through the democratic versus the judicial process is entirely

18   rational.

19        As the *Mazzoleni* court made clear, absent a clear

20   public policy statement, the definition of marriage could be a

21   matter for courts.   And wanting to retain the right to define

22   marriage through the judicial practice -- excuse me -- through

23   the democratic versus the judicial process is entirely

24   rational.

25        And this case illustrates that changing laws through

1   the judicial process in the piecemeal fashion that plaintiffs

2   seek can create inconsistencies through Ohio law.  And it is

3   rational for Ohioans to say, no, we want to do this through the

4   democratic, not through the judicial process.

5        THE COURT:  I mean, you can't say that we've got a

6   rational state interest in this because we want to control it

7   and we want to pass stuff that doesn't recognize the role of

8   the United States Constitution in preserving our fundamental

9   rights, like our liberty interests in who we associate with,

10  and our right to have equal protection of the laws.

11       Just because you want to control it, and you want to

12  vote on it, doesn't give you that right, does it?

13       MS. COONTZ:  The *Windsor* court re-affirmed that right

14  six months ago in the court's decision, when it talked of the

15  states' rights to define marriage.

16       THE COURT:  That didn't -- it didn't answer the

17  question.  It did talk about states' rights.

18       MS. COONTZ:  Correct.

19       THE COURT:  And I've always found the politicians say,

20  I'll leave this to the states.  But if the United States

21  Supreme Court has said the federal government cannot fail to

22  recognize valid same-sex marriages, why can't the states?   And

23  it is what Justice -- that dissenting guy --

24       MS. COONTZ:  Scalia.

25       THE COURT:  Scalia.  That's what he predicted.  And he

said, you know, they're going to cite this case, and he repeated the case and he struck "federal" government and wrote in "state" government. And that, you know -- and the shoe dropped, and now it's here. And I'm required to follow the law of the United States Supreme Court.

MS. COONTZ: And, again, the State's position is that *Windsor* is distinguishable because of the unusual character of the federal government's act in prohibiting recognition of the State's definition of marriage. It didn't strike down the State's right to define marriage, and it didn't touch Section 2. Neither --

THE COURT: And it didn't deal with due process or equal protection. It said, you know, you don't need to pay attention to the Full Faith and Credit Clause when you do this, but that's not what is presented here, right?

MS. COONTZ: I --

THE COURT: Lost you? Continue your argument. You're doing fine.

You were running through these legitimate reasons, and you said tradition, and we want to prevail -- continue the Democratic tradition in voting campaigns.

What are the other legitimate reasons that you had not yet identified, or have you gone through them?

MS. COONTZ: Your Honor, the plaintiffs recognize and they agree that religious liberties need to be accommodated for

and balanced when setting forth a marriage policy in Ohio.  And
voters -- Ohioans' desire to assure that those accommodations
are in place, before changing Ohio's marriage laws, if they're
going to change, is entirely rational.

And as the Supreme Court told us in *Heller*, the fact
that any one of these rationales is arguable is sufficient to
immunize it from constitutional challenge.

THE COURT:  Unless they're talking about intermediate
review or Sixth Circuit.

MS. COONTZ:  Which we're not.  And plaintiffs agree
that we're not.

THE COURT:  I don't think plaintiffs agree.  They say
that, you know, it doesn't even pass rational basis.  But their
first argument is heightened scrutiny, a fundamental right.
And you pretty quickly said, pay no attention to all those
declarations from all those law professors.

MS. COONTZ:  Well, plaintiffs want it to be heightened
scrutiny.

THE COURT:  Right.

MS. COONTZ:  And I realize that.  Plaintiffs agree
that it is rational basis and that the *Windsor* court applied
rational basis.

They also cite in their brief the controlling Sixth
Circuit precedent which they argue that -- should be reexamined
after *Windsor*.  But they identify the controlling Sixth Circuit

precedent as *Davis* and *Scarbrough*, which are both cases that applied rational basis scrutiny to a classification based on sexual orientation.

THE COURT: And they argued and relied on *Bowers*, which was overruled.

MS. COONTZ: Which was overruled by *Lawrence*. However, what the Supreme Court said in *Lawrence* is that that case did not involve whether a government must give formal recognition to any relationship that homosexual persons seek to enter. That's 539 U.S. at 579. *Lawrence* did not deal with same-sex marriages. Expressly didn't deal with same-sex marriages.

Further, it wasn't an equal protection case that in any way changed the standard of review to apply to classification based on sexual orientation. The *Windsor* court obviously knew that *Lawrence* existed. And knowing that *Lawrence* existed, the *Windsor* court still applied rational basis.

So heightened scrutiny simply doesn't apply in this case. We have *Davis* from 2001, and we have *Windsor* from only six months ago. Both are binding and both apply rational basis to the classification at issue in this case.

THE COURT: And *Windsor* said that there was no rational basis for the federal law barring recognition because it was motivated by animus, hatred, and discrimination, right?

1    MS. COONTZ:  Due to the unusual character of the

2 federal government's intrusion into an area that was

3 traditionally and historically left to the states.

4    THE COURT:  You're telling me I can't look at what the

5 purpose of the amendment in 2004 was?

6    MS. COONTZ:  Not under Sixth Circuit precedent.  It is

7 not -- the Court cannot -- the State cannot look at the

8 motivations -- the Court cannot look at the motivations behind

9 Issue 1.

10    Because, again, how do we reduce to one sentence, to

11 one thought, the thoughts of three million voters?  We simply

12 can't do it.  And in doing so, would improperly infer -- could

13 potentially improperly infer some sort of animus that voters

14 didn't have.  And that's why the court said, we don't go there.

15 We don't look at the motivations behind a popularly enacted

16 measure, such as Ohio's marriage laws.

17    So, yes, plaintiffs want heightened scrutiny to apply

18 and plaintiffs say that *Lawrence* is controlling, but it simply

19 is not.

20    Rational basis applies in this case.  Again, the

21 narrow relief that plaintiffs seek shows that rational basis is

22 appropriate -- that there's a rational basis for applying

23 Ohio's marriage laws consistently.  And because plaintiffs have

24 not negated every conceivable basis for Ohio's marriage laws,

25 their motion for permanent injunction should be denied.

1          THE COURT:  What do you make of the notion that if

2     somebody gets married out of state, and now they've got a

3     fundamental liberty interest in their status as married, and

4     they move to Ohio, and Ohio takes that away by its ban, why is

5     that not the deprivation of taking away a liberty interest

6     based on due process of law?

7          MS. COONTZ:  Well, the Court's question to plaintiffs'

8     counsel was appropriate regarding the fact that no court has

9     ever said that there's a fundamental right to same-sex

10    marriage.  So that's really the issue.  Is there a fundamental

11    right?  No.  And if the *Windsor* court felt there was a

12    fundamental right, then six months ago they would have applied

13    heightened scrutiny and it would be a different standard of

14    review.

15         THE COURT:  But that's a fundamental right as to

16    getting married same sex.

17         I'm asking you about the fundamental right, the

18    liberty interest that I got married here, I've got all of my

19    benefits, and now I come to your state and you strip them from

20    me without any procedural protection.  That's a violation of a

21    due process liberty interest, not equal protection.  Why is

22    that okay?  Why can't Ohio, when faced with a bunch of co-equal

23    states, decide that a marriage license from Delaware is

24    worthless for this occurrence?

25         MS. COONTZ:  Because Ohio has the right to define its

marriage policy pursuant to the constitutional federal marriage statute. The *Windsor* court recognized Ohio's right to define marriage. The *Windsor* court was clearly aware of this liberty interest that the Court has posed in its question. And even given that, that question, it still said states have the right to define marriage. Section 2 of DOMA still exists, and states have a historical right to do exactly what Ohio did.

And the outcome of this case will not change that. It will still exist.

THE COURT: Do citizens have a fundamental right, a liberty interest, in the right to remain married?

MS. COONTZ: Under the laws of Ohio or under the laws of the state in which the marriage was performed?

Ohio -- do citizens with a marriage performed out of state, that was against the public policy of Ohio, have a right to be considered married under the laws of Ohio? No. Are they still married under the laws of the state in which the marriage was performed? Yes.

Ohio is not invalidating someone else's marriage. We're simply saying that, for Ohio's purposes, their marriage is not recognized under the laws of the State of Ohio. Congress has said that we're allowed to do that, and that's the posture of this case.

THE COURT: Well, I suppose I better recognize it on the record. You're a good lawyer.

1    MS. COONTZ:  Thank you, Judge.

2    THE COURT:  Other issues?

3    MS. COONTZ:  No, Your Honor.  No issues from the

4 State.

5    THE COURT:  Very well.

6    MS. COONTZ:  Thank you.

7    THE COURT:  We'll ask the other lawyers:  Do you feel

8 compelled to reply?

9    MR. GERHARDSTEIN:  Very briefly.

10   THE COURT:  That's what they always say.

11   MR. GERHARDSTEIN:  *Windsor* is not distinguishable.  It

12 really is adequate precedent for this marriage-recognition

13 case.  And we're getting closer because we're all focused on

14 the same language.

15   There is an unusual character to what Congress did.

16 It started picking between marriages among the states, and it

17 had never done that before.  That created the careful

18 consideration.

19   Ohio has never picked among the states.  If your

20 marriage is valid where it is celebrated, Ohio will honor that.

21 And now, because of same-sex marriage, they've started doing

22 it.  Same issue.  It is a recognition case.  *Windsor* is

23 adequate precedent.

24   And it is interesting that now we're criticized for

25 seeking too little.  I guess if we had tried to hit a home run,

then, you know, somehow that would be a better equal protection argument.

We are proposing that this Court solve only the problem in front of it.  It can cite to whatever legal principles are appropriate, which are equal protection and due process, and if the next case has to address some of the other issues, then it will.

We're not saying that Ohio law will stay the same after this case because there will probably be further legal actions, further attempts at repeal, further legislation, and that's the way the whole process works -- legislation, initiatives, and judicial review.

So the fact that we're seeking relief only for these plaintiffs is a recognition of judicial restraint and nothing that should be held against the plaintiffs.

The defense counsel said Ohio should not have dictated to it what marriages should be valid.  They should have thought of that before they started following the place-of-celebration rule.  I mean, they have the place-of-celebration rule, now when they suddenly see a type of marriage they don't want to honor, they abandon the rule.  And that is just the type of unusual discrimination that causes, even under equal protection, the level of scrutiny that would strike it down.

And this is why it is also interesting to think about common-law marriage.  Because we don't have a court order, we

don't have a marriage certificate, we don't have an edict.  And
so that clearly doesn't implicate Section 2 of DOMA.  We simply
have an Ohio place-of-celebration rule that says, if your
common-law marriage is valid in whatever state you entered into
it, and you come to Ohio, we'll give you a divorce.  Or we'll
recognize it on your death certificate.  Or we'll let you
appeal to the Probate Court as a surviving spouse.  And that
doesn't involve DOMA at all because there was no paperwork back
there when they got the common-law marriage.

          And yet Ohio went to the pain to amend its common-law
marriage statute to say, well, we're not going to recognize
this with respect to same-sex marriages, an unusual
discrimination that triggers careful consideration.

          DOMA is irrelevant, to that and to the rest of the
argument, because you don't need to go through that passage if
you choose not to.  If we have the appropriate case where
somebody is using the Full Faith and Credit Clause, will we
attack Section 2?   Absolutely.  Do we need to here?  No.  And,
again, that's an appeal to using judicial restraint and solving
only the problem in front of you.

          THE COURT:  And you'll file that civil action in
Columbus?

          MR. GERHARDSTEIN:  Well, we'll see where venue lies.

          There was a question about religious liberty.  We
don't need to solve the religious problem before there's any

change in the law.  This Court addresses constitutional
problems and then the rest of the civic system, with
legislatures and so forth, can come afterwards to address any
additional problems that might come up.

Finally, Judge, there was this notion that Ohio law
prohibited same-sex marriages before and that the law we're
challenging didn't change anything.  I just wanted to clear
this up.

There was no reference in Ohio law to same-sex
marriages before the statute which we're challenging, 3101, was
passed and became effective in 2004.  The amendment, Issue 1,
became effective afterward, in November.  So I suppose
technically, the amendment didn't change what the statute did,
but we're here challenging both.

We're here challenging the marriage recognition ban,
both in the statute and in the Ohio Constitution.  And, in
fact, there was a major difference in Ohio law as a result of
the bans recognized by those acts, and that was a huge change
in how Ohio applied the place-of-celebration rule, which is
deficient under heightened scrutiny, which we urge the Court to
apply, and under rational basis as applied using that language
we've been talking about in *Windsor* and *Romer*.

And even under other aspects of rational basis, we've
cited in our brief at document 62, page 16, *Craigmiles versus
Giles*.  In that case, the Court, applying rational basis said:

All right, Tennessee cannot -- can't allow only licensed funeral directors to sell caskets because there are other stores out there that want to sell caskets. And this is a law that just simply favors one business person over another. That failed rational basis.

So rational basis is not crystal clear all the time. But clearly, when the purpose is to harm one to the benefit of another, especially when the target has historically been discriminated against, as the Court did in *Windsor*, we'd ask this Court to do here, and strike down the Ohio marriage recognition ban as applied in this context.

Thank you.

THE COURT: Very well. Well, oral argument has been helpful to the Court. It's been helpful all along. Briefing is excellent and the Court's preparing to act.

The current order expires December 31st. The Court needs to act before then. I would like to act before the holidays.

It's been helpful and I'm prepared to adjourn, unless there's more. Is there more from the plaintiff's perspective?

MR. GERHARDSTEIN: Nothing from the plaintiffs, Your Honor.

THE COURT: From the defendants?

MS. COONTZ: Nothing, Your Honor. Thank you.

MR. HERZIG: Nothing, Your Honor.

1                    THE COURT:  Very well.  Thank you all.  The Court

2     prepares to recess.

3                    THE COURTROOM DEPUTY:  All rise.

4               (The proceedings concluded at 11: 24 a.m.)

5                              - - -

6

7

8

9

10

11

12

13                    C E R T I F I C A T E

14          I, Jodie D. Perkins, RMR, CRR, the undersigned,

15     certify that the foregoing is a correct transcript from the

16     record of proceedings in the above-entitled matter.

17

18                              s/Jodie D. Perkins
                                 _____
                                 Jodie D. Perkins, RMR, CRR
19                               Official Court Reporter

20

21

22

23

24

25