IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES OBERGEFELL, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 13-CV-501 |
| | : | |
| v. | : | Judge Timothy S. Black |
| | : | |
| DR. THEODORE WYMYSLO | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF THEODORE E. WYMYSLO, MD

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | ss: |
| COUNTY OF FRANKLIN | ) | |

Theodore E. Wymyslo, MD, being first duly cautioned and sworn, states as follows:

1.   Pursuant to this Court's December 23, 2013 Order and through the Ohio Department of Health's Office of General Counsel, I instructed the Office of Vital Statistics to distribute the attached Notice of Court Order to persons within Ohio who assist with completing Ohio death certificates.

2.   On February 21, 2014, the Office of Vital Statistics sent the attached Notice of Court Order to local registrars and funeral directors via email using the office's current distribution list.

3.   In addition, the Office of Vital Statistics will post the Notice of Court Order on its website http://vitalsupport.citrix.odh.ohio.gov to ensure wide distribution.

FURTHER AFFIANT SAYETH NAUGHT

Theodore E. Wymyslo, MD

Sworn before me and subscribed in my presence this 21st day of February, 2014.

Notary Public, State of Ohio

SOCRATES H. TUCH, ATTORNEY AT LAW
NOTARY PUBLIC, STATE OF OHIO
My commission has no expiration date.
Section 147.03 R.C.

## NOTICE OF COURT ORDER

Pursuant to the Order of the United States District Court for the Southern District of Ohio in *Obergefell, et al. v. Wymyslo,* 13-CV-501, Dr. Theodore E. Wymyslo, Director of the Ohio Department of Health, provides this notice to persons within Ohio who assist with completing Ohio death certificates. On December 23, 2013 United States District Court Judge Timothy S. Black issued a Final Order and Declaratory Judgment and Permanent Injunction (ECF Docs. No. 65 & 66) in the matter of *Obergefell, et al. v. Wymyslo, et al.*, Case No. 13-CV-501. Importantly, while you are being provided with this notice as somebody who may assist in completing Ohio death certificates, the Court's Order only applies to Plaintiffs James Obergefell, John Arthur, David Michener, and Robert Grunn (with respect to his future clients about whom he reports information regarding their marital status and status as surviving spouses in support of their requests for death certificates).

In its Order, the Court declared unconstitutional Ohio's prohibition against same-sex marriage as applied to Plaintiffs James Obergefell, John Arthur, David Michener, and Robert Grunn in the context of death certificates. Further, the Court required Dr. Wymyslo, Dr. Camille Jones, and anyone acting on either of their behalves, to recognize the out-of-state same-sex marriages of Mr. Arthur, Mr. Obergefell and Mr. Michener by listing each as "married" on their respective death certificates and by listing each decedent's "surviving spouse." The Court further declared that Plaintiff, Mr. Grunn, a funeral director, may report that a decedent married in a state authorizing same-sex marriage is "married" or "widowed" and report the name of the decedents' "surviving spouse" on an Ohio death certificate that he completes in the course of his work as a funeral director in Ohio. The Court prohibited Dr. Wymyslo and Dr. Jones from

initiating any criminal prosecution or administrative proceeding against Mr. Grunn for recording a same-sex marriage on an Ohio death certificate.

Finally, the Court ordered Dr. Wymyslo to "make a best faith effort to communicate notice of its final Orders to all persons within the State who assist with completing Ohio death certificates".

Specifically, the Order:

1.) Declares that Ohio Const. Art. XV, §11 and Ohio Rev. Code § 3101.01(C) are unconstitutional as applied to Plaintiffs [James Obergefell, John Arthur, David Michener, and/or Robert Grunn], and that the filing of death certificates on behalf of Plaintiffs in valid same-sex marriages from other jurisdictions, if requested, shall recognize decedents as "married" or "widowed" and shall acknowledge decedents' "surviving spouses".

2.) Declares that Ohio Const. Art. XV, §11 and Ohio Rev. Code § 3101.01(C) violate the constitutional rights of same-sex couples married in jurisdictions that authorize same-sex marriage who become clients of Plaintiff Robert Grunn and about whom he reports information regarding their marital status and status as surviving spouses in support of their requests for death certificates.

3.) Declares that Plaintiff Robert Grunn may, consistent with the Constitution of the United States and this Court's Final Order, report that a decedent married in a state authorizing same-sex marriage is "married" or "widowed" and report the name of the decedent's surviving same-sex spouse on an Ohio death certificate he completes in the course of his work as a funeral director in Ohio.

4.) Provides that Defendants Theodore Wymyslo and Camille Jones, and their officers, agents, and employees, and those persons acting in active concert or participation with Defendants who receive actual notice of this Order, are also permanently enjoined from enforcing Ohio Const. Art. XV§11 and Ohio Rev. Code § 3101.01(C), as applied to Plaintiffs [James Obergefell, John Arthur, David Michener, and/or Robert Grunn] such that Defendants, and all those acting in concert, are required to issue permanently to each married Plaintiff a death certificate that records his or her marital status as "married" or "widowed" and lists the same-sex "surviving spouse" by name, and Defendants, and those persons in active concert or participation with Defendants who receive actual notice of this Order, are prohibited from initiating any criminal prosecution or administrative discipline against Plaintiff Grunn for recording same-sex marriages and same-sex surviving spouses on the death certificates he completes.

Copies of Judge Black's *Final Order Granting Plaintiffs' Motion for Declaratory Judgment and Permanent Injunction* (ECF Doc. No. 65) and *Declaratory Judgment and Permanent Injunction* (ECF Doc. No. 66) are attached in *.pdf* format for reference. This *Notice* is being transmitted pursuant to the Court's Order.

The Ohio Department of Health has appealed this Order to the United States Court of Appeals for the Sixth Circuit.

2/20/2014
_____
Date

*[signature]*

Theodore E. Wymyslo, M.D.,
Director, Ohio Department of Health

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES OBERGEFELL, *et al.* | : | Case No. 1:13-cv-501 |
| | : | |
| Plaintiffs, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| THEODORE W. WYMYSLO, M.D., *et al.* | : | |
| | : | |
| Defendants. | : | |

DECLARATORY JUDGMENT
AND PERMANENT INJUNCTION

This Court earlier entered a Temporary Restraining Order in this case as applied to

Plaintiffs Obergefell and Arthur and a similar Order as applied to Plaintiff Michener.

(Docs. 14 and 23). The parties extended these Orders by agreement until final disposition

of this case. (Docs. 16 and 23). Now, upon consideration of Plaintiffs' Motion for

Declaratory Judgment and Permanent Injunction (Doc. 53), the parties' responsive

memoranda (Docs. 56 and 62), and the record evidence, the Court has found and

concluded that Plaintiffs' motion is appropriately granted. (Doc. 56). Consequently,

the Court now enters final judgment of declaratory judgment and permanent injunction.

Specifically, the Court finds that Plaintiffs have established that Ohio Const. Art.

XV, §11 and Ohio Rev. Code. § 3101.01(C) violate rights secured by the Fourteenth

Amendment to the United States Constitution in that same-sex couples legally married in

other jurisdictions who seek to have their out-of-state marriages recognized and accepted

as legal in and by Ohio are denied due process of law when the attendant protections and benefits of their existing marriages are denied by the state and are denied the equal protection of the laws when Ohio does recognize heterosexual marriages from other jurisdictions, even if the heterosexual marriage is of a kind not authorized in Ohio. The evidence demonstrates that there is no state interest sufficient to justify denying same-sex married couples the same recognition of their existing marriages.

Therefore, this Court hereby **DECLARES** that Ohio Const. Art. XV, §11 and Ohio Rev. Code. § 3101.01(C) are unconstitutional as applied to Plaintiffs, and that the filing of death certificates on behalf of Plaintiffs in valid same-sex marriages from other jurisdictions, if requested, shall recognize decedents as "married" or "widowed" and shall acknowledge decedents' "surviving spouses."

The Court further **DECLARES** that Ohio Const. Art. XV, §11 and Ohio Rev. Code. § 3101.01(C) violate the constitutional rights of those same-sex couples married in jurisdictions that authorize same-sex marriage who become clients of Plaintiff Robert Grunn and about whom he reports information regarding their marital status and status as surviving spouses in support of their requests for death certificates.

Specifically, this Court **DECLARES** that Plaintiff Robert Grunn may, consistent with the Constitution of the United States and this Court's Final Order, report that a decedent married in a state authorizing same-sex marriage is "married" or "widowed" and report the name of the decedent's surviving same-sex spouse on an Ohio death certificate he completes in the course of his work as a funeral director in Ohio.

2

Defendants Theodore Wymyslo and Camille Jones, and their officers, agents, and employees, and those persons in active concert or participation with Defendants who receive actual notice of this Order, are also **PERMANENTLY ENJOINED** from enforcing Ohio Const. Art. XV, §11 and Ohio Rev. Code. § 3101.01(C), as applied to Plaintiffs, such that Defendants, and all those acting in concert, are required to issue permanently to each married Plaintiff a death certificate that records his or her marital status as "married" or "widowed" and lists the same-sex "surviving spouse" by name, and Defendants, and those persons in active concert or participation with Defendants who receive actual notice of this Order, are prohibited from initiating any criminal prosecution or administrative discipline against Plaintiff Grunn for recording same-sex marriages and same-sex surviving spouses on the death certificates he completes.

Defendant Dr. Theodore E. Wymyslo is further **ORDERED** to make a best faith effort to communicate Notice of this Court's Final Orders (Docs. 56 & 57) to all persons within Ohio who assist with completing Ohio death certificates, and Dr. Wymyslo shall evidence such compliance by filing with this Court an Affidavit by 3/31/14.

**IT IS SO ORDERED**.

Date: 12/23/13

*/s/ Timothy S. Black*
Timothy S. Black
United States District Judge

3

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JAMES OBERGEFELL, *et al.*,      :      Case No. 1:13-cv-501
      Plaintiffs,      :      Judge Timothy S. Black
      :
vs.      :
      :
THEODORE E. WYMYSLO, M.D., *et al.*,  :
      Defendants.      :

### FINAL ORDER
### GRANTING PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT
### AND PERMANENT INJUNCTION

      This civil case is before the Court for final decision on Plaintiffs' Motion for

Declaratory Judgment and Permanent Injunction (Doc. 53), the record evidence (Docs.

34, 42-47, 61; *see* Appendix at pp. 49-50[1]), Defendants' memorandum in opposition

(Doc. 56), Plaintiffs' reply (Doc. 62), and oral argument held on December 18, 2013.

Plaintiffs include two individuals who entered into legal same-sex marriages in states that

provide for such marriages and have been denied recognition of those legal marriages on

their spouses' death certificates by the State of Ohio. Plaintiffs seek a declaratory

judgment that, as applied to them, Ohio's ban on the recognition of legal same-sex

marriages granted in other states is unconstitutional; and, therefore, that a permanent

injunction compelling Defendants and their officers to recognize Plaintiffs' marriages on

Ohio death certificates is required under the law and the evidence. Also present as a

Plaintiff is Robert Grunn, an Ohio funeral director, who seeks a declaration of his rights

and duties when preparing death certificates for individuals in same-sex marriages.

Defendants are the local and state officers responsible for death certificates.

1

## OVERVIEW

The Court's ruling today is a limited one, and states simply, that under the Constitution of the United States, Ohio must recognize valid out-of-state marriages between same-sex couples on Ohio death certificates, just as Ohio recognizes all other out-of-state marriages, if valid in the state performed, and even if not authorized nor validly performed under Ohio law, such as marriages between first cousins, marriages of certain minors, and common law marriages.

That is, once you get married lawfully in one state, another state cannot summarily take your marriage away, because the right to remain married is properly recognized as a fundamental liberty interest protected by the Due Process Clause of the United States Constitution. U.S. Const. amend. XIV, § 1.

Moreover, as this Court held in its initial Orders this summer and reaffirms today, by treating lawful same-sex marriages differently than it treats lawful opposite sex marriages (e.g., marriages of first cousins, marriages of certain minors, and common law marriages), Ohio law, as applied to these Plaintiffs, violates the United States Constitution's guarantee of equal protection: that "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction equal protection of the laws." U.S. Const. amend. XIV, § 1.

Therefore, under the Constitution of the United States, Ohio must recognize on Ohio death certificates valid same-sex marriages from other states.

2

    This conclusion flows from the *Windsor* decision of the United States Supreme Court this past summer, which held that the federal government cannot refuse to recognize a valid same-sex marriage. *United States v. Windsor*, \_\_\_ U.S. \_\_\_, 133 S. Ct. 2675 (2013). And now it is just as Justice Scalia predicted[1] – the lower courts are applying the Supreme Court's decision,[2] as they must, and the question is presented whether a state can do what the federal government cannot – *i.e.*, discriminate against same-sex couples … simply because the majority of the voters don't like homosexuality (or at least didn't in 2004). Under the Constitution of the United States, the answer is no, as follows.[3]

---

[1] In a vigorous dissent to the *Windsor* ruling, Justice Scalia predicted that the question whether states could refuse to recognize other states' same-sex marriages would come quickly, and that the majority's opinion spelled defeat for any state's refusal to recognize same-sex marriages authorized by a co-equal state. As Justice Scalia predicted: "no one should be fooled [by this decision] … the majority arms well any challenger to a state law restricting marriage to its traditional definition … it's just a matter of listening and waiting for the other shoe [to drop]." *Windsor*, 133 S. Ct. at 2710 (Scalia, J., dissenting).

[2] *See Griego v. Oliver*, No. 34,306, 2013 WL 6670704, at \*22 (**N.M. Dec. 19, 2013**) ("Denying same-gender couples the right to marry and thus depriving them and their families of the rights, protections, and responsibilities of civil marriage violates the equality demanded by the Equal Protection Clause of the New Mexico Constitution."); *see also Kitchen v. Herbert*, 2:13-CV-00217 (D. **Utah Dec. 20, 2013**) ("Utah's prohibition on same-sex marriage conflicts with the United States Constitution's guarantees of equal protection and due process under the law.").

[3] As the Supreme Court has explained:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (emphasis supplied).

3

## I.    ESTABLISHED FACTS

### A.    Marriage Law in Ohio

The general rule in the United States for interstate marriage recognition is the "place of celebration" rule, or *lex loci contractus*, which provides that marriages valid where celebrated are valid everywhere. (Doc. 44-1 at ¶ 7). Historically, Ohio has recognized marriages that would be invalid if performed in Ohio, but are valid in the jurisdiction where celebrated. This is true even when such marriages clearly violate Ohio law and are entered into outside of Ohio with the purpose of evading Ohio's unwillingness to grant them. (*Id.*). Ohio departed from this tradition in 2004 to adopt its statutory and constitutional prohibitions on the recognition of marriages between two individuals of the same sex ("marriage recognition bans"). (*Id.* at ¶¶ 7, 32, 60). Prior to 2004, the Ohio legislature had never passed a law denying recognition to a specific type of marriage solemnized outside of the state. (*Id.* at ¶¶ 32, 51).

Ohio Revised Code Section 3101 was amended in 2004 to prohibit same-sex marriages in the state and to prohibit recognition of same-sex marriages from other states. Sub-section (C) provides the following:

> (1) Any marriage between persons of the same sex is against the strong public policy of this state. Any marriage between persons of the same sex shall have no legal force or effect in this state and, if attempted to be entered into in this state, is void ab initio and shall not be recognized by this state.

> (2) Any marriage entered into by persons of the same sex in any other jurisdiction shall be considered and treated in all respects as having no legal force or effect in this state and shall not be recognized by this state.

4

(3) The recognition or extension by the state of the specific statutory benefits of a legal marriage to nonmarital relationships between persons of the same sex or different sexes is against the strong public policy of this state. Any public act, record, or judicial proceeding of this state, as defined in section 9.82 of the Revised Code, that extends the specific statutory benefits of legal marriage to nonmarital relationships between persons of the same sex or different sexes is void ab initio . . .

(4) Any public act, record, or judicial proceeding of any other state, country, or other jurisdiction outside this state that extends the specific benefits of legal marriage to nonmarital relationships between persons of the same sex or different sexes shall be considered and treated in all respects as having no legal force or effect in this state and shall not be recognized by this state.

Ohio Rev. Code Ann. § 3101.01.

Also adopted in 2004 was an amendment to the Ohio Constitution, which states:

Only a union between one man and one woman may be a marriage valid in or recognized by this state and its political subdivisions. This state and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance or effect of marriage.

Ohio Const. art. XV, § 11.

At the time of the passage of these provisions, Governor Robert Taft stated that

their purpose was "to reaffirm existing Ohio law with respect to our most basic, rooted,

and time-honored institution: marriage between a man and a woman." He went on:

Marriage is an essential building block of our society, an institution we must reaffirm. At a time when parents and families are under constant attack within our social culture, it is important to confirm and protect those environments that offer our children, and ultimately our society, the best opportunity to thrive.

(Doc. 41-1 at ¶ 72).

5

During the 2004 floor debates over the legislation, Senator Jeff Jacobson stated that the legislation would not interfere with "the way adults choose to order their lives" because "[a]dults can form household relationships" after the passage of the legislation even though those relationships "don't have all the bells and whistles," "[p]erhaps don't have all the opportunities," and do not appear "equal to everyone else's." (*Id.* at ¶ 59).

The primary sponsor for the 2004 Ohio constitutional amendment, Citizens for Community Values ("CCV"), described as its core principle its goal to protect Ohio from the "inherent dangers of the homosexual activists' agenda." (*Id.* at ¶ 82).

CCV sent letters to school boards and superintendents in Ohio warning them, erroneously, that they would face criminal and "daunting" civil liability if they took measures to protect lesbian and gay students from violence and harassment. (*Id.* at ¶ 84). In one of CCV's campaign publications, the organization misled Ohio voters about the need for the amendment, stating that marriage equality advocates sought to eliminate age requirements for marriage, advocated polygamy, and sought elimination of kinship limitations so that incestuous marriages could occur. (*Id.* at ¶ 85). CCV warned Ohio employers that "[s]exual relationships between members of the same sex expose gays, lesbians and bisexuals to extreme risks of sexually transmitted diseases, physical injuries, mental disorders and even a shortened life span." (*Id.* at ¶ 86). The television and media campaign in support of the amendment contained misleading statements, such as "[w]e won't have a future unless [heterosexual] moms and dads have children," and that

6

"[e]very major social science study tells us time and again: families are stronger with a wife and a husband; children do better with a mother and a father." (*Id.* at ¶ 88).[4]

**B.** **Plaintiffs James Obergefell, John Arthur (now deceased), David Michener, and Robert Grunn**

Longtime Cincinnati residents James Obergefell and John Arthur met in 1992 and lived together in a loving, committed relationship for more than 20 years. (Doc. 3-1 at ¶¶ 2-3). In 2011, Mr. Arthur was diagnosed with amyotrophic lateral sclerosis ("ALS"), a terminal illness. (*Id.* at ¶ 8). After the Supreme Court's decision in *Windsor* requiring the federal government to recognize valid same-sex marriages, Mr. Obergefell and Mr. Arthur decided to get married. (*Id.* at ¶ 11). On July 11, 2013, the couple boarded a medically equipped plane to travel to Maryland, a state that provides for same-sex marriages, and were married in the plane as it sat on the tarmac. (*Id.* at ¶ 12). Under Ohio law, their marriage was not recognized for any purpose until this Court granted them a temporary restraining order requiring that upon Mr. Arthur's death, his death certificate reflect that he was married and that Mr. Obergefell is his surviving spouse. (*Id.* at ¶ 13; Doc. 14). Mr. Arthur died on October 22, 2013, and his death certificate was issued in compliance with this Court's Order. (Docs. 51, 52). Without this Court ordering a permanent injunction, Mr. Arthur's death certificate would need to be amended to remove any mention of his husband, Mr. Obergefell, or their marriage. Ohio Rev. Code Ann. § 3705.22.

---

[4] With this Court's leave, CCV also filed an amicus brief in this case. (Doc. 61). Among its many remarkable and fundamentally baseless arguments, one of the most offensive is that adopted children are less emotionally healthy than children raised by birth parents.

Plaintiff David Michener and his late spouse, William Herbert Ives, were together as a loving couple for 18 years and adopted three children together. (Doc. 21 at 1). On July 22, 2013, Mr. Michener and Mr. Ives were married in Delaware, a state that provides for same-sex marriages. (*Id.*) On August 27, 2013, Mr. Ives died unexpectedly of natural causes. (*Id.*) In order for the cremation of Mr. Ives' remains to proceed, a death certificate had to be issued, and Plaintiff Michener sought a death certificate that accurately reflected their marriage. (*Id.*) This Court entered a temporary restraining order granting such relief on September 3, 2013. (Doc. 23). Without a permanent injunction, the Court-ordered death certificate of William Herbert Ives would need to be amended to remove any mention of Mr. Michener or their marriage. Ohio Rev. Code Ann. § 3705.22.

Robert Grunn is a licensed funeral director operating his business in Cincinnati, Ohio. (Doc. 34-1 at ¶¶ 2, 12). Mr. Grunn is a gay man and is known within the gay community as a gay-friendly funeral director. (*Id.* at ¶ 11). One of his responsibilities as a funeral director is to fill out death certificates, including the portion of the certificate indicating the deceased's marital status and the name of the surviving spouse. (*Id.* at ¶ 3). He uses Ohio Department of Health software to do this, and for deaths that occur in Cincinnati, he delivers the death certificates to the office of Defendant Camille Jones. (*Id.* at ¶¶ 3, 5). In his experience, his clients often do not realize the importance of death certificates until he returns certified copies to them. (*Id.* at ¶ 7). Mr. Grunn has multiple married gay or lesbian clients, including Mr. Obergefell, who utilized his services when Mr. Arthur died. (*Id.* at ¶¶ 13-15). In the future, Mr. Grunn is <u>certain</u> to face the question

8

of how to fill out death certificates for married same-sex couples. (*Id.*) Mr. Grunn intends to record the marital status as "married" and list the surviving spouse of the next married decedent with a same-sex spouse that he serves, but fears that by doing so he may be prosecuted for purposely making a false statement on a death certificate. (*Id.* at ¶ 17). He seeks a declaration of his rights and duties when serving clients with same-sex spouses. (Doc. 53-1 at 12).

## II.    STANDARD OF REVIEW

An "as-applied challenge" to a law, as here, limits the relief to the particular circumstances of the plaintiff. A "facial challenge," not presented here, generally seeks to declare or enjoin a law as unconstitutional in all respects. In this case, Plaintiffs have requested injunctive and declaratory relief limited to the issue of marriage recognition on death certificates. The narrow breadth of the remedy employed by this Court reflects this distinction. *See Citizens United v. Fed. Elections Comm.*, 558 U.S. 310, 331 (2010).

A permanent injunction is appropriate if a party "can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)). It is within the sound discretion of the district court to grant or deny a motion for permanent injunction. *See Kallstrom*, 136 F.3d at 1067; *Wayne v. Vill. of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994) (district court erred in failing to rule on permanent injunction request).

9

In the Sixth Circuit, "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Savoie v. Martin*, 673 F.3d 488, 495-96 (6th Cir. 2012) (quoting *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). Both criteria for rendering a declaratory judgment are established here.

### III. ANALYSIS

#### A. Due Process Clause

The Due Process Clause of the Fourteenth Amendment to the United States Constitution establishes that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. And "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men" that is protected by the Due Process Clause. *Loving v. Virginia*, 388 U.S. 1, 12 (1967).[5]

However, although neither the United States Court of Appeals for the Sixth Circuit nor the Supreme Court of the United States has spoken on the issue, most courts have <u>not</u> found that a right to same-sex marriage is implicated in the fundamental right to marry.

---

[5] *See also Turner v. Safley*, 482 U.S. 78, 95 (1987) ("The decision to marry is a fundamental right"); *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition"); *Griswold v. Connecticut*, 381 U.S. 479, 485-486 (1965) (intrusions into the "sacred precincts of marital bedrooms" offend rights "older than the Bill of Rights"); *id.*, at 495-496 (Goldberg, J., concurring) (the law in question "disrupt[ed] the traditional relation of the family – a relation as old and as fundamental as our entire civilization"); *see generally Washington v. Glucksberg*, 521 U.S. 702, 727 n.19 (1997) (citing cases).

10

*See, e.g., Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1094-98 (D. Haw. 2012) ("Other courts considering claims that same-sex couples have a fundamental right to marry, have concluded that the right at issue is not the existing fundamental 'right to marry.'") (collecting cases).[6]

In situations like those of Plaintiffs, however, where same-sex couples legally marry outside of Ohio and then reside in Ohio, a different right than the fundamental right to marry is also implicated: here, the constitutional due process right at issue is not the right to marry, but, instead, the right not to be deprived of one's already-existing legal marriage and its attendant benefits and protections.[7]

### 1.    Right of Marriage Recognition

As the Supreme Court has observed, the idea of being married in one state and unmarried in another is one of "the most perplexing and distressing complication[s] in the domestic relations of . . . citizens." *Williams v. North Carolina*, 317 U.S. 287, 299 (1942). In identifying the right to remain married as fundamental, Professor Sanders points out that the "[l]aw favors stability in legal relationships, vindication of justified expectations, and preventing casual evasion of legal duties and responsibilities."

---

[6] *See also Wilson v. Ake*, 354 F. Supp. 2d 1298, 1306-07 (M.D. Fla. 2005) ("No federal court has recognized that [due process] . . . includes the right to marry a person of the same sex") (internal citation omitted); *Conaway v. Deane*, 932 A.2d 571, 628 (Md. App. 2007) ("[V]irtually every court to have considered the issue has held that same-sex marriage is not constitutionally protected as fundamental in either their state or the Nation as a whole"); *Hernandez v. Robles*, 855 N.E.2d 1, 9 (N.Y. 2006) ("The right to marry is unquestionably a fundamental right . . . The right to marry someone of the same sex, however, is not "deeply rooted," it has not even been asserted until relatively recent times"). *But see Kitchen v. Herbert*, 2:13-CV-00217 (D. Utah Dec. 20, 2013).

[7] The concept of the right to remain married as a liberty interest protected by the Due Process Clause is eloquently advanced by Professor Steve Sanders in his article, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 MICH. L. REV. 1421 (2011). This judge acknowledges significant reliance upon Professor Sanders's learned (and more extended) analysis of the fundamental right to remain married.

11

Sanders, 110 MICH. L. REV. at 1425.   Moreover, the Supreme Court has established that existing marital, family, and intimate relationships are areas into which the government should generally not intrude without substantial justification. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *see also Lawrence v. Texas*, 549 U.S. 558, 578 (2003).  Based on these principles, the concept that a marriage that has legal force where it was celebrated also has legal force throughout the country has been a longstanding general rule in every state.[8]

The right to remain married is therefore properly recognized as one that is a fundamental liberty interest appropriately protected by the Due Process Clause of the United States Constitution.  Here, Ohio's marriage recognition bans violate this fundamental right without rational justification.

### a.   Level of Scrutiny

As a general matter, the Supreme Court applies strict scrutiny when a state law encroaches on a fundamental right. *Roe v. Wade*, 410 U.S. 113, 155 (1973).  While the right to marriage recognition has not historically been labeled "fundamental," in the Supreme Court cases establishing the highly-protected status of existing marriage, family, and intimate relationships, the Court has applied an intermediate standard of review falling between rational basis and strict scrutiny. *See, e.g.*, *Moore*, 431 U.S. at 113 (1977) (balancing the state interests advanced and the extent to which they are served by the challenged law against the burden on plaintiff's rights); *Zablocki v. Redhail*, 434 U.S.

---

[8] Joanna L. Grossman, *Resurrecting Comity: Revisiting the Problem of Non-Uniform Marriage Laws*, 84 OR. L. REV. 433, 461 (2005) (historically, "[a]ll jurisdictions followed some version of *lex loci contractus* in evaluating the validity of a marriage").

374 (1978) (same). As the Ninth Circuit has observed, in *Lawrence*, the "[Supreme] Court's rationale for its holding – the inquiry analysis that it was applying – is inconsistent with rational basis review." *Witt v. Dep't of the Air Force*, 527 F.3d 806, 817 (9th Cir. 2008). The Ninth Circuit also took note of a post-*Lawrence* substantive due process case, *Sell v. United States*, 39 U.S. 166 (2003), in which the Supreme Court recognized a "significant constitutionally protected liberty interest" (but not a fundamental right) in "avoiding the unwanted administration of antipsychotic drugs." *Id.* at 178 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)). The Supreme Court held that such intrusion on personal interests by the government was permissible only where it was "necessary significantly to further important governmental trial-related interests." *Id.* at 179. In other words, a mere legitimate interest would not suffice. The court's conclusion in *Witt* that, based on *Lawrence* and *Sell*, intermediate scrutiny was appropriate is also applicable to the case at hand: for when "the government attempts to intrude upon the private lives of homosexuals," then "the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest." *Witt*, 527 F.3d at 817.

Based on the foregoing, the balancing approach of intermediate scrutiny is appropriate in this similar instance where Ohio is intruding into – and in fact erasing – Plaintiffs' already-established marital and family relations.

### b. Burden on Plaintiffs

When couples – including same-sex couples – enter into marriage, it generally involves long-term plans for how they will organize their finances, property, and family

13

lives. "In an age of widespread travel and ease of mobility, it would create inordinate confusion and defy the reasonable expectations of citizens whose marriage is valid in one state to hold that marriage invalid elsewhere." *In re Estate of Lenherr*, 314 A.2d 255, 258 (Pa. 1974).

Couples moving from state to state have an expectation that their marriage and, more concretely, the property interests involved with it – including bank accounts, inheritance rights, property, and other rights and benefits associated with marriage – will follow them. When a state effectively terminates the marriage of a same-sex couple married in another jurisdiction, it intrudes into the realm of private marital, family, and intimate relations specifically protected by the Supreme Court. After *Lawrence*, same-sex relationships fall squarely within this sphere, and when it comes to same-sex couples, a state may not "seek to control a personal relationship," "define the meaning of the relationship," or "set its boundaries absent injury to a person or abuse of an institution the law protects." *Lawrence*, 539 U.S at 578.

For example, when a parent's legal relationship to her child is terminated by the state, it must present clear and convincing evidence supporting its action to overcome the burden of its loss. *Santosky v. Kramer*, 455 U.S. 745, 753, 769 (1982). Here, in this case, a similar legal familial relationship is unilaterally terminated by Ohio's marriage recognition bans, without any due process.

Moreover, Ohio's official statutory and constitutional establishment of same-sex couples married in other jurisdictions as a disfavored and disadvantaged subset of people has a destabilizing and stigmatizing impact on them.

14

In striking down the statutory provision that had denied gay and lesbian couples federal recognition of their otherwise valid marriages, the Supreme Court in *Windsor* observed:

> [The relevant statute] tells those couples, and all the world, that their otherwise valid marriages are unworthy of . . . recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects . . . And it humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

*Windsor*, 133 S. Ct. at 2694.

Ohio death certificates, which currently do not reflect legal marriages of same-sex couples outside of this litigation, are important not only for the dignity of the surviving spouse and his or her family, but also have evidentiary value for rights such as receiving life insurance payouts, claiming social security survivors benefits, administering wills, and title transfers for automobiles, real estate, and other property. (Doc. 34-1 at ¶ 6; Doc. 45-1 at ¶ 17).  However, in Ohio, when a married person domiciled in Ohio who has a valid same-sex marriage from another jurisdiction dies, the estate administration unfolds as if the person had died unmarried, and the many rights afforded to surviving spouses under Ohio probate law are denied to same-sex surviving spouses.  While, after *Windsor*, many federal tax laws that used to disfavor same-sex spouses over opposite-sex spouses no longer do so, Ohio's tax commission has refused to offer same-sex spouses equal rights under its regulations. (Doc. 45-1 at ¶¶ 40-43).  Married same-sex couples must

consider many additional burdens in their estate planning in order to try to protect their surviving spouse from financial vulnerability. (*Id.* at ¶¶ 50-65).

In the family law context, while opposite-sex married couples can invoke step-parent adoption procedures or adopt children together, same-sex married couples cannot. While Ohio courts allow an individual gay or lesbian person to adopt a child, a same-sex couple cannot. (Doc. 41-1 at ¶ 17). Same-sex couples are denied local and state tax benefits available to heterosexual married couples, denied access to entitlement programs (*e.g.*, Medicaid, food stamps, welfare benefits, *etc.*) available to heterosexual married couples and their families, barred by hospital staff and/or relatives from their long-time partners' bedsides during serious and final illnesses due to lack of legally-recognized relationship status, denied the remedy of loss of consortium when a spouse is seriously injured through the acts of another, denied the remedy of a wrongful death claim when a spouse is fatally injured through the wrongful acts of another, and evicted from their homes following a spouse's death because same-sex spouses are considered complete strangers to each other in the eyes of the law. (*Id.* at ¶ 23).

The benefits of state-sanctioned marriage are extensive, and the injuries raised and evidenced by Plaintiffs represent just a portion of the harm suffered by same-sex married couples due to Ohio's refusal to recognize and give the effect of law to their legal unions.

### c. Potential State Interests

Defendants advance a number of interests in support of Ohio's marriage recognition bans. (Doc. 56 at 33-40). Defendants cite "Ohioans' desire to retain the right to define marriage through the democratic process," "avoiding judicial intrusion upon a

16

historically legislative function," "Ohio's interest in approaching social change with

deliberation and due care," "the desire not to alter the definition of marriage without

evaluating steps to safeguard the religious rights and beliefs of others," and "[p]reserving

the traditional definition of marriage," although they raise these interests in the context of

a rational basis equal protection analysis. (*Id.*)

In the intermediate scrutiny context, however, these vague, speculative, and

unsubstantiated state interests do not rise anywhere near the level necessary to

counterbalance the specific, quantifiable, and particularized injuries evidenced here and

suffered by same-sex couples when their existing legal marriages and the attendant

protections and benefits are taken from them by the state.

Defendants argue that *Windsor* stressed that "regulation of domestic relations is an

area that has long been regarded as a virtually exclusive province of the States."

*Windsor*, 133 S. Ct. at 2692. However, as Defendants acknowledge, this regulation is

"subject to constitutional guarantees." (Doc. 56 at 18). As the Supreme Court has

explained:

> The very purpose of a Bill of Rights was to withdraw certain subjects from
> the vicissitudes of political controversy, to place them beyond the reach of
> majorities and officials and to establish them as legal principles to be
> applied by the courts. One's right to life, liberty, and property, to free
> speech, a free press, freedom of worship and assembly, and other
> fundamental rights may not be submitted to vote; they depend on the
> outcome of no elections.

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (emphasis supplied).

Regardless of the justifications provided by an enactment's proponents, the

Supreme Court has clearly stated that if such an enactment violates the U.S. Constitution

17

– whether passed by the people or their representatives – judicial intervention is necessary to preserve the rule of law. *See, e.g., Watson v. City of Memphis*, 373 U.S. 526, 528 (1963) (rejecting appeal by city to permit delay in desegregation based on alleged "need and wisdom of proceeding slowly and gradually"). The electorate cannot order a violation of the Due Process or Equal Protection Clauses by referendum or otherwise, just as the state may not avoid their application by deferring to the wishes or objections of its citizens. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985).

The fact that each state has the exclusive power to create marriages within its territory does not logically lead to the conclusion that states can nullify already-established marriages from other co-equal states absent due process of law. Perhaps the interests raised by Defendants may be more compelling in the context of marriage *creation* than they are in the context of marriages that have already taken place and same-sex relationships that already exist, *i.e.*, marriage *recognition*.[9]

Defendants have not provided evidence of any state interest compelling enough to counteract the harm Plaintiffs suffer when they lose, simply because they are in Ohio, the immensely important dignity, status, recognition, and protection of lawful marriage. As

---

[9] The Court acknowledges the continuing pendency of Section 2 of the discredited federal Defense of Marriage Act ("DOMA"), which Section 2 was not before the Supreme Court in *Windsor*, and wherein Congress has sought to invoke its power under the Constitution's full faith and credit clause to state that "[n]o State . . . shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State," 28 U.S.C. § 1738C, but this Court states affirmatively that Section 2 of DOMA does not provide a legitimate basis for otherwise constitutionally invalid state laws, like Ohio's marriage recognition bans, no matter what the level of scrutiny. Although Section 2 of DOMA is not specifically before this Court, the implications of today's ruling speak for themselves. *See also Kitchen v. Herbert*, 2:13-CV-00217 (D. Utah Dec. 20, 2013).

18

the Supreme Court held in *Windsor*, marriage confers "a dignity and status of immense import." *Windsor*, 133 U.S. at 2692.

Accordingly, Ohio's refusal to recognize same-sex marriages performed in other states violates the substantive due process rights of the parties to those marriages because it deprives them of their significant liberty interest in remaining married absent a sufficient articulated state interest for doing so or <u>any</u> due process procedural protection whatsoever.

### 2. Right to Marry

Although it is unnecessary to reach the issue of whether the fundamental right to marry itself also endows Ohio same-sex couples married in other jurisdictions with a significant liberty interest in their marriages for substantive due process purposes, the Court notes that a substantial logical and jurisprudential basis exists for such a conclusion as well.[10]

---

[10] While states do have a legitimate interest in regulating and promoting marriage, the fundamental right to marry belongs to the individual. Thus, "the regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made." *Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990); *see also Loving*, 388 U.S. at 12 ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State"); *Roberts*, 468 U.S. at 620 ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . .").

In individual cases regarding parties to potential marriages with a wide variety of characteristics, the Supreme Court consistently describes a general "fundamental right to marry" rather than "the right to interracial marriage," "the right to inmate marriage," or "the right of people owing child support to marry." *See Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n.5 (N.D. Cal. 2012) (citing *Loving*, 388 U.S. at 12; *Turner*, 482 U.S. at 94-96; *Zablocki*, 434 U.S. at 383-86; *accord In re Marriage Cases*, 183 P.3d 384, 421 n.33 (Cal. 2008) (*Turner* "did not characterize the constitutional right at issue as 'the right to inmate marriage'"). And the Supreme Court held in *Lawrence* that the right of consenting adults (including same-sex couples) to engage in private, sexual intimacy is protected by the Fourteenth Amendment's protection of liberty, notwithstanding the historical existence of sodomy laws and their use against gay people.

19

## B.  Equal Protection Clause

In addition to concluding that Ohio's marriage recognition bans are an

impermissible and unconstitutional burden on Plaintiffs' significant liberty interest in

the continued existence and recognition of their marriages under the Due Process Clause,

this Court further finds and declares that Plaintiffs have also demonstrated that Ohio's

same-sex marriage recognition bans further violate Plaintiffs' constitutional rights by

denying them equal protection of the laws.

---

For the same reasons, the fundamental right to marry is "deeply rooted in this Nation's history and tradition" for purposes of constitutional protection even though same-sex couples have not historically been allowed to exercise that right. "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *Lawrence*, 539 U.S. at 572 (citation omitted).

While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a right once that right is recognized as one that due process protects. "Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights." *In re Marriage Cases*, 183 P.3d at 430 (quotation omitted).

For example, when the Supreme Court held that anti-interracial marriage laws violated the fundamental right to marry in *Loving*, it did so despite a long tradition of excluding interracial couples from marriage. *Planned Parenthood v. Casey*, 505 U.S. 833, 847-48 (1992) ("[I]nterracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving* . . . "); *Lawrence*, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack") (citation omitted).

Cases subsequent to *Loving* have similarly confirmed that the fundamental right to marry is available even to those who have not traditionally been eligible to exercise that right. *See Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) (states may not require indigent individuals to pay court fees in order to obtain a divorce, since doing so unduly burdened their fundamental right to marry again); *see also Zablocki*, 434 U.S. at 388-90 (state may not condition ability to marry on fulfillment of existing child support obligations). Similarly, the right to marry as traditionally understood in this country did not extend to people in prison. *See* Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L. Rev. 275, 277-79 (1985). Nevertheless, in *Turner*, 482 U.S. at 95-97, the Supreme Court held that a state cannot restrict a prisoner's ability to marry without sufficient justification. Thus, when analyzing other fundamental rights and liberty interests in other contexts, the Supreme Court has consistently adhered to the principle that a fundamental right, once recognized, properly belongs to everyone.

20

As the Court previously held:

> "The issue is whether the State of Ohio can discriminate against same-sex marriages lawfully solemnized out of state, when Ohio law has historically and unambiguously provided that the validity of a marriage is determined by whether it complies with the law of the jurisdiction where it was celebrated.
>
> Throughout Ohio's history, Ohio law has been clear: a marriage solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. Thus, for example, under Ohio law, out-of-state marriages between first cousins are recognized by Ohio, even though Ohio law does not authorize marriages between first cousins. Likewise, under Ohio law, out of state marriages of minors are recognized by Ohio, even though Ohio law does not authorize marriages of minors.
>
> How then can Ohio, especially given the historical status of Ohio law, single out same-sex marriages as ones it will not recognize? The short answer is that Ohio cannot . . . at least not under the circumstances here.
>
> By treating lawful same-sex marriages differently than it treats lawful opposite sex marriages (*e.g.*, marriages of first cousins and marriages of minors), Ohio law, as applied to these Plaintiffs, violates the United States Constitution which guarantees that "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction equal protection of the laws."

(Doc. 13 at 1-2, Order Granting Plaintiffs' Motion for a Temporary Restraining Order, 7/22/13).

As to equal protection, to repeat the analysis previously stated by this Court and re-affirmed today:

The Fourteenth Amendment to the United States Constitution provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis supplied).

21

Plaintiffs, two same-sex couples, were legally married in Maryland and Delaware. They reside in Ohio where their marriage is not recognized as valid. They are treated differently than they would be if they were in a comparable opposite-sex marriage. By treating lawful same-sex marriages differently than it treats lawful opposite sex marriages (*e.g.*, marriages of first cousins and marriages of minors), the Ohio laws barring recognition of out-of-state same-sex marriages, enacted in 2004, violate equal protection principles.

Although the law has long recognized that marriage and domestic relations are matters generally left to the states, *see Ex parte Burrus*, 136 U.S. 586, 593-94 (1890), the restrictions imposed on marriage must nonetheless comply with the United States Constitution. *Loving*, 388 U.S. at 12 (statute limiting marriage to same-race couples violated equal protection and due process); *Zablocki*, 434 U.S. at 383 (statute restricting from marriage persons owing child support violated equal protection).

In *Windsor*, the Supreme Court again applied the principle of equal protection to a statute restricting marriage when it reviewed the constitutionality of the federal Defense of Marriage Act ("DOMA"), which denied recognition to same-sex marriages for purposes of federal law. This included marriages from the twelve states and District of Columbia in which same-sex couples could legally marry. The Supreme Court held that the federal law was unconstitutional because it violated equal protection and due process principles guaranteed by the Fifth Amendment. *Windsor*, 133 S. Ct. at 2675.

In reality, the decision of the United States Supreme Court in *Windsor* was not unprecedented. The Court relied upon its equal protection analysis from a 1996 case

22

holding that an amendment to a state constitution, ostensibly merely prohibiting any special protections for gay people, in truth violated the Equal Protection Clause under even a rational basis analysis. *Romer v. Evans*, 517 U.S. 620 (1996).

In *Romer*, the Supreme Court struck down Colorado's Amendment 2 because, the Court held, "[w]e cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id.* at 635. The Supreme Court deemed this "class legislation . . . obnoxious to the prohibitions of the Fourteenth Amendment." *Id.* (quoting *Civil Rights Cases*, 109 U.S. 3, 24 (1883)).

As the Supreme Court held so succinctly in *Romer*: "[Colorado law] classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot so deem a class of persons a stranger to its laws. Amendment 2 violates the Equal Protection Clause[.]" 517 U.S. at 635-36.

As the Supreme Court explained in striking down Section 3 of DOMA, "[t]he avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Windsor*, 133 S. Ct. at 2693.

Similarly, in *Windsor*, the Supreme Court cited *U. S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973), for the proposition that a legislative desire to harm a

23

politically unpopular group of people cannot justify disparate treatment of that group. *Windsor*, 133 S. Ct. at 2693. In *Moreno*, a federal statute prohibiting households containing "unrelated persons" from qualifying for food stamps was held to be in violation of the Equal Protection Clause under a rational basis analysis. The legislative purpose of the statute was to prohibit "hippies" from taking advantage of food stamps. The Supreme Court held that "the classification here . . . is wholly without any rational basis." *Moreno*, 413 U.S. at 538. Likewise, in *Windsor*, the Supreme Court held that the purpose of the federal DOMA was "to impose inequality, not for other reasons like governmental efficiency." 133 S. Ct. at 2694.

Under Supreme Court jurisprudence, states are free to determine conditions for valid marriages, but these restrictions must be supported by legitimate state purposes because they infringe on important liberty interests around marriage and intimate relations.

Here, in derogation of law, the Ohio scheme has unjustifiably created two tiers of couples: (1) opposite-sex married couples legally married in other states; and (2) same-sex married couples legally married in other states. This lack of equal protection of law is fatal.

As a threshold matter, it is absolutely clear that under Ohio law, from the founding of the state through at least 2004, the validity of a heterosexual marriage is to be determined by whether it complies with the law of the jurisdiction where it was celebrated. This legal approach is firmly rooted in the longstanding legal principle of *lex loci contractus – i.e.*, the law of the place of contracting controls. That is, a marriage

24

Obergefell v. Wymsyslo
Case No. 1:13cv501

Defendant's Notice of Compliance
Exh. A, p|34

solemnized outside of Ohio is valid in Ohio if it is valid where solemnized. As the

leading compendium of Ohio law states:

> Generally, a marriage solemnized outside of Ohio is valid in Ohio if it is
> valid where solemnized. Thus, the validity of a common-law marriage is
> determined by the law of the state where it was consummated, and that of a
> solemnized marriage by the law of the state where it was contracted.
> Likewise, a marriage created in a foreign nation is valid according to that
> nation's laws. [. . .] The fact that the parties to a marriage left the state to
> marry in order to evade Ohio's marriage laws is immaterial to the
> marriage's validity in Ohio.

*See* 45 Ohio Jur. 3d Family Law § 11 (emphasis supplied).[11]

Thus, for example, as declared by the Supreme Court of Ohio in 1958, out-of-state

marriages between first cousins are recognized by Ohio, even though Ohio law does not

authorize marriages between first cousins. *Mazzolini v. Mazzolini*, 155 N.E.2d 206, 208

(Ohio Sup. Ct. 1958) (marriage of first cousins was legal in Massachusetts and therefore

is legal in Ohio regardless of Ohio statute to the contrary); *Hardin v. Davis*, 16 Ohio

Supp. 19, at *22 (Com. Pl. Hamilton Co. May 18, 1945) ("But, although first cousins

cannot marry in Ohio, it has been held that if they go to another state where such

marriages are allowed, marry, and return to Ohio, the marriage is legal in Ohio");

*Slovenian Mut. Ben. Ass'n v. Knafelj*, 173 N.E. 630, 631 (Ohio App. 1930) ("It is true

that, under the laws of Ohio, if she were his first cousin he could not marry her; but they

could go to the state of Michigan, or the state of Georgia, and perhaps many other states

in the United States, and intermarry, and then come right back into Ohio and the marriage

would be legal").

---

[11] Defendants did not argue that the Plaintiffs' marriages were obtained by fraud, nor that Plaintiffs were
not genuinely migratory couples.

25

Likewise, under Ohio law, out-of-state marriages of minors are recognized by Ohio, even though Ohio law does not authorize marriages of minors. S*ee Peefer v. State*, 182 N.E. 117, 121 (Ohio App. 1931) (where underage couples leave the state to marry in a state in which their marriage is valid and return to Ohio, the marriage cannot be set aside based on Ohio's law against marriage of underage people); *see also Courtright v. Courtright*, 1891 Ohio Misc. LEXIS 161, at *7, *aff'd without opinion*, 53 Ohio 685 (Ohio 1895) (marriage between persons considered underage in Ohio married in a state where their marriage is legal "cannot be set aside, either because it was not contracted in accordance with the law of this state, or because the parties went out of the state for the purpose of evading the laws of this state").

Upon the record before this Court, Plaintiffs prevail on their claim that by treating lawful same-sex marriages differently than it treats lawful heterosexual marriages (*e.g.*, marriages of first cousins and marriages of minors), Ohio law, as applied here, violates the United States Constitution's guarantee that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction equal protection of the laws."

### 1. Heightened Scrutiny

Since *Windsor*, the Sixth Circuit has not reviewed controlling law regarding the appropriate level of scrutiny for evaluating classifications based on sexual orientation, such as Ohio's marriage recognition bans. In the most recent Sixth Circuit case to consider the issue, *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012), the court rejected heightened scrutiny by relying on *Scarbrough v. Morgan Cnty. Bd. of*

26

*Educ.*, 470 F.3d 250, 261 (6th Cir. 2006), for the proposition that sexual orientation has never been recognized as a suspect class in this circuit. *Scarbrough*, in turn, relied on *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 293 (6th Cir. 1997).

However, *Equality Foundation* no longer stands as sound precedential authority for the proposition that restrictions on gay and lesbian individuals are subject to rational basis analysis. As the Court for the Eastern District of Michigan recently pointed out, there are "ample reasons to revisit the question of whether sexual orientation is a suspect classification," including the fact that Sixth Circuit precedent on this issue – including *Equality Foundation* – is based on *Bowers v. Hardwick*, 478 U.S. 186 (1986), which was overruled by *Lawrence* in 2003. *Bassett v. Snyder*, No. 12-10038, 2013 WL 3285111, at *1 (E.D. Mich. June 28, 2013) (same-sex couples demonstrated a likelihood of success on the merits of their equal protection claim regarding a Michigan law prohibiting same-sex partners from receiving public employer benefits). The Supreme Court, in overruling *Bowers*, emphatically declared that it "was not correct when it was decided and is not correct today." *Lawrence*, 539 U.S. at 578. In repudiating the *Bowers* decision, the Supreme Court stated that "[i]ts continuance as precedent demeans the lives of homosexual persons" and represents "an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Id.*

27

In overruling *Bowers*, the Supreme Court eliminated a major jurisprudential

foundation of *Scarbrough*, *Equality Foundation*, and other decisions relied on to

foreclose the possibility of heightened scrutiny for sexual orientation classifications.[12]

As a result, lower courts, without controlling post-*Lawrence* precedent on the

issue, should now apply the criteria mandated by the Supreme Court to determine

whether sexual orientation classifications should receive heightened scrutiny.

In deciding whether a new classification qualifies as a suspect or quasi-suspect

class, the Supreme Court considers:

> A) whether the class has been historically "subjected to discrimination";
> B) whether the class has a defining characteristic that "frequently bears [a]
> relation to ability to perform or contribute to society"; C) whether the class
> exhibits "obvious, immutable, or distinguishing characteristics that define
> them as a discrete group"; and D) whether the class is "a minority or
> politically powerless."

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (quoting *Bowen v. Gilliard*,

483 U.S. 587, 602 (1987) and *City of Cleburne, Tex.*, 473 U.S. at 440-41 (citations

omitted). Of these considerations, the first two are the most important. *See id.*

("Immutability and lack of political power are not strictly necessary factors to identify a

suspect class"); *accord Golinski*, 824 F. Supp. 2d at 987. As several federal and state

---

[12] *See Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn. 2012) ("The Supreme Court's holding in Lawrence 'remov[ed] the precedential underpinnings of the federal case law supporting the defendants' claim that gay persons are not a [suspect or] quasi-suspect class'") (citations omitted); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 984 (N.D. Cal. 2012) ("[T]he reasoning in [prior circuit court decisions], that laws discriminating against gay men and lesbians are not entitled to heightened scrutiny because homosexual conduct may be legitimately criminalized, cannot stand post-*Lawrence*"). *Lawrence* "does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." 539 U.S. at 578. It does, however, erase the jurisprudential basis to conclude that sexual orientation is defined by constitutionally proscribable sexual acts and thus that classifications based on it are only appropriately evaluated under the rational basis test.

28

courts have recently recognized, a reasonable application of these factors leads to the conclusion that sexual orientation classifications should be subject to some form of heightened scrutiny.[13]

### a.   Historical Discrimination

The history of discrimination against gay and lesbian individuals has been both severe and pervasive. In 1952, Congress prohibited gay men and women from entering the country. (Doc. 42-1 at ¶ 48). In 1953, President Eisenhower issued an executive order requiring the discharge of gay people from all federal employment and mandating that all defense contractors and other private corporations with federal contracts ferret out and fire all homosexual employees, a policy which remained in place until 1975. (*Id.* at ¶¶ 46-47, 78). Even then, federal agencies were free to discriminate based on sexual orientation until President Clinton issued the first executive order forbidding such hiring discrimination in 1998. After World War II, known homosexual service members were denied GI Bill benefits, and later, when other people with undesirable discharges had their benefits restored, the Veterans Administration refused to restore them to gay people. (*Id.* at ¶ 42).

Until the Supreme Court's *Lawrence* decision in 2003, consensual homosexual conduct was criminalized in many states. In the mid-twentieth century, bars in major American cities posted signs telling potential gay customers they were not welcome, and

---

[13] *See, e.g., Windsor*, 699 F.3d at 181-85; *Golinski*, 824 F. Supp. 2d at 985-90; *Pedersen*, 881 F. Supp. 2d at 310-33; *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D. Cal. 2010) aff'd sub nom *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) vacated and remanded sub nom *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013); *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D. Cal. 2011) (decision of 20 bankruptcy judges); *Varnum v. Brien*, 763 N.W.2d 862, 885-96 (Iowa 2009); *In re Marriage Cases*, 183 P.3d at 441-44; *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 425-31 (Conn. 2008).

raids on gay bars in this period were "a fact of life, a danger every patron risked by walking through the door." (*Id.* at ¶ 56). Until 2011, homosexuals could not openly serve in the military, and the military still criminalizes sodomy today. (*Id.* at ¶ 40).

In 1993, Cincinnati voters passed Issue 3, which amended the city charter to prohibit the city from extending civil rights protections based on sexual orientation, which was not repealed until 2004. (*Id.* at ¶ 74).

The Republican Party in its 2012 Platform reaffirmed its support for a Constitutional amendment prohibiting same-sex marriage, and baselessly alleged that supporters of same-sex marriage rights were engaged in "hate campaigns, threats of violence, and vandalism . . . against advocates of traditional marriage." (Doc. 53-1 at 26).

The governor of Pennsylvania recently compared same-sex marriage to incest. (*Id.* at 25).

These are just some of the most egregious examples of discrimination against gays and lesbians at the hands of both federal and state governments, their officials, and one of the two primary political parties in our country, and based on these examples alone, "[i]t is easy to conclude that homosexuals have suffered a history of discrimination." *Windsor*, 699 F.3d at 182; *see Pedersen*, 881 F. Supp. 2d at 318 ("The long history of anti-gay discrimination which evolved from conduct-based proscriptions to status or identity-based proscriptions perpetrated by federal, state and local governments as well as private parties amply demonstrates that homosexuals have suffered a long history of invidious discrimination").

30

### b. Ability to Contribute to Society

The other essential factor in the Supreme Court's heightened scrutiny analysis is whether the group in question is distinctively different from other groups in a way that "frequently bears [a] relation to ability to perform or contribute to society." *City of Cleburne, Tex.*, 473 U.S. at 440-41 (citation omitted); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society").

"It is well-established that homosexuality is a normal expression of human sexuality. It is not a mental illness, and being gay or lesbian has no inherent association with a person's ability to lead a happy, healthy, and productive life or to contribute to society." (Doc. 46-1 at ¶ 11). As the *Windsor* appellate court provides: "There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society, at least in some respect. But homosexuality is not one of them." *Windsor*, 699 F.3d at 682.[14] (emphasis supplied).

In this respect, sexual orientation is akin to race, gender, alienage, and national origin, all of which "are so seldom relevant to the achievement of any legitimate state

---

[14] *See also Golinski*, 824 F. Supp. 2d at 986 ("[T]here is no dispute in the record or the law that sexual orientation has no relevance to a person's ability to contribute to society") (emphasis supplied); *Pedersen*, 881 F. Supp. 2d at 320 ("Sexual orientation is not a distinguishing characteristic like mental retardation or age which undeniably impacts an individual's capacity and ability to contribute to society. Instead like sex, race, or illegitimacy, homosexuals have been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"); *see also* Am. Psychiatric Ass'n, *Position Statement On Homosexuality and Civil Rights*, 131 AM. J. PSYCHIATRY 436, 497 (1974).

interest that laws grounded in such considerations are deemed to reflect <u>prejudice and antipathy</u>." *City of Cleburne, Tex.*, 473 U.S. at 440 (emphasis supplied).

### c. Lack of Political Power

Lack of political power is <u>not</u> essential for recognition as a suspect or quasi-suspect class, *see Windsor*, 699 F.3d at 181, but the limited ability of gay people as a group to protect themselves in the political process also weighs in favor of heightened scrutiny of laws that discriminate based on sexual orientation.

In analyzing this factor, "[t]he question is not whether homosexuals have achieved political successes over the years; they clearly have. The question is whether they have the strength to politically protect themselves from wrongful discrimination." *Id.* at 184. Due to the history of prejudice that gay men, lesbians, and bisexuals have faced, they are lacking in the political power to expand their civil rights. (Doc. 47-1 at ¶ 27) ("In light of the political disadvantages still faced by a small, targeted, and disliked group . . . gay men and lesbians are powerless to secure basic rights within the normal political processes").

One way gay men, lesbians, and bisexuals' lack of power is demonstrated is by the absence of statutory protections for them. For example, the gridlocked U.S. Congress has failed to pass any federal legislation prohibiting discrimination on the basis of sexual orientation in employment, education, access to public accommodations, or housing. (*Id.* at ¶ 30). Although a number of states have now extended basic anti-discrimination protections to gay men, lesbians, and bisexuals, the majority of states, including Ohio, have no statutory prohibition on firing, refusing to hire, or demoting a person in private sector employment solely on the basis of their sexual orientation. (Doc. 42-1 at ¶ 77).

Similarly, the majority of states, including Ohio, do not provide statutory protections against discrimination in housing or public accommodations on the basis of sexual orientation. (*Id.*) In the last two decades, more than two-thirds of ballot initiatives that proposed to enact (or prevent the repeal of) basic anti-discrimination protections for gay, lesbian, and bisexual individuals have failed. (Doc. 47-1 at ¶ 40). Other measures of this group's lack of political power are the repeal or pre-emption of various legislative protections through ballot initiatives including anti-discrimination policies, anti-marriage initiatives, and adoption bans, and the underrepresentation of gays and lesbians in political office. (*Id.* at 15-22). In Ohio, for instance, only two of 132 members – or 1.5% – of the state legislature identify as gay. (*Id.* at ¶ 51).

This lack of political power is caused by a number of factors, including small population size and dispersion, the effect of HIV/AIDS on the community, violence against gay and lesbian people, relative invisibility because many gay, lesbian, and bisexual people are not open about their sexual orientation, censorship, public hostility and prejudice, political and social hostility, unreliable allies in the political process, moral and political condemnation, and a powerful, numerous, and well-funded opposition. (*Id.* at 22-35). For example, violence against gay and lesbian people engenders intimidation, which can "undermine the mobilization of gays and lesbians and their allies to limit their free exercise of economic and social liberties." (*Id.* at ¶ 58). In Ohio, the number of hate crimes committed on the basis of sexual orientation increased from 15.8% of total hate crimes reported in 2009 to 25% in 2012. (*Id.* at ¶ 60). The total number of reported

33

incidents decreased, but the number of incidents motivated by sexual orientation increased. (*Id.*)

The relative lack of political influence of gay people today stands in contrast to the political power of women in 1973, when a plurality of the Court concluded in *Frontiero*, 411 U.S. at 688, that sex-based classifications required heightened scrutiny. Congress had already passed Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963, both of which protect women from discrimination in the workplace. *See id.* at 687-88. As stated, there are still no such bans on discrimination based on sexual orientation in the federal government or the majority of states. *See Golinski*, 824 F. Supp. 2d at 988-989; *Pedersen*, 881 F. Supp. 2d at 326-27.

As political power has been defined by the Supreme Court for purposes of heightened scrutiny analysis, gay people do not have it.

### d.      Immutability

The heightened scrutiny inquiry sometimes also considers whether laws discriminate on the basis of "'immutable . . . or distinguishing characteristics that define [persons] as a discrete group.'" *Bowen*, 483 U.S. at 602 (citation omitted). This consideration derives from the "basic concept of our system that legal burdens should bear some relationship to individual responsibility." *Frontiero*, 411 U.S. at 686; *see also Plyler v. Doe*, 457 U.S. 202, 220 (1982) (noting that illegal alien children "have little control" over that status). There is no requirement, however, that a characteristic be immutable in order to trigger heightened scrutiny. For example, heightened scrutiny applies to classifications based on alienage and legitimacy, even though "[a]lienage and

34

illegitimacy are actually subject to change." *Windsor*, 699 F.3d at 183 n.4; *see Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting the argument that alienage did not deserve strict scrutiny because it was mutable).

To the extent that "immutability" is relevant to the inquiry of whether to apply heightened scrutiny, the question is not whether a characteristic is strictly unchangeable, but whether the characteristic is a core trait or condition that one cannot or should not be required to abandon. *See Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir. 2000) overruled on other grounds by *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) ("[S]exual orientation and sexual identity are immutable; they are so fundamental to one's identity that a person should not be required to abandon them"); *Watkins v. U.S. Army*, 875 F.2d 699, 726 (9th Cir. 1989) (Norris, J., concurring in judgment) ("It is clear that by 'immutability' the [Supreme] Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class. . . . the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity").

Under any definition of immutability, sexual orientation clearly qualifies. There is now broad medical and scientific consensus that sexual orientation is immutable. "Sexual orientation refers to an enduring pattern of emotional, romantic, and/or sexual attractions to men, women, or both sexes. Most adults are attracted to and form relationships with members of only one sex. Efforts to change a person's sexual orientation through religious or psychotherapy interventions have not been shown to be

35

effective." (Doc. 46-1 at ¶ 10).  Indeed, there is significant evidence to show that interventions to change sexual orientation can be harmful to patients, and no major mental health professional organization has approved their use.  (*Id.* at ¶¶ 26-27). Further, when asked whether they have any choice in their sexual orientation, the vast majority of gay men and lesbians state that they have very little or no choice in the matter.  (*Id.* at ¶ 25).[15]  Even more importantly, <u>sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual – even if such a choice could be made</u>.  *See Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are <u>"an integral part of human freedom"</u>).[16]

Sexual orientation discrimination accordingly fulfills all the criteria the Supreme Court has identified, and thus Defendants must justify Ohio's failure to recognize same-sex marriages in accordance with a heightened scrutiny analysis.  Defendants have utterly failed to do so.

---

[15] *See also Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation"); *accord Golinski*, 824 F. Supp. 2d at 986; *Pedersen*, 881 F. Supp. 2d at 320-24.

[16] *See also In re Marriage Cases*, 183 P.3d. at 442 ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment"); *Kerrigan*, 957 A.2d at 438 ("In view of the central role that sexual orientation plays in a person's fundamental right to self-determination, we fully agree with the plaintiffs that their sexual orientation represents the kind of distinguishing characteristic that defines them as a discrete group for purposes of determining whether that group should be afforded heightened protection under the equal protection provisions of the state constitution"); *accord Golinski*, 824 F. Supp. 2d at 987; *Pedersen*, 881 F. Supp. 2d at 325.

### 2. Rational Basis

Moreover, even if no heightened level of scrutiny is applied to Ohio's marriage recognition bans, they still fail to pass constitutional muster.

"Even in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. "[S]ome objectives . . . are not legitimate state interests" and, even when a law is justified by an ostensibly legitimate purpose, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex.*, 473 U.S. at 446-47. "Rational basis review, while deferential, is not 'toothless.'" *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998) (citing *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)).

At the most basic level, by requiring that classifications be justified by an independent and legitimate purpose, the Equal Protection Clause prohibits classifications from being drawn for "the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see also Windsor*, 133 S. Ct. at 2693; *City of Cleburne, Tex.*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534.

The Supreme Court invoked this principle most recently in *Windsor* when it held that the principal provision of the federal DOMA violated equal protection guarantees because the "purpose and practical effect of the law . . . [was] to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages." *Windsor*, 133 S. Ct. at 2693.

37

The Supreme Court has described this impermissible purpose as "animus" or a "bare . . . desire to harm a politically unpopular group." *Id.* at 2693; *Romer*, 517 U.S. at 633; *City of Cleburne, Tex.*, 473 U.S. at 447; *Moreno*, 413 U.S. at 534.

However, an impermissible motive does not always reflect "malicious ill will." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring). It can also take the form of "negative attitudes," "fear," "irrational prejudice," "some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *City of Cleburne, Tex.*, 473 U.S. at 448, 450; *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring).

The Sixth Circuit has held that "the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause." *Davis*, 679 F.3d at 438 (emphasis supplied) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 873-74 (6th Cir. 1997) (inmate had viable equal protection claim where he alleged prison officials purposefully discriminated against him based on his sexual orientation when he was removed from prison job)).

In addition, even when the government offers an ostensibly legitimate purpose, the court must also examine the statute's connection to that purpose to assess whether it is too "attenuated" to rationally advance the asserted governmental interest. *City of Cleburne, Tex.*, 473 U.S. at 446; *see, e.g.*, *Eisenstadt*, 405 U.S. at 448-49 (invalidating law on rational basis review because, even if deterring premarital sex is a legitimate governmental interest, "the effect of the ban on distribution of contraceptives to

38

unmarried persons has at best a marginal relation to the proffered objective"); *Moreno*,

413 U.S. at 535-36 (invalidating law on rational basis review because "even if we were to

accept as rational the Government's wholly unsubstantiated assumptions concerning

[hippies] . . . we still could not agree with the Government's conclusion that the denial of

essential federal food assistance . . . constitutes a rational effort to deal with these

concerns").

    This search for a meaningful connection between a classification and the asserted

governmental interest also provides a safeguard against intentional discrimination. As

the Supreme Court has explained, "[b]y requiring that the classification bear a rational

relationship to an independent and legitimate legislative end, we ensure that

classifications are not drawn for the purpose of disadvantaging the group burdened by the

law." *Romer*, 517 U.S. at 633.[17]

    In *Bassett*, the court held that same-sex couples demonstrated a likelihood of

success on the merits of their equal protection claim regarding a Michigan law

prohibiting same-sex partners from receiving public employee benefits where "[t]he

historical background and legislative history of the Act demonstrate that it was motivated

---

[17] The Supreme Court has been particularly likely to find a classification too attenuated to serve an asserted government interest when the law imposes a sweeping disadvantage on a group that is grossly out of proportion to accomplishing that purpose. In *Romer*, the Court invalidated a Colorado constitutional amendment excluding gay people from eligibility for nondiscrimination protections because the law "identifie[d] persons by a single trait and then denie[d] them protection across the board." 517 U.S. at 633. Similarly, in *Windsor*, the Supreme Court invalidated the challenged section of DOMA as not sufficiently related to any legitimate governmental purpose in part because it was "a system-wide enactment with no identified connection" to any particular government program. *Windsor*, 133 S. Ct. at 2694. In such situations, the law's breadth may "outrun and belie any legitimate justifications that may be claimed for it." *Romer*, 517 U.S. at 635 ("The breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them"). Ohio's sweeping marriage bans likewise exclude same-sex couples and their children system-wide from the protections and benefits afforded married couples and their families under the law.

by animus against gay men and lesbians." 2013 WL 3285111 at *24-26. The Sixth

Circuit has stated that where a provision has "no rational relationship to any of the

articulated purposes of the state," a court is left with the necessary conclusion that the

cited interests are pretextual. *Craigmiles v. Giles*, 312 F.3d 220, 228 (6th Cir. 2002). In

*Windsor*, the Supreme Court bolstered this truth, finding that:

> DOMA's unusual deviation from the usual tradition of recognizing and
> accepting state definitions of marriage here operates to deprive same-sex
> couples of the benefits and responsibilities that come with the federal
> recognition of their marriages. This is strong evidence of a law having the
> purpose and effect of disapproval of that class.

*Windsor*, 133 S. Ct. at 2693. A review of the historical background and legislative

history of the Ohio laws at issue leads to the same conclusion in the case at hand, that in

refusing to recognize a particular type of legal out-of-state marriages <u>for the first time in</u>

<u>its history</u>, Ohio is engaging in "discrimination[ ] of an unusual character" without a

rational basis for doing so. *Id.* at 2692 (citing *Romer*, 517 U.S. at 633).

Consequently, the evidentiary record establishes that the requested relief is also to

be granted to Plaintiffs on the basis of the Equal Protection Clause.

### 3. Potential State Interests

To survive rational basis scrutiny, the marriage recognition bans must be justified

by some legitimate state interest other than simply maintaining a "traditional" definition

of marriage.[18] "Ancient lineage of a legal concept does not give it immunity from attack

for lacking a rational basis." *Heller v. Doe by Doe*, 509 U.S. 312, 326-27 (1993).

---

[18] As stated, at the time of the passage of Ohio's same-sex marriage bans, Governor Robert Taft stated
that their purpose was "to reaffirm existing Ohio law with respect to our most basic, rooted, and time-
honored institution: marriage between a man and a woman." (Doc. 41-1 at ¶ 72).

Indeed, the fact that a form of discrimination has been "traditional" is a reason to be more skeptical of its rationality. "The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a tradition of disfavor for a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification." *City of Cleburne, Tex.,* 473 U.S. at 454 n.6 (Stevens, J., concurring).[19] Indeed, just as the tradition of banning interracial marriage represented the embodiment of deeply-held prejudice and long-term racial discrimination in *Loving,* 388 U.S. at 1, the same is true here with regard to Ohio's marriage recognition bans and discrimination based on sexual orientation.

Supporters of Ohio's marriage recognition bans have also asserted that children are best off when raised by a mother and father. (Doc. 41-1 at ¶¶ 41, 88). Even if it were rational for legislators to speculate that children raised by heterosexual couples are better off than children raised by gay or lesbian couples, which it is not,[20] there is simply no rational connection between the Ohio marriage recognition bans and the asserted goal, as

---

[19] *See also Marsh v. Chambers,* 463 U.S. 783, 791-92 (1983) (even longstanding practice should not be "taken thoughtlessly, by force of long tradition and without regard to the problems posed by a pluralistic society"); *In re Marriage Cases,* 183 P.3d at 853-54 ("[E]ven the most familiar and generally accepted of social practices and traditions often mask an unfairness and inequality that frequently is not recognized or appreciated by those not directly harmed by those practices or traditions").

[20] The overwhelming scientific consensus, based on decades of peer-reviewed scientific research, shows unequivocally that children raised by same-sex couples are just as well adjusted as those raised by heterosexual couples. (Doc. 43-1 at ¶¶ 18-19) ("[i]n . . . widely variable studies, the same findings continue to emerge: children reared by lesbian and gay parents are doing as well as children raised by heterosexual parents"). The American Psychological Association, the American Academy of Pediatrics, the American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the American Academy of Family Physicians (among others) have all released statements in support of gay and lesbian parents and their ability and rights to rear children. (*Id.* at ¶ 16). This consensus has also been recognized by numerous courts. *See Perry,* 704 F. Supp. 2d at 980 (finding that the research supporting the conclusion that "[c]hildren raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted" is "accepted beyond serious debate in

41

Ohio's marriage recognition bans do not prevent gay couples from having children.[21]

The only effect the bans have on children's well-being is harming the children of same-

sex couples who are denied the protection and stability of having parents who are legally

married. The Supreme Court aptly described how laws such as Ohio's marriage

recognition bans affect families with same-sex parents:

> The differentiation demeans the couple, whose moral and sexual choices
> the Constitution protects . . . And it humiliates . . . children now being
> raised by same-sex couples. The law in question makes it even more
> difficult for the children to understand the integrity and closeness of their
> own family and its concord with other families in their community and in
> their daily lives.

*Windsor*, 133 S. Ct. at 2694 (internal citations omitted).

Because there is no rational connection between Ohio's marriage recognition bans

and the asserted state interests, this Court can conclude that the ban violates equal

protection even without considering whether it is motivated by an impermissible purpose.

---

the field of developmental psychology"); *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct. Nov. 25, 2008) ("[B]ased on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests of children are not preserved by prohibiting homosexual adoption"), aff'd sub nom. *Fla. Dep't of Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010); *Howard v. Child Welfare Agency Rev. Bd.*, Nos. 1999-9881, 2004 WL 3154530, at *9 and 2004 WL 3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004) (holding based on factual findings regarding the wellbeing of children of gay parents that "there was no rational relationship between the [exclusion of gay people as foster parents] and the health, safety, and welfare of the foster children"), aff'd sub nom. *Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006); *Varnum*, 763 N.W.2d at 899, n.26 (concluding, after reviewing "an abundance of evidence and research," that "opinions that dual-gender parenting is the optimal environment for children . . . is based more on stereotype than anything else"); *Golinski*, 824 F. Supp. 2d at 991 ("More than thirty years of scholarship resulting in over fifty peer-reviewed empirical reports have overwhelmingly demonstrated that children raised by same-sex parents are as likely to be emotionally healthy, and educationally and socially successful as those raised by opposite-sex parents").

[21] *See Golinski*, 824 F. Supp. 2d at 997 ("Even if the Court were to accept as true, which it does not, that opposite-sex parenting is somehow superior to same-sex parenting, DOMA is not rationally related to this alleged governmental interest"); *accord Windsor*, 699 F.3d at 188; *Pedersen*, 881 F. Supp. 2d at 340-41; *Varnum*, 763 N.W.2d at 901.

42

*See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (allegations of irrational discrimination "quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis"). In this case, however, the lack of any connection between Ohio's marriage recognition bans and any legitimate state interest also leads to the conclusion that it was passed because of, not in spite of, its burden on same-sex couples.

Even if it were possible to hypothesize regarding a rational connection between Ohio's marriage recognition bans and some legitimate governmental interest, no hypothetical justification can overcome the clear primary purpose and practical effect of the marriage bans . . . to disparage and demean the dignity of same-sex couples in the eyes of the State and the wider community. When the primary purpose and effect of a law is to harm an identifiable group, the fact that the law may also incidentally serve some other neutral governmental interest cannot save it from unconstitutionality. *Windsor*, 133 S. Ct at 2696.

Consequently, no rational state basis to justify the marriage recognition bans has been advanced or evidenced in this case.[22]

---

[22] As a final note, although the question of whether Ohio's refusal to grant same-sex marriages also violates Ohio same-sex couples' right to due process and equal protection is not before the Court in this case, the logical conclusion to be drawn from the evidence, arguments, and law presented here is that Ohio's violation of the constitutional rights of its gay citizens extends beyond the bounds of this lawsuit. *See also Kitchen v. Herbert*, 2:13-CV-00217 (D. Utah Dec. 20, 2013).

## IV.  A PERMANENT INJUNCTION BARRING ENFORCEMENT IN THIS CASE OF OHIO'S BANS ON RECOGNITION OF OTHER STATES' LAWFUL SAME-SEX MARRIAGES IS NECESSARY

As the United States Supreme Court found in *Windsor*, there is no legitimate state purpose served by Ohio's refusal to recognize same-sex marriages celebrated in states where they are legal.  Instead, as in *Windsor*, the very purpose of the Ohio provisions, enacted in 2004, is to "impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." *Windsor*, 133 S.Ct. at 2639.  That is, the purpose served by treating same-sex married couples differently than heterosexual married couples is the same improper purpose that failed in *Windsor* and in *Romer*: "to impose inequality" and to make gay citizens unequal under the law.  *See Windsor*, 133 S.Ct. at 2694; *Romer*, 517 U.S. at 635-36.  It is beyond debate that it is constitutionally prohibited to single out and disadvantage an unpopular group.

Even if there were proffered some attendant governmental purpose to discriminate against gay couples other than to effect pure animus, it is difficult to imagine how it could outweigh the severe burden imposed by the bans on same-sex couples legally married in other states.  Families deserve the highest level of protection under the First Amendment right of association:

> Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for as noble a purpose as any involved in our prior decisions.

44

*Zablocki*, 434 U.S. at 384 (citing *Griswold*, 381 U.S. at 486).

Even if the classification of same-sex couples legally married in other states is reviewed under the least demanding rational basis test, this Court on this record cannot find a rational basis for the Ohio provisions discriminating against lawful, out-of-state same-sex marriages that is not related to the impermissible expression of disapproval of same-sex married couples.

Moreover, denying Plaintiffs their associational rights under the circumstances presented here imposes irreparable harm. Constitutional violations are routinely recognized as triggering irreparable harm unless they are promptly remedied. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). In fact, "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." Moore, 11A Federal Practice and Procedure at § 2948.1 (2d ed.).[23]

---

[23] *See, e.g., Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (6th Cir. 2002) (a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of plaintiff's constitutional rights); *ACLU of Kentucky v. McCreary County, Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) (if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm) (citations omitted); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876 (3rd Cir. 1997) (denial of preliminary injunctive relief was irreparable harm to plaintiffs' voting and associational rights); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (holding that plaintiffs may establish irreparable harm based on an alleged violation of their Fourth Amendment rights); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) (finding that a violation of privacy constitutes an irreparable harm); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (holding allegation of violation of Eighth Amendment rights sufficient showing of irreparable harm); *Doe v. Mundy*, 514 F.2d 1179 (7th Cir 1975) (denial of constitutional privacy right was irreparable harm); *Beerheide v. Zavaras*, 997 F.Supp. 1405 (D.C. Colo. 1998) (irreparable harm satisfied by allegation of deprivation of free exercise of religion).

Without a permanent injunction, the official records of Plaintiffs' spouses' deaths, and the last official document recording their existence on earth, if amended to reflect Ohio law (and not this Court's Orders), would incorrectly classify them as unmarried, despite their legal marriages. The death certificates, if amended, would also incorrectly fail to record Plaintiffs as their surviving spouses, a status they lawfully enjoy. Furthermore, Mr. Arthur is now buried in his family plot at Spring Grove Cemetery. He also wanted Mr. Obergefell to be buried next to him someday, but the family plot directive limits those who may be interred in the plot to descendants and married spouses. Thus, without a permanent injunction, Mr. Arthur's burial could conceivably be upset and his remains might need to be exhumed. *See Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 209 F. Supp. 2d 1008, 1022 (D.S.D. 2002) (disruption of human remains can be irreparable harm). Dying with an incorrect death certificate that prohibits the deceased Plaintiffs from being buried with dignity constitutes irreparable harm.

Moreover, there is absolutely no evidence that the State of Ohio or its citizens will be harmed by the issuance of a permanent injunction restraining the enforcement of the marriage recognition ban provisions against the Plaintiffs in this case. Without an injunction, however, the harm to Plaintiffs is severe. Plaintiffs are not currently accorded the same dignity and recognition as similarly situated opposite-sex couples. Moreover, without a permanent injunction, Plaintiffs' legally valid marriages would be susceptible to amended incorrect recording in Ohio as not existing. Balanced against this severe and irreparable harm to Plaintiffs is the truth that there is no evidence in the record that the issuance of a permanent injunction will cause substantial harm to the public. And, as a

46

final consideration, "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban 15 Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012).

Plaintiffs bear the burden of demonstrating their entitlement to an injunction, and an "injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573. Here, nevertheless, weighing all factors applicable to analyzing whether injunctive relief should issue, the Court finds that each factor supports the granting of a permanent injunction.

47

## V.    CONCLUSION

Accordingly, Plaintiffs' Motion for Declaratory Judgment and Permanent

Injunction (Doc. 53) is hereby **GRANTED** as applied to these Plaintiffs.  Specifically:

1.    The Court finds and declares that Article 15, Section 11, of the Ohio Constitution, and Ohio Revised Code Section 3101.01(C), violate rights secured by the Fourteenth Amendment to the United States Constitution in that same-sex couples married in jurisdictions where same-sex marriage is lawful, who seek to have their out-of-state marriage recognized and accepted as legal in Ohio, are denied their fundamental right to marriage recognition without due process of law; and are denied their fundamental right to equal protection of the laws when Ohio does recognize comparable heterosexual marriages from other jurisdictions, even if obtained to circumvent Ohio law.

2.    Defendants and their officers are permanently enjoined from enforcing Ohio's marriage recognition bans on Plaintiffs.  This includes such officials completing death certificates as the need arises for Plaintiffs in a manner consistent with this Order.

3.    The Court finds and declares that Plaintiff Robert Grunn may, consistent with and in reliance upon the United States Constitution and this Court's Final Order, report on Ohio death certificates he completes as an Ohio funeral director that a decedent married in a state authorizing same-sex marriage is "married" or "widowed" and report the name of the decedent's surviving same-sex spouse as the "surviving spouse".

4.    Defendant Dr. Theodore E. Wymyslo shall make a best faith effort to communicate Notice of this Final Order to all persons within Ohio who assist with completing Ohio death certificates, and Dr. Wymyslo shall evidence such compliance by filing with this Court an Affidavit by 3/31/14.

5.    The Court will separately issue an Order of Permanent Injunction to these effects, whereupon the Clerk shall enter judgment accordingly and **TERMINATE this case** (in this Court).

**IT IS SO ORDERED.**

Date:  December 23, 2013                         _/s/ Timothy S. Black_
                                                  Timothy S. Black
                                                  United States District Judge

48

## APPENDIX OF PLAINTIFFS' EXPERTS

---

[i] Susan J. Becker has been a professor at Cleveland State University's Cleveland-Marshall School of Law since 1990, before which she was a litigator for the law firm then known as Jones, Day, Reavis and Pogue. She teaches a course entitled "Sexual Orientation and the Law" and the majority of her scholarship addresses the animus historically directed at the LGBT population as well as the historic and continuing rationales for that discrimination. She also maintains a pro bono practice, the majority of which involves providing legal advice to same-sex couples about their rights under Ohio law. (*See* Doc. 41).

George Chauncy is the Samuel Knight Professor of History and American Studies and past Chair of the Department of History at Yale University, where he has taught since 2006. From 1991 to 2006, he was a Professor of History at the University of Chicago. He teaches, researches, and writes extensively on gay rights generally and same-sex marriage in particular, and has provided testimony for numerous cases involving similar issues. (*See* Doc. 42).

Megan Fulcher, Ph.D., is an Associate Professor in the Department of Psychology at Washington and Lee University. She received her Ph.D. in psychology from the University of Virginia in 2004, where she was mentored by Dr. Charlotte J. Patterson, a preeminent scholar in research on lesbian and gay parents. Dr. Fulcher teaches, researches, and writes extensively on the topics of child development, sexuality, gender-role development and parent-child relationships. (*See* Doc. 43).

Joanna L. Grossman is the Sidney and Walter Siben Distinguished Professor of Family Law at the Maurice A. Deane School of Law at Hofstra University, teaching family law with special emphasis on the history of marriage regulation and the legal responses to modern family forms. She has also taught at American University School of Law, Cardozo Law School, Tulane Law School, University of North Carolina School of Law, and Vanderbilt Law School. She teaches, researches, and writes extensively on the sociolegal history of marriage, divorce and the family, state regulation of marriage, the law and controversy regarding same-sex marriage, and the rules of interstate marriage recognition. (*See* Doc. 44).

49

Bernard L. McKay is a licensed and practicing attorney with Frost Brown Todd LLC in Cincinnati who practices mainly in the areas of estate planning, probate, and trust administration and is certified by the Ohio State Bar Association as a specialist in estate planning, trust, and probate law. Mr. McKay is a Fellow in the American College of Trust and Estate Counsel and a member of the Cincinnati Estate Planning Council and the Cincinnati Bar Association, where he has served as Chair of the Estate Planning and Probate and Advanced Estate Planning and Probate Institute Committees. (*See* Doc. 45).

Letitia Anne Peplau, Ph.D., is a Distinguished Research Professor and the Psychology Department Vice Chair for Graduate Studies at the University of California, Los Angeles. She was a Professor of Psychology at UCLA from 1973 until 2010. From 2005-2011, she served as Director of the UCLA Interdisciplinary Relationship Science Program, which trains doctoral students in the study of families and other personal relationships. She teaches, researches, and writes extensively on personal relationships, gender, and sexual orientation, and has provided testimony for numerous cases involving similar issues. In the 1970s, she was one of the first researchers to conduct empirical investigations of the intimate relationships of lesbians and gay men, and has continued this program of research for the past 35 years. (*See* Doc. 46).

Gary M. Segura, Ph.D., is a Professor of American Politics in the Department of Political Science at Stanford University. He is the founding Director of the Institute on the Politics of Inequality, Race and Ethnicity at Stanford, and the founding co-Director of the Stanford Center for American Democracy. He is one of the Principal Investigators of the American National Election Studies for 2009-2013, the premier data-gathering project for scholars of American elections. He teaches, researches, and writes extensively on public attitudes, opinion, and behavior with respect to politics and minority group politics in particular. He is a member of the Sexuality and Politics organized section of the American Political Science Association, has served on the Southern Political Science Association's Committee on the Status of Gays and Lesbians, and was part of the Executive Committee of the Sexuality Studies Program at the University of Iowa. (*See* Doc. 47).