# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 06, 2014

Mr. Byron Jeffords Babione
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260

Ms. Sara Bartel
Morrison & Foerster
425 Market Street
San Francisco, CA 94131

Mr. Carmine D. Boccuzzi Jr.
Cleary, Gottlieb, Steen & Hamilton
One Liberty Plaza
New York, NY 10006

Mr. Joseph Paul Bowser
Arent Fox
1717 K Street, N.W.
Washington, DC 20036

Ms. Jennifer L. Branch
Gerhardstein & Branch
432 Walnut Street
Suite 400
Cincinnati, OH 45202

Mr. George David Carter Jr.
Innovista Law
1200 18th Street, N.W.
Suite 700
Washington, DC 20036

Mr. Hunter Thompson Carter

Arent Fox
1675 Broadway
New York, NY 10019

Mr. Paul David Castillo
Lambda Legal
3500 Oak Lawn Avenue
Suite 500
Dallas, TX 75219

Mr. Marshall Currey Cook
Lambda Legal
120 Wall Street
19th Floor
New York, NY 10005

Ms. Bridget Carty Coontz
Office of the Attorney General
of Ohio
30 E. Broad Street
16th Floor
Columbus, OH 43215

Mr. Andrew John Davis
Folger Levin
199 Freemont Street
20th Floor
San Francisco, CA 94105

Mr. Drew Sebastian Dennis
ACLU of Ohio
4506 Chester Avenue
Cleveland, OH 44103

Ms. Emma L. Dill
Bryan Cave
560 Mission Street
25th Floor
San Francisco, CA 94105

Ms. Felicia H. Ellsworth
Wilmer Hale
60 State Street
Boston, MA 02109

Mr. James D. Esseks

ACLU
125 Broad Street
18th Floor
New York, NY 10004

Mr. Mark Christopher Fleming
Wilmer Hale
60 State Street
Boston, MA 02109

Mr. Sean Robert Gallagher
Polsinelli Shughart
1515 Wynkoop Street
Suite 600
Denver, CO 80202

Ms. Marjory A. Gentry
Arnold & Porter
Three Embarcadero Center
10th Floor
San Francisco, CA 94111

Mr. Alphonse A. Gerhardstein
Gerhardstein & Branch
432 Walnut Street
Suite 400
Cincinnati, OH 45202

Ms. Suzanne B. Goldberg
Columbia University School of Law
435 W. 116th Street
New York, NY 10027

Ms. Marcia D. Greenberger
National Women's Law Center
11 Dupont Circle, N.W.
Suite 800
Washington, DC 20036

Mr. Joseph R. Guerra
Sidley Austin
1501 K Street, N.W.
Washington, DC 20005

Ms. Tina Rose Haddad
Haddad Law Office

3155 W. 33rd Street
Cleveland, OH 44109

Mr. Jyotin R. Hamid
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022

Mr. Keith R. Hammeran
Lambda Legal
120 Wall Street
19th Floor
New York, NY 10005

Mr. Jacob Harris Hupart
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Ms. Jaren Janghorbani
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Mr. Lawrence J. Joseph
Law Office
1250 Connecticut Avenue
Suite 200
Washington, DC 20036

Ms. Roberta A. Kaplan
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Mr. Harlan D. Karp
Law Offices
850 Euclid Avenue
Suite 1330
Cleveland, OH 44114

Mr. Joshua David Kaye
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019

Mr. Zachery P. Keller
Office of the Attorney General
Constitutional Offices Section
30 E. Broad Street
16th Floor
Columbus, OH 43215

Mr. Daniel McNeel Lane Jr.
Akin Gump
300 Convent Street
Suite 1500
San Antonio, TX 78205

Mr. Christopher Dowden Man
Chadbourne & Parke
1200 New Hampshire Avenue, N.W.
Suite 300
Washington, DC 20036-0000

Ms. Ria Tabacco Mar
NAACP Legal Defense & Educational Fund
40 Rector Street
Fifth Floor
New York, NY 10006

Ms. Emily J. Martin
National Women's Law Center
11 Dupont Circle, N.W.
Suite 800
Washington, DC 20036

Ms. Jacklyn Gonzales Martin
Gerhardstein & Branch
432 Walnut Street
Suite 400
Cincinnati, OH 45202

Ms. Lisa Talmadge Meeks
Newman & Meeks
215 E. Ninth Street
Suite 650
Cincinnati, OH 45202

Mr. Shannon Price Minter
National Center for Lesbian Rights
870 Market Street

Suite 370
San Francisco, CA 94102

Ms. Dina Bernick Mishra
Wilmer Hale
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Mr. Alan B. Morrison
George Washington University Law School
2000 H Street, N.W.
Washington, DC 20052

Mr. Michael Edward Mumford
Baker & Hostetler
1900 E. Ninth Street
Suite 3200
Cleveland, OH 44114

Mr. Eric E. Murphy
Office of the Attorney General
of Ohio
30 E. Broad Street
17th Floor State Office Tower
Columbus, OH 43215

Mr. Gregory R. Nevins
Lambda Legal Defense and Education Fund
Southern Regional Office
730 Peachtree Street, N.E.
Suite 1070
Atlanta, GA 30308-1210

Mr. Nicholas M. O'Donnell
Sullivan & Worcester
One Post Office Square
Boston, MA 02109

Mr. Matthew Edwin Pepping
Akin Gump
300 Convent Street
Suite 1500
San Antonio, TX 78205

Ms. Ryan Lynn Richardson
Office of the Attorney General

of Ohio
30 E. Broad Street
16th Floor
Columbus, OH 43215

Mr. Paul Daniel Ritter
Kegler, Brown, Hill & Ritter
65 E. State Street
Suite 1800
Columbus, OH 43215

Mr. Joseph Benjamin Rome
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022

Mr. Alan Evan Schoenfeld
Wilmer Hale
250 Greenwich Street
7 World Trade Center
New York, NY 10007

Mr. Robert George Schuler
Kegler, Brown, Hill & Ritter
65 E. State Street
Suite 1800
Columbus, OH 43215

Mr. Benjamin G. Shatz
Manatt, Phelps & Phillips
11355 W. Olympic Boulevard
Los Angeles, CA 90064

Mr. Paul March Smith
Jenner & Block
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001

Ms. Susan L. Sommer
Lambda Legal
120 Wall Street
19th Floor
New York, NY 10005

Ms. Diane M. Soubly

Stevenson Keppelman
444 S. Main Street
Ann Arbor, MI 48104

Ms. Catherine Emily Stetson
Hogan Lovells
555 Thirteenth Street, N.W.
Columbia Square
Washington, DC 20004

Mr. Christopher F. Stoll
National Center for Lesbian Rights
870 Market Street
Suite 370
San Francisco, CA 94102

Mr. Chase Strangio
ACLU
125 Broad Street
18th Floor
New York, NY 10004

Ms. Camilla B. Taylor
Lambda Legal Defense and Education Fund
11 E. Adams Street
Suite 1008
Chicago, IL 60603

Mr. Jeffrey S. Trachtman
Kramer, Levin, Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Mr. Rocky Chiu-feng Tsai
Ropes & Gray
Three Embarcadero Center
San Francisco, CA 94111

Mr. Thomas D. Warren
Baker & Hostetler
1900 E. Ninth Street
Suite 3200
Cleveland, OH 44114

Mr. Christopher J. Weber
Kegler, Brown, Hill & Ritter

65 E. State Street
Suite 1800
Columbus, OH 43215

Ms. Jessica Weisel
Akin Gump
2029 Century Park, E.
Suite 2400
Los Angeles, CA 90067

Mr. Paul R.Q. Wolfson
Wilmer Hale
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

        Re:  Case Nos. 14-3057/3464, *James Obergefell, et al v. Richard Hodges, et al*
              Originating Case No. : 1:13-cv-00501

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                        Yours very truly,

                        Deborah S. Hunt, Clerk

                        Cathryn Lovely
                        Deputy Clerk

cc:  Mr. John P. Hehman

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0275p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

**14-1341**

APRIL DEBOER, et al.,

*Plaintiffs-Appellees,*

*v.*

RICHARD SNYDER, Governor, State of Michigan, in his official capacity, et al.,

*Defendants-Appellants.*

Nos. 14-1341; 3057; 3464; 5291; 5297; 5818

**14-3057**

JAMES OBERGEFELL, et al.,

*Plaintiffs-Appellees,*

*v.*

RICHARD HODGES, Director of the Ohio Department of Health, in his official capacity,

*Defendant-Appellant.*

**14-3464**

BRITTANI HENRY, et al.,

*Plaintiffs-Appellees,*

*v.*

RICHARD HODGES, Director of the Ohio Department of Health, in his official capacity,

*Defendant-Appellant.*

**14-5291**

GREGORY BOURKE, et al.,

*Plaintiffs-Appellees,*

*v.*

STEVE BESHEAR, Governor, Commonwealth of Kentucky, in his official capacity,

*Defendant-Appellant.*

1

Nos. 14-1341/ 3057/ 3464/ 5291/ 5297/ 5818      *DeBoer v. Snyder*                    Page 2

**14-5297**

VALERIA TANCO, et al.,

                                    *Plaintiffs-Appellees*,

        *v.*

WILLIAM EDWARD "BILL" HASLAM, Governor, State
of Tennessee, in his official capacity, et al.,

                                    *Defendants-Appellants.*

**14-5818**

TIMOTHY LOVE, et al.,

                                    *Plaintiffs/Intervenors-Appellees*,

        *v.*

STEVE BESHEAR, Governor, Commonwealth of
Kentucky, in his official capacity,

                                    *Defendant-Appellant.*

**14-1341**

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit;
No. 2:12-cv-10285—Bernard A. Friedman, District Judge.

**14-3057 & 14-3464**

Appeals from the United States District Court
for the Southern District of Ohio at Cincinnati;
Nos. 1:13-cv-00501 & 1:14-cv-00129—Timothy S. Black, District Judge.

**14-5291 & 14-5818**

Appeals from the United States District Court
for the Western District of Kentucky at Louisville;
No. 3:13-cv-00750—John G. Heyburn II, District Judge.

**14-5297**

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville;
No. 3:13-cv-01159—Aleta Arthur Trauger, District Judge.

Argued:  August 6, 2014

Decided and Filed:  November 6, 2014

Before:  DAUGHTREY, SUTTON and COOK, Circuit Judges.

Nos. 14-1341/ 3057/ 3464/ 5291/ 5297/ 5818     *DeBoer v. Snyder*                    Page 3

_____

COUNSEL

**ARGUED:** Aaron D. Lindstrom, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant in 14-1341. Carole M. Stanyar, Ann Arbor, Michigan, for Appellees in 14-1341. Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant in 14-3057 and 14-3464. Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, for Appellees in 14-3057 and 14-3464. Leigh Gross Latherow, VANANTWERP, MONGE, JONES, EDWARDS & MCCANN, LLP, Ashland, Kentucky, for Appellant in 14-5291 and 14-5818. Laura E. Landenwich, CLAY DANIEL WALTON & ADAMS, PLC, Louisville, Kentucky, for Appellees in 14-5291 and 14-5818. Joseph F. Whalen, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants in 14-5297. William L. Harbison, SHERRARD & ROE, PLC, Nashville, Tennessee, for Appellees in 14-5297. **ON BRIEF:** **14-1341:** Aaron D. Lindstrom, Kristin M. Heyse, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Carole M. Stanyar, Ann Arbor, Michigan, Dana M. Nessel, Detroit, Michigan, Robert A. Sedler, WAYNE STATE UNIVERSITY LAW SCHOOL, Detroit, Michigan, Kenneth M. Mogill, MOGILL, POSNER & COHEN, Lake Orion, Michigan, for Appellees. Kyle J. Bristow, BRISTOW LAW, PLLC, Clarkston, Michigan, Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, David A. Robinson, North Haven, Connecticut, Deborah J. Dewart, Swansboro, North Carolina, Paul Benjamin Linton, Northbrook, Illinois, James R. Wierenga, DAVID & WIERENGA, P.C., Grand Rapids, Michigan, Eric Rassbach, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., James J. Walsh, Thomas J. Rheaume, Jr., BODMAN PLC, Detroit, Michigan, William J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, Lawrence J. Joseph, Washington, D.C., Thomas M. Fisher, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, Mary E. McAlister, LIBERTY COUNSEL, Lynchburg, Virginia, Mathew D. Staver, Anita L. Staver, LIBERTY COUNSEL, Orlando, Florida, Anthony R. Picarello, Jr., Jeffrey Hunter Moon, Michael F. Moses, U.S. CONFERENCE OF CATHOLIC BISHOPS, Washington, D.C., Alexander Dushku, R. Shawn Gunnarson, KIRTON MCCONKIE, Salt Lake City, Utah, Erin Elizabeth Mersino, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, David Boyle, Long Beach, California, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, Elizabeth B. Wydra, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., Paul M. Smith, JENNER & BLOCK LLP, Washington, D.C., Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., Jason Walta, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., Diana Raimi, JAFFE RAITT HEUER & WEISS, P.C., Ann Arbor, Michigan, Rocky C. Tsai, ROPES & GRAY LLP, San Francisco, California, Alan M. Gershel, THOMAS M. COOLEY LAW SCHOOL, Auburn Hills, Michigan, Jerome C. Roth, Nicole S. Phillis, MUNGER, TOLLES & OLSON LLP, San Francisco, California, Andrew J. Davis, FOLGER LEVIN LLP, San Francisco, California, Nicholas M. O'Donnell, SULLIVAN & WORCESTER LLP, Boston, Massachusetts, Sean R. Gallagher, POLSINELLI PC, Denver, Colorado, Mark C. Fleming, Felicia H. Ellsworth, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, Paul R.Q. Wolfson, Dina B. Mishra, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Alan Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Diane M. Soubly, STEVENSON KEPPELMAN ASSOCIATES, Ann Arbor, Michigan,

Ria Tabacco Mar, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., New York, New York, Christy L. Anderson, BRYAN CAVE LLP, Denver, Colorado, Carmine D. Boccuzzi, Jr., CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Jonathan B. Miller, OFFICE OF THE MASSACHUSETTS ATTORNEY GENERAL, Boston, Massachusetts, Jyotin Hamid, Joseph Rome, DEBEVOISE & PLIMPTON LLP, New York, New York, Jeffrey S. Trachtman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Christopher D. Man, CHADBOURNE & PARKE LLP, Washington, D.C., Chase B. Strangio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Suzanne B. Goldberg, COLUMBIA LAW SCHOOL, New York, New York, Marcia D. Greenberger, Emily J. Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., G. David Carter, Joseph P. Bowser, Hunter Carter, ARENT FOX LLP, Washington, D.C., Sara Bartel, MORRISON & FOERSTER LLP, San Francisco, California, Daniel McNeel Lane, Jr., Matthew E. Pepping, AKIN GUMP STRAUSS HAUER & FELD LLP, San Antonio, Texas, Jessica M. Weisel, AKIN GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, Michael L. Whitlock, BINGHAM MCCUTCHEN LLP, Washington, D.C., for Amici Curiae. **14-3057:** Bridget E. Coontz, Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Alphonse A. Gerhardstein, Jennifer L. Branch, Jacklyn Gonzales Martin, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Lisa T. Meeks, NEWMAN & MEEKS CO., LPA, Cincinnati, Ohio, Chase B. Strangio, James D. Esseks, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Drew Dennis, ACLU OF OHIO, INC., Cleveland, Ohio, for Appellees. Byron J. Babione, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Lawrence J. Joseph, Washington, D.C., Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, Carmine D. Boccuzzi, Jr., CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Gregory R. Nevins, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Atlanta, Georgia, Susan L. Sommer, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., New York, New York, Camilla B. Taylor, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Chicago, Illinois, Mark C. Fleming, Felicia H. Ellsworth, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, Paul R.Q. Wolfson, Dina B. Mishra, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Alan Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Paul M. Smith, JENNER & BLOCK LLP, Washington, D.C., Roberta A. Kaplan, Jaren Janghorbani, Joshua D. Kaye, Jacob H. Hupart, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, Thomas D. Warren, BAKER & HOSTETLER LLP, Cleveland, Ohio, Jeffrey S. Trachtman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Marcia D. Greenberger, Emily J. Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., Shannon P. Minter, Christopher F. Stoll, NATIONAL CENTER FOR LESBIAN RIGHTS, Washington, D.C., for Amici Curiae. **14-3464:** Eric E. Murphy, Bridget E. Coontz, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Alphonse A. Gerhardstein, Jennifer L. Branch, Jacklyn Gonzales Martin, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Lisa T. Meeks, NEWMAN & MEEKS CO., LPA, Cincinnati, Ohio, Susan L. Sommer, M. Currey Cook, Keith Hammeran, LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC., New York, New York, Paul D. Castillo, LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC., Dallas, Texas, for Appellees. Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., Andrew J. Davis, FOLGER LEVIN LLP, San Francisco, California, Sean R. Gallagher, POLSINELLI PC,

Denver, Colorado, Nicholas M. O'Donnell, SULLIVAN & WORCESTER LLP, Boston, Massachusetts, Carmine D. Boccuzzi, Jr., CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Ria Tabacco Mar, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., New York, New York, Jyotin Hamid, Joseph Rome, DEBEVOISE & PLIMPTON LLP, New York, New York, Suzanne B. Goldberg, COLUMBIA LAW SCHOOL, New York, New York, Daniel McNeel Lane, Jr., Matthew E. Pepping, AKIN GUMP STRAUSS HAUER & FELD LLP, San Antonio, Texas, Jessica M. Weisel, AKIN GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, Paul D. Ritter, Jr., Christopher J. Weber, Robert G. Schuler, KEGLER, BROWN, HILL & RITTER CO., L.P.A., Columbus, Ohio, Lawrence J. Joseph, Washington, D.C., Harlan D. Karp, Tina R. Haddad, Cleveland, Ohio, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, Christopher D. Man, CHADBOURNE & PARKE LLP, Washington, D.C., Mark C. Fleming, Felicia H. Ellsworth, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, Paul R.Q. Wolfson, Dina B. Mishra, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Alan Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Rocky C. Tsai, ROPES & GRAY LLP, San Francisco, California, Joseph R. Guerra, SIDLEY AUSTIN LLP, Washington, D.C., Emma L. Dill, BRYAN CAVE LLP, San Francisco, California, Jeffrey S. Trachtman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Marcia D. Greenberger, Emily J. Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., Sara Bartel, MORRISON & FOERSTER LLP, San Francisco, California, G. David Carter, Joseph P. Bowser, Hunter T. Carter, ARENT FOX LLP, Washington, D.C., Marjory A. Gentry, ARNOLD & PORTER LLP, San Francisco, California, Diane M. Soubly, STEVENSON KEPPELMAN ASSOCIATES, Ann Arbor, Michigan, Harlan D. Karp, Cleveland, Ohio, for Amici Curiae. **14-5291:** Leigh Gross Latherow, William H. Jones, Jr., Gregory L. Monge, VANANTWERP, MONGE, JONES, EDWARDS & MCCANN, LLP, Ashland, Kentucky, for Appellant. Laura E. Landenwich, Daniel J. Canon, L. Joe Dunman, CLAY DANIEL WALTON & ADAMS, PLC, Louisville, Kentucky, Shannon R. Fauver, Dawn R. Elliott, FAUVER LAW OFFICE, PLLC, Louisville, Kentucky, for Appellees. David A. Robinson, North Haven, Connecticut, Deborah J. Dewart, Swansboro, North Carolina, Stanton L. Cave, LAW OFFICE OF STAN CAVE, Lexington, Kentucky, Eric Rassbach, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., David Boyle, Long Beach, California, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, Paul M. Smith, JENNER & BLOCK LLP, Washington, D.C., Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., Andrew J. Davis, FOLGER, LEVIN LLP, San Francisco, California, Rocky C. Tsai, ROPES & GRAY LLP, San Francisco, California, Jerome C. Roth, Nicole S. Phillis, MUNGER, TOLLES & OLSON LLP, San Francisco, California, Nicholas M. O'Donnell, SULLIVAN & WORCESTER LLP, Boston, Massachusetts, Carmine D. Boccuzzi, Jr., CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Mark C. Fleming, Felicia H. Ellsworth, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, Paul R.Q. Wolfson, Dina B. Mishra, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Alan Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Sean R. Gallagher, POLSINELLI PC, Denver, Colorado, Jyotin Hamid, Joseph Rome, DEBEVOISE & PLIMPTON LLP, New York, New York, Christy L. Anderson, BRYAN CAVE LLP, Denver, Colorado, Ria Tabacco Mar, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., New York, New York, Suzanne B. Goldberg,

COLUMBIA LAW SCHOOL, New York, New York, Joshua A. Block, Chase Strangio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Elizabeth B. Wydra, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., Marcia D. Greenberger, Emily J. Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., Jeffrey S. Trachtman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Christopher D. Man, CHADBOURNE & PARKE LLP, Washington, D.C., Sara Bartel, MORRISON & FOERSTER LLP, San Francisco, California, Daniel McNeel Lane, Jr., Matthew E. Pepping, AKIN GUMP STRAUSS HAUER & FELD LLP, San Antonio, Texas, Jessica M. Weisel, AKIN GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, Diane M. Soubly, STEVENSON KEPPELMAN ASSOCIATES, Ann Arbor, Michigan, Marjory A. Gentry, ARNOLD & PORTER LLP, San Francisco, California, Michael L. Whitlock, BINGHAM MCCUTCHEN LLP, Washington, D.C., G. David Carter, Joseph P. Bowser, Hunter Carter, ARENT FOX LLP, Washington, D.C., for Amici Curiae. **14-5297:** Joseph F. Whalen, Martha A. Campbell, Kevin G. Steiling, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants. William L. Harbison, Phillip F. Cramer, J. Scott Hickman, John L. Farringer, SHERRARD & ROE, PLC, Nashville, Tennessee, Abby R. Rubenfeld, RUBENFELD LAW OFFICE, PC, Nashville, Tennessee, Maureen T. Holland, HOLLAND AND ASSOCIATES, PLLC, Memphis, Tennessee, Regina M. Lambert, Knoxville, Tennessee, Shannon P. Minter, Christopher F. Stoll, Amy Whelan, Asaf Orr, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California, for Appellees. Deborah J. Dewart, Swansboro, North Carolina, Eric Rassbach, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., Byron J. Babione, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Paul M. Smith, JENNER & BLOCK LLP, Washington, D.C., Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, Elizabeth B. Wydra, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., Andrew J. Davis, FOLGER LEVIN LLP, San Francisco, California, Rocky C. Tsai, ROPES & GRAY LLP, San Francisco, California, Jerome C. Roth, Nicole S. Phillis, MUNGER, TOLLES & OLSON LLP, San Francisco, California, Nicholas M. O'Donnell, SULLIVAN & WORCESTER LLP, Boston, Massachusetts, Sean R. Gallagher, POLSINELLI PC, Denver, Colorado, Carmine D. Boccuzzi, Jr., CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, Mark C. Fleming, Felicia H. Ellsworth, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, Paul R.Q. Wolfson, Dina B. Mishra, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., Alan Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, Barbara J. Chisholm, P. Casey Pitts, ALTSHULER BERZON LLP, San Francisco, California, Christy L. Anderson, BRYAN CAVE LLP, Denver, Colorado, Jyotin Hamid, Joseph Rome, DEBEVOISE & PLIMPTON LLP, New York, New York, Ria Tabacco Mar, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., New York, New York, Joshua A. Block, Chase B. Strangio, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Christopher D. Man, CHADBOURNE & PARKE LLP, Washington, D.C., Marcia D. Greenberger, Emily J. Martin, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., Jeffrey S. Trachtman, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, G. David Carter, Joseph P. Bowser, Hunter Carter, ARENT FOX LLP, Washington, D.C., Sara Bartel, MORRISON & FOERSTER LLP, San Francisco, California, Daniel McNeel Lane, Jr., Matthew E. Pepping, AKIN GUMP STRAUSS HAUER & FELD LLP, San Antonio, Texas, Jessica M. Weisel, AKIN

GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, Marjory A. Gentry, ARNOLD & PORTER LLP, San Francisco, California, Diane M. Soubly, STEVENSON KEPPELMAN ASSOCIATES, Ann Arbor, Michigan, Michael L. Whitlock, BINGHAM MCCUTCHEN LLP, Washington, D.C., Suzanne B. Goldberg, COLUMBIA LAW SCHOOL, New York, New York, for Amici Curiae.  **14-5818:** Leigh Gross Latherow, William H. Jones, Jr., Gregory L. Monge, VANANTWERP, MONGE, JONES, EDWARDS & MCCANN, LLP, Ashland, Kentucky, for Appellant.  Laura E. Landenwich, Daniel J. Canon, L. Joe Dunman, CLAY DANIEL WALTON & ADAMS, PLC, Louisville, Kentucky, for Appellees.  Diane M. Soubly, STEVENSON KEPPELMAN ASSOCIATES, Ann Arbor, Michigan, for Amicus Curiae.

SUTTON, J., delivered the opinion of the court, in which COOK, J., joined. DAUGHTREY, J. (pp. 43–64), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

SUTTON, Circuit Judge.  This is a case about change—and how best to handle it under the United States Constitution.  From the vantage point of 2014, it would now seem, the question is not whether American law will allow gay couples to marry; it is when and how that will happen.  That would not have seemed likely as recently as a dozen years ago.  For better, for worse, or for more of the same, marriage has long been a social institution defined by relationships between men and women.  So long defined, the tradition is measured in millennia, not centuries or decades.  So widely shared, the tradition until recently had been adopted by all governments and major religions of the world.

But things change, sometimes quickly.  Since 2003, nineteen States and the District of Columbia have expanded the definition of marriage to include gay couples, some through state legislation, some through initiatives of the people, some through state court decisions, and some through the actions of state governors and attorneys general who opted not to appeal adverse court decisions.  Nor does this momentum show any signs of slowing.  Twelve of the nineteen States that now recognize gay marriage did so in the last couple of years.  On top of that, four federal courts of appeals have compelled several other States to permit same-sex marriages under the Fourteenth Amendment.

What remains is a debate about whether to allow the democratic processes begun in the States to continue in the four States of the Sixth Circuit or to end them now by requiring all States in the Circuit to extend the definition of marriage to encompass gay couples. Process and structure matter greatly in American government. Indeed, they may be the most reliable, liberty-assuring guarantees of our system of government, requiring us to take seriously the route the United States Constitution contemplates for making such a fundamental change to such a fundamental social institution.

Of all the ways to resolve this question, one option is not available: a poll of the three judges on this panel, or for that matter all federal judges, about whether gay marriage is a good idea. Our judicial commissions did not come with such a sweeping grant of authority, one that would allow just three of us—just two of us in truth—to make such a vital policy call for the thirty-two million citizens who live within the four States of the Sixth Circuit: Kentucky, Michigan, Ohio, and Tennessee. What we have authority to decide instead is a legal question: Does the Fourteenth Amendment to the United States Constitution prohibit a State from defining marriage as a relationship between one man and one woman?

Through a mixture of common law decisions, statutes, and constitutional provisions, each State in the Sixth Circuit has long adhered to the traditional definition of marriage. Sixteen gay and lesbian couples claim that this definition violates their rights under the Fourteenth Amendment. The circumstances that gave rise to the challenges vary. Some involve a birth, others a death. Some involve concerns about property, taxes, and insurance, others death certificates and rights to visit a partner or partner's child in the hospital. Some involve a couple's effort to obtain a marriage license within their State, others an effort to achieve recognition of a marriage solemnized in another State. All seek dignity and respect, the same dignity and respect given to marriages between opposite-sex couples. And all come down to the same question: Who decides? Is this a matter that the National Constitution commits to resolution by the federal courts or leaves to the less expedient, but usually reliable, work of the state democratic processes?

I.

*Michigan.*  One case comes from Michigan, where state law has defined marriage as a relationship between a man and a woman since its territorial days.  *See* An Act Regulating Marriages § 1 (1820), *in* 1 *Laws of the Territory of Michigan* 646, 646 (1871).  The State reaffirmed this view in 1996 when it enacted a law that declared marriage "inherently a unique relationship between a man and a woman."  Mich. Comp. Laws § 551.1.  In 2004, after the Massachusetts Supreme Judicial Court invalidated the Commonwealth's prohibition on same-sex marriage, *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003), nearly fifty-nine percent of Michigan voters opted to constitutionalize the State's definition of marriage.  "To secure and preserve the benefits of marriage for our society and for future generations of children," the amendment says, "the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose."  Mich. Const. art. I, § 25.

April DeBoer and Jayne Rowse, a lesbian couple living in Michigan, challenge the constitutionality of this definition.  Marriage was not their first objective.  DeBoer and Rowse each had adopted children as single parents, and both wanted to serve as adoptive parents for the other partner's children.  Their initial complaint alleged that Michigan's adoption laws violated the Equal Protection Clause of the Fourteenth Amendment.  The State moved to dismiss the lawsuit for lack of standing, and the district court tentatively agreed.  Rather than dismissing the action, the court "invit[ed the] plaintiffs to seek leave to amend their complaint to . . . challenge" Michigan's laws denying them a marriage license.  *DeBoer* R. 151 at 3.  DeBoer and Rowse accepted the invitation and filed a new complaint alleging that Michigan's marriage laws violated the due process and equal protection guarantees of the Fourteenth Amendment.

Both sets of parties moved for summary judgment.  The district court concluded that the dispute raised "a triable issue of fact" over whether the "rationales" for the Michigan laws furthered "a legitimate state interest," and it held a nine-day trial on the issue.  *DeBoer* R. 89 at 4, 8.  The plaintiffs' experts testified that same-sex couples raise children as well as opposite-sex couples, and that denying marriage to same-sex couples creates instabilities for their children and families.  The defendants' experts testified that the evidence regarding the comparative success of children raised in same-sex households is inconclusive.  The district court sided with the

plaintiffs. It rejected all of the State's bases for its marriage laws and concluded that the laws failed to satisfy rational basis review.

*Kentucky.* Two cases challenge two aspects of Kentucky's marriage laws. Early on, Kentucky defined marriage as "the union of a man and a woman." *Jones v. Hallahan*, 501 S.W.2d 588, 589 (Ky. 1973); *see* An Act for Regulating the Solemnization of Marriages § 1, 1798 Ky. Acts 49, 49–50. In 1998, the Kentucky legislature codified the common law definition. The statute says that "'marriage' refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex." Ky. Rev. Stat. § 402.005. In 2004, the Kentucky legislature proposed a constitutional amendment providing that "[o]nly a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky." Ky. Const. § 233A. Seventy-four percent of the voters approved the amendment.

Two groups of plaintiffs challenge these Kentucky laws. One group, the fortuitously named *Love* plaintiffs, challenges the Commonwealth's marriage-licensing law. Two couples filed that lawsuit: Timothy Love and Lawrence Ysunza, along with Maurice Blanchard and Dominique James. Both couples claim that the Fourteenth Amendment prohibits Kentucky from denying them marriage licenses.

The other group, the *Bourke* plaintiffs, challenges the ban on recognizing out-of-state same-sex marriages. Four same-sex couples filed the lawsuit: Gregory Bourke and Michael DeLeon; Jimmy Meade and Luther Barlowe; Randell Johnson and Paul Campion; and Kimberly Franklin and Tamera Boyd. All four couples were married outside Kentucky, and they contend that the State's recognition ban violates their due process and equal protection rights. Citing the hardships imposed on them by the recognition ban—loss of tax breaks, exclusion from intestacy laws, loss of dignity—they seek to enjoin its enforcement.

The district court ruled for the plaintiffs in both cases. In *Love*, the court held that the Commonwealth could not justify its definition of marriage on rational basis grounds. It also thought that classifications based on sexual orientation should be subjected to intermediate

scrutiny, which the Commonwealth also failed to satisfy.  In *Bourke*, the court invalidated the recognition ban on rational basis grounds.

*Ohio.*  Two cases challenge Ohio's refusal to recognize out-of-state same-sex marriages. Ohio also has long adhered to the traditional definition of marriage.  *See* An Act Regulating Marriages § 1, 1803 Ohio Laws 31, 31; *Carmichael v. State*, 12 Ohio St. 553, 560 (1861).  It reaffirmed this definition in 2004, when the legislature passed a Defense of Marriage Act, which says that marriage "may only be entered into by one man and one woman."  Ohio Rev. Code § 3101.01(A).  "Any marriage entered into by persons of the same sex in any other jurisdiction," it adds, "shall be considered and treated in all respects as having no legal force or effect."  *Id.* § 3101.01(C)(2).  Later that same year, sixty-two percent of Ohio voters approved an amendment to the Ohio Constitution along the same lines.  As amended, the Ohio Constitution says that Ohio recognizes only "a union between one man and one woman" as a valid marriage.  Ohio Const. art. XV, § 11.

Two groups of plaintiffs challenge these Ohio laws.  The first group, the *Obergefell* plaintiffs, focuses on one application of the law.  They argue that Ohio's refusal to recognize their out-of-state marriages on Ohio-issued death certificates violates due process and equal protection.  Two same-sex couples in long-term, committed relationships filed the lawsuit: James Obergefell and John Arthur; and David Michener and William Herbert Ives.  All four of them are from Ohio and were married in other States.  When Arthur and Ives died, the State would not list Obergefell and Michener as spouses on their death certificates.  Obergefell and Michener sought an injunction to require the State to list them as spouses on the certificates. Robert Grunn, a funeral director, joined the lawsuit, asking the court to protect his right to recognize same-sex marriages on other death certificates.

The second group, the *Henry* plaintiffs, raises a broader challenge.  They argue that Ohio's refusal to recognize out-of-state marriages between same-sex couples violates the Fourteenth Amendment no matter what marital benefit is affected.  The *Henry* case involves four same-sex couples, all married in other States, who want Ohio to recognize their marriages on their children's birth certificates.  Three of the couples (Brittani Henry and Brittni Rogers; Nicole and Pam Yorksmith; Kelly Noe and Kelly McCracken) gave birth to children in Ohio and wish to have both of their names listed on each child's birth certificate rather than just the child's

biological mother.  The fourth couple (Joseph Vitale and Robert Talmas) lives in New York and adopted a child born in Ohio.  They seek to amend their son's Ohio birth certificate so that it lists both of them as parents.

The district court granted the plaintiffs relief in both cases.  In *Obergefell*, the court concluded that the Fourteenth Amendment protects a fundamental right to keep existing marital relationships intact, and that the State failed to justify its law under heightened scrutiny.  The court likewise concluded that classifications based on sexual orientation deserve heightened scrutiny under equal protection, and that Ohio failed to justify its refusal to recognize the couples' existing marriages.  Even under rational basis review, the court added, the State came up short.  In *Henry*, the district court reached many of the same conclusions and expanded its recognition remedy to encompass all married same-sex couples and all legal incidents of marriage under Ohio law.

*Tennessee.*  The Tennessee case is of a piece with the two Ohio cases and one of the Kentucky cases, as it too challenges the State's same-sex-marriage recognition ban.  Tennessee has always defined marriage in traditional terms.  *See* An Act Concerning Marriages § 3 (1741), *in Public Acts of the General Assembly of North-Carolina and Tennessee* 46, 46 (1815).  In 1996, the Tennessee legislature reaffirmed "that the historical institution and legal contract solemnizing the relationship of one (1) man and one (1) woman shall be the only legally recognized marital contract in this state in order to provide the unique and exclusive rights and privileges to marriage."  Tenn. Code Ann. § 36-3-113(a).  In 2006, the State amended its constitution to incorporate the existing definition of marriage.  *See* Tenn. Const. art. XI, § 18. Eighty percent of the voters supported the amendment.

Three same-sex couples, all in committed relationships, challenge the recognition ban: Valeria Tanco and Sophy Jesty; Ijpe DeKoe and Thomas Kostura; and Johno Espejo and Matthew Mansell.  All three couples were legally married in other States.  The district court preliminarily enjoined the law.  Relying on district court decisions within the circuit and elsewhere, the court concluded that the couples likely would show that Tennessee's ban failed to satisfy rational basis review.  The remaining preliminary injunction factors, the court held, also weighed in the plaintiffs' favor.

All four States appealed the decisions against them.

II.

Does the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment require States to expand the definition of marriage to include same-sex couples? The Michigan appeal (*DeBoer*) presents this threshold question, and so does one of the Kentucky appeals (*Love*).  Caselaw offers many ways to think about the issue.

A.

*Perspective of an intermediate court.*  Start with a recognition of our place in the hierarchy of the federal courts.  As an "inferior" court (the Constitution's preferred term, not ours), a federal court of appeals begins by asking what the Supreme Court's precedents require on the topic at hand.  Just such a precedent confronts us.

In the early 1970s, a Methodist minister married Richard Baker and James McConnell in Minnesota.  Afterwards, they sought a marriage license from the State.  When the clerk of the state court denied the request, the couple filed a lawsuit claiming that the denial of their request violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  *Baker v. Nelson*, 191 N.W.2d 185, 186 (Minn. 1971).  The Minnesota Supreme Court rejected both claims.  As for the due process claim, the state court reasoned:  "The institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis. . . .  This historic institution manifestly is more deeply founded than the asserted contemporary concept of marriage and societal interests for which petitioners contend.  The due process clause . . . is not a charter for restructuring it by judicial legislation."  *Id.*  As for the equal protection claim, the court reasoned:  "[T]he state's classification of persons authorized to marry" does not create an "irrational or invidious discrimination. . . .  [T]hat the state does not impose upon heterosexual married couples a condition that they have a proved capacity or declared willingness to procreate . . . [creates only a] theoretically imperfect [classification] . . . [and] 'abstract symmetry' is not demanded by the Fourteenth Amendment."  *Id.* at 187.  The Supreme Court's decision four years earlier in *Loving v. Virginia*, 388 U.S. 1 (1967), which invalidated Virginia's ban on interracial marriages, did not change this conclusion.  "[I]n commonsense and in a constitutional sense," the state court

explained, "there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex." *Baker*, 191 N.W.2d at 187.

Baker and McConnell appealed to the United States Supreme Court. The Court rejected their challenge, issuing a one-line order stating that the appeal did not raise "a substantial federal question." *Baker v. Nelson*, 409 U.S. 810, 810 (1972). This type of summary decision, it is true, does not bind the Supreme Court in later cases. But it does confine lower federal courts in later cases. It matters not whether we think the decision was right in its time, remains right today, or will be followed by the Court in the future. Only the Supreme Court may overrule its own precedents, and we remain bound even by its summary decisions "until such time as the Court informs [us] that [we] are not." *Hicks v. Miranda*, 422 U.S. 332, 345 (1975) (internal quotation marks omitted). The Court has yet to inform us that we are not, and we have no license to engage in a guessing game about whether the Court will change its mind or, more aggressively, to assume authority to overrule *Baker* ourselves.

But that was then; this is now. And now, claimants insist, must account for *United States v. Windsor*, 133 S. Ct. 2675 (2013), which invalidated the Defense of Marriage Act of 1996, a law that refused for purposes of federal statutory benefits to respect gay marriages authorized by state law. Yet *Windsor* does not answer today's question. The decision never mentions *Baker*, much less overrules it. And the outcomes of the cases do not clash. *Windsor* invalidated a federal law that refused to respect state laws permitting gay marriage, while *Baker* upheld the right of the people of a State to define marriage as they see it. To respect one decision does not slight the other. Nor does *Windsor*'s reasoning clash with *Baker*. *Windsor* hinges on the Defense of Marriage Act's unprecedented intrusion into the States' authority over domestic relations. *Id.* at 2691–92. Before the Act's passage in 1996, the federal government had traditionally relied on state definitions of marriage instead of purporting to define marriage itself. *Id.* at 2691. That premise does not work—it runs the other way—in a case involving a challenge in federal court to state laws defining marriage. The point of *Windsor* was to prevent the Federal Government from "divest[ing]" gay couples of "a dignity and status of immense import" that New York's extension of the definition of marriage gave them, an extension that "without doubt" any State could provide. *Id.* at 2692, 2695. *Windsor* made explicit that it does not answer today's question, telling us that the "opinion and its holding are confined to . . . lawful

marriages" already protected by some of the States.  *Id.* at 2696.  Bringing the matter to a close, the Court held minutes after releasing *Windsor* that procedural obstacles in *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), prevented it from considering the validity of state marriage laws. Saying that the Court declined in *Hollingsworth* to overrule *Baker* openly but decided in *Windsor* to overrule it by stealth makes an unflattering and unfair estimate of the Justices' candor.

Even if *Windsor* did not overrule *Baker* by name, the claimants point out, lower courts still may rely on "doctrinal developments" in the aftermath of a summary disposition as a ground for not following the decision.  *Hicks*, 422 U.S. at 344.  And *Windsor*, they say, together with *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Romer v. Evans*, 517 U.S. 620 (1996), permit us to cast *Baker* aside.  But this reading of "doctrinal developments" would be a groundbreaking development of its own.  From the perspective of a lower court, summary dispositions remain "controlling precedent, unless and until re-examined by [the Supreme] Court."  *Tully v. Griffin, Inc.*, 429 U.S. 68, 74 (1976); *see Hicks*, 422 U.S. at 343–45.  And the Court has told us to treat the two types of decisions, whether summary dispositions or full-merits decisions, the same, "prevent[ing] lower courts" in both settings "from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions."  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  Lest doubt remain, the Court has also told us not to ignore its decisions even when they are in tension with a new line of cases.  "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see Agostini v. Felton*, 521 U.S. 203, 237 (1997).

Just two scenarios, then, permit us to ignore a Supreme Court decision, whatever its form:  when the Court has overruled the decision by name (if, say, *Windsor* had directly overruled *Baker*) or when the Court has overruled the decision by outcome (if, say, *Hollingsworth* had invalidated the California law without mentioning *Baker*).  Any other approach returns us to a world in which the lower courts may anticipatorily overrule all manner of Supreme Court decisions based on counting-to-five predictions, perceived trajectories in the caselaw, or, worst of all, new appointments to the Court.  In the end, neither of the two preconditions for ignoring Supreme Court precedent applies here.  *Windsor* as shown does not

mention *Baker*, and it clarifies that its "opinion and holding" do not govern the States' authority to define marriage. *Hollingsworth* was dismissed. And neither *Lawrence* nor *Romer* mentions *Baker*, and neither is inconsistent with its outcome. The one invalidates a State's criminal antisodomy law and explains that the case "does not involve . . . formal recognition" of same-sex relationships. *Lawrence*, 539 U.S. at 578. The other invalidates a "[s]weeping" and "unprecedented" state law that prohibited local communities from passing laws that protect citizens from discrimination based on sexual orientation. *Romer*, 517 U.S. at 627, 633, 635–36.

That brings us to another one-line order. On October 6, 2014, the Supreme Court "denied" the "petitions for writs of certiorari" in 1,575 cases, seven of which arose from challenges to decisions of the Fourth, Seventh, and Tenth Circuits that recognized a constitutional right to same-sex marriage. But this kind of action (or inaction) "imports no expression of opinion upon the merits of the case, as the bar has been told many times." *United States v. Carver*, 260 U.S. 482, 490 (1923). "The 'variety of considerations [that] underlie denials of the writ' counsels against according denials of certiorari any precedential value." *Teague v. Lane*, 489 U.S. 288, 296 (1989) (internal citation omitted). Just as the Court's three decisions to stay those same court of appeals decisions over the past year, all without a registered dissent, did not end the debate on this issue, so too the Court's decision to deny certiorari in all of these appeals, all without a registered dissent, does not end the debate either. A decision not to decide is a decision not to decide.

But don't *these* denials of certiorari signal that, from the Court's perspective, the right to same-sex marriage is inevitable? Maybe; maybe not. Even if we grant the premise and assume that same-sex marriage will be recognized one day in all fifty States, that does not tell us how—whether through the courts or through democracy. And, if through the courts, that does not tell us why—whether through one theory of constitutional invalidity or another. Four courts of appeals thus far have recognized a constitutional right to same-sex marriage. They agree on one thing: the result. But they reach that outcome in many ways, often more than one way in the same decision. *See Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) (fundamental rights); *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014) (rational basis, animus); *Latta v. Otter*, No. 14-35420, 2014 WL 4977682 (9th Cir. Oct. 7, 2014) (animus, fundamental rights, suspect classification); *Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014) (fundamental rights); *Kitchen v. Herbert*,

755 F.3d 1193 (10th Cir. 2014) (same).  The Court's certiorari denials tell us nothing about the democracy-versus-litigation path to same-sex marriage, and they tell us nothing about the validity of any of these theories.  If a federal court denies the people suffrage over an issue long thought to be within their power, they deserve an explanation.  We, for our part, cannot find one, as several other judges have concluded as well.  *See Bostic*, 760 F.3d at 385–98 (Niemeyer, J., dissenting); *Kitchen*, 755 F.3d at 1230–40 (Kelly, J., concurring in part and dissenting in part); *Conde-Vidal v. Garcia-Padilla*, No. 14-1253-PG, 2014 WL 5361987 (D.P.R. Oct. 21, 2014); *Robicheaux v. Caldwell*, 2 F. Supp. 3d 910 (E.D. La. 2014).

There are many ways, as these lower court decisions confirm, to look at this question: originalism; rational basis review; animus; fundamental rights; suspect classifications; evolving meaning.  The parties in one way or another have invoked them all.  Not one of the plaintiffs' theories, however, makes the case for constitutionalizing the definition of marriage and for removing the issue from the place it has been since the founding:  in the hands of state voters.

B.

*Original meaning.*  All Justices, past and present, start their assessment of a case about the meaning of a constitutional provision by looking at how the provision was understood by the people who ratified it.  If we think of the Constitution as a covenant between the governed and the governors, between the people and their political leaders, it is easy to appreciate the force of this basic norm of constitutional interpretation—that the originally understood meaning of the charter generally will be the lasting meaning of the charter.  When two individuals sign a contract to sell a house, no one thinks that, years down the road, one party to the contract may change the terms of the deal.  That is why the parties put the agreement in writing and signed it publicly—to prevent changed perceptions and needs from changing the guarantees in the agreement.  So it normally goes with the Constitution:  The written charter cements the limitations on government into an unbending bulwark, not a vane alterable whenever alterations occur—unless and until the people, like contracting parties, choose to change the contract through the agreed-upon mechanisms for doing so.  *See* U.S. Const. art. V.  If American lawyers in all manner of settings still invoke the original meaning of Magna Carta, a Charter for England in 1215, surely it is not too much to ask that they (and we) take seriously the original meaning of the United States Constitution, a Charter for this country in 1789.  Any other approach, too

lightly followed, converts federal judges from interpreters of the document into newly commissioned authors of it.

Many precedents gauging individual rights and national power, leading to all manner of outcomes, confirm the import of original meaning in legal debates. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 173–80 (1803); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401–25 (1819); *Legal Tender Cases*, 79 U.S. 457, 536–38 (1870); *Myers v. United States*, 272 U.S. 52, 110–39 (1926); *INS v. Chadha*, 462 U.S. 919, 944–59 (1983); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–25 (1995); *Washington v. Glucksburg*, 521 U.S. 702, 710–19 (1997); *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Boumediene v. Bush*, 553 U.S. 723, 739–46 (2008); *Giles v. California*, 554 U.S. 353, 358–61 (2008); *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008).

In trying to figure out the original meaning of a provision, it is fair to say, the line between interpretation and evolution blurs from time to time. That is an occupational hazard for judges when it comes to old or generally worded provisions. Yet that knotty problem does not confront us. Yes, the Fourteenth Amendment is old; the people ratified it in 1868. And yes, it is generally worded; it says: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Nobody in this case, however, argues that the people who adopted the Fourteenth Amendment understood it to require the States to change the definition of marriage.

Tradition reinforces the point. Only months ago, the Supreme Court confirmed the significance of long-accepted usage in constitutional interpretation. In one case, the Court held that the customary practice of opening legislative meetings with prayer alone proves the constitutional permissibility of legislative prayer, quite apart from how that practice might fare under the most up-to-date Establishment Clause test. *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1818–20 (2014). In another case, the Court interpreted the Recess Appointments Clause based in part on long-accepted usage. *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559–60 (2014). Applied here, this approach permits today's marriage laws to stand until the democratic processes say they should stand no more. From the founding of the Republic to 2003, every State defined marriage as a relationship between a man and a woman, meaning that the Fourteenth Amendment permits, though it does not require, States to define marriage in that way.

C.

*Rational basis review.*  Doctrine leads to the same place as history.  A first requirement of any law, whether under the Due Process or Equal Protection Clause, is that it rationally advance a legitimate government policy.  *Vance v. Bradley*, 440 U.S. 93, 97 (1979).  Two words ("judicial restraint," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993)) and one principle (trust in the people that "even improvident decisions will eventually be rectified by the democratic process," *Vance*, 440 U.S. at 97) tell us all we need to know about the light touch judges should use in reviewing laws under this standard.  So long as judges can conceive of some "plausible" reason for the law—*any* plausible reason, even one that did not motivate the legislators who enacted it—the law must stand, no matter how unfair, unjust, or unwise the judges may consider it as citizens.  *Heller v. Doe*, 509 U.S. 312, 330 (1993); *Nordlinger v. Hahn*, 505 U.S. 1, 11, 17–18 (1992).

A dose of humility makes us hesitant to condemn as unconstitutionally irrational a view of marriage shared not long ago by every society in the world, shared by most, if not all, of our ancestors, and shared still today by a significant number of the States.  Hesitant, yes; but still a rational basis, some rational basis, must exist for the definition.  What is it?  Two at a minimum suffice to meet this low bar.  One starts from the premise that governments got into the business of defining marriage, and remain in the business of defining marriage, not to regulate love but to regulate sex, most especially the intended and unintended effects of male-female intercourse.  Imagine a society without marriage.  It does not take long to envision problems that might result from an absence of rules about how to handle the natural effects of male-female intercourse: children.  May men and women follow their procreative urges wherever they take them?  Who is responsible for the children that result?  How many mates may an individual have?  How does one decide which set of mates is responsible for which set of children?  That we rarely think about these questions nowadays shows only how far we have come and how relatively stable our society is, not that States have no explanation for creating such rules in the first place.

Once one accepts a need to establish such ground rules, and most especially a need to create stable family units for the planned and unplanned creation of children, one can well appreciate why the citizenry would think that a reasonable first concern of any society is the need to regulate male-female relationships and the unique procreative possibilities of them.  One way

to pursue this objective is to encourage couples to enter lasting relationships through subsidies and other benefits and to discourage them from ending such relationships through these and other means. People may not need the government's encouragement to have sex. And they may not need the government's encouragement to propagate the species. But they may well need the government's encouragement to create and maintain stable relationships within which children may flourish. It is not society's laws or for that matter any one religion's laws, but nature's laws (that men and women complement each other biologically), that created the policy imperative. And governments typically are not second-guessed under the Constitution for prioritizing how they tackle such issues. *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970).

No doubt, that is not the only way people view marriage today. Over time, marriage has come to serve another value—to solemnize relationships characterized by love, affection, and commitment. Gay couples, no less than straight couples, are capable of sharing such relationships. And gay couples, no less than straight couples, are capable of raising children and providing stable families for them. The quality of such relationships, and the capacity to raise children within them, turns not on sexual orientation but on individual choices and individual commitment. All of this supports the policy argument made by many that marriage laws should be extended to gay couples, just as nineteen States have done through their own sovereign powers. Yet it does not show that the States, circa 2014, suddenly must look at this policy issue in just one way on pain of violating the Constitution.

The signature feature of rational basis review is that governments will not be placed in the dock for doing too much or for doing too little in addressing a policy question. *Id.* In a modern sense, crystallized at some point in the last ten years, many people now critique state marriage laws for doing too little—for being underinclusive by failing to extend the definition of marriage to gay couples. Fair enough. But rational basis review does not permit courts to invalidate laws every time a new and allegedly better way of addressing a policy emerges, even a better way supported by evidence and, in the Michigan case, by judicial factfinding. If legislative choices may rest on "rational speculation unsupported by evidence or empirical data," *Beach Commc'ns*, 508 U.S. at 315, it is hard to see the point of premising a ruling of unconstitutionality on factual findings made by one unelected federal judge that favor a different policy. Rational basis review does not empower federal courts to "subject" legislative line-

drawing to "courtroom" factfinding designed to show that legislatures have done too much or too little. *Id.*

What we are left with is this:  By creating a status (marriage) and by subsidizing it (e.g., with tax-filing privileges and deductions), the States created an incentive for two people who procreate together to stay together for purposes of rearing offspring.  That does not convict the States of irrationality, only of awareness of the biological reality that couples of the same sex do not have children in the same way as couples of opposite sexes and that couples of the same sex do not run the risk of unintended offspring.  That explanation, still relevant today, suffices to allow the States to retain authority over an issue they have regulated from the beginning.

To take another rational explanation for the decision of many States not to expand the definition of marriage, a State might wish to wait and see before changing a norm that our society (like all others) has accepted for centuries.  That is not preserving tradition for its own sake.  No one here claims that the States' original definition of marriage was unconstitutional when enacted.  The plaintiffs' claim is that the States have acted irrationally in standing by the traditional definition in the face of changing social mores.  Yet one of the key insights of federalism is that it permits laboratories of experimentation—accent on the plural—allowing one State to innovate one way, another State another, and a third State to assess the trial and error over time.  As a matter of state law, the possibility of gay marriage became real in 2003 with the Massachusetts Supreme Judicial Court's decision in *Goodridge*.  Eleven years later, the clock has not run on assessing the benefits and burdens of expanding the definition of marriage.  Eleven years indeed is not even the right timeline.  The fair question is whether in 2004, *one* year after *Goodridge*, Michigan voters could stand by the traditional definition of marriage.  How can we say that the voters acted irrationally for sticking with the seen benefits of thousands of years of adherence to the traditional definition of marriage in the face of one year of experience with a new definition of marriage?  A State still assessing how this has worked, whether in 2004 or 2014, is not showing irrationality, just a sense of stability and an interest in seeing how the new definition has worked elsewhere.  Even today, the only thing anyone knows *for sure* about the long-term impact of redefining marriage is that they do not know.  A Burkean sense of caution does not violate the Fourteenth Amendment, least of all when measured by a timeline less than a

dozen years long and when assessed by a system of government designed to foster step-by-step, not sudden winner-take-all, innovations to policy problems.

In accepting these justifications for the four States' marriage laws, we do not deny the foolish, sometimes offensive, inconsistencies that have haunted marital legislation from time to time. States will hand some people a marriage license no matter how often they have divorced or remarried, apparently on the theory that practice makes perfect. States will not even prevent an individual from remarrying the same person three or four times, where practice no longer seems to be the issue. With love and commitment nowhere to be seen, States will grant a marriage license to two friends who wish to share in the tax and other material benefits of marriage, at least until the State's no-fault divorce laws allow them to exit the partnership freely. And States allow couples to continue procreating no matter how little stability, safety, and love they provide the children they already have. Nor has unjustified sanctimony stayed off the stage when it comes to marital legislation—with monogamists who "do not monog" criticizing alleged polygamists who "do not polyg." *See* Paul B. Beers, *Pennsylvania Politics Today and Yesterday* 51 (1980).

How, the claimants ask, could *anyone* possibly be unworthy of this civil institution? Aren't gay and straight couples both capable of honoring this civil institution in some cases and of messing it up in others? All of this, however, proves much too much. History is replete with examples of love, sex, and marriage tainted by hypocrisy. Without it, half of the world's literature, and three-quarters of its woe, would disappear. Throughout, we have never leveraged these inconsistencies about deeply personal, sometimes existential, views of marriage into a ground for constitutionalizing the field. Instead, we have allowed state democratic forces to fix the problems as they emerge and as evolving community mores show they should be fixed. Even if we think about today's issue and today's alleged inconsistencies solely from the perspective of the claimants in this case, it is difficult to call that formula, already coming to terms with a new view of marriage, a failure.

Any other approach would create line-drawing problems of its own. Consider how plaintiffs' love-and-commitment definition of marriage would fare under their own rational basis test. Their definition does too much because it fails to account for the reality that no State in the country requires couples, whether gay or straight, to be in love. Their definition does too little

because it fails to account for plural marriages, where there is no reason to think that three or four adults, whether gay, bisexual, or straight, lack the capacity to share love, affection, and commitment, or for that matter lack the capacity to be capable (and more plentiful) parents to boot. If it is constitutionally irrational to stand by the man-woman definition of marriage, it must be constitutionally irrational to stand by the monogamous definition of marriage. Plaintiffs have no answer to the point. What they might say they cannot: They might say that tradition or community mores provide a rational basis for States to stand by the monogamy definition of marriage, but they cannot say that because that is exactly what they claim is illegitimate about the States' male-female definition of marriage. The predicament does not end there. No State is free of marriage policies that go too far in some directions and not far enough in others, making all of them vulnerable—if the claimants' theory of rational basis review prevails.

Several cases illustrate just how seriously the federal courts must take the line-drawing deference owed the democratic process under rational basis review. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976), holds that a State may require law enforcement officers to retire without exception at age fifty, in order to assure the physical fitness of its police force. If a rough correlation between age and strength suffices to uphold exception-free retirement ages (even though some fifty-year-olds swim/bike/run triathlons), why doesn't a correlation between male-female intercourse and procreation suffice to uphold traditional marriage laws (even though some straight couples don't have kids and many gay couples do)? *Armour v. City of Indianapolis*, 132 S. Ct. 2073 (2012), says that if a city cancels a tax, the bureaucratic hassle of issuing refunds entitles it to keep money already collected from citizens who paid early. If administrative convenience amounts to an adequate public purpose, why not a rough sense of social stability? More deferential still, *Kotch v. Board of River Port Pilot Commissioners*, 330 U.S. 552 (1947), concludes that a State's interest in maintaining close ties among those who steer ships in its ports justifies denying pilotage licenses to anyone who isn't a friend or relative of an incumbent pilot. Can we honestly say that traditional marriage laws involve more irrationality than *nepotism*?

The debate over marriage of course has another side, and we cannot deny the costs to the plaintiffs of allowing the States to work through this profound policy debate. The traditional definition of marriage denies gay couples the opportunity to publicly solemnize, to say nothing

of subsidize, their relationships under state law.  In addition to depriving them of this status, it deprives them of benefits that range from the profound (the right to visit someone in a hospital as a spouse or parent) to the mundane (the right to file joint tax returns).  These harms affect not only gay couples but also their children.  Do the benefits of standing by the traditional definition of marriage make up for these costs?  The question demands an answer—but from elected legislators, not life-tenured judges.  Our task under the Supreme Court's precedents is to decide whether the law has some conceivable basis, not to gauge how that rationale stacks up against the arguments on the other side.  Respect for democratic control over this traditional area of state expertise ensures that "a statewide deliberative process that enable[s] its citizens to discuss and weigh arguments for and against same-sex marriage" can have free and reasonable rein. *Windsor*, 133 S. Ct. at 2689.

## D.

*Animus.*  Given the broad deference owed the States under the democracy-reinforcing norms of rational basis review, the cases in which the Supreme Court has struck down a state law on that basis are few.  When the Court has taken this step, it usually has been due to the novelty of the law and the targeting of a single group for disfavored treatment under it.  In one case, a city enacted a new zoning code with the none-too-subtle purpose of closing down a home for the intellectually disabled in a neighborhood that apparently wanted nothing to do with them.  The reality that the code applied only to homes for the intellectually disabled—and not to other dwellings such as fraternity houses—led the Court to invalidate the regulation on the ground that the city had based it upon "an irrational prejudice against the mentally retarded."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985).  In another case, a statewide initiative denied gays, and gays alone, access to the protection of the State's existing antidiscrimination laws.  The novelty of the law, coupled with the distance between the reach of the law and any legitimate interest it might serve, showed that the law was "born of animosity toward" gays and suggested a design to make gays "unequal to everyone else."  *Romer*, 517 U.S. at 634–35.

None of the statewide initiatives at issue here fits this pattern.  The four initiatives, enacted between 2004 and 2006, codified a long-existing, widely held social norm already reflected in state law.  "[M]arriage between a man and a woman," as the Court reminded us just

last year, "had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization." *Windsor*, 133 S. Ct. at 2689.

Neither was the decision to place the definition of marriage in a State's constitution unusual, nor did it otherwise convey the kind of malice or unthinking prejudice the Constitution prohibits. Nineteen States did the same thing during that period. Human Rights Campaign Found., *Equality from State to State 2006*, at 13–14 (2006), *available at* http://s3.amazonaws.com/hrc-assets//files/assets/resources/StateToState2007.pdf. And if there was one concern animating the initiatives, it was the fear that the courts would seize control over an issue that people of good faith care deeply about. If that is animus, the term has no useful meaning.

Who in retrospect can blame the voters for having this fear? By then, several state courts had altered their States' traditional definitions of marriage under the States' constitutions. Since then, more have done the same. Just as state judges have the authority to construe a state constitution as they see fit, so do the people have the right to overrule such decisions or preempt them as they see fit. Nor is there anything static about this process. In some States, the people have since re-amended their constitutions to broaden the category of those eligible to marry. In other States, the people seemed primed to do the same but for now have opted to take a wait-and-see approach of their own as federal litigation proceeds. *See, e.g.*, Wesley Lowery, *Same-Sex Marriage Is Gaining Momentum, but Some Advocates Don't Want It on the Ballot in Ohio*, Wash. Post (June 14, 2014), http://www.washingtonpost.com/politics/same-sex-marriage-is-gaining-momentum-but-ohio-advocates-dont-want-it-on-the-ballot/2014/06/14/a090452a-e77e-11e3-afc6-a1dd9407abcf_story.html (explaining that Ohio same-sex marriage advocates opted not to place the question on the 2014 state ballot despite collecting nearly twice the number of required signatures). What the Court recently said about another statewide initiative that people care passionately about applies with equal vigor here: "Deliberative debate on sensitive issues such as racial preferences all too often may shade into rancor. But that does not justify removing certain court-determined issues from the voters' reach. Democracy does not presume that some subjects are either too divisive or too profound for public debate." *Schuette v. Coal. to Defend Affirmative Action*, 134 S. Ct. 1623, 1638 (2014). "It is demeaning to the

democratic process to presume that the voters are not capable of deciding an issue of this sensitivity on decent and rational grounds." *Id.* at 1637.

What of the possibility that other motivations affected the amendment process in the four States? If assessing the motives of multimember legislatures is difficult, assessing the motives of *all* voters in a statewide initiative strains judicial competence. The number of people who supported each initiative—Michigan (2.7 million), Kentucky (1.2 million), Ohio (3.3 million), and Tennessee (1.4 million)—was large and surely diverse. In addition to the proper role of the courts in a democracy, many other factors presumably influenced the voters who supported *and* opposed these amendments: that some politicians favored the amendment and others opposed it; that some faith groups favored the amendment and others opposed it; that some thought the amendment would strengthen families and others thought it would weaken them or were not sure; that some thought the amendment would be good for children and others thought it would not be or were not sure; and that some thought the amendment would preserve a long-established definition of marriage and others thought it was time to accommodate gay couples. Even a rough sense of morality likely affected voters, with some thinking it immoral to exclude gay couples and others thinking the opposite. For most people, whether for or against the amendment, the truth of why they did what they did is assuredly complicated, making it impossible to pin down any one consideration, as opposed to a rough aggregation of factors, as motivating them. How in this setting can we indict the 2.7 million Michigan voters who supported the amendment in 2004, less than *one year* after the *first* state supreme court recognized a constitutional right to gay marriage, for favoring the amendment for prejudicial reasons and for prejudicial reasons alone? Any such conclusion cannot be squared with the benefit of the doubt customarily given voters and legislatures under rational basis review. Even the gay-rights community, remember, was not of one mind about taking on the benefits and burdens of marriage until the early 1990s. *See* George Chauncey, *Why Marriage? The History Shaping Today's Debate over Gay Equality* 58, 88 (2004); Michael J. Klarman, *From the Closet to the Altar: Courts, Backlash, and the Struggle for Same-Sex Marriage* 48–52 (2013). A decade later, a State's voters should not be taken to task for failing to be of one mind about the issue themselves.

Some equanimity is in order in assessing the motives of voters who invoked a constitutionally respected vehicle for change and for resistance to change:  direct democracy.  *See Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 151 (1912).  Just as gay individuals are no longer abstractions, neither should we treat States as abstractions.  Behind these initiatives were real people who teach our children, create our jobs, and defend our shores.  Some of these people supported the initiative in 2004; some did not.  It is no less unfair to paint the proponents of the measures as a monolithic group of hate-mongers than it is to paint the opponents as a monolithic group trying to undo American families.  "Tolerance," like respect and dignity, is best traveled on a "two-way street."  *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012).  If there is a dominant theme to the Court's cases in this area, it is to end otherness, not to create new others.

All of this explains why the Court's decisions in *City of Cleburne* and *Romer* do not turn on reading the minds of city voters in one case or of statewide initiative supporters in the other.  They turn on asking whether anything but prejudice to the affected class could explain the law.  *See City of Cleburne*, 473 U.S. at 450; *Romer*, 517 U.S. at 635.  No such explanations existed in those cases.  Plenty exist here, as shown above and as recognized by many others.  *See Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring in the judgment) ("Unlike the moral disapproval of same-sex relations[,] . . . other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."); *Bishop*, 760 F.3d at 1104–09 (Holmes, J., concurring) (same); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 868 (8th Cir. 2006) (enactment not "'inexplicable by anything but animus' towards same-sex couples"); *Conaway v. Deane*, 932 A.2d 571, 635 (Md. 2007) (no reason to "infer antipathy"); *Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006) (those who favor the traditional definition are not "irrational, ignorant or bigoted"); *Andersen v. King Cnty.*, 138 P.3d 963, 981 (Wash. 2006) (en banc) ("the only reason" for the law was not "anti-gay sentiment").

One other point.  Even if we agreed with the claimants that the nature of these state constitutional amendments, and the debates surrounding them, required their invalidation on animus grounds, that would not give them what they request in their complaints:  the right to same-sex marriage.  All that the invalidation of the amendments would do is return state law to where it had always been, a status quo that in all four States included state statutory and common

law definitions of marriage applicable to one man and one woman—definitions that no one claims were motivated by ill will.  The elimination of the state constitutional provisions, it is true, would allow individuals to challenge the four States' other marital laws on state constitutional grounds.  No one filed such a challenge here, however.

E.

*Fundamental right to marry.*  Under the Due Process Clause, courts apply more muscular review—"strict," "rigorous," usually unforgiving, scrutiny—to laws that impair "fundamental" rights.  In considering the claimants' arguments that they have a fundamental right to marry each other, we must keep in mind that something can be fundamentally important without being a fundamental right under the Constitution.  Otherwise, state regulations of many deeply important subjects—from education to healthcare to living conditions to decisions about when to die— would be subject to unforgiving review.  They are not.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) (public education); *Maher v. Roe*, 432 U.S. 464, 469 (1977) (healthcare); *Lindsey v. Normet*, 405 U.S. 56, 73–74 (1972) (housing); *Glucksberg*, 521 U.S. at 728 (right to die).  Instead, the question is whether our nation has treated the right as fundamental and therefore worthy of protection under substantive due process.  More precisely, the test is whether the right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed."  *Glucksberg*, 521 U.S. at 721 (internal citations omitted).  That requirement often is met by placing the right in the Constitution, most obviously in (most of) the guarantees in the Bill of Rights.  *See id*. at 720.  But the right to marry in general, and the right to gay marriage in particular, nowhere appear in the Constitution.  That route for recognizing a fundamental right to same-sex marriage does not exist.

That leaves the other option—that, even though a proposed right to same-sex marriage does not appear in the Constitution, it turns on bedrock assumptions about liberty.  This too does not work.  The first state high court to redefine marriage to include gay couples did not do so until 2003 in *Goodridge*.

Matters do not change because *Loving v. Virginia*, 388 U.S. 1 (1967), held that "marriage" amounts to a fundamental right.  When the Court decided *Loving*, "marriage between

a man and a woman no doubt [was] thought of . . . as essential to the very definition of that term." *Windsor*, 133 S. Ct. at 2689. In referring to "marriage" rather than "opposite-sex marriage," *Loving* confirmed only that "opposite-sex marriage" would have been considered redundant, not that marriage included same-sex couples. *Loving* did not change the definition. That is why the Court said marriage is "fundamental to our very existence and survival," 388 U.S. at 12, a reference to the procreative definition of marriage. Had a gay African-American male and a gay Caucasian male been denied a marriage license in Virginia in 1968, would the Supreme Court have held that Virginia had violated the Fourteenth Amendment? No one to our knowledge thinks so, and no Justice to our knowledge has ever said so. The denial of the license would have turned not on the races of the applicants but on a request to change the definition of marriage. Had *Loving* meant something more when it pronounced marriage a fundamental right, how could the Court hold in *Baker* five years later that gay marriage does not even raise a substantial federal question? *Loving* addressed, and rightly corrected, an unconstitutional eligibility requirement for marriage; it did not create a new definition of marriage.

A similar problem confronts the claimants' reliance on other decisions treating marriage as a fundamental right, whether in the context of a statute denying marriage licenses to fathers who could not pay child support, *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978), or a regulation restricting prisoners' ability to obtain marriage licenses, *Turner v. Safley*, 482 U.S. 78, 94–95 (1987). It strains credulity to believe that a year after each decision a gay indigent father could have required the State to grant him a marriage license for his partnership or that a gay prisoner could have required the State to permit him to marry a gay partner. When *Loving* and its progeny used the word marriage, they did not redefine the term but accepted its traditional meaning.

No doubt, many people, many States, even some dictionaries, now define marriage in a way that is untethered to biology. But that does not transform the fundamental-rights decision of *Loving* under the old definition into a constitutional right under the new definition. The question is whether the old reasoning applies to the new setting, not whether we can shoehorn new meanings into old words. Else, evolving-norm lexicographers would have a greater say over the meaning of the Constitution than judges.

The upshot of fundamental-rights status, keep in mind, is strict-scrutiny status, subjecting all state eligibility rules for marriage to rigorous, usually unforgiving, review. That makes little sense with respect to the trials and errors societies historically have undertaken (and presumably will continue to undertake) in determining who may enter and leave a marriage. Start with the *duration* of a marriage. For some, marriage is a commitment for life and beyond. For others, it is a commitment for life. For still others, it is neither. In 1969, California enacted the first pure no-fault divorce statute. *See* Family Law Act of 1969, 1969 Cal. Stat. 3312. A dramatic expansion of similar laws followed. *See* Lynn D. Wardle, *No-Fault Divorce and the Divorce Conundrum*, 1991 BYU L. Rev. 79, 90. The Court has never subjected these policy fits and starts about who may *leave* a marriage to strict scrutiny.

Consider also the *number* of people eligible to marry. As late as the eighteenth century, "[t]he predominance of monogamy was by no means a foregone conclusion," and "[m]ost of the peoples and cultures around the globe" had adopted a different system. Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 9 (2000). Over time, American officials wove monogamy into marriage's fabric. Beginning in the nineteenth century, the federal government "encouraged or forced" Native Americans to adopt the policy, and in 1878 the Supreme Court upheld a federal antibigamy law. *Id.* at 26; *see Reynolds v. United States*, 98 U.S. 145 (1878). The Court has never taken this topic under its wing. And if it did, how would the constitutional, as opposed to policy, arguments in favor of same-sex marriage not apply to plural marriages?

Consider finally the *nature* of the individuals eligible to marry. The age of consent has not remained constant, for example. Under Roman law, men could marry at fourteen, women at twelve. The American colonies imported that rule from England and kept it until the mid-1800s, when the people began advocating for a higher minimum age. Today, all but two States set the number at eighteen. *See* Vivian E. Hamilton, *The Age of Marital Capacity: Reconsidering Civil Recognition of Adolescent Marriage*, 92 B.U. L. Rev. 1817, 1824–32 (2012). The same goes for the social acceptability of marriage between cousins, a union deemed "desirable in many parts of the world"; indeed, around "10 percent of marriages worldwide are between people who are second cousins or closer." Sarah Kershaw, *Living Together: Shaking Off the Shame*, N.Y. Times (Nov. 25, 2009), http://www.nytimes.com/2009/11/26/garden/26cousins.html. Even in the United States, cousin marriage was not prohibited until the mid-nineteenth century, when

Kansas—followed by seven other States—enacted the first ban. *See* Diane B. Paul & Hamish G. Spencer, *"It's Ok, We're Not Cousins by Blood": The Cousin Marriage Controversy in Historical Perspective*, 6 PLoS Biology 2627, 2627 (2008). The States, however, remain split: half of them still permit the practice. *Ghassemi v. Ghassemi*, 998 So. 2d 731, 749 (La. Ct. App. 2008). Strict scrutiny? Neither *Loving* nor any other Supreme Court decision says so.

## F.

*Discrete and insular class without political power.* A separate line of cases, this one under the Equal Protection Clause, calls for heightened review of laws that target groups whom legislators have singled out for unequal treatment in the past. This argument faces an initial impediment. Our precedents say that rational basis review applies to sexual-orientation classifications. *See Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260–61 (6th Cir. 2006); *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997).

There is another impediment. The Supreme Court has never held that legislative classifications based on sexual orientation receive heightened review and indeed has not recognized a new suspect class in more than four decades. There are ample reasons for staying the course. Courts consider four rough factors in deciding whether to treat a legislative classification as suspect and presumptively unconstitutional: whether the group has been historically victimized by governmental discrimination; whether it has a defining characteristic that legitimately bears on the classification; whether it exhibits unchanging characteristics that define it as a discrete group; and whether it is politically powerless. *See Rodriguez*, 411 U.S. at 28.

We cannot deny the lamentable reality that gay individuals have experienced prejudice in this country, sometimes at the hands of public officials, sometimes at the hands of fellow citizens. Stonewall, Anita Bryant's uninvited answer to the question "Who are we to judge?", unequal enforcement of antisodomy laws between gay and straight partners, Matthew Shepard, and the language of insult directed at gays and others make it hard for anyone to deny the point. But we also cannot deny that the institution of marriage arose independently of this record of discrimination. The traditional definition of marriage goes back thousands of years and spans

almost every society in history.  By contrast, "American laws targeting same-sex couples did not develop until the last third of the 20th century."  *Lawrence*, 539 U.S. at 570.  This order of events prevents us from inferring from history that prejudice against gays led to the traditional definition of marriage in the same way that we can infer from history that prejudice against African Americans led to laws against miscegenation.   The usual leap from history of discrimination to intensification of judicial review does not work.

Windsor says nothing to the contrary.  In arguing otherwise, plaintiffs mistake *Windsor*'s avoidance of one federalism question for avoidance of federalism altogether.  Here is the key passage:

> Despite these considerations, it is unnecessary to decide whether this federal intrusion on state power is a violation of the Constitution because it disrupts the federal balance.  The State's power in defining the marital relation is of central relevance in this case quite apart from principles of federalism.  Here the State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import.  When the State used its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community.  DOMA, because of its reach and extent, departs from this history and tradition of reliance on state law to define marriage. "'[D]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'"

*Windsor*, 133 S. Ct. at 2692 (quoting *Romer*, 517 U.S. at 633).  Plaintiffs read these words (and others that follow) as an endorsement of heightened review in today's case, pointing to the first two sentences as proof that individual dignity, not federalism, animates *Windsor*'s holding.

Yet federalism permeates both parts of this passage and both parts of the opinion. *Windsor* begins by expressing doubts about whether Congress has the delegated power to enact a statute like DOMA at all.  But instead of resolving the case on the far-reaching enumerated-power ground, it resolves the case on the narrower *Romer* ground—that anomalous exercises of power targeting a single group raise suspicion that bigotry rather than legitimate policy is afoot. Why was DOMA anomalous?  Only federalism can supply the answer.  The national statute trespassed upon New York's time-respected authority to define the marital relation, including by "enhanc[ing] the recognition, dignity, and protection" of gay and lesbian couples. *Id.*  Today's case involves no such "divest[ing]"/"depriv[ing]"/"undermin[ing]" of a marriage status granted

through a State's authority over domestic relations within its borders and thus provides no basis for inferring that the purpose of the state law was to "impose a disadvantage"/"a separate status"/"a stigma" on gay couples. *Id.* at 2692–95. When the Framers "split the atom of sovereignty," *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (Kennedy, J., concurring), they did so to *enhance* liberty, not to allow the National Government to *divest* liberty protections granted by the States in the exercise of their historic and in this instance nearly exclusive power. What we have here is something entirely different. It is the States doing exactly what every State has been doing for hundreds of years: defining marriage as they see it. The only thing that has changed is the *willingness* of many States over the last eleven years to expand the definition of marriage to encompass gay couples.

Any other reading of *Windsor* would require us to subtract key passages from the opinion and add an inverted holding. The Court noted that New York "without doubt" had the power under its traditional authority over marriage to extend the definition of marriage to include gay couples and that Congress had no power to enact "unusual" legislation that interfered with the States' long-held authority to define marriage. *Windsor*, 133 S. Ct. at 2692–93. A decision premised on heightened scrutiny under the Fourteenth Amendment that redefined marriage nationally to include same-sex couples not only would divest the States of their traditional authority over this issue, but it also would authorize Congress to do something no one would have thought possible a few years ago—to use its Section 5 enforcement powers to add new definitions and extensions of marriage rights in the years ahead. That would leave the States with little authority to resolve ever-changing debates about how to define marriage (and the benefits and burdens that come with it) outside the beck and call of Congress and the Court. How odd that one branch of the National Government (Congress) would be reprimanded for entering the fray in 2013 and two branches of the same Government (the Court and Congress) would take control of the issue a short time later.

Nor, as the most modest powers of observation attest, is this a setting in which "political powerlessness" requires "extraordinary protection from the majoritarian political process." *Rodriguez*, 411 U.S. at 28. This is not a setting in which dysfunction mars the political process. *See Reynolds v. Sims*, 377 U.S. 533 (1964); *Baker v. Carr*, 369 U.S. 186 (1962). It is not a setting in which the recalcitrance of Jim Crow demands judicial, rather than we-can't-wait-

forever legislative, answers. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). It is not a setting in which time shows that even a potentially powerful group cannot make headway on issues of equality. *See Frontiero v. Richardson*, 411 U.S. 677 (1973). It is not a setting where a national crisis—the Depression—seemingly demanded constitutional innovation. *See W. Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937). And it is not a setting, most pertinently, in which the local, state, and federal governments historically disenfranchised the suspect class, as they did with African Americans and women. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

Instead, from the claimants' perspective, we have an eleven-year record marked by nearly as many successes as defeats and a widely held assumption that the future holds more promise than the past—if the federal courts will allow that future to take hold. Throughout that time, other advances for the claimants' cause are manifest. Nationally, "Don't Ask, Don't Tell" is gone. Locally, the Cincinnati charter amendment that prevented gay individuals from obtaining certain preferences from the city, upheld by our court in 1997, *Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289 (6th Cir. 1997), is no more. The Fourteenth Amendment does not insulate influential, indeed eminently successful, interest groups from a defining attribute of all democratic initiatives—some succeed, some fail—particularly when succeeding more and failing less are in the offing.

Why, it is worth asking, the sudden change in public opinion? If there is one thing that seems to challenge hearts and minds, even souls, on this issue, it is the transition from the abstract to the concrete. If twenty-five percent of the population knew someone who was openly gay in 1985, and seventy-five percent knew the same in 2000, Klarman, *supra*, at 197, it is fair to wonder how few individuals still have not been forced to think about the matter through the lens of a gay friend or family member. *That* would be a discrete and insular minority.

The States' undoubted power over marriage provides an independent basis for reviewing the laws before us with deference rather than with skepticism. An analogy shows why. When a *state* law targets noncitizens—a group marked by its lack of political power and its history of enduring discrimination—it must in general meet the most demanding of constitutional tests in order to survive a skirmish with a court. But when a *federal* law targets noncitizens, a mere rational basis will save it from invalidation. This disparity arises because of the Nation's

authority (and the States' corresponding lack of authority) over international affairs. *Mathews v. Diaz*, 426 U.S. 67, 84–85 (1976). If federal preeminence in foreign relations requires lenient review of federal immigration classifications, why doesn't state preeminence in domestic relations call for equally lenient review of state marriage definitions?

G.

*Evolving meaning.* If all else fails, the plaintiffs invite us to consider that "[a] core strength of the American legal system . . . is its capacity to evolve" in response to new ways of thinking about old policies. *DeBoer* Appellees' Br. at 57–58. But even if we accept this invitation and put aside the past—original meaning, tradition, time-respected doctrine—that does not take the plaintiffs where they wish to go. We could, to be sure, look at this case alongside evolving moral and policy considerations. The Supreme Court has done so before. *Lawrence*, 539 U.S. at 573. It may do so again. "A prime part of the history of our Constitution . . . is the story of the extension of constitutional rights . . . to people once ignored or excluded." *United States v. Virginia*, 518 U.S. 515, 557 (1996). Why not do so here?

Even on this theory, the marriage laws do not violate the Constitution. A principled jurisprudence of constitutional evolution turns on evolution in *society's* values, not evolution in *judges'* values. Freed of federal-court intervention, thirty-one States would continue to define marriage the old-fashioned way. *Lawrence*, by contrast, dealt with a situation in which just thirteen States continued to prohibit sodomy, and even then most of those laws had fallen into desuetude, rarely being enforced at all. On this record, what right do we have to say that societal values, as opposed to judicial values, have evolved toward agreement in favor of same-sex marriage?

The theory of the living constitution rests on the premise that every generation has the right to govern itself. If that premise prevents judges from insisting on principles that society has moved past, so too should it prevent judges from anticipating principles that society has yet to embrace. It follows that States must enjoy some latitude in matters of timing, for reasonable people can disagree about just when public norms have evolved enough to require a democratic response. Today's case captures the point. Not long ago American society took for granted the rough correlation between marriage and creation of new life, a vision under which limiting

marriage to opposite-sex couples seemed natural. Not long from now, if current trends continue, American society may define marriage in terms of affirming mutual love, a vision under which the failure to add loving gay couples seems unfair. Today's society has begun to move past the first picture of marriage, but it has not yet developed a consensus on the second.

If, *before* a new consensus has emerged on a social issue, federal judges may decide when the time is ripe to recognize a new constitutional right, surely the people should receive some deference in deciding when the time is ripe to move from one picture of marriage to another. So far, not a single United States Supreme Court Justice in American history has written an opinion maintaining that the traditional definition of marriage violates the Fourteenth Amendment. No one would accuse the Supreme Court of acting irrationally in failing to recognize a right to same-sex marriage in 2013. Likewise, we should hesitate to accuse the States of acting irrationally in failing to recognize the right in 2004 or 2006 or for that matter today. Federal judges engaged in the inherent pacing that comes with living constitutionalism should appreciate the inherent pacing that comes with democratic majorities deciding within reasonable bounds when and whether to embrace an evolving, as opposed to settled, societal norm. The one form of pacing is akin to the other, making it anomalous for the Court to hold that the States act unconstitutionally when making reasonable pacing decisions of their own.

From time to time, the Supreme Court has looked beyond our borders in deciding when to expand the meaning of constitutional guarantees. *Lawrence*, 539 U.S. at 576. Yet foreign practice only reinforces the impropriety of tinkering with the democratic process in this setting. The great majority of countries across the world—including such progressive democracies as Australia and Finland—still adhere to the traditional definition of marriage. Even more telling, the European Court of Human Rights ruled only a few years ago that European human rights laws do not guarantee a right to same-sex marriage. *Schalk & Kopf v. Austria*, 2010-IV Eur. Ct. H.R. 409. "The area in question," it explained in words that work just as well on this side of the Atlantic, remains "one of evolving rights with no established consensus," which means that States must "enjoy [discretion] in the timing of the introduction of legislative changes." *Id.* at 438. It reiterated this conclusion as recently as this July, declaring that "the margin of appreciation to be afforded" to States "must still be a wide one." *Hämäläinen v. Finland*, No. 37359/09, HUDOC, at *19 (Eur. Ct. H.R. July 16, 2014). Our Supreme Court relied on the

European Court's gay-rights decisions in *Lawrence*. 539 U.S. at 576. What neutral principle of constitutional interpretation allows us to ignore the European Court's same-sex marriage decisions when deciding this case? If the point is relevant in the one setting, it is relevant in the other, especially in a case designed to treat like matters alike.

Other practical considerations also do not favor the creation of a new constitutional right here. While these cases present a denial of access to many benefits, what is "[o]f greater importance" to the claimants, as they see it, "is the loss of . . . dignity and respect" occasioned by these laws. *Love* Appellees' Br. at 5. No doubt there is much to be said for "dignity and respect" in the eyes of the Constitution and its interpreters. But any loss of dignity and respect on this issue did not come from the Constitution. It came from the neighborhoods and communities in which gay and lesbian couples live, and in which it is worth trying to correct the problem in the first instance—and in that way "to allow the formation of consensus respecting the way the members" of a State "treat each other in their daily contact and constant interaction with each other." *Windsor*, 133 S. Ct. at 2692.

For all of the power that comes with the authority to interpret the United States Constitution, the federal courts have no long-lasting capacity to change what people think and believe about new social questions. If the plaintiffs are convinced that litigation is the best way to resolve today's debate and to change heads and hearts in the process, who are we to say? Perhaps that is not the only point, however. Yes, we cannot deny thinking the plaintiffs deserve better—earned victories through initiatives and legislation and the greater acceptance that comes with them. But maybe the American people too deserve better—not just in the sense of having a say through representatives in the legislature rather than through representatives in the courts, but also in the sense of having to come face to face with the issue. Rights need not be countermajoritarian to count. *See, e.g.*, Civil Rights Act of 1964, Pub. L. No. 88352, 78 Stat. 241. Isn't the goal to create a culture in which a majority of citizens dignify and respect the rights of minority groups through majoritarian laws rather than through decisions issued by a majority of Supreme Court Justices? It is dangerous and demeaning to the citizenry to assume that *we*, and only *we*, can fairly understand the arguments for and against gay marriage.

Last, but not least, federal courts never expand constitutional guarantees in a vacuum. What one group wants on one issue from the courts today, another group will want on another

issue tomorrow.  The more the Court innovates under the Constitution, the more plausible it is for the Court to do still more—and the more plausible it is for other advocates on behalf of other issues to ask the Court to innovate still more.  And while the expansion of liberal and conservative constitutional rights will solve, or at least sidestep, the amendment-difficulty problem that confronts many individuals and interest groups, it will exacerbate the judge-confirmation problem.  Faith in democracy with respect to issues that the Constitution has not committed to the courts reinforces a different, more sustainable norm.

III.

Does the Constitution prohibit a State from denying recognition to same-sex marriages conducted in other States?  That is the question presented in the two Ohio cases (*Obergefell* and *Henry*), one of the Kentucky cases (*Bourke*), and the Tennessee case (*Tanco*).  Our answer to the first question goes a long way toward answering this one.  If it is constitutional for a State to define marriage as a relationship between a man and a woman, it is also constitutional for the State to stand by that definition with respect to couples married in other States or countries.

The Constitution in general does not delineate when a State must apply its own laws and when it must apply the laws of another State.  Neither any federal statute nor federal common law fills the gap.  Throughout our history, each State has decided for itself how to resolve clashes between its laws and laws of other sovereigns—giving rise to the field of conflict of laws.  The States enjoy wide latitude in fashioning choice-of-law rules.  *Sun Oil Co. v. Wortman*, 486 U.S. 717, 727–29 (1988); *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 307–08 (1981).

The plaintiffs in these cases do not claim that refusal to recognize out-of-state gay and lesbian marriages violates the Full Faith and Credit Clause, the principal constitutional limit on state choice-of-law rules.  Wisely so.  The Clause "does not require a State to apply another State's law in violation of its own legitimate public policy."  *Nevada v. Hall*, 440 U.S. 410, 422 (1979).  If defining marriage as an opposite-sex relationship amounts to a legitimate public policy—and we have just explained that it does—the Full Faith and Credit Clause does not prevent a State from applying that policy to couples who move from one State to another.

The plaintiffs instead argue that failure to recognize gay marriages celebrated in other States violates the Due Process and Equal Protection Clauses.  But we do not think that the

invocation of these different clauses justifies a different result. As shown, compliance with the
Due Process and Equal Protection Clauses in this setting requires only a rational relationship
between the legislation and a legitimate public purpose. And a State does not behave irrationally
by insisting upon its own definition of marriage rather than deferring to the definition adopted by
another State. Preservation of a State's authority to recognize, or to opt not to recognize, an out-
of-state marriage preserves a State's sovereign interest in deciding for itself how to define the
marital relationship. It also discourages evasion of the State's marriage laws by allowing
individuals to go to another State, marry there, then return home. Were it irrational for a State to
adhere to its own policy, what would be the point of the Supreme Court's repeated holdings that
the Full Faith and Credit Clause "does not require a State to apply another State's law in
violation of its own public policy"? *Id.*

Far from undermining these points, *Windsor* reinforces them. The case observes that
"[t]he definition of marriage is the foundation of the State's broader authority to regulate the
subject of domestic relations with respect to the protection of offspring, property interests, and
the enforcement of marital responsibilities." 133 S. Ct. at 2691 (internal quotation marks
omitted). How could it be irrational for a State to decide that the foundation of its domestic-
relations law will be *its* definition of marriage, not somebody else's? *Windsor* adds that "[e]ach
state as a sovereign has a rightful and legitimate concern in the marital status of persons
domiciled within its borders." *Id.* How could it be irrational for a State to apply its definition of
marriage to a couple in whose marital status the State as a sovereign has a rightful and legitimate
concern?

Nor does the policy of nonrecognition trigger *Windsor*'s (or *Romer*'s) principle that
unprecedented exercises of power call for judicial skepticism. States have always decided for
themselves when to yield to laws of other States. Exercising this power, States often have
refused to enforce all sorts of out-of-state rules on the grounds that they contradict important
local policies. *See* Restatement (First) of Conflict of Laws § 612; Restatement (Second) of
Conflict of Laws § 90. Even more telling, States in many instances have refused to recognize
marriages performed in other States on the grounds that these marriages depart from cardinal
principles of the State's domestic-relations laws. *See* Restatement (First) of Conflict of Laws

§ 134; Restatement (Second) of Conflict of Laws § 283.  The laws challenged here involve routine rather than anomalous uses of state power.

What of the reality that Ohio recognizes some heterosexual marriages solemnized in other States even if those marriages could not be performed in Ohio?  *See, e.g.*, *Mazzolini v. Mazzolini*, 155 N.E.2d 206, 208 (Ohio 1958).  The only reason Ohio could have for banning recognition of same-sex marriages performed elsewhere and not prohibiting heterosexual marriages performed elsewhere, the Ohio plaintiffs claim, is animus or "discrimination[] of an unusual character."  *Obergefell* Appellees' Br. at 18 (quoting *Windsor*, 133 S. Ct. at 2692).

But, in making this argument, the plaintiffs misapprehend Ohio law, wrongly assuming that Ohio would recognize as valid *any* heterosexual marriage that was valid in the State that sanctioned it.  That is not the case.  Ohio law recognizes some out-of-state marriages that could not be performed in Ohio, but not all such marriages.  *See, e.g.*, *Mazzolini*, 155 N.E.2d at 208 (marriage of first cousins); *Hardin v. Davis*, 16 Ohio Supp. 19, 20 (Ohio Ct. Com. Pl. 1945) (marriage by proxy).  In *Mazzolini*, the most relevant precedent, the Ohio Supreme Court stated that a number of heterosexual marriages—ones that were "incestuous, polygamous, shocking to good morals, unalterably opposed to a well defined public policy, or prohibited"—would not be recognized in the State, even if they were valid in the jurisdiction that performed them. 155 N.E.2d at 208–09 (noting that first-cousin marriages fell outside this rule because they were "not made void by explicit provision" and "not incestuous").  Ohio law declares same-sex marriage contrary to the State's public policy, placing those marriages within the longstanding exception to Ohio's recognition rule.  *See* Ohio Rev. Code § 3101.01(C).

## IV.

That leaves one more claim, premised on the constitutional right to travel.  In the Tennessee case (*Tanco*) and one of the Ohio cases (*Henry*), the claimants maintain that a State's refusal to recognize out-of-state same-sex marriages illegitimately burdens the right to travel—in the one case by penalizing couples who move into the State by refusing to recognize their marriages, in the other by preventing their child from obtaining a passport because the State refused to provide a birth certificate that included the names of both parents.

The United States Constitution does not mention a right to travel by name. "Yet the constitutional right to travel from one State to another is firmly embedded in our jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (internal quotation marks omitted). It provides three guarantees: (1) "the right of a citizen of one State to enter and to leave another State"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien" when visiting a second State; and (3) the right of new permanent residents "to be treated like other citizens of that State." *Id.* at 500.

Tennessee's nonrecognition law does not violate these prohibitions. It does not ban, or for that matter regulate, movement into or out of the State other than in the respect all regulations create incentives or disincentives to live in one place or another. Most critically, the law does not punish out-of-state new residents in relation to its own born and bred. Nonresidents are "treated" just "like other citizens of that State," *id.*, because the State has not expanded the definition of marriage to include gay couples in all settings, whether the individuals just arrived in Tennessee or descend from Andrew Jackson.

The same is true for the Ohio law. No regulation of movement or differential treatment between the newly resident and the longstanding resident occurs. All Ohioans must follow the State's definition of marriage. With respect to the need to obtain an Ohio birth certificate before obtaining a passport, they can get one. The certificate just will not include both names of the couple. The "just" of course goes to the heart of the matter. In that respect, however, it is due process and equal protection, not the right to travel, that govern the issue.

* * *

This case ultimately presents *two* ways to think about change. One is whether the Supreme Court will constitutionalize a new definition of marriage to meet new policy views about the issue. The other is whether the Court will begin to undertake a different form of change—change in the way we as a country optimize the handling of efforts to address requests for new civil liberties.

If the Court takes the first approach, it may resolve the issue for good and give the plaintiffs and many others relief. But we will never know what might have been. If the Court takes the second approach, is it not possible that the traditional arbiters of change—the people—

will meet today's challenge admirably and settle the issue in a productive way?  In just eleven years, nineteen States and a conspicuous District, accounting for nearly forty-five percent of the population, have exercised their sovereign powers to expand a definition of marriage that until recently was universally followed going back to the earliest days of human history.  That is a difficult timeline to criticize as unworthy of further debate and voting.  When the courts do not let the people resolve new social issues like this one, they perpetuate the idea that the heroes in these change events are judges and lawyers.  Better in this instance, we think, to allow change through the customary political processes, in which the people, gay and straight alike, become the heroes of their own stories by meeting each other not as adversaries in a court system but as fellow citizens seeking to resolve a new social issue in a fair-minded way.

　　　　For these reasons, we reverse.

———————————

**DISSENT**

———————————

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting.

**"The great tides and currents which engulf the rest of men
do not turn aside in their course to pass the judges by."**

Benjamin Cardozo, *The Nature of the Judicial Process* (1921)

The author of the majority opinion has drafted what would make an engrossing TED Talk or, possibly, an introductory lecture in Political Philosophy. But as an appellate court decision, it wholly fails to grapple with the relevant constitutional question in this appeal: whether a state's constitutional prohibition of same-sex marriage violates equal protection under the Fourteenth Amendment. Instead, the majority sets up a false premise—that the question before us is "who should decide?"—and leads us through a largely irrelevant discourse on democracy and federalism. In point of fact, the real issue before us concerns what is at stake in these six cases for the individual plaintiffs and their children, and what should be done about it. Because I reject the majority's resolution of these questions based on its invocation of *vox populi* and its reverence for "proceeding with caution" (otherwise known as the "wait and see" approach), I dissent.

In the main, the majority treats both the issues and the litigants here as mere abstractions. Instead of recognizing the plaintiffs as persons, suffering actual harm as a result of being denied the right to marry where they reside or the right to have their valid marriages recognized there, my colleagues view the plaintiffs as social activists who have somehow stumbled into federal court, inadvisably, when they should be out campaigning to win "the hearts and minds" of Michigan, Ohio, Kentucky, and Tennessee voters to their cause. But these plaintiffs are not political zealots trying to push reform on their fellow citizens; they are committed same-sex couples, many of them heading up *de facto* families, who want to achieve equal status—*de jure* status, if you will—with their married neighbors, friends, and coworkers, to be accepted as contributing members of their social and religious communities, and to be welcomed as fully

legitimate parents at their children's schools. They seek to do this by virtue of exercising a civil right that most of us take for granted—the right to marry.[1]

Readers who are familiar with the Supreme Court's recent opinion in *United States v. Windsor*, 133 S. Ct. 2675 (2013), and its progeny in the circuit courts, particularly the Seventh Circuit's opinion in *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014) ("Formally these cases are about discrimination against the small homosexual minority in the United States. But at a deeper level, . . . they are about the welfare of American children."), must have said to themselves at various points in the majority opinion, "But what about the children?" I did, and I could not find the answer in the opinion. For although my colleagues in the majority pay lip service to marriage as an institution conceived for the purpose of providing a stable family unit "within which children may flourish," they ignore the destabilizing effect of its absence in the homes of tens of thousands of same-sex parents throughout the four states of the Sixth Circuit.

Indeed, with the exception of Ohio, the defendants in each of these cases—the proponents of their respective "defense of marriage" amendments—spent virtually their entire oral arguments professing what has come to be known as the "irresponsible procreation" theory: that limiting marriage and its benefits to opposite-sex couples is rational, even necessary, to provide for "unintended offspring" by channeling their biological procreators into the bonds of matrimony. When we asked counsel why that goal required the simultaneous exclusion of same-sex couples from marrying, we were told that permitting same-sex marriage might denigrate the institution of marriage in the eyes of opposite-sex couples who conceive out of wedlock, causing subsequent abandonment of the unintended offspring by one or both biological parents. We also were informed that because same-sex couples cannot themselves produce wanted or unwanted offspring, and because they must therefore look to non-biological means of parenting that require planning and expense, stability in a family unit headed by same-sex parents is assured without the benefit of formal matrimony. But, as the court in *Baskin* pointed out, many "abandoned children [born out of wedlock to biological parents] are adopted by homosexual couples, and

---

[1]*See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") (quoting *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942)). The Supreme Court has described the right to marry as "of fundamental importance for all individuals" and as "part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978).

those children would be better off both emotionally and economically if their adoptive parents were married." *Id*. How ironic that irresponsible, unmarried, opposite-sex couples in the Sixth Circuit who produce unwanted offspring must be "channeled" into marriage and thus rewarded with its many psychological and financial benefits, while same-sex couples who become model parents are punished for their responsible behavior by being denied the right to marry. As an obviously exasperated Judge Posner responded after puzzling over this same paradox in *Baskin*, "Go figure." *Id*. at 662.

In addressing the "irresponsible procreation" argument that has been referenced by virtually every state defendant in litigation similar to this case, the *Baskin* court noted that estimates put the number of American children being raised by same-sex parents at over 200,000. *Id*. at 663. "Unintentional offspring are the children most likely to be put up for adoption," *id*. at 662, and because statistics show that same-sex couples are many times more likely to adopt than opposite-sex couples, "same-sex marriage improves the prospects of unintended children by increasing the number and resources of prospective adopters." *Id*. at 663. Moreover, "[i]f marriage is better for children who are being brought up by their biological parents, it must be better for children who are being brought up by their adoptive parents." *Id*. at 664.

The concern for the welfare of children that echoes throughout the *Baskin* opinion can be traced in part to the earlier opinion in *Windsor*, in which the Supreme Court struck down, as unconstitutional on equal-protection grounds, section 3 of the federal Defense of Marriage Act (DOMA), which defined the term "marriage" for federal purposes as "mean[ing] only a legal union between one man and one woman as husband and wife," and the term "spouse" as "refer[ring] only to a person of the opposite sex who is a husband or a wife." *Id*. at 2683 (citing 1 U.S.C. § 7). Although DOMA did not affect the prerogative of the states to regulate marriage within their respective jurisdictions, it did deprive same-sex couples whose marriages were considered valid under state law of myriad federal benefits. As Justice Kennedy, writing for the majority, pointed out:

> DOMA's principal effect is to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency . . . . The differentiation demeans the [same-sex] couple, whose moral and sexual choices the Constitution protects, see

> *Lawrence* [*v. Texas*], 539 U.S. 558 [(2003)], and whose relationship the State has
> sought to dignify. And it humiliates tens of thousands of children now being
> raised by same-sex couples. The law in question makes it even more difficult for
> the children to understand the integrity and closeness of their own family and its
> concord with other families in their community and in their daily lives.

*Id.* at 2694.

Looking more closely at the situation of just one of the same-sex couples from the six
cases before us brings Justice Kennedy's words on paper to life. Two of the Michigan plaintiffs,
April DeBoer and Jayne Rowse, are unmarried, same-sex partners who have lived as a couple for
eight years in a home they own together. They are both trained and employed as nurses, DeBoer
in a hospital neonatal department and Rowse in an emergency department at another hospital.
Together they are rearing three children but, due to existing provisions in Michigan's adoption
laws, DeBoer and Rowse are prohibited from adopting the children as joint parents because they
are unmarried. Instead, Rowse alone adopted two children, who are identified in the record as N
and J. DeBoer adopted the third child, who is identified as R.

All three children had difficult starts in life, and two of them are now characterized as
"special needs" children. N was born on January 25, 2009, to a biological mother who was
homeless, had psychological impairments, was unable to care for N, and subsequently
surrendered her legal rights to N. The plaintiffs volunteered to care for the boy and brought him
into their home following his birth. In November 2009, Rowse completed the necessary steps to
adopt N legally.

Rowse also legally adopted J after the boy's foster care agency asked Rowse and DeBoer
initially to serve as foster parents and legal guardians for him, despite the uphill climb the baby
faced. According to the plaintiffs' amended complaint:

> J was born on November 9, 2009, at Hutzel Hospital, premature at 25 weeks, to a
> drug addicted prostitute. Upon birth, he weighed 1 pound, 9 ounces and tested
> positive for marijuana, cocaine, opiates and methadone. His birth mother
> abandoned him immediately after delivery. J remained in the hospital in the
> NICU for four months with myriad different health complications, and was not
> expected to live. If he survived, he was not expected to be able to walk, speak or
> function on a normal level in any capacity. . . . With Rowse and DeBoer's
> constant care and medical attention, many of J's physical conditions have
> resolved.

The third adopted child, R, was born on February 1, 2010, to a 19-year-old girl who received no prenatal care and who gave birth at her mother's home before bringing the infant to the hospital where plaintiff DeBoer worked. R continues to experience issues related to her lack of prenatal care, including delayed gross motor skills. She is in a physical-therapy program to address these problems.

Both DeBoer and Rowse share in the responsibilities of raising the two four-year-olds and the five-year-old. The plaintiffs even have gone so far as to "coordinate their work schedules so that at least one parent is generally home with the children" to attend to their medical needs and perform other parental duties. Given the close-knit, loving environment shared by the plaintiffs and the children, DeBoer wishes to adopt N and J legally as a second parent, and Rowse wishes to adopt R legally as her second parent.

Although Michigan statutes allow married couples and single persons to adopt, those laws preclude unmarried couples from adopting each other's children. As a result, DeBoer and Rowse filed suit in federal district court challenging the Michigan adoption statute, Michigan Compiled Laws § 710.24, on federal equal-protection grounds. They later amended their complaint to include a challenge to the so-called Michigan Marriage Amendment, *see* Mich. Const. art. I, § 25, added to the Michigan state constitution in 2004, after the district court suggested that the plaintiffs' "injury was not traceable to the defendants' enforcement of section [710.24]" but, rather, flowed from the fact that the plaintiffs "were not married, and any legal form of same-sex union is prohibited" in Michigan. The case went to trial on the narrow legal issue of whether the amendment could survive rational basis review, *i.e.*, whether it proscribes conduct in a manner that is rationally related to any conceivable legitimate governmental purpose.

The bench trial lasted for eight days and consisted of testimony from sociologists, economists, law professors, a psychologist, a historian, a demographer, and a county clerk. Included in the plaintiffs' presentation of evidence were statistics regarding the number of children in foster care or awaiting adoption, as well as testimony regarding the difficulties facing same-sex partners attempting to retain parental influence over children adopted in Michigan. Gary Gates, a demographer, and Vivek Sankaran, the director of both the Child Advocacy Law Clinic and the Child Welfare Appellate Clinic at the University of Michigan Law School,

together offered testimony painting a grim picture of the plight of foster children and orphans in the state of Michigan.  For example, Sankaran noted that just under 14,000 foster children reside in Michigan, with approximately 3,500 of those being legal orphans.  Nevertheless, same-sex couples in the state are not permitted to adopt such children as a couple.  Even though one person can legally adopt a child, should anything happen to that adoptive parent, there is no provision in Michigan's legal framework that would "ensure that the children would necessarily remain with the surviving non-legal parent," even if that parent went through the arduous, time-consuming, expensive adoption-approval process.  Thus, although the State of Michigan would save money by moving children from foster care or state care into adoptive families, and although same-sex couples in Michigan are almost three times more likely than opposite-sex couples to be raising an adopted child and twice as likely to be fostering a child, there remains a legal disincentive for same-sex couples to adopt children there.

David Brodzinsky, a developmental and clinical psychologist, for many years on the faculty at Rutgers University, reiterated the testimony that Michigan's ban on adoptions by same-sex couples increases the potential risks to children awaiting adoptions.  The remainder of his testimony was devoted to a systematic, statistic-based debunking of studies intimating that children raised in gay or lesbian families, *ipso facto*, are less well-adjusted than children raised by heterosexual couples.  Brodzinsky conceded that marriage brings societal legitimatization and stability to children but noted that he found no statistically significant differences in general characteristics or in development between children raised in same-sex households and children raised in opposite-sex households, and that the psychological well-being, educational development, and peer relationships were the same in children raised in gay, lesbian, or heterosexual homes.

Such findings led Brodzinsky to conclude that the gender of a parent is far less important than the quality of the parenting offered and that family processes and resources are far better predictors of child adjustment than the family structure.  He testified that those studies presuming to show that children raised in gay and lesbian families exhibited more adjustment problems and decreased educational achievement were seriously flawed, simply because they relied on statistics concerning children who had come from families experiencing a prior traumatic breakup of a failed heterosexual relationship.  In fact, when focusing upon children of

lesbian families created through donor insemination, Brodzinsky found no differences in comparison with children from donor insemination in heterosexual families or in comparison with children conceived naturally in heterosexual families. According to Brodzinsky, such a finding was not surprising given the fact that all such children experienced no family disruption in their past. For the same reason, few differences were noted in studies of children adopted at a very early age by same-sex couples and children naturally born into heterosexual families.

Nancy Cott, a professor of history at Harvard University, the director of graduate studies there, and the author of <u>Public Vows: A History of Marriage and the Nation</u>, also testified on behalf of the plaintiffs. She explained how the concept of marriage and the roles of the marriage partners have changed over time. As summarized by Cott, the wife's identity is no longer subsumed into that of her husband, interracial marriages are legal now that the antiquated, racist concept of preserving the purity of the white race has fallen into its rightful place of dishonor, and traditional gender-assigned roles are no longer standard. Cott also testified that solemnizing marriages between same-sex partners would create tangible benefits for Michigan citizens because spouses would then be allowed to inherit without taxation and would be able to receive retirement, Social Security, and veteran's benefits upon the death of an eligible spouse. Moreover, statistics make clear that heterosexual marriages have not suffered or decreased in number as a result of states permitting same-sex marriages. In fact, to the contrary, Cott noted that there exists some evidence that many young people now refuse to enter into heterosexual marriages until their gay or lesbian friends can also enjoy the legitimacy of state-backed marriages.

Michael Rosenfeld, a Stanford University sociologist, testified about studies he had undertaken that confirmed the hypothesis that legitimation of same-sex relationships promotes their stability. Specifically, Rosenfeld's research established that although same-sex couples living in states without recognition of their commitments to each other did have a higher break-up rate than heterosexual married couples, the break-up rates of opposite-sex married couples and same-sex couples in recognized civil unions were virtually identical. Similarly, the break-up rates of same-sex couples not living in a state-recognized relationship approximated the break-up rate of heterosexual couples cohabiting without marriage.

Rosenfeld also criticized the methodology of studies advanced by the defendants that disagreed with his conclusions. According to Rosenfeld, those critical studies failed to take into account the stability or lack of stability of the various groups examined. For example, he testified that one such study compared children who had experienced no adverse family transitions with children who had lived through many such traumatic family changes. Not surprisingly, children from broken homes with lower-income-earning parents who had less education and lived in urban areas performed more poorly in school than other children. According to Rosenfeld, arguments to the contrary that failed to control for such differences, taken to their extreme, would lead to the conclusion that only high-income individuals of Asian descent who earned advanced degrees and lived in suburban areas should be allowed to marry.

To counteract the testimony offered by the plaintiffs' witnesses, the defendants presented as witnesses the authors or co-authors of three studies that disagreed with the conclusions reached by the plaintiffs' experts. All three studies, however, were given little credence by the district court because of inherent flaws in the methods used or the intent of the authors. For example, the New Family Structures Study reported by Mark Regnerus, a sociologist at the University of Texas at Austin, admittedly relied upon interviews of children from gay or lesbian families who were products of broken heterosexual unions in order to support a conclusion that living with such gay or lesbian families adversely affected the development of the children. Regnerus conceded, moreover, that his own department took the highly unusual step of issuing the following statement on the university website in response to the release of the study:

> [Dr. Regnerus's opinions] do not reflect the views of the sociology department of the University of Texas at Austin. Nor do they reflect the views of the American Sociological Association which takes the position that the conclusions he draws from his study of gay parenting are fundamentally flawed on conceptual and methodological grounds and that the findings from Dr. Regnerus'[s] work have been cited inappropriately in efforts to diminish the civil rights and legitimacy of LBGTQ partners and their families.

In fact, the record before the district court reflected clearly that Regnerus's study had been funded by the Witherspoon Institute, a conservative "think tank" opposed to same-sex marriage, in order to vindicate "the traditional understanding of marriage."

Douglas Allen, the co-author of another study with Catherine Pakaluk and Joe Price, testified that children raised by same-sex couples graduated from high school at a significantly

lower rate than did children raised by heterosexual married couples.  On cross-examination, however, Allen conceded that "many of those children who . . . were living in same-sex households had previously lived in an opposite sex household where their parents had divorced, broken up, some kind of separation or transition."  Furthermore, Allen provided evidence of the bias inherent in his study by admitting that he believed that engaging in homosexual acts "means eternal separation from God, in other words[,] going to hell."

    The final study advanced by the defendants was conducted by Loren Marks, a professor in human ecology at Louisiana State University, in what was admittedly an effort to counteract the "groupthink" portrayed by perceived "liberal psychologists."  But although Marks criticized what he perceived to be "a pronounced liberal lean on social issues" by many psychologists, he revealed his own bias by acknowledging that he was a lay clergyman in the Church of Jesus Christ of Latter Day Saints (LDS) and that the LDS directive "for a couple to be married by God's authority in God's house, the holy temple, and then to have children per the teaching that God's commandment for his children to multiply and replenish the earth remains in force."

    Presented with the admitted biases and methodological shortcomings prevalent in the studies performed by the defendant's experts, the district court found those witnesses "largely unbelievable" and not credible.  *DeBoer v. Snyder*, 973 F. Supp.2d 757, 768 (E.D. Mich. 2014).  Proceeding to a legal analysis of the core issue in the litigation, the district court then concluded that the proscriptions of the marriage amendment are not rationally related to any legitimate state interest.  Addressing the defendants' three asserted rational bases for the amendment,[2] the district court found each such proffered justification without merit.

    Principally, the court determined that the amendment is in no way related to the asserted state interest in ensuring an optimal environment for child-rearing.  The testimony adduced at trial clearly refuted the proposition that, all things being equal, same-sex couples are less able to provide for the welfare and development of children.  Indeed, marriage, whether between same-sex or opposite-sex partners, increases stability within the family unit.  By permitting same-sex

---

[2]In the district court, the state did not advance an "unintended pregnancy" argument, nor was that claim included in the state's brief on appeal, although counsel did mention it during oral argument.  In terms of "optimal environment," the state emphasized the need for children to have "both a mom and a dad," because "men and women are different," and to have a "biological connection to their parents."

couples to marry, that stability would not be threatened by the death of one of the parents.  Even more damning to the defendants' position, however, is the fact that the State of Michigan allows heterosexual couples to marry even if the couple does not wish to have children, even if the couple does not have sufficient resources or education to care for children, even if the parents are pedophiles or child abusers, and even if the parents are drug addicts.

Furthermore, the district court found no reason to believe that the amendment furthers the asserted state interests in "proceeding with caution" before "altering the traditional definition of marriage" or in "upholding tradition and morality."  As recognized by the district court, there is no legitimate justification for delay when constitutional rights are at issue, and even adherence to religious views or tradition cannot serve to strip citizens of their right to the guarantee of equal protection under the law.

Finally, and relatedly, the district court acknowledged that the regulation of marriage traditionally has been seen as part of a state's police power but concluded that this fact cannot serve as an excuse to ignore the constitutional rights of individual citizens.  Were it otherwise, the court observed, the prohibition in Virginia and in many other states against miscegenation still would be in effect today.  Because the district court found that "regardless of whoever finds favor in the eyes of the most recent majority, the guarantee of equal protection must prevail," the court held the amendment and its implementing statutes "unconstitutional because they violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." *Id.* at 775.

If I were in the majority here, I would have no difficulty in affirming the district court's opinion in *DeBoer*.  The record is rich with evidence that, as a pragmatic matter, completely refutes the state's effort to defend the ban against same-sex marriage that is inherent in the marriage amendment.  Moreover, the district court did a masterful job of supporting its legal conclusions.  Upholding the decision would also control the resolution of the other five cases that were consolidated for purposes of this appeal.

Is a thorough explication of the legal basis for such a result appropriate?  It is, of course. Is it necessary?  In my judgment, it is not, given the excellent—even eloquent—opinion in *DeBoer* and in the opinions that have come from four other circuits in the last few months that

have addressed the same issues involved here:  *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014)  (holding Utah statutes and state constitutional amendment banning same-sex marriage unconstitutional under the Fourteenth Amendment); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014) (same, Virginia); *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014) (same, Indiana statute and Wisconsin state constitutional amendment); and *Latta v. Otter*, Nos. 14-35420, 14-35421, 12-17668, 2014 WL 4977682 (9th Cir. Oct. 7, 2014) (same, Idaho and Nevada statutes and state constitutional amendments).[3]

    *Kitchen* was decided primarily on the basis of substantive due process, based on the Tenth Circuit's determination that under Supreme Court precedents, the right to marry includes the right to marry the person of one's choice.  The court located the source of that right in Supreme Court opinions such as *Maynard v. Hill*, 125 U.S. 190, 205 (1888) (recognizing marriage as "the most important relation in life"); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (holding that the liberty protected by the Fourteenth Amendment includes the freedom "to marry, establish a home and bring up children"); *Loving*, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Zablocki*, 434 U.S. at 384 (recognizing that "the right to marry is of fundamental importance for all individuals"); and *Turner v. Safley*, 482 U.S. 78, 95-96 (1987) (in the context of a prison inmate's right to marry, "[such] marriages are expressions of emotional support and public commitment[,] . . . elements [that] are important and significant aspects of the marital relationship" even in situations in which procreation is not possible).  *Kitchen*, 755 F.3d at 1209-11.  The Tenth Circuit also found that the Utah laws violated equal protection, applying strict scrutiny because the classification in question impinged on a fundamental right.  In doing so, the court rejected the state's reliance on various justifications offered to establish a compelling state interest in denying marriage to same-sex couples, finding  "an insufficient causal connection" between the prohibition on same-sex marriage and the state's "articulated goals," which included a purported interest in fostering biological reproduction, encouraging optimal childrearing, and maintaining gendered parenting styles.  *Id.* at 1222.  The court also

---

[3]On October 6, the Supreme Court denied *certiorari* and lifted stays in *Kitchen, Bostic*, and *Baskin*, putting into effect the district court injunctions entered in each of those three cases.  A stay of the mandate in the Idaho case in *Latta* also has been vacated, and the appeal in the Nevada case is not being pursued.  As a result, marriage licenses are currently being issued to same-sex couples throughout most—if not all—of the Fourth, Seventh, Ninth, and Tenth Circuits.

rejected the state's prediction that legalizing same-sex marriage would result in social discord, citing *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) (rejecting "community confusion and turmoil" as a reason to delay desegregation of public parks).  *Id.* at 1227.

The Fourth Circuit in *Bostic* also applied strict scrutiny to strike down Virginia's same-sex-marriage prohibitions as infringing on a fundamental right, citing *Loving* and observing that "[o]ver the decades, the Supreme Court has demonstrated that the right to marry is an expansive liberty interest that may stretch to accommodate changing societal norms." 760 F.3d at 376.  In a thoughtful opinion, the court analyzed each of the state's proffered interests:  maintaining control of the "definition of marriage," adhering to the "tradition of opposite-sex marriage," "protecting the institution of marriage," "encouraging responsible procreation," and "promoting the optimal childrearing environment."  *Id.* at 378.  In each instance, the court found that there was no link between the state's purported "compelling interest" and the exclusion of same-sex couples "from participating fully in our society, which is precisely the type of segregation that the Fourteenth Amendment cannot countenance."  *Id.* at 384.  As to the state's interest in federalism, the court pointed to the long-recognized principle that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons," *id.* at 379 (quoting *Windsor*, 133 S. Ct. at 2691), and highlighted *Windsor*'s reiteration of "*Loving*'s admonition that the states must exercise their authority without trampling constitutional guarantees."  *Id.*  Addressing the state's contention that marriage under state law should be confined to opposite-sex couples because unintended pregnancies cannot result from same-sex unions, the court noted that "[b]ecause same-sex couples and infertile opposite-sex couples are similarly situated, the Equal Protection Clause counsels against treating these groups differently."  *Id.* at 381-82 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

The Seventh Circuit's *Baskin* opinion is firmly grounded in equal-protection analysis. The court proceeded from the premise that "[d]iscrimination by a state or the federal government against a minority, when based on an immutable characteristic of the members of that minority (most familiarly skin color and gender), and occurring against an historical background of discrimination against the persons who have that characteristic, makes the discriminatory law or policy constitutionally suspect."  766 F.3d at 654.  But the court also found that "discrimination against same-sex couples is irrational, and therefore unconstitutional even if the discrimination is

not subjected to heightened scrutiny." *Id.* at 656. This conclusion was based on the court's rejection of "the only rationale that the states put forth with any conviction—that same-sex couples and their children don't *need* marriage because same-sex couples can't *produce* children, intended or unintended," an argument "so full of holes that it cannot be taken seriously." *Id.* (emphasis in original). The court therefore found it unnecessary to engage in "the more complex analysis found in more closely balanced equal-protection cases" or under the due process clause of the Fourteenth Amendment." *Id.* at 656-57.

The Ninth Circuit's opinion in *Latta* also focuses on equal-protection principles in finding that Idaho's and Nevada's statutes and constitutional amendments prohibiting same-sex marriage violate the Fourteenth Amendment. Because the Ninth Circuit had recently held in *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014), that classifications based on sexual orientation are subject to heightened scrutiny, a conclusion the court drew from its reading of *Windsor* to require assessment more rigorous than rational-basis review, the path to finding an equal-protection violation was less than arduous. As did the Tenth Circuit in *Kitchen*, the court in *Latta* found it "wholly illogical" to think that same-sex marriage would affect opposite-sex couples' choices with regard to procreation. *Latta*, 2014 WL 4977682, *5 (citing *Kitchen*, 755 F.3d at 1223).

These four cases from our sister circuits provide a rich mine of responses to every rationale raised by the defendants in the Sixth Circuit cases as a basis for excluding same-sex couples from contracting valid marriages. Indeed, it would seem unnecessary for this court to do more than cite those cases in affirming the district courts' decisions in the six cases now before us. Because the correct result is so obvious, one is tempted to speculate that the majority has purposefully taken the contrary position to create the circuit split regarding the legality of same-sex marriage that could prompt a grant of *certiorari* by the Supreme Court and an end to the uncertainty of status and the interstate chaos that the current discrepancy in state laws threatens. Perhaps that is the case, but it does not relieve the dissenting member of the panel from the obligation of a rejoinder.

*Baker v. Nelson*

If ever there was a legal "dead letter" emanating from the Supreme Court, *Baker v. Nelson*, 409 U.S. 810 (1972), is a prime candidate.  It lacks only a stake through its heart.  Nevertheless, the majority posits that we are bound by the Court's aging one-line order denying review of an appeal from the Minnesota Supreme Court "for want of a substantial federal question."  As the majority notes, the question concerned the state's refusal to issue a marriage license to a same-sex couple, but the decision came at a point in time when sodomy was legal in only one state in the country, Illinois, which had repealed its anti-sodomy statute in 1962.  The Minnesota statute criminalizing same-sex intimate relations was not struck down until 2001, almost 30 years after *Baker* was announced.[4]  The Minnesota Supreme Court's denial of relief to a same-sex couple in 1971 and the United States Supreme Court's conclusion that there was no *substantial* federal question involved in the appeal thus is unsurprising.  As the majority notes— not facetiously, one hopes—"that was then; this is now."

At the same time, the majority argues that we are bound by the eleven words in the order, despite the Supreme Court silence on the matter in the 42 years since it was issued.  There was no recognition of *Baker* in *Romer v. Evans*, 517 U.S. 620 (1996), nor in *Lawrence v. Texas*, 539 U.S. 558 (2003), and not in *Windsor*, despite the fact that the dissenting judge in the Second Circuit's opinion in *Windsor* made the same argument that the majority makes in this case.  *See Windsor v. United States*, 699 F.3d 169, 189, 192-95 (2d Cir. 2012) (Straub, J., dissenting in part and concurring in part).  And although the argument was vigorously pressed by the DOMA proponents in their Supreme Court brief in *Windsor*,[5] neither Justice Kennedy in his opinion for the court nor any of the four dissenting judges in their three separate opinions mentioned *Baker*.  In addition, the order was not cited in the three orders of October 6, 2014, denying *certiorari* in *Kitchen*, *Bostic*, and *Baskin*.  If this string of cases—*Romer*, *Lawrence*, *Windsor*, *Kitchen*, *Bostic*, and *Baskin*—does not represent the Court's overruling of *Baker sub silentio*, it certainly creates the "doctrinal development" that frees the lower courts from the strictures of a summary

---

[4] *See Doe v. Ventura*, No. 01-489, 2001 WL 543734 (D. Ct. of Hennepin Cnty. May 15, 2001) (unreported).

[5] *See United States v. Windsor*, Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives, No. 12-307, 2013 WL 267026 at 16-19, 25-26 (Jan. 22, 2013).

disposition by the Supreme Court.  *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (internal quotation marks and citation omitted).

*Definition of Marriage*

The majority's "original meaning" analysis strings together a number of case citations but can tell us little about the Fourteenth Amendment, except to assure us that "the people who adopted the Fourteenth Amendment [never] understood it to require the States to change the definition of marriage."  The quick answer is that they undoubtedly did not understand that it would also require school desegregation in 1955 or the end of miscegenation laws across the country, beginning in California in 1948 and culminating in the *Loving* decision in 1967. Despite a civil war, the end of slavery, and ratification of the Fourteenth Amendment in 1868, extensive litigation has been necessary to achieve even a modicum of constitutional protection from discrimination based on race, and it has occurred primarily by judicial decree, not by the democratic election process to which the majority suggests we should defer regarding discrimination based on sexual orientation.

Moreover, the majority's view of marriage as "a social institution defined by relationships between men and women" is wisely described in the plural.  There is not now and never has been a universally accepted definition of marriage.  In early Judeo-Christian law and throughout the West in the Middle Ages, marriage was a religious obligation, not a civil status. Historically, it has been pursued primarily as a political or economic arrangement.  Even today, polygynous marriages outnumber monogamous ones—the practice is widespread in Africa, Asia, and the Middle East, especially in countries following Islamic law, which also recognizes temporary marriages in some parts of the world.  In Asia and the Middle East, many marriages are still arranged and some are even coerced.

Although some of the older statutes regarding marriage cited by the majority do speak of the union of "a man and a woman," the picture hardly ends there.  When Justice Alito noted in *Windsor* that the opponents of DOMA were "implicitly ask[ing] us to endorse [a more expansive definition of marriage and] to reject the traditional view," *Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting), he may have been unfamiliar with all that the "traditional view" entailed, especially for women who were subjected to coverture as a result of Anglo-American common law.

Fourteenth Amendment cases decided by the Supreme Court in the years since 1971 that "invalidat[ed] various laws and policies that categorized by sex have been part of a transformation that has altered the very institution at the heart of this case, marriage." *Latta*, 2014 WL 4977682, at *20 (Berzon, J., concurring).

> Historically, marriage was a profoundly unequal institution, one that imposed distinctly different rights and obligations on men and women.  The law of coverture, for example, deemed the "the husband and wife . . . one person," such that "the very being or legal existence of the woman [was] suspended . . . or at least [was] incorporated and consolidated into that of the husband" during the marriage.  1 William Blackstone, Commentaries on the Laws of England 441 (3d rev. ed. 1884).  Under the principles of coverture, "a married woman [was] incapable, without her husband's consent, of making contracts . . . binding on her or him."  *Bradwell v. Illinois*, 83 U.S. 130, 141 (1872) (Bradley, J., concurring).  She could not sue or be sued without her husband's consent.  *See, e.g.*, Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* 11–12 (2000).  Married women also could not serve as the legal guardians of their children.  *Frontiero v. Richardson*, 411 U.S. 677, 685 (1973) (plurality op.).
>
> Marriage laws further dictated economically disparate roles for husband and wife. In many respects, the marital contract was primarily understood as an economic arrangement between spouses, whether or not the couple had or would have children.  "Coverture expressed the legal essence of marriage as reciprocal: a husband was bound to support his wife, and in exchange she gave over her property and labor."  Cott, *Public Vows*, at 54.  That is why "married women traditionally were denied the legal capacity to hold or convey property . . . ." *Frontiero*, 411 U.S. at 685.  Notably, husbands owed their wives support even if there were no children of the marriage.  *See, e.g.*, Hendrik Hartog, *Man and Wife in America: A History* 156 (2000).
>
> There was also a significant disparity between the rights of husbands and wives with regard to physical intimacy.  At common law, "a woman was the sexual property of her husband; that is, she had a duty to have intercourse with him." John D'Emilio & Estelle B. Freedman, *Intimate Matters: A History of Sexuality in America* 79 (3d ed. 2012).  Quite literally, a wife was legally "the possession of her husband, . . . [her] husband's property."  Hartog, *Man and Wife in America*, at 137.  Accordingly, a husband could sue his wife's lover in tort for "entic[ing]" her or "alienat[ing]" her affections and thereby interfering with his property rights in her body and her labor.  *Id.*  A husband's possessory interest in his wife was undoubtedly also driven by the fact that, historically, marriage was the only legal site for licit sex; sex outside of marriage was almost universally criminalized. *See, e.g.*, Ariela R. Dubler, *Immoral Purposes: Marriage and the Genus of Illicit Sex*, 115 Yale L.J. 756, 763–64 (2006).
>
> Notably, although sex was strongly presumed to be an essential part of marriage, the ability to procreate was generally not. *See, e.g.*, Chester Vernier, American

Family Laws: A Comparative Study of the Family Law of the Forty-Eight American States, Alaska, the District of Columbia, and Hawaii (to Jan. 1, 1931) (1931) I § 50, 239–46 (at time of survey, grounds for annulment typically included impotency, as well as incapacity due to minority or "non-age"; lack of understanding and insanity; force or duress; fraud; disease; and incest; but not inability to conceive); II § 68, at 38–39 (1932) (at time of survey, grounds for divorce included "impotence"; vast majority of states "generally held that impotence. . . does not mean sterility but must be of such a nature as to render complete sexual intercourse practically impossible"; and only Pennsylvania "ma[d]e sterility a cause" for divorce).

The common law also dictated that it was legally impossible for a man to rape his wife. Men could not be prosecuted for spousal rape. A husband's "incapacity" to rape his wife was justified by the theory that "'the marriage constitute[d] a blanket consent to sexual intimacy which the woman [could] revoke only by dissolving the marital relationship.'" *See, e.g.*, Jill Elaine Hasday, *Contest and Consent: A Legal History of Marital Rape*, 88 Calif. L. Rev 1373, 1376 n.9 (2000) (quoting Model Penal Code and Commentaries, § 213.1 cmt. 8(c), at 342 (Official Draft and Revised Comments 1980)).

Concomitantly, dissolving the marital partnership via divorce was exceedingly difficult. Through the mid-twentieth century, divorce could be obtained only on a limited set of grounds, if at all. At the beginning of our nation's history, several states did not permit full divorce except under the narrowest of circumstances; separation alone was the remedy, even if a woman could show "cruelty endangering life or limb." Peter W. Bardaglio, *Reconstructing the Household: Families, Sex, and the Law in the Nineteenth-Century South* 33 (1995); *see also id.* 32–33. In part, this policy dovetailed with the grim fact that, at English common law, and in several states through the beginning of the nineteenth century, "a husband's prerogative to chastise his wife"—that is, to beat her short of permanent injury—was recognized as his marital right. Reva B. Siegel, *"The Rule of Love": Wife Beating as Prerogative and Privacy*, 105 Yale L.J. 2117, 2125 (1996).

*Id.* at *20-21.

Women were not the only class deprived of equal status in "traditional marriage." Until the end of the Civil War in 1865, slaves were prohibited from contracting legal marriages and often resorted to "jumping the broomstick" to mark a monogamous conjugal relationship. Informal "slave marriage" was the rule until the end of the war, when Freedmen's Bureaus began issuing marriage licenses to former slaves who could establish the existence of long-standing family relationships, despite the fact that family members were sometimes at great distances from one another. The ritual of jumping the broomstick, thought of in this country in terms of

slave marriages, actually originated in England, where civil marriages were not available until enactment of the Marriage Act of 1837. Prior to that, the performance of valid marriages was the sole prerogative of the Church of England, unless the participants were Quakers or Jews. The majority's admiration for "traditional marriage" thus seems misplaced, if not naïve. The legal status has been through so many reforms that the marriage of same-sex couples constitutes merely the latest wave in a vast sea of change.

*Rational-Basis Review.*

The principal thrust of the majority's rational-basis analysis is basically a reiteration of the same tired argument that the proponents of same-sex-marriage bans have raised in litigation across the country: marriage is about the regulation of "procreative urges" of men and women who therefore do not need the "government's encouragement to have sex" but, instead, need encouragement to "create and maintain stable relationships within which children may flourish." The majority contends that exclusion of same-sex couples from marriage must be considered rational based on "the biological reality that couples of the same sex do not have children in the same way as couples of opposite sexes and that couples of the same sex do not run the risk of unintended children." As previously noted, however, this argument is one that an eminent jurist has described as being "so full of holes that it cannot be taken seriously." *Baskin*, 766 F.3d at 656 (Posner, J.).

At least my colleagues are perceptive enough to acknowledge that "[g]ay couples, no less than straight couples, are capable of sharing such relationships . . . [and] are capable of raising stable families." The majority is even persuaded that the "quality of [same-sex] relationships, and the capacity to raise children within them, turns not on sexual orientation but on individual choices and individual commitment." All of which, the majority surmises, "supports the policy argument made by many that marriage laws should be extended to gay couples." But this conclusion begs the question: why reverse the judgments of four federal district courts, in four different states, and in six different cases that would do just that?

There are apparently two answers; first, "let the people decide" and, second, "give it time." The majority posits that "just as [same-sex marriage has been adopted in] nineteen states and the District of Columbia," the change-agents in the Sixth Circuit should be "elected

legislators, not life-tenured judges."   Of course, this argument fails to acknowledge the impracticalities involved in amending, re-amending, or un-amending a state constitution.[6]   More to the point, under our constitutional system, the courts are assigned the responsibility of determining individual rights under the Fourteenth Amendment, regardless of popular opinion or even a plebiscite.   As the Supreme Court has noted, "It is plain that the electorate as a whole, whether by referendum or otherwise, could not order [government] action violative of the Equal Protection Clause, and the [government] may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic."   *City of Cleburne*, 473 U.S. at 448 (internal citation omitted).

Moreover, as it turns out, legalization of same-sex marriage in the "nineteen states and the District of Columbia" mentioned by the majority was not uniformly the result of popular vote or legislative enactment.   Nine states now permit same-sex marriage because of *judicial* decisions, both state and federal: Massachusetts, Connecticut, Iowa, New Mexico, and Colorado (state supreme court decisions); New Jersey (state superior court decision not appealed by defendant); California (federal district court decision allowed to stand in ruling by United States Supreme Court); and Oregon and Pennsylvania (federal district court decisions not appealed by defendants).   Despite the majority's insistence that, as life-tenured judges, we should step aside and let the voters determine the future of the state constitutional provisions at issue here, those nine federal and state courts have seen no acceptable reason to do so.   In addition, another 16 states have been or soon will be added to the list, by virtue of the Supreme Court's denial of *certiorari* review in *Kitchen*, *Bostick*, and *Baskin*, and the Court's order dissolving the stay in *Latta*.   The result has been the issuance of hundreds—perhaps thousands—of marriage licenses in the wake of those orders.   Moreover, the 35 states that are now positioned to recognize same-sex marriage are comparable to the 34 states that permitted interracial marriage when the

---

[6]In Tennessee, for example, a proposed amendment must first be approved by a simple majority of both houses.   In the succeeding legislative session, which can occur as long as a year or more later, the same proposed amendment must then be approved "by two-thirds of all the members elected to each house."   Tenn. Const. art. XI, § 3.   The proposed amendment is then presented "to the people at the next general election in which a Governor is to be chosen," *id.*, which can occur as long as three years or more later.   If a majority of all citizens voting in the gubernatorial election also approve of the proposed amendment, it is considered ratified.   The procedure for amending the constitution by convention can take equally long and is, if anything, more complicated.   In Michigan, a constitutional convention, one of three methods of amendment, can be called no more often than every 16 years. *See* Mich. Const. art. XII, § 3.

Supreme Court decided <u>Loving</u>.  If the majority in this case is waiting for a tipping point, it seems to have arrived.

The second contention is that we should "wait and see" what the fallout is in the states where same-sex marriage is now legal.  The majority points primarily to Massachusetts, where same-sex couples have had the benefit of marriage for "only" ten years—not enough time, the majority insists, to know what the effect on society will be.  But in the absence of hard evidence that the sky has actually fallen in, the "states as laboratories of democracy" metaphor and its pitch for restraint has little or no resonance in the fast-changing scene with regard to same-sex marriage.  Yet, whenever the expansion of a constitutional right is proposed, "proceed with caution" seems to be the universal mantra of the opponents.  The same argument was made by the State of Virginia in *Loving*.  And, in *Frontiero v. Richardson*, 411 U.S. 677 (1973), the government asked the Court to postpone applying heightened scrutiny to allegations of gender discrimination in a statute denying equal benefits to women until the Equal Rights Amendment could be ratified.  If the Court had listened to the argument, we would, of course, still be waiting.  One is reminded of the admonition in Martin Luther King, Jr.'s "Letter from Birmingham Jail" (1963):  "For years now I have heard the word "Wait"!  . . .  [But h]uman progress never rolls in on wheels of inevitability . . . [and] time itself becomes an ally of the forces of social stagnation."

*Animus*

Finally, there is a need to address briefly the subject of unconstitutional animus, which the majority opinion equates only with actual malice and hostility on the part of members of the electorate.  But in many instances involving rational-basis review, the Supreme Court has taken a more objective approach to the classification at issue, rather than a subjective one.  Under such an analysis, it is not necessary for a court to divine individual malicious intent in order to find unconstitutional animus.  Instead, the Supreme Court has instructed that an exclusionary law violates the Equal Protection Clause when it is based not upon relevant facts, but instead upon only a general, ephemeral distrust of, or discomfort with, a particular group, for example, when legislation is justified by the bare desire to exclude an unpopular group from a social institution or arrangement.  In *City of Cleburne*, for example, the Court struck down a zoning regulation that was justified simply by the "negative attitude" of property owners in the community toward individuals with intellectual disabilities, not necessarily by actual malice toward an unpopular

minority.  In doing so, the Court held that "the City may not avoid the strictures of the [Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic," 473 U.S. at 448, and cited *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984), for the proposition that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."  In any event, as the majority here concedes, we as a country have such a long history of prejudice based on sexual orientation that it seems hypocritical to deny the existence of unconstitutional animus in the rational-basis analysis of the cases before us.

To my mind, the soundest description of this analysis is found in Justice Stevens's separate opinion in *City of Cleburne*:

> In every equal protection case, we have to ask certain basic questions.  What class is harmed by the legislation, and has it been subjected to a "tradition of disfavor" by our laws?  What is the public purpose that is being served by the law?  What is the characteristic of the disadvantaged class that justifies the disparate treatment?  In most cases the answer to these questions will tell us whether the statute has a "rational basis."

*Id.* at 453 (Stevens, J., concurring) (footnotes omitted).  I would apply just this analysis to the constitutional amendments and statutes at issue in these cases, confident that the result of the inquiry would be to affirm the district courts' decisions in all six cases.  I therefore dissent from the majority's decision to overturn those judgments.

Today, my colleagues seem to have fallen prey to the misguided notion that the intent of the framers of the United States Constitution can be effectuated only by cleaving to the legislative will and ignoring and demonizing an independent judiciary.  Of course, the framers presciently recognized that two of the three co-equal branches of government were representative in nature and necessarily would be guided by self-interest and the pull of popular opinion.  To restrain those natural, human impulses, the framers crafted Article III to ensure that rights, liberties, and duties need not be held hostage by popular whims.

More than 20 years ago, when I took my oath of office to serve as a judge on the United States Court of Appeals for the Sixth Circuit, I solemnly swore to "administer justice without respect to persons," to "do equal right to the poor and to the rich," and to "faithfully and impartially discharge and perform all the duties incumbent upon me . . . under the Constitution and laws of the United States."  *See* 28 U.S.C. § 453.  If we in the judiciary do not have the

Case: 1:13-cv-00501-TSB Doc #: 79 Filed: 01/07/14 Page: 73 of 75 PAGEID #: 1593  (73 of 75)

authority, and indeed the responsibility, to right fundamental wrongs left excused by a majority of  the electorate, our whole intricate, constitutional system of checks and balances, as well as the oaths to which we swore, prove to be nothing but shams.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 14-3057

JAMES OBERGEFELL, et al.,

               Plaintiffs - Appellees,

     v.

RICHARD HODGES, Director of the
Ohio Department of Health, in his official capacity,

               Defendant - Appellant.

```
╭─────────────────────────────╮
│          FILED              │
│       Nov 06, 2014          │
│   DEBORAH S. HUNT, Clerk    │
╰─────────────────────────────╯
```

Before: DAUGHTREY, SUTTON, and COOK, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is REVERSED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 14-3464

BRITTANI HENRY, et al.,

          Plaintiffs - Appellees,

    v.

RICHARD HODGES, Director of the
Ohio Department of Health, in his official capacity,

          Defendant - Appellant.

> **FILED**
> *Nov 06, 2014*
> DEBORAH S. HUNT, Clerk

Before: DAUGHTREY, SUTTON, and COOK, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is REVERSED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk